IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CASANDRA SALCIDO, AS NEXT FRIEND OF MINOR CHILDREN KHLOE LUCAS AND CAINE LUCAS, DENISE COLLINS, KENNETH LUCAS, AMBER LUCAS INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF KENNETH CHRISTOPHER LUCAS, DECEASED, AND DEIDRE MCCARTY, AS NEXT FRIEND OF MINOR CHILDREN K.J.L. AND T.J.L. | § § § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CASE NO. _____ |
| HARRIS COUNTY, TEXAS, DEPUTY DAVID GORDAN, DEPUTY XAVIER LEVINGSTON, DETENTION OFFICER BRODERICK GREEN, DETENTION OFFICER ALICIA SCOTT, DETENTION OFFICER JESSE BELL, DETENTION OFFICER MORRIS THOMAS, AND DETENTION OFFICER ADAM KNEITZ, | § § § § § § § § § § § | JURY DEMANDED |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Casandra Salcido, as next friend of minor children Khloe Lucas and Caine Lucas, Denise

Collins, Kenneth Lucas, Amber Lucas Individually and as Representative of the Estate of

Kenneth Christopher Lucas, Deceased, and Deidre McCarty, on behalf of her minor children

K.J.L. and T.J.L. (**Plaintiffs**) file this Original Complaint complaining of Harris County, Texas (**County**), Deputy David Gordan, Deputy Xavier Levingston, Detention Officer Broderick Green, Detention Officer Alicia Scott, Detention Officer Jesse Bell, Detention Officer Morris Thomas, and Detention Officer Adam Kneitz.[1]

## NATURE OF LAWSUIT

1.    This is a civil rights action brought under Title 42 U.S.C. Section 1983 (**Section 1983**) and a discrimination action under the Americans with Disabilities Act, Americans with Disabilities Act Amendments Act, and Rehabilitation Act of 1973.

## PARTIES

2.    This lawsuit arises from the death of Mr. Kenneth Christopher Lucas (**Mr. Lucas**).

3.    Plaintiff Casandra Salcido is the mother of Mr. Lucas's minor children, Plaintiffs Khloe Lucas and Caine Lucas.

4.    Plaintiff Deidre McCarty is the mother of Mr. Lucas's minor children K.J.L. and T.J.L.

5.    Plaintiff Denise Collins is Mr. Lucas's mother.

6.    Plaintiff Kenneth Lucas is Mr. Lucas's father.

7.    Plaintiff Amber Lucas is Mr. Lucas's surviving spouse and is the duly-appointed representative of Mr. Lucas's estate.

8.    Defendant Harris County is a Texas county and may be served by and through its county judge, the Honorable Ed Emmett, 1001 Preston, Suite 911, Houston, Harris County, Texas 77002.

9.    Defendant Deputy David Gordan is a Harris County employee sued in his individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas

---

[1] "**County**" or "**County Defendants**" refers collectively to defendant Harris County, Texas, and County employees sued in their official capacity. "**Individual County Defendants**" refers to all County employees sued in their individual capacities. "**Officers**" refers to County jail officers in their individual and official capacities.

77002.   The County designated Deputy Gordan as the "Team Supervisor" for its Detention Command Containment Team.   Given Deputy Gordan's involvement and supervision of the Officers, whose actions are described in detail below, and for purposes of Plaintiffs' Section 1983 claims against the County, the Officers' relevant actions may be deemed the result of orders by Defendant Gordan as a final decision-maker for the County.

10.   Defendant Deputy Xavier Levingston is a Harris County employee sued in his individual and official capacities, and may be served with process at 1200 Baker Street, Houston, Harris County, Texas 77002.

11.   Defendant Officer Broderick Green is a Harris County employee sued in his individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas 77002.

12.   Defendant Officer Alicia Scott is a Harris County employee sued in her individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas 77002.

13.   Defendant Officer Jesse Bell is a Harris County employee sued in his individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas 77002.

14.   Defendant Officer Morris Thomas is a Harris County employee sued in his individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas 77002.

15.   Defendant Officer Adam Kneitz is a Harris County employee sued in his individual and official capacities, and may be served at 1200 Baker Street, Houston, Harris County, Texas 77002.

16.   All Individual Defendants were, at all relevant times, acting under color of law.

## JURISDICTION & VENUE

17.   This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States.

18.   Venue is proper in this Court because all relevant acts and omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas and because Defendants are all located or may be found in Harris County.  *See* 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

19.   On February 17, 2014, Defendants forcibly restrained Mr. Lucas in a hogtie position, employed a powerful sedative to restrain him, and suffocated and killed Mr. Lucas.

### A.  *The County Defendants Have a Notorious and Longstanding Custom, Policy, and Practice of Killing Detainees Such as Mr. Lucas.*

20.   Killing detainees is nothing new for the County.   Between 2001 and 2007, 101 detainees died in Harris County jails, and most of those detainees had not even been convicted of a crime at the time of their death.   On June 9, 2009, the United States Department of Justice issued a memorandum entitled "Investigation of the Harris County Jail" (**2009 DOJ Memorandum**).   The DOJ concluded generally "that certain conditions in the Jail violate the constitutional rights of detainees."

21.   Among the many, many constitutional deficiencies identified by the DOJ were (1) "Harris County Jail does not train staff that hogtying and choke holds are dangerous, prohibited practices"; (2) the County failed to sufficiently consult medical staff before cell extractions and other planned uses of force against detainees; (3) the County permitted its employees to use significant force without having measures in place that would enable the County to review the propriety of such uses of force; (4) jail supervisors approved officers' use of force without

investigating the need for that force.  The DOJ referred to these deficiencies as "systemic"  and added, "[T]he number of inmates deaths related to inadequate medical care . . . is alarming."

22.    The 2009 DOJ Memorandum recommended remedial action.    Among other "recommended remedial measures" the DOJ stated, "The Jail should prohibit the use of chokeholds and hogtying."  The DOJ also recommended that the County "alter its procedures for cell extractions and other use of force situations to ensure that staff are utilizing appropriate force techniques."   The DOJ submitted these recommendations to the Harris County judge, Harris County Attorney, and Sheriff Adrian Garcia, who was sheriff on the date Defendants killed Mr. Lucas.

23.    The County intentionally and consciously disregarded the DOJ's admonitions.  Between 2009 and 2011, thirty more detainees died in the County's jails undoubtedly due to uncorrected failures cited in the 2009 DOJ Memorandum.  Since 2007, approximately 106 detainees died in Harris County jails.   Between January 2014 and September 2014, eighteen Harris County detainees died in custody.  This case arises from Defendants' continued execution of the illegal policies, customs, and practices that caused these deaths.

### B.  Mr. Lucas's Arrest and Violent Cell Extraction

24.    On February 14, 2015, Mr. Lucas was arrested for keeping his children too long during a scheduled visit, which allegedly constituted a violation of a civil child custody order.  Mr. Lucas was not convicted of a crime but was detained in a Harris County jail following his arrest.

25.    On February 17, 2015, Mr. Lucas became upset while locked in a private cell, and Defendants organized a group of Officers to extract Mr. Lucas from his cell.  Although Mr. Lucas was upset, he was locked in a cell unarmed and did not pose a threat to the Officers, other County employees, or inmates and detainees.  Despite the complete lack of threat, five Officers

wearing full riot gear assembled in a jail corridor, and another Officer operated a video camera and recorded most of the relevant events.   The Officers could all see, feel, hear, and otherwise sense the events leading to Mr. Lucas's death which are described in this Complaint.   Despite knowing that their acts and omissions were causing Mr. Lucas severe physiological distress and placing him at risk of imminent death, the Officers continued those actions disdainfully and with a complete disregard for Mr. Lucas's safety, medical needs, and constitutional rights.



**[The photo above shows the Officers assembling in the jail corridor.]**

26.   Once in Mr. Lucas's cell, the five Officers pinned Mr. Lucas face-down on the floor of his cell and handcuffed Mr. Lucas securely behind his back.   The Officers broke Mr. Lucas's finger during their attack though the exact time of the break remains unknown.   The officers also successfully shackled Mr. Lucas's feet but continued to hold him face-down while applying immense pressure to his body.   At one point during the Officers' initial attack, Mr. Lucas

exclaimed, "I'm gonna pass out!"  The officers made no adjustments and continued to apply

pressure and to sit on top of him as he lay face-down on his stomach.  At no time did the Officers

inform any medical staff that Mr. Lucas indicated that he was going to "pass out."   On

information and belief, Defendants did not consult with medical staff before this cell extraction.



**[The photo above shows the Officers on top of Mr. Lucas in his cell while Mr. Lucas lay face-down on his stomach in restraints.]**

> ### C. *The County and Its Officers Effectively Hogtied Mr. Lucas and Ruthlessly Killed Him Despite Mr. Lucas's Lack of Resistance, His Clear Physiological Distress, His Apparent Loss of Consciousness, and His Obvious Death.*

27.   After placing Mr. Lucas in restraints, the Officers dragged Mr. Lucas out of his cell

while he still lay face-down on his stomach.  The Officers bent Mr. Lucas's knees and pushed

them toward his back.   An Officer then straddled Mr. Lucas's shins, forcing Mr. Lucas's lower

legs and feet toward his back as other Officers held Mr. Lucas's handcuffed hands high upon his

back.   Thus, the Officers effectively placed Mr. Lucas in a hogtie position where he would

remain until after he died. While no mechanical restraint connected Mr. Lucas's hands to his

feet, the net result was the same because of the Officers' use of immense force to press Mr.

Lucas's hands and feet toward the back of Mr. Lucas's head.



**[The photo above shows the Officers forcing Mr. Lucas into a hogtie position where he would stay until after he died.]**

28.   The Officers effectively hogtied Mr. Lucas and placed him on a gurney where he would

remain in the hogtie position until minutes ***after*** his death.   The Officers used a gurney that was

elevated at the section against which the Officers pinned Mr. Lucas's head and face.   Thus, the

Officers had forced Mr. Lucas's neck, nose, and mouth into a position that hindered Mr. Lucas's

ability to breathe.   Because of the force applied by the Officers, Mr. Lucas's face was often

buried in the elevated portion of the gurney, making it impossible for Mr. Lucas to breathe.



[The photo above shows an Officer forcing Mr. Lucas's lower legs toward the back of Mr. Lucas's head to achieve the hogtie position that killed Mr. Lucas.]



[The photo above shows the Officers forcing Mr. Lucas's hands to a position high upon his back.]

29.   Approximately five minutes after the Officers had effectively hogtied Mr. Lucas and placed him on the gurney, the Officers entered the jail infirmary.  On their way to the infirmary, the Officers and Mr. Lucas passed several County jail personnel, and no one suggested that the Officers consider an alternative way to restrain Mr. Lucas.  On information and belief, one or more of these bystanders, along with Defendant Gordan, were supervisory personnel and final decision-makers regarding how the Officers were to restrain Mr. Lucas.  Despite the clear, documented, well-known dangers to detainees who are placed in a hogtie position and despite the DOJ admonishing the County to refrain from restraining detainees in this manner, these supervisory personnel approved the Officer's placement of Mr. Lucas in the hogtie position.  Alternatively, the complete lack of objection by any bystanders indicates that the Officers' actions were consistent with County culture, policies, and norms.

30.   The Officers had not warned infirmary staff that the Officers intended to take a hogtied pretrial detainee to the infirmary to restrain him further with a powerful sedative called Ativan.  Thus, medical personnel were not prepared to monitor Mr. Lucas's condition despite the DOJ's suggestion that such notification be given to medical staff before the County conducts a cell extraction.  At no time before or after this point did Mr. Lucas threaten or appear to threaten anyone.  And while he may have given minimal resistance as he was extracted from his cell, he did not resist at any time as the Officers took him to the infirmary or after he arrived at the infirmary.  Despite the fact that Mr. Lucas neither posed a threat nor resisted, the Officers maintained the hogtie hold, failing to fulfill their promises to Mr. Lucas that they would release him if he ceased "resisting."



**[The photo above shows the Officers' continued use of the hogtie restraint as they entered the jail infirmary.]**

31.     Approximately   six   minutes   after   the   Officers   effectively   hogtied   Mr. Lucas,   he exhibited obvious signs of physiological distress.   He grimaced.   He panted.   He struggled to breathe.   The Officers continued to force Mr. Lucas to remain in a hogtie position.



**[The photo above shows just one of the many instances when Mr. Lucas's face was pressed hard against the inclined gurney and when Mr. Lucas was in apparent physiological stress.]**

32.   At approximately six-and-a-half minutes after the Officers effectively hogtied Mr. Lucas, he clearly cried, "***I cannot breathe!***"   Unfazed by Mr. Lucas's plea, the Officers continued to force Mr. Lucas into a hogtie position, with one Officer sitting on his lower legs pushing them toward Mr. Lucas's back and two other Officers pulling his hands up toward the back of his head.



**[The photo above depicts Mr. Lucas and the Officers at the moment Mr. Lucas cried, "I cannot breathe."]**

33.   Beginning approximately seven minutes after the Officers initially forced Mr. Lucas into a hogtie position, Mr. Lucas could no longer speak and could only manage to mumble. Moments thereafter, with his face still planted in the gurney and his body still forced in a hogtie position, Mr. Lucas's eyes closed and his movements essentially ceased.



**[The photo above depicts Mr. Lucas at the time he has lost his ability to speak intelligibly.]**

34.   Around ten minutes after the Officers effectively hogtied Mr. Lucas, the Officers still held Mr. Lucas in a hogtie position ***even though*** Mr. Lucas had ceased any resistance and had lain motionless for several minutes, and was apparently unconscious and unable to speak. Around this same time, Mr. Lucas's eyes rolled back in his head and he coughed faintly. Although the Officers witnessed this, they continued to hinder Mr. Lucas's breathing and continued to hold him forcefully in a hogtie position.



**[The photo above shows the white of Mr. Lucas's left eye when his eyes rolled into his head.]**

35.   Despite Mr. Lucas's apparent lack of consciousness, lack of movement, and inability to speak, Defendants injected Ativan into Mr. Lucas's hip.  Ativan is a powerful sedative, which Harris County routinely used to chemically restrain detainees following cell extractions. The Ativan was not used for any medical purpose or to address any medical condition from which Mr. Lucas suffered, but was only administered as a chemical restraint. During Defendants' first attempt, the needle broke.  Defendants then injected more Ativan into Mr. Lucas's hip, and an infirmary employee told the Officers that Mr. Lucas should fall asleep within fifteen to twenty minutes. However, Mr. Lucas appeared completely unconscious just seconds later.  The Officers continued to hold Mr. Lucas in a hogtie position despite the complete lack of any actual or threatened resistance or danger.

36.   After Mr. Lucas had lain unconscious, motionless, and silent for several more minutes, the Officers continued to hold Mr. Lucas in a hogtie position.  Despite having ample opportunity, at no point before this time did any of the Defendants attempt to check for Mr. Lucas's pulse or

measure other vital signs.  Instead, the Officers continued to keep him face-down on his stomach, with his neck tilted upward, with his face pressed down against the inclined gurney, and in the hogtie position.

37.   Finally, infirmary personnel attempted to measure Mr. Lucas's blood pressure, as the Officers continued to force Mr. Lucas in a hogtie position, pushing his hands between his shoulder blades and pushing his shins and feet toward his back.  On information and belief, no blood pressure was detected, but the Officers continued to hold Mr. Lucas in a hogtie position despite the utter lack of any resistance or threat of harm by Mr. Lucas.



[**The photo above shows infirmary personnel checking Mr. Lucas's blood pressure for the first time long after he had lost consciousness but while the Officers still forced his motionless body into a hogtie position.**]

38.   Approximately eight minutes after Mr. Lucas could no longer speak intelligibly, and approximately four to five minutes after Mr. Lucas's eyes rolled back and he appeared to lose consciousness, an infirmary employee asked the Officer straddling Mr. Lucas's shins to relieve

some of the pressure on Mr. Lucas's legs.  It is clear that the Officers had no intention of releasing Mr. Lucas from this hogtie hold even though Mr. Lucas had long quit resisting, had fallen unconscious, and had been dead for several moments.

39.  At last, Defendants turned Mr. Lucas's apparently-lifeless body on its side and ultimately to a face-up position.  Infirmary personnel tried to resuscitate Mr. Lucas, but he had been dead too long.

## CAUSES OF ACTION

### A.  *Section 1983*

40.  Plaintiffs incorporate paragraphs 1 – 39 in this section for all purposes as if fully restated herein.

#### i.   Violations of Federal Law

41.  Defendants violated Mr. Lucas's Fourteenth Amendment freedom from excessive use of force by a government actor.  As a result of Defendants' objectively unreasonable use of force, Mr. Lucas could not breathe, fell unconscious, suffocated, suffered a cardiac event, and ultimately died.  Defendants acted unreasonably and applied force that vastly exceeded their need when they hogtied and killed Mr. Lucas—especially considering that Mr. Lucas was an unarmed, nonviolent pretrial detainee who was held merely because he allegedly kept his children too long in violation of a child custody order.  Defendants' use of force was also objectively unreasonable because Mr. Lucas did not fight with the Officers, was in a secure environment, was not resisting or threatening to resist, and was vastly outnumbered by the Officers wearing full riot gear.

42.  Defendants also violated Mr. Lucas's right to substantive and procedural due process. First, Defendants had a duty to refrain from being deliberately indifferent to Mr. Lucas's serious

medical needs—especially considering they caused Mr. Lucas's most serious medical needs. Intentionally shirking their duty, Defendants (1) failed to consult with medical staff before the extraction; (2) hogtied Mr. Lucas face-down on a gurney; (3) hindered the ability of medical professionals to assess and attend to Mr. Lucas's medical needs; and (4) watched Mr. Lucas struggle face-down, lose the ability to speak, fall unconscious, suffer from visible and audible signs of physiological distress, and die.  Defendants were well aware of Mr. Lucas's serious medical needs and risk of serious injury and death, but they consciously refused to act until several minutes after he fell unconscious and grew limp, and several moments after he had apparently died.

43.   Additionally, Defendants created Mr. Lucas's serious medical conditions that caused Mr. Lucas's death by forcing him into a prone, face-down, hogtie position even though Mr. Lucas was visibly struggling to breathe and was losing consciousness.  Despite that danger, Defendants intentionally prevented Mr. Lucas from breathing, hindered medical professionals' ability to treat Mr. Lucas, and failed to release Mr. Lucas from a hogtie position or seek medical treatment for him until after he died.

ii.    Qualified Immunity Does Not Apply

44.   Qualified immunity does not shield the Individual County Defendants from suit or liability.  As set forth above, the Individual County Defendants violated Mr. Lucas's federal rights.  Additionally, at the time the Individual County Defendants killed Mr. Lucas, it was clearly established that they had a duty to not be deliberately indifferent to the serious medical needs of a pretrial detainee such as Mr. Lucas.  Additionally, the law clearly imposed a duty on state actors such as the Individual County Defendants to use a quantum and method of force that is reasonable under the circumstances.   The law clearly prohibited the Individual County

Defendants from using the quantum and method of force they used against Mr. Lucas in the circumstances described above.  The law clearly prohibited the Individual County Defendants from deliberately refusing to address Mr. Lucas's serious medical needs, especially when Defendants caused those medical needs.  Accordingly, the Individual County Defendants' conduct was objectively unreasonable under the state of the law at that time.

45.    Additionally, the Individual County Defendants were aware that their acts and omissions violated clearly established constitutional duties.  However, the Individual County Defendants consciously disregarded their clearly-established duties because they intended to harm Mr. Lucas and because they were allowed to unlawfully inflict harm on pretrial detainees pursuant to the County's customs, policies, and practices.

46.    For these reasons, qualified immunity does not shield the Individual County Defendants from suit or liability.

### iii.    Policy or Custom

47.    The Harris County sheriff at all relevant times was Sheriff Adrian Garcia, and the DOJ submitted the 2009 DOJ Memorandum directly to Sheriff Garcia.  Thus, Sheriff Garcia undisputedly was aware of the County's conduct and the DOJ's admonitions in that memorandum.  As such, given that the patterns and practices described by the 2009 DOJ Memorandum continued while Sheriff Garcia still held office, it is undisputable that Sheriff Garcia consciously and deliberately decided ***not*** to address the concerns raised by the memorandum.

48.    Further, Sheriff Garcia owed the duty to supervise, train, and direct the County jail officers and other staff.  Sheriff Garcia could delegate this authority to other County officials such as Defendant Deputy Gordan.  For purposes of Plaintiffs' Section 1983 claims, Sheriff

Garcia and his delegees, collectively or individually, constitute policymakers, who promulgated policies and procedures that encouraged Defendants to—or failed to discourage Defendants from—employing excessive and lethal force against pretrial detainees, being deliberately indifferent to pretrial detainees' serious medical needs, hindering medical assistance to pretrial detainees in need of such assistance, and causing serious medical conditions and refusing or failing to remedy those conditions.

49.   Alternatively, those failures represent persistent, widespread practices of which the policymakers were aware.   Indeed, the DOJ expressly made Sheriff Garcia and other high ranking County officials aware that County employees hogtied jail detainees and otherwise exposed detainees to serious injury and death.   Although this Complaint is drafted without the benefit of discovery, and although the Defendants have vehemently resisted Plaintiffs' requests for information under the Texas Public Information Act, the number of County employees perpetuating and observing this egregious conduct—without objection—shows that it was carried out according to County policy or custom.   These County policies, practices, and customs have been well-documented by the press and by the DOJ, and they provided the moving force that caused Mr. Lucas's injuries and death, and the Plaintiffs' damages.   Absent these policies, practices, and customs, Defendants would not have effectively hogtied Mr. Lucas face-down on a gurney despite his lack of resistance, watched him struggle and die, and refused to provide him medical assistance in the interim.

50.   Furthermore, the County consciously and deliberately failed to adequately train its employees to safely restrain pretrial detainees such as Mr. Lucas.   It is well-known that placing a person in a hogtie position will cause serious injury and death.   Use of hogtie restraints is also inappropriate given the many alternative methods of restraining nonviolent pretrial detainees

such as Mr. Lucas, whose guilt has not even been adjudicated.  At the very least, the County consciously chose not to train its employees to discontinue the use of hogtie restraint techniques and otherwise decrease the quantum of force as the need for force decreases and to monitor hogtied detainees (or providing and requiring medical personnel to do so) to prevent suffocation, cardiovascular complications, other medical complications, and death.

51.   Mr. Lucas's death and Plaintiffs' damages were also caused by the conditions of Mr. Lucas's confinement.  Mr. Lucas's death was the predictable result of the County Defendant's *de facto* policy that (1) restraining detainees in a hogtie position is acceptable; (2) restraining detainees with powerful sedatives such as Ativan is acceptable; (3) denies detainees adequate medical monitoring during such restraint by, among other things, failing to staff the infirmary with a sufficient number of medical professionals, by staffing the infirmary with inadequately-trained staff, and failing to consult medical personnel prior to cell extractions; (4) denies detainees proper treatment for medical conditions such as hypertension; (5) encourages and permits the types of restraint at issue here to be employed against detainees with medical conditions that increase the risk of death during these types of restraint; or (6) some combination thereof.  These policies reveal themselves in many ways, including without limitation inadequate policies, understaffing medical and jail staff, and failing to properly train County employees. The County's policy is evidenced by, among other things, a pattern of acts or omissions that demonstrate an intended condition or practice, and the policy is not related to a legitimate goal of the County.  Accordingly, Mr. Lucas died because of his conditions of confinement.

52.   On information and belief, the Officers who caused or contributed to cause Mr. Lucas's death had previously exhibited a tendency to employ excessive force against pretrial detainees and to ignore pretrial detainees' serious medical needs.  The County, its sheriff during all

relevant times, and their delegates knew of those tendencies and intentionally refused to prevent the resulting harm..

53.   The County's policies, customs, practices, and conditions described in this Complaint provided the moving force for and caused Mr. Lucas's injuries and death.

**B.   *Americans With Disabilities Act, Americans with Disabilities Act Amendment Act, and Rehabilitation Act of 1973***

54.   Plaintiffs incorporate paragraphs 1-53 in this section for all purposes as if fully restated herein.

55.   Mr. Lucas suffered from obesity, hypertension, anxiety, and depression.   On information and belief Mr. Lucas's impairments were documented, and Defendants were aware of them.   These impairments substantially limited Mr. Lucas's ability to breathe, to carry out normal operation of his cardiovascular system, to think, to focus, and to exert himself physically. To the extent Defendants claim they were unaware of Mr. Lucas' disabilities, Plaintiffs aver that Mr. Lucas's disabilities were obvious, as was his need for accommodations.

56.   Mr. Lucas' disabilities made him especially vulnerable to positional asphyxiation while in a hogtie position.   Mr. Lucas's disabilities substantially increased Mr. Lucas's risk of injury and death as a result of the restraint techniques described above.

57.   Defendants intentionally failed to make reasonable accommodations for Mr. Lucas's needs, thereby causing him to suffer more pain and punishment than non-disabled detainees. Because of Defendants' failures, Mr. Lucas could not breathe, fell unconscious, and died.

58.   On information and belief, Defendants intentionally and consciously refused to implement any plans or protocols to protect detainees with Mr. Lucas's disabilities from injury and death caused by the quantum and type of restraint at issue in this case.

59.   On information and belief, Defendants intentionally failed to employ any special effort, techniques, or personnel to protect detainees with Mr. Lucas's disabilities from injury and death caused by the quantum and type of restraint at issue in this case.

60.   On information and belief, Defendants intentionally failed to monitor the restraint of detainees with Mr. Lucas's disabilities to protect such detainees from injury and death caused by the quantum and type of restraint at issue in this case.

61.   As a result of Defendants' actions, Mr. Lucas died and Plaintiffs suffered damages.

62.   On information and belief, the County accepts federal funding for the programs, divisions, and personnel at issue in this lawsuit.

## **DAMAGES**

63.   Plaintiffs incorporate paragraphs 1-62 here for all purposes as if fully restated herein.

64.   As a result of Defendants' acts and omissions set forth herein, Plaintiffs suffered injuries and damages including without limitation the following:

(A) Loss of advice and counsel that Mr. Lucas might have rendered had he survived;

(B) Loss of services, including, without limitation, parent's services;

(C) Expenses for psychological treatment incurred as a result of Defendants' conduct and Mr. Lucas's death;

(D) Funeral expenses;

(E) Mental anguish;

(F) Loss of companionship and society;

(G) Loss of Mr. Lucas's earnings;

(H) Physical pain and suffering; and

(I)  Loss of inheritance.

## ATTORNEY'S FEES

65.   Plaintiffs would show that they are entitled to recover reasonable and necessary attorney's fees incurred as a result of prosecuting these claims, pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a(b).

## PUNITIVE DAMAGES

66.   As set forth above, Defendants' conduct demonstrated evil motive or intent; reckless or callous indifference to Mr. Lucas's federally-protected rights;  a subjective consciousness of extreme risk of injury or illegality; a criminal indifference to civil obligations; subjective recklessness; a violation of well-established precedent regarding treatment of pretrial detainees; gross negligence; or some combination thereof.  Accordingly, Plaintiffs are entitled to punitive damages.

## JURY DEMAND

67.   Plaintiffs request that this case be tried by jury and pay the jury fee contemporaneously with the filing of this Original Complaint.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Defendants be cited to appear and answer herein and that upon final hearing they have judgment against Defendants for actual and punitive damages, for prejudgment and post-judgment interest, for costs of court and attorney's fees, and for all other relief, legal and equitable, to which they may be entitled.

Respectfully submitted,

THE LANIER LAW FIRM, P.C.


By: /s/ Lawrence P. Wilson
       W. MARK LANIER
       State Bar No.: 11934600
       S.D. Tex. No. 8461
       wml@lanierlawfirm.com
       Lawrence P. Wilson
       State Bar No.: 21704100
       S.D. Tex. No. 9217
       larry.wilson@lanierlawfirm.com
       Benjamin T. Major
       State Bar No.: 24074639
       S.D. Tex. No. 1503277
       benjamin.major@lanierlawfirm.com
       6810 FM 1960 West
       Houston, Texas 77069
       Telephone: (713) 659-5200
       Telecopier: (713) 659-2204

*Attorneys in Charge for Plaintiffs Denise Collins, Kenneth Lucas, and Casandra Salcido, as Next Friend of Minor Children Khloe Lucas and Caine Lucas*

**[Signature blocks for attorneys in charge for additional plaintiffs on the next page]**

EDWARDS LAW

The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel.    512-623-7727
Fax.    512-623-7729

By:    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
SCOTT MEDLOCK
State Bar No. 24044783
scott@edwards-law.com

*Attorneys in Charge for Plaintiff Deidra McCarty, as Friend of Minor Children K.J.L. and T.J.L*

ROY W. SMITH
Attorney at Law

2616 South Loop West, Suite 670
Houston, Texas  77054
(713) 759-9266 Office
(713) 759-9412 Facsimile

By:    /s/ Roy W. Smith
Roy W. Smith
State Bar No. 181681500
roy.w.smith@live.com

*Attorney in Charge for Plaintiff Amber Lucas Individually and In Her Capacity as Representative of the Estate of Kenneth Christopher Lucas, Deceased.*