**In the United States District Court**
**for the Southern District of Texas**
**Houston Division**

| | | |
|---|---|---|
| **CASANDRA SALCIDO, AS NEXT FRIEND OF MINOR CHILDREN K.L. AND C.L., DENISE COLLINS, KENNETH LUCAS, AMBER LUCAS INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF KENNETH CHRISTOPHER LUCAS, DECEASED, AND DEIDRE MCCARTY, AS NEXT FRIEND OF MINOR CHILDREN K.J.L. AND T.J.L.,** | § § § § § § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 4:15-cv-2155** |
| **v.** | § § § | **Jury Demand** |
| **HARRIS COUNTY, TEXAS, DEPUTY DAVID GORDAN, DEPUTY XAVIER LEVINGSTON, DETENTION OFFICER BRODERICK GREEN, DETENTION OFFICER ALICIA SCOTT, DETENTION OFFICER JESSE BELL, DETENTION OFFICER MORRIS THOMAS, AND DETENTION OFFICER ADAM KNEITZ,** | § § § § § § § § § § | |
| **Defendants.** | § | |

## DEFENDANT HARRIS COUNTY'S AMENDED MOTION FOR SUMMARY JUDGMENT

**LAURA BECKMAN HEDGE**
Assistant County Attorney
**Attorney-in-Charge**
Texas Bar No. 00790288
Southern District of Texas No. 23243

Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5137
Fax: (713) 755-8924
Email: Laura.Hedge@cao.hctx.net

February 9, 2018

**OF COUNSEL:**

VINCE RYAN
Harris County Attorney

KEITH A. TOLER
Assistant County Attorney
Texas Bar No. 24088541
Southern District of Texas No. 2599245

Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5265
Fax: (713) 755-8924
Email: Keith.Toler@cao.hctx.net

**ATTORNEYS FOR DEFENDANT
HARRIS COUNTY, TEXAS**

# TABLE OF CONTENTS

Table of Contents ....................................................................................................... iii

Table of Authorities .................................................................................................. vii

Nature & Stage of the Proceeding ............................................................................. 1

Background ................................................................................................................. 2

    I.     History of violence ..............................................................................................2

          A.    February 16, 2014 .......................................................................................3

          B.    February 17, 2014 .......................................................................................3

    II.    Cell Extraction ....................................................................................................6

    III.   DCCT were properly trained & followed their training ...................................11

          A.    Training of the DCCT team .....................................................................11

              i.    HCSO Jail School – TCOLE-certified ...........................................12

              ii.   State TCOLE-certified Specialized DCCT Training..........................13

          B.    The process for a planned cell extraction ................................................14

    IV.   Harris County Policies and Procedures ...........................................................16

          A.    Restraints (Policy D-239), Use of Force (Policy D- 307), & Separation (Policy D-219) ...........................................................................................................16

          B.    Addressing Inmates with Mental Health Issues/CIRT Call-out Procedures (Policy D-301) ...........................................................................................................19

          C.    Detention Command Containment Team (Policy D-302) ........................20

          D.    Videotaping of Planned Use of Force Events (Policy D-308).................21

          E.    Americans with Disabilities Act (Policy D-202) ....................................22

Statement of Issues ................................................................................................... 22

Summary of Argument .............................................................................................. 22

Standard of Review................................................................................................... 24

Argument ................................................................................................................... 25

    I.     Constitutional Standards....................................................................................25

          A.    *Monell* liability in an episodic acts or omissions case ............................25

          B.    No liability for employees' negligence or gross negligence....................27

          C.    No vicarious liability................................................................................28

          D.    The Harris County Sheriff is the only official policymaker ....................28

II.   Harris County is not liable under Section 1983. ..................................................29

    A.   No Harris County policy was the moving force behind any constitutional violation ...................................................................................................29

        i.   Plaintiffs do not point to an official policy. ....................................30

        ii.   Harris County did not promulgate any unconstitutional policy with deliberate indifference to the known or obvious consequences that a constitutional violation would result ....................................................................31

        iii.   There is no persistent, widespread pattern or practice of unconstitutional activity that amounts to custom fairly representing County policy ................33

        iv.   The Sheriff had no knowledge of an alleged unconstitutional custom ...........37

        v.   Plaintiffs' complaint of HCSO's isolated acts does not trigger liability .........40

        vi.   No Harris County policy was the "moving force" behind any constitutional violation ...................................................................................................40

    B.   Plaintiffs have no evidence any jail official used excessive force that violated Lucas's constitutional rights. .........................................................................41

        i.   Lucas's injury did not result directly and only from a use of force that was excessive to the need ....................................................................42

        ii.   The use of force was not objectively unreasonable .........................................57

III.   No failure to train .........................................................................................................61

    A.   Each involved officer was TCOLE certified and licensed by the State of Texas .....62

    B.   HCSO's training procedures are constitutionally adequate ......................................64

    C.   HCSO's Sheriff, the official policymaker, was not deliberately indifferent in adopting any training policy ...................................................................................66

    D.   No notice of a pattern of similar violations ............................................................68

    E.   No single incident liability .....................................................................................70

    F.   No inadequate training policy caused Lucas's injury ..............................................71

IV.   No failure to supervise ...............................................................................................72

V.   No deliberate indifference to serious medical needs ................................................72

    A.   No municipal liability .............................................................................................73

    B.   No underlying constitutional violation ...................................................................77

    C.   No state-created danger theory recognized in the Fifth Circuit ...............................81

VI.   This is an episodic acts or omission case, not a conditions of confinement case ............81

VII.   Plaintiffs failed to establish a claim for violation of the ADA/RA/AADA.....................84

    A.   Lucas's conditions do not demonstrate Lucas was disabled within the meaning of the ADA. .................................................................................................................86

B.   The DCCT was not aware of Lucas's alleged "disabilities." ................................. 92

C.   Plaintiffs cannot show Lucas was denied a reasonable accommodation. ................ 93

    i.    Lucas's hypertension ...................................................................... 93

    ii.   Lucas's anxiety ............................................................................... 93

    iii.  Lucas's depression .......................................................................... 94

    iv.   Lucas's obesity ............................................................................... 94

D.   The ADA should not apply to the cell extraction because of the exigent circumstances. ..................................................................................................... 97

E.   Plaintiffs cannot meet the high burden to prove intentional discrimination by allegations sounding in negligence. ........................................................... 99

F.   Plaintiffs have failed to prove Lucas was denied access to a program or service which imposed more pain and punishment on him than other similarly situated detainees. ........................................................................................................... 104

G.   Harris County's jail does not receive federal funding for any program, service or activity alleged by Plaintiffs. ............................................................................. 107

H.   Failure to monitor is not an ADA claim. ............................................................ 108

I.   Refusal or failure to protect is not an ADA claim. ............................................. 108

Conclusion & Request for Relief .................................................................................... 109

Certificate of Service ...................................................................................................... 111

Exhibits

1.   Excerpts from the September 9, 2016 Deposition of Deidre McCarty

2.   JIMS Booking Inquiry (Lucas 1036)

3.   Texas DPS Criminal History (Lucas 329 - 343)

4.   Inmate Offense Report 2014-4552 (Lucas 307, 309); Offense Charges (Lucas 311)

5.   Medical Records

6.   Inmate Offense Report 2014-4602 (Lucas 177-178)

7.   Offense Charges (Lucas 264)

8.   Inmate Offense Report 2014-4633 (Lucas 180-181)

9.   Affidavit of Jumall Johnson

10.  Inmate Offense Report 2014-4658 (Lucas 183-184)

11.  Affidavit of Marcus Guice, MD

12.  Sworn Statement of Lynette Anderson (Lucas 87-89)

13.  Excerpts from the October 18, 2016 Deposition of Lynette Anderson

14.  Photographs of smoke detector and handcuffs

15.     HCSO Policies (Lucas 3579 and 2648-2752)

16.     Video of Cell Extraction

17.     Sworn Statement of Alicia Scott (Lucas 30-33)

18.     Excerpts from the August 18, 2016 Deposition of Morris Thomas

19.     Affidavit of Lester Bourgeois

20.     Second Sworn Statement of Alicia Scott (Lucas 1517-1521)

21.     Excerpts from the September 13, 2016 Deposition of Laxman Sunder, MD

22.     Excerpts from the December 1, 2016 Deposition of Carrie O'Pry

23.     Affidavit of Stacy Barton

24.     Autopsy Report (Lucas 979 - 994)

25.     TCOLE Training Records with Business Records Affidavit

26.     Excerpts from the December 8, 2016 Deposition of Adrian Garcia

27.     Excerpts from the September 14, 2016 Deposition of David Gordon

28.     HCSO Incident Report (Lucas 2144-2149)

29.     Affidavit of Major John Martin

30.     Affidavit of Gary Pinkerton

31.     Affidavit of Bryan Pair

32.     Affidavit of Tom S. Neuman, MD

33.     Excerpts from the August 24, 2017 Deposition of Binh Ly, MD

34.     Excerpts from the February 23, 2017 Deposition of Kris Hall, MD

35.     Excerpts from the March 2, 2017 Deposition of Robert Cohen, MD

36.     Excerpts from the August 25, 2017 Deposition of Tom S. Neuman, M.D.

37.     Excerpts from the August 23, 2016 Deposition of Amber Lucas

38.     Excerpts from the May 2, 2017 Deposition of Shaneika Gradney

39.     Excerpts from the May 15, 2017 Deposition of Anna Chlamon

40.     Excerpts from the October 18, 2016 Deposition of Anna Fonseca

41.     Excerpts from the August 19, 2016 Deposition of Brodrick Green

42.     Excerpts from the September 1, 2016 Deposition of Jesse Bell

43.     Excerpts from the September 15, 2016 Deposition of Riley Scott

44.     Excerpts from the September 1, 2016 Deposition of Xavier Leveston

45.     Excerpts from the August 24, 2016 Deposition of Casandra Salcido

## TABLE OF AUTHORITIES

**Cases**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................... 24

*Banuelos v. McFarland*,
   41 F.3d 232 (5th Cir. 1995) ....................................................................... 78

*Baughman v. Garcia*,
   254 F. Supp. 3d 848 (S.D. Tex. 2017) ...................................................... 28

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
   520 U.S. 397 (1997) ............................................................................ passim

*Bell v. Wolfish*,
   441 U.S. 520 (1979) .................................................................................... 58

*Benavides v. Cnty. of Wilson*,
   955 F.2d 968 (5th Cir. 1992) ........................................................ 29, 63, 66

*Bennett v. City of Slidell*,
   728 F.2d 762 (5th Cir. 1984) (en banc) ...................................... 37, 38, 40

*Bennett-Nelson v. La. Bd. Of Regents*,
   431 F.3d 448 (5th Cir. 2005) ..................................................................... 95

*Blanks v. Sw. Bell Commc'ns*,
   310 F.3d 398 (5th Cir.2002) ...................................................................... 85

*Brumfield v. Hollins*,
   551 F.3d 322 (5th Cir. 2008) ............................................................. 70, 72

*Bryant v. Madigan*,
   84 F.3d 246 (7th Cir.1996) ..................................................................... 105

*Burge v. St. Tammany Parish*,
   336 F.3d 363 (5th Cir. 2003) ..................................................................... 70

*Bush v. Strain*,
   513 F.3d 492 (5th Cir. 2008) ..................................................................... 41

*Campbell v. City of San Antonio*,
   43 F.3d 973 (5th Cir. 1995) ....................................................................... 29

*Carrion v. Wilkinson*,
   309 F. Supp. 2d 1007 (N.D. Ohio 2004) ................................................ 105

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................ 24, 25

*Cheek v. Nueces Cnty., Tex.*,
    No. 2:13-cv-26, 2013 WL 4017132 (S.D. Tex. Aug. 5, 2013) ................... 85, 104

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ................................................................................ passim

*City of Los Angeles v. Heller*,
    475 U.S. 796 (1986) ................................................................................ 26

*City of Oklahoma  v. Tuttle*,
    471 U.S. 808 (1985) ................................................................................ 62

*Colle v. Brazos Cnty., Tex.*,
    981 F.2d 237 (5th Cir. 1993) .................................................................. 29

*Conner v. Travis Cnty.*,
    209 F.3d 794 (5th Cir. 2000) .................................................................. 61, 66, 70

*Connick v. Thompson*,
    563 U.S. 51 (2011) ................................................................................. passim

*Cox v. City of Dallas, Tex.*,
    450 F.3d 734 (5th Cir. 2005) .................................................................. 27

*D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*,
    629 F.3d 450 (5th Cir.2010) ................................................................... 100

*Daniels v. Williams*,
    474 U.S. 327 (1986) ................................................................................ 27

*Davidson v. Texas Dept. of Criminal Justice*,
    91 Fed. Appx. 963 (5th Cir.2004) ........................................................... 104

*Davis v. City of N. Richland Hills*,
    406 F.3d 375 (5th Cir. 2005) .................................................................. 69, 70

*Delano–Pyle v. Victoria Cnty.*,
    302 F.3d 567 (5th Cir.2002) ................................................................... 85, 99

*Doe ex rel. MaGee v. Covington Cnty. Sch. Dist. ex rel. Keys*,
    675 F.3d 849 (2012) ................................................................................ 81

*Doe v. U.S.*,
    831 F.3d 309 (5th Cir. 2016) .................................................................. 31

*Domino v. Tex. Dep't of Crim. J.*,
    239 F.3d 752 (5th Cir. 2001) .................................................................. 78, 100, 101

*Douglass v. United Servs. Auto. Ass'n*,
    79 F.3d 1415 (5th Cir.1996) ................................................................... 85

*Edwards v. Harris Cnty. Sheriff's Dep't,*
    864 F.Supp. 633 (S.D. Tex. 1994) ........................................................................ 29

*EEOC v. Watkins Motor Lines, Inc.,*
    463 F.3d 436 (6th Cir. 2007) ................................................................................. 89

*Estate of A.R. v. Muzyka,*
    543 Fed. Appx. 363 (5th Cir.2013) ............................................... 85, 100, 101, 102

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ................................................................................................. 78

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ...................................................................... 26, 77, 100, 101

*Fear v. Box,*
    170 F.3d 184 (5th Cir. 1999) (per curiam) ........................................................... 73

*Florence v. Bd. of Chosen Freeholders,*
    566 U.S. 318 (2012) ............................................................................................... 58

*Fontenot v. City of Houston,*
    647 Fed. App'x 402 (5th Cir. May 2, 2016) ......................................................... 40

*Fraire v. City of Arlington,*
    957 F.2d 1268 (5th Cir. 1992) .............................................................................. 27

*Francis v. City of Meriden,*
    129 F.3d 281 (2d Cir. 1997) ................................................................................. 89

*Galvin v. Cook,*
    No. CV 00-29-ST, 2000 WL 1520231 (D. Or. Oct.3, 2000) .............................. 106

*Garner v. Chevron Phillips Chem. Co., L.P.,*
    834 F. Supp. 2d 528 (S.D. Tex.2011) .................................................................. 87

*Glenn v. City of Tyler,*
    242 F.3d 307 (5th Cir. 2001) ................................................................................ 41

*Gobert v. Caldwell,*
    463 F.3d 339 (5th Cir. 2006) ........................................................................... 77, 78

*Gonzalez v. Ysleta Ind. Sch. Dist.,*
    996 F.2d 745 (5th Cir. 1993) .................................................................. 27, 39, 66, 67

*Goodson,*
    202 F.3d 130 (5th Cir. 2000) ................................................................................ 41

*Graham v. Connor,*
    490 U.S. 386 (1989) ..................................................................................... 27, 57, 58

*Griffin v. United Parcel Serv., Inc.,*
    661 F.3d 216 (5th Cir.2011) ................................................................................ 86

*Gutierrez v. City of San Antonio*,
   139 F.3d 441 (5th Cir. 1998) ...................................................................... 47, 48, 50

*Hainze v. Richards*,
   207 F.3d 795 (5th Cir. 2000) ...................................................................... 86, 97, 98

*Hale v. Bexar County,Tex.*,
   342 Fed. App'x 921 (5th Cir. 2009) (per curiam) ................................................. 26

*Hale v. King*,
   642 F.3d 492 (5th Cir.2011) ...................................................................... 86, 95, 104

*Hall v. Thomas*,
   190 F.3d 693 (5th Cir. 1999) ................................................................................ 100

*Haralson v. Campuzano*,
   356 F. App'x 692 (5th Cir.2009) ............................................................................ 85

*Hare v. City of Corinth, Miss.*,
   74 F.3d 633 (5th Cir. 1996) (en banc) ................................................. 26, 78, 81, 82

*Harris v. Hegman*,
   198 F.3d 153 (5th Cir. 1999) .................................................................................. 78

*Harris v. Serpas*,
   745 F.3d 767 (5th Cir. 2014) .................................................................................. 58

*Hay v. Thaler*,
   470 Fed. Appx. 411 (5th Cir.2012) ...................................................................... 104

*Hayden v. Trinity Railcar Repair, Inc.*,
   No. 1:16-cv-2154, 2017 WL 1485499 (E.D. Tex., Mar. 30, 2017) ...................... 91

*Hill v. Carroll Cnty., Miss.*,
   587 F.3d 230 (5th Cir. 2009) ......................................................................... passim

*Hinojosa v. Livingston*,
   807 F.3d 657 (5th Cir. 2015) .................................................................................. 77

*Hoffman v. Baylor Health Care System*,
   No. 3:12-cv-3781-L, 2014 WL 772672 (N.D. Tex. Feb. 27, 2014) .................... 85

*Hudson v. McMillian*,
   503 U.S. 1 (1992) .................................................................................................... 57

*Hudson v. McMillian*,
   962 F.2d 522 (5th Cir. 1992) .................................................................................. 57

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) .................................................................................. 24

*James v. Harris Cnty.*,
   577 F.3d 612 (5th Cir. 2009) .................................................................................. 31

*Jenkins v. Cleco Power, LLC*,
    487 F.3d 309 (5th Cir.2007).................................................................. 85

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*,
    379 F.3d 293 (5th Cir. 2004) ........................................................27, 31

*Kaufman v. Carter*,
    952 F. Supp. 520 (W.D. Mich. 1996) ................................................ 106

*Kemp v. Holder*,
    610 F.3d 231 (5th Cir. 2010) .............................................................. 86

*Khan v. Normand*,
    683 F.3d 192 (5th Cir. 2012) ........................................................passim

*Kingsley v. Hendrickson*,
    --- U.S. ---, 135 S.Ct. 2466, 2472–73 (2015) .................................passim

*Kitchen v. Dallas Cnty.*,
    759 F.3d 468 (5th Cir. 2014), *abrogated on other grounds by*
    *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015) ......................68, 70, 73

*Kovacic v. Villareal*,
    628 F.3d 209 (5th Cir. 2010) .............................................................. 81

*Lawson v. Dallas Cnty.*,
    286 F.3d 257 (5th Cir. 2002) ............................................................ 100

*Lee v. Valdez*,
    No. 3:07-cv-1298-D, 2009 WL 1406244 (N.D. Tex. May 20, 2009) ............... 104

*Lightbourn v. Cnty. of El Paso, Tex.*,
    118 F.3d 421 (5th Cir. 1997) ............................................................ 107

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) .............................................................. 25

*Lock v. Torres*,
    694 Fed. App'x 960 (5th Cir. 2017) (per curiam) ................................. 26

*Mace v. City of Palestine*,
    333 F.3d 521 (5th Cir. 2003) .............................................................. 58

*Mann v. La. High Sch. Athletic Ass'n*,
    535 F. App'x 405 (5th Cir. 2013) ....................................................... 87

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................24, 25

*Mayweather v. Foti*,
    958 F.2d 91 (5th Cir. 1992) ............................................................... 78

*McCoy v. Tex. Dep't of Crim. J.*,
No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) .............................. 106

*Melson v. Chetofield*,
No. 08-3683, 2009 WL 537457 (E.D. La. Mar. 4, 2009)...................................... 88

*Mendoza v. Lynaugh*,
989 F.2d 191 (5th Cir. 1993) ................................................................................. 78

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ................................................................................... passim

*Nazerzadeh v. Harris Cnty.*,
No. H-08-0499, 2010 WL 3817149 (S.D. Tex. Sept. 27, 2010) .................... 26, 81

*Nottingham v. Richardson*,
499 F. App'x 368 (5th Cir.2012) ...................................................... 102, 104, 105

*Olabisiomotosho v. City of Houston*,
185 F.3d 521 (5th Cir. 1999) ................................................................................. 26

*Oswalt v. Sara Lee Corp.*,
74 F.3d 91 (5th Cir.1996) ...................................................................................... 86

*Peterson v. City of Ft. Worth*,
588 F.3d 838 (5th Cir. 2009) ................................................................................. 35

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) ...................................................................... passim

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ...................................................................... passim

*Price v. Cnty. of San Diego*,
990 F. Supp. 1230 (S.D. Cal. 1998) .......................................................... passim

*Rios v. City of Del Rio, Tex.*,
444 F.3d 417 (5th Cir. 2006) ................................................................................. 26

*Rivera v. Houston Indep. Sch. Dist.*,
349 F.3d 244 (5th Cir. 2003) ................................................................................. 81

*Roberts v. City of Shreveport*,
397 F.3d 287 (5th Cir. 2005) ................................................................................. 70

*Sanders-Burns v. City of Plano*,
594 F.3d 366 (5th Cir. 2010) .................................................................. 63, 68, 69

*Scott v. Moore*,
114 F.3d 51 (5th Cir. 1997) (en banc) .......................................................... 81, 82

*Simmons v. Navajo Cnty.*,
609 F.3d 1011 (9th Cir.2010) ...................................................................... 85, 104

*Snyder v. Trepagnier*,
142 F.3d 791 (5th Cir. 1998), *cert. dismissed*, 526 U.S. 1083 (1999) ............ 27, 66

*Stokes v. Bullins*,
844 F.2d 269 (5th Cir. 1988) ................................................................. 27

*Taylor v. Richmond State Supported Living Ctr.*,
No. 4:11-3740, 2012 WL 6020372 (S.D. Tex. Nov. 30, 2012) ......................... 100

*Terry v. Ohio*,
392 U.S. 1 (1968) .............................................................................. 57

*Thompson v. Upshur Cnty., Tex.*,
245 F.3d 447 (5th Cir. 2001) ................................................................. 72

*Torello v. Sikorsky Aircraft Corp.*,
No. 3:04CV848, 2006 WL 680508 (D. Conn, Mar. 14, 2006) ..................... 91

*Tuft v. Tex.*,
410 Fed. Appx. 770 (5th Cir. 2011) ........................................... 104, 105

*Turner v. Safley*,
482 U.S. 78 (1987) ........................................................................... 58

*Turner v. Upton Cnty., Tex.*,
915 F.2d 133 (5th Cir. 1990) ................................................................ 28

*U.S. Dept. of Trans. v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986) ........................................................................ 107

*Wagner v. Bay City, Tex.*,
227 F.3d 316 (5th Cir. 2000) ......................................................... 51, 52

*Waller ex rel. Estate of Hunt v. Danville, VA*,
556 F.3d 171 (4th Cir. 2009) ................................................................ 98

*Webster v. City of Houston*,
735 F.2d 838 (5th Cir.1984) (en banc) ............................................. passim

*Whitley v. Hanna*,
726 F.3d 631 (5th Cir. 2013) ................................................................ 73

*Windham v. Harris Cnty.*,
875 F.3d 229 (5th Cir. 2017) ....................................................... 95, 96, 98

*Worsham v. City of Pasadena*,
881 F.2d 1336 (5th Cir. 1989) .............................................................. 29

*Youngberg v. Romeo*,
457 U.S. 307 (1982) .......................................................................... 78

*Zaunbrecher v. Gaudin*,
641 Fed. App'x 340 (5th Cir. Feb. 10, 2016) .................................... 77, 78

*Zenor v. El Paso Healthcare Sys., Ltd.*,
    176 F.3d 847 (5th Cir. 1999) ................................................................. 91

## Statutes

29 U.S.C. §794 ............................................................................................... 93

42 U.S.C. § 12102 ......................................................................................... 85

42 U.S.C. § 12114 ......................................................................................... 91

Tex. Loc. Gov't Code § 351.041 ................................................................. 28

Tex. Loc. Gov't Code § 351.041(b) ............................................................ 28

Tex. Occup. Code § 1701.253 ..................................................................... 63

Tex. Occup. Code § 1701.301 ..................................................................... 63

Tex. Occup. Code § 1701.307 ..................................................................... 63

Tex. Occup. Code § 1701.310 ..................................................................... 63

## Rules

Fed. R. Civ. P. 56 ......................................................................................... 24

Fed. R. Civ. P. 8 ........................................................................................... 25

## Other Authorities

Course Curriculum Materials & Updates, Tex. Comm'n on Law Enforcement, available
    at http://www.tcole.texas.gov/content/course-curriculum-materials-and-updates-0 (last
    visited Feb. 7, 2019) ............................................................................... 63

**In the United States District Court
for the Southern District of Texas
Houston Division**

| | | |
|---|---|---|
| **CASANDRA SALCIDO, ET AL,** | § | |
| **Plaintiffs,** | §<br>§ | **Civil Action No. 4:15-cv-2155** |
| **v.** | §<br>§ | **Jury Demand** |
| **HARRIS COUNTY, TEXAS, ET AL,** | §<br>§ | |
| **Defendants.** | §<br>§ | |

## DEFENDANT HARRIS COUNTY'S AMENDED MOTION FOR SUMMARY JUDGMENT

To the Honorable Sim Lake, United States District Judge:

Defendant Harris County, Texas, files this amended motion for summary judgment on all of Plaintiffs' claims against it, respectfully showing the Court the following:

## NATURE & STAGE OF THE PROCEEDING

1.      This is a federal civil rights case allegedly arising out of the in-custody death of pretrial detainee Kenneth Lucas shortly after a cell extraction. Lucas was in the Harris County jail medical clinic surrounded by medical staff when he died from a sudden cardiac arrest on February 17, 2014. Unbeknownst to Harris County, Lucas had several serious medical conditions that caused this cardiac event. Lucas's autopsy revealed he had severe heart disease and an enlarged heart, both conditions that are known causes of sudden cardiac death. Lucas had other conditions that may have contributed to his sudden cardiac death, including his illegal use of drugs, being overweight and a history of hypertension.

2.      Plaintiffs amorphously allege numerous claims, including excessive force, failure to train, deliberate indifference to medical needs, and claims under the Americans with Disabilities Act and Rehabilitation Act. Plaintiffs seek recovery of unspecified compensatory damages and attorneys' fees.

3.      Harris County denies that Lucas's constitutional or other rights were violated in any way, and denies that it is liable to Plaintiffs in any amount under any theory of recovery.

1

Plaintiffs have failed to adduce competent summary judgment evidence raising a genuine issue of material fact as to any violation of Lucas's constitutional or other rights, and as to harris County's liability for such alleged violation. Under these circumstances, Harris County is entitled to summary judgment on all theories of recovery asserted against it in accordance with Federal Rule of Civil Procedure 56.

### BACKGROUND

4.      The events that led Lucas to the medical clinic began shortly after he was incarcerated in the Harris County jail as a pretrial detainee on February 12, 2014. Lucas was arrested for violating a child custody order, after he refused to return his teenage children to their mother.[1] These children are parties to this lawsuit, represented by their mother, Deidra McCarty.[2]

## I.      History of violence

5.      Lucas had a long history of prior violent offenses, including assault/bodily injury of a former girlfriend (2013), assault (2012), assault (1999), assault/bodily injury (1997) and evading arrest (1995).[3] Lucas's violent behavior leading up to his cell extraction explains why the DCCT had to extract Lucas from his cell and why he could not simply be "walked" down to the medical clinic, but had to be transported on a gurney.

---

[1]      See McCarty Depo., p. 16:20-17:13, Ex. 1

[2]      One of the teenagers, T.J.L, is no longer a minor and no longer needs her mother to appear in the suit on her behalf. The other parties to this lawsuit include Cassandra Salcido, on behalf of her two minor children with Lucas, Lucas's estranged wife Amber Lucas and Lucas's parents, Denise Collins and Kenneth Lucas.

[3]      See JIMS booking inquiry, Bates # 1036, Ex. 2. See also Texas DPS Criminal History, Bates # 329-343, Ex. 3.

### A.      February 16, 2014

6.      After four days in the Harris County jail, on February 16, 2014 at 6:25 am, Lucas assaulted an inmate he was sharing a cell with while the inmate was sleeping.[4] Lucas was removed from his cell and placed in a holding cell where he began to complain of chest pain.[5] Lucas was evaluated in the jail clinic and then transferred to the hospital for further evaluation.[6] Upon discharge from the hospital, Lucas became uncooperative and did not want to return to the jail.[7] At around 5:35 pm, Lucas returned to the jail and a couple hours later began yelling in the medical clinic that he needed to go back to the "fucking hospital." *Id*. At 8:10 pm, officers began to escort Lucas to his cell and realized they needed to move his handcuffs to secure his hands behind his back instead of in front. *Id*. While moving the handcuffs, Lucas turned around and attempted to grab one of the officers, causing Lucas to trip over the leg shackles and fall to the ground. *Id*. Lucas was charged with "Resisting Restraint" and assigned to a single cell in administrative separation.[8]

### B.      February 17, 2014

7.      The next morning at 6:25am, Lucas clogged his toilet with his shirt and flooded his cell.[9] Detention Officer Jumall Johnson attempted to speak with Lucas, but Lucas responded in an angry and aggressive manner, shouting, rambling and talking to himself.[10] After Officer Johnson

---

[4]      See Inmate Offense Report 2014-4552, Bates # 307, 309 and the charges filed against Lucas at Bates # 311, collectively Ex. 4.

[5]      See Inmate Offense Report 2014-4552, Bates # 307, 309 and the charges filed against Lucas at Bates # 311, collectively Ex. 4.

[6]      See medical records, Bates # 116, 125, Ex. 5.

[7]      See Inmate Offense Report 2014-4602, Bates # 177-178, Ex. 6.

[8]      See Inmate Offense Report 2014-4602, Bates # 177-178, Ex. 6; See also offense charges, Bates # 264, Ex. 7.

[9]      See Inmate Offense Report 2014-4633, Bates # 180-181, Ex. 8.

[10]     See Inmate Offense Report 2014-4633, Bates # 180-181, Ex. 8; See also Johnson Aff., Ex. 9.

observed Lucas placing his toilet-water soaked clothing over his head and appearing confused, he generated a referral to the mental health clinic, thinking a mental health professional could help Lucas.[11]

8.      At 9:55am, Officer Johnson observed Lucas pull the smoke detector from the ceiling and instructed him stop.[12] Lucas refused to follow his instructions, and instead wrapped his wet clothing over the smoke detector and used his body weight to disconnect it from the wiring in the ceiling. *Id.* Lucas began throwing the large metal smoke detector against the glass window of his cell. *Id*. Officer Johnson saw this, and informed Lucas he had committed the offense of "Destroying, Altering or Damaging County Property," and Lucas refused an opportunity to provide a written statement. *Id*. Officer Johnson reported this to his supervisor, Sgt. Keculah.[13]

9.      At approximately 11:35am, LaMonica Kinch, an LPHA Intern and mental health worker, attempted to meet with Lucas.[14] Before entering the cellblock, Ms. Kinch could hear Lucas yelling, screaming and banging on his cell door. *Id*. Although she found Lucas to be rambling unintelligibly, he correctly identified his name, date of birth, and the current date. *Id*. Physically, she saw him sweating on his chest, neck and face, and out of breath as if he had been running. *Id*. When Ms. Kinch was unable to redirect him and he started banging on the door, she terminated the assessment and referred him to the medical clinic for possible Xanax withdrawal. *Id*.

---

[11]      See Inmate Offense Report 2014-4633, Bates # LUCAS 180-181, Ex. 8; See also Johnson Aff., Ex. 9.

[12]      See Johnson Aff., Ex. 9 and Inmate Offense Report 2014-4658, Bates # LUCAS 183-184, Ex. 10.

[13]      See Johnson Aff., Ex. 9.

[14]      See HCSO MH Progress Note by LaMonica Kinch, Bates # LUCAS 115, Ex. 5. HCSO contracts with the Harris Center for Mental Health and IDD (formerly Mental Health and Mental Retardation Authority ("MHMRA")), an independent entity, to provide mental services to those in the Harris County Jail. Licensed Practitioner of the Healing Arts ("LPHA") interns are licensed by the state of Texas and work under the supervision of other mental health staff in the Harris County jail. See Guice Aff., Ex. 11.

10.     Also around 11:30 am, First Shift Watch Commander Lt. Lynette Anderson was notified by second floor Sergeant Oldman Keculah about disruptive Lucas.[15] She was advised of Lucas's violent history over the previous 24 hours and considered whether to activate the Detention Command Containment Team ("DCCT") to extract Lucas from his cell, take him to the medical clinic and then re-house him. *Id*. Because Lucas had removed the smoke detector, he needed to be re-housed to a cell with a working smoke detector.[16] While waiting for information on the re-housing and because the Crisis Incident Response Team ("CIRT") was not available to meet with Lucas, Lt. Anderson went to assess the situation at Lucas's cell.[17] Lt. Anderson observed Lucas yelling, screaming, cussing and banging the smoke detector against the cell window. *Id*. She attempted to speak with him, but he cussed at her and would not stop yelling and screaming.[18] Lt. Anderson was concerned Lucas could injure himself with the metal smoke detector he was swinging around his head and banging against the wall.[19] She activated the DCCT and met with the team to advise that Lucas was combative and had a weapon—the smoke detector with jagged edges— that could harm himself or others.[20]

---

[15]     See Anderson Sworn Statement (Feb. 17, 2014 at 5:35 pm), Bates # LUCAS 87-89, Ex. 12.

[16]     See Anderson Depo., p. 15:7-12, Ex. 13.

[17]     See Anderson Depo., p. 15:7-12, Ex. 13.

[18]     See Anderson Depo., p. 44:14 – 46:18, Ex. 13; Anderson Sworn Statement, Ex. 12.

[19]     See Anderson Depo., p. 121:20 – 122:16, Ex. 13.

[20]     See Anderson Depo., p. 125:15-21, Ex. 13; Anderson Sworn Statement, Ex. 12; Photos of smoke detector, Ex. 14.

II.     **Cell Extraction**

11.     Harris County policy requires the DCCT to video record all planned cell extractions.[21] Officer Adam Kneitz, a DCCT member, recorded the DCCT lining up, walking in an organized fashion to the cellblock, performing the cell extraction, and transporting Lucas to the medical clinic and the treatment Lucas received in the jail medical clinic until shortly after Dr. Laxman Sunder told the nurse to call 911.[22] While the video is the best evidence of what transpired, it is important to note certain relevant events depicted on the video.

12.     The video shows Lucas's combativeness before the DCCT goes into the cell to extract him and at least 23 orders by DCCT Supervisor Deputy David Gordon to give up the metal smoke detector.[23] The video shows Lucas slamming the metal smoke detector into the door and refusing to give it up.[24] The video shows Lucas charge at the DCCT as they entered his cell nearly five minutes after Lucas refused to comply with Deputy Gordon's orders.[25]

13.     Team Leader Officer Alicia Scott, who was responsible for assessing the situation and giving orders to other team members during the cell extraction, stated that Lucas held the smoke detector above his shoulder in his right hand and his left hand was balled up in a fist when they entered, indicating he was intent on assaulting on the team.[26] Deputy Morris Thomas testified Lucas charged at the team as they entered, the team safely pushed Lucas back to the wall with the shield and Lucas was swinging the smoke detector trying to hit someone.[27] Officers were unable

---

[21]     See HC Policy D-308 Videotaping of Planned Use of Force Events, Bates # LUCAS 2737-2739, Ex. 15.

[22]     See Video of cell extraction, at 0:01, Ex. 16.

[23]     See Video, Ex. 16.

[24]     See Video, Ex. 16.

[25]     See Video, at 4:48, Ex. 16.

[26]     See Scott Sworn Statement, Bates # LUCAS 30-33, Ex. 17.

[27]     See Thomas Depo., p. 42:15-44:5, Ex. 18.

to remove the makeshift weapon until after Lucas was on the ground and restrained.[28] The video shows DCCT using respect and professionalism when speaking to and handling the combative Lucas—Deputy Leveston told Lucas numerous times to "stop resisting" while the team attempted to place handcuffs and ankle shackles on Lucas.[29] Officer Scott stated that none of the DCCT team put their weight on Lucas while applying the restraints.[30] Lucas refused to cooperate.[31]

14.     The video shows that it took the team about four minutes to put handcuffs and ankle shackles on Lucas because he was combative and refused to cooperate.[32] Officers used "HT" extended-length handcuffs, colloquially referred to as "big-boy cuffs," to accommodate Lucas's large size.[33] The video shows the team slide Lucas out of the cell and Lucas kicking and fighting against his restraints as the team lifts him and places him on the gurney.[34] To further accommodate Lucas's large size, the Officers did not raise the side rails of the gurney.[35] Officer Scott straddled Lucas's legs and crossed them in front of her so she could keep him secure on the gurney and to keep him from kicking the team.[36] Officer Scott did not apply constant pressure to Lucas's legs,

---

[28]     See Thomas Depo., p. 44:24-45:11, Ex. 18.

[29]     See Video, Ex. 16.

[30]     See Scott Sworn Statement, p. 2, Ex. 17.

[31]     Deputy Thomas testified that when Lucas was asked to place his hands behind his back he refused. See Thomas Depo., p.45:12-46:18, Ex. 18.

[32]     See Video, at 4:53 – 8:53, Ex. 16.

[33]     See Bourgeois Aff., Ex. 19; Scott Sworn Statement, p. 3, Ex. 17. See also Photos of handcuffs, Ex. 14.

[34]     See Video, at 9:06, Ex. 16.

[35]     See Bourgeois Aff., Ex. 19.

[36]     See Scott Sworn Statement, p. 3, Ex. 17.

but instead used counter pressure when Lucas would try to kick and then eased off when he stopped.[37]

15.    The video shows Lucas cussing and pushing against his restraints during his transport to the clinic, while officers repeatedly tell him to relax and stop resisting.[38] While waiting in the elevator lobby, Lucas said to female officer Lt. Anderson, "I can't breathe you fucking bitch."[39]

16.    Lucas arrived in the medical clinic about ten minutes after the cell extraction began.[40] Immediately after Lucas arrived in the clinic, Dr. Sunder is heard on the video ordering 4 mg of Ativan.[41] Lucas continued to cuss and the team continued to tell him to relax and calm down as he tried to twist his body and resist his restraints.[42] Dr. Sunder is also heard on the video telling Lucas to "relax, we are going to give you your medicines."[43] Lucas responded by saying "Fuck you" and then a few seconds later yelled "take this off me, I can't breathe" as he continued to fight against his restraints.[44] The team continued to tell Lucas to "relax," to which Lucas responded, "I

---

[37]    See Scott 2d Sworn Statement, p. 3, Bates # LUCAS 1517-1521, Ex. 20.

[38]    See Video, at 11:35-14:58, Ex. 16. See also Thomas Depo., p.69:8-18, Ex. 18.

[39]    See Anderson Depo., at 103:16-18, 104:3-11, Ex. 13.

[40]    Video, at 15:30, Ex. 16.

[41]    Video, at 15:43, Ex. 16. Dr. Sunder prescribed Ativan for Lucas's drug withdrawals or delirium, which he believed ailed Lucas. Sunder Depo. at p. 238:21 – 240:15, Ex. 21.

[42]    Video, at 16:00-16:35, Ex. 16.

[43]    Video, at 16:35, Ex. 16.

[44]    Video, at 16:43, Ex. 16.

can't bro."[45] While in the clinic, Nurse O'Pry also takes Lucas's temperature, blood sugar and counted his respirations.[46]

17.     A couple minutes after arriving in the clinic, Nurse O'Pry is heard in the background saying, "*would it be better for ya'll if we rolled him over and, and . . . ? Oh, okay, never mind.*"[47] Lucas is seen continuing to struggle against his restraints while the team tells him to "calm down" and relax."[48] The team is heard adjusting the handcuffs and the officers are seen easing off of their restraint on Lucas. Lucas mumbles as Nurse O'Pry attempts to administer an additional 2 mg of Ativan but the needle breaks.[49]

18.     About a minute later and within seconds of Nurse O'Pry administering another shot of Ativan, she says that Lucas should be "sleeping" within 15-20 minutes.[50] Deputy Gordon is seen checking on Lucas, Lucas moves his head and it appears Deputy Gordon is not aware that Lucas is in any medical distress.[51] Nurse O'Pry attempts to take Lucas's blood pressure, but is not successful.[52] Dr. Sunder states that Lucas has "already calmed down" and asks Nurse O'Pry if it is the drugs that has calmed him down or if it is "just these people" to which Nurse O'Pry responds, "I think it is a combination, I think he realizes they're not going to move."[53] Nurse O'Pry lets Dr.

---

[45]     Video, at 17:15, Ex. 16.

[46]     See O'Pry Depo., p. 115:6-116:6, Ex. 22.

[47]     Video, at 17:58 (emphasis added), Ex. 16. See also Barton Aff., Ex. 23 (stating she overheard Nurse O'Pry).

[48]     Video, at 18:40 and 19:06, Ex. 16.

[49]     Video, at 19:20 and 19:34, Ex. 16.

[50]     Video, at 20:02, Ex. 16.

[51]     Video, at 21:02, Ex. 16.

[52]     Video, at 22:45, Ex. 16.

[53]     Video, at 25:00, Ex. 16.

Sunder know she is "working on a blood pressure monitor" and Dr. Sunder asks her if they can "move him a little bit on the legs" and Officer Scott gets off the gurney.[54] While Nurse O'Pry asks Dr. Sunder if she can finish getting the blood pressure, the video shows Dr. Sunder looking at Lucas's face.[55] While Nurse O'Pry makes the "last" attempt at taking Lucas's blood pressure, Dr. Sunder speaks to Lucas, saying "Sir" and then gets closer down to his face to look at him. [56]

19.     Dr. Sunder becomes concerned about whether Lucas is breathing and instructs the DCCT to turn Lucas over.[57] Nurse O'Pry, still trying to get a blood pressure reading, says "I'm almost done."[58] When Dr. Sunder loudly repeats he wants to make sure Lucas is breathing, Nurse O'Pry says "oh" and the team turns Lucas over.[59] Dr. Sunder tells Nurse O'Pry to get a "pulse ox" on Lucas "ASAP" and she responds that she is "working on it."[60] Nurse O'Pry asserts she has a "carotid pulse" and that "we are doing good," to which Dr. Sunder again tells her to get the pulse ox on Lucas.[61] After Dr. Sunder tells Nurse O'Pry to get a pulse ox on Lucas for the third time, she responds that she is "working on it."[62] Dr. Sunder instructs the medical team to "bag him" and to call "HFD."[63] Dr. Sunder inquires about the pulse ox, which is still not on Lucas. The nurse, who was using a bag-valve mask (commonly called an Ambu bag) had a DCCT team member take

---

[54]     Video, at 25:12, Ex. 16.

[55]     Video, at 25:32, Ex. 16.

[56]     Video, at 26:12, Ex. 16.

[57]     Video, Ex. 16.

[58]     Video, at 26:50, Ex. 16.

[59]     Video, at 26:56, Ex. 16.

[60]     Video, at 27:20, Ex. 16.

[61]     Video, 27:30, Ex. 16.

[62]     Video, 28:13, Ex. 16.

[63]     Video, 28:39, Ex. 16.

over so she can get the pulse ox on Lucas.[64] The pulse ox is put on Lucas and Dr. Sunder says he is not breathing.[65] The video ends shortly thereafter.

## III.   DCCT were properly trained & followed their training

20.     Lucas did not die during the cell extraction or during the transport to the medical clinic. As determined by an autopsy, Lucas suffered a sudden cardiac death while in the medical clinic and surrounded by medical staff.[66] Although the DCCT received some training regarding medical care, they are not trained medical professionals.[67]

### A.     Training of the DCCT team[68]

21.     The DCCT are specially trained on how to perform a cell extraction and how to transport a combative inmate like Lucas.[69] The DCCT performed Lucas's cell extraction and transport according to their training and Harris County's policies and procedures.[70] These TCOLE-certified jailers were chosen to be a part of the DCCT.[71]

---

[64]      Video, 29:00, Ex. 16.

[65]      Video, 29:11, Ex. 16.

[66]      Autopsy Report, p. 1, Ex. 24.

[67]      See Policy No. D-212, Inmate Health Care Access, Bates #2665-2669, Ex. 15.

[68]      Attached as Ex. 25 are the collective TCOLE training records of the DCCT (Defendants in this suit), Anderson, Johnson and Bourgeois, and business records affidavit.

[69]      See Bourgeois Aff., Ex. 19.

[70]      See Anderson Depo., p. 32:31:23-32:16, Ex. 13. See also Garcia Depo., p. 62:16-63:6; 111:11-112:3; 163:1-167:13; 174:4-14, Ex. 26.

[71]      TCOLE is the Texas Commission on Law Enforcement (previously known as Texas Commission on Law Enforcement Officer Standards and Education). See Policy # D-302 Detention Command Containment Team, Bates #2716-2724, p.1, III(B)(2), Ex. 15; Bourgeois Aff., Ex. 19.

    *i.*       ***HCSO Jail School – TCOLE-certified***

    22.     All jailers who worked in the Harris County jail in February 2014 were required to have completed the Harris County Sheriff's Office's ("HCSO") TCOLE-certified, 7-week Basic County Corrections Course ("BCCC") to become a licensed, certified jailer before working in the Harris County jail.[72] During this 7-week training program, the officers learned HCSO policies including policies on dealing with inmates that may have mental illness, disabilities or are in crisis, inmate conduct (including disruptive conduct), inmate health care access, inmate observation, and inmate rules, rights and discipline.[73] This training additionally included 24 hours of crisis intervention response training and certification in CPR and AED. With regard to force, the jail school trained in use of force law and use of force concepts, which included a minimum of 8 hours of instruction on use of force law and 16 hours on use of force concepts.

    23.     Pertinent to the claims in this suit, TCOLE did not and does not require the HCSO jail school to provide training on "drug withdrawal," "accommodating detainees suffering from drug withdrawal," or accommodating individuals with "prescription drug dependence, hypertension or obesity" beyond what Harris County already provides in jail school.[74]

    24.     HCSO's Inmate Health Care Access policy (No. D-212) required all deputies and detention officers to be trained to recognize and respond to medical emergencies.[75] The members of the DCCT (and particularly the Defendant officers sued in this case), as well as all deputies and detention officers in jail school, went through this training, which incorporates this policy.[76] These individuals were trained to respond to a medical emergency and to take immediate action anytime

---

[72]    See Bourgeois Aff., Ex. 19.

[73]    See policies attached collectively as Ex. 15; Bourgeois Aff., Ex. 19. See also Gordon Depo., p. 41:15-19, 42:23-43:8, 43:23-44:20, Ex. 27.

[74]    See Bourgeois Aff., Ex. 19.

[75]    See Bourgeois Aff., Ex. 19; Policy D-212 (version revised Mar. 13, 2012), Bates # 2665, Ex. 15.

[76]    See Bourgeois Aff., Ex. 19.

they believed an inmate needed medical attention.[77] This includes reacting to any perceived distress of an inmate from the time the inmate is extracted until the time the inmate has been re-housed following their medical screening.[78]

### ii.    State TCOLE-certified Specialized DCCT Training

25.    Application to the DCCT is a rigorous process requiring a complete review.[79] After becoming TCOLE-certified and graduating from HCSO jail school, DCCT candidates must pass a physical training test.[80] If successful, the candidate will be interviewed by a review board, which is composed of the Lieutenant, Sergeant, and current Team Leaders for the DCCT.[81] Candidates who pass the interview must attend a 40-hour boot camp before acceptance in the DCCT.[82] DCCT training is state approved and certified.[83]

26.    This 40-hour training includes (1) review of Harris County policies, including the restraints policy and the prohibition on "hogtying," (2) hands-on scenario-type cell extractions in which each officer practices each of the five positions on the cell extraction team, (3) practice transporting an inmate on a gurney following the cell extraction, (4) training on what a "hogtie" is, (5) training to decrease the quantum of force used as the need for force decreases, and (6) monitoring the inmate during the cell extraction and transport.[84]

---

[77]    See Bourgeois Aff., Ex. 19.

[78]    See Bourgeois Aff., Ex. 19.

[79]    See Bourgeois Aff., Ex. 19.

[80]    See Bourgeois Aff., Ex. 19.

[81]    See Bourgeois Aff., Ex. 19.

[82]    See Bourgeois Aff., Ex. 19.

[83]    See Bourgeois Aff., Ex. 19.

[84]    See Bourgeois Aff., Ex. 19.; Anderson Depo., p. 91:16-92:23, 127:3-129:1, Ex. 13. See also Bourgeois Aff., attached DCCT Training Manual at Bates # LUCAS 3946-4340, Ex. 19.

**B.      The process for a planned cell extraction**

27.      When the DCCT is activated for a cell extraction, the supervisor first tries to gain the inmate's compliance and have the inmate exit his or her cell peacefully.[85] If unsuccessful, the DCCT forms a line outside the inmate's cell in a five-person configuration.[86] Each position in the configuration is responsible for securing a particular part of the prisoner's body upon entering the cell.[87] In addition, the team supervisor and a videographer (who is also a DCCT member) support the team.[88]

28.      At the time of the Lucas cell extraction, the DCCT team was comprised of:

Team Supervisor: Deputy David Gordon, responsible for monitoring the safety
          of the inmate and the members of the DCCT.

Position 1: Officer Xavier Leveston was responsible for delivering the initial
          impact and supporting Lucas's head and neck.

Position 2: Officer Broderick Green was responsible for securing the weapon
          in Lucas's hand and controlling his left arm.

Position 3: Officer Alicia Scott was the team leader responsible for giving
          commands to the team and controlling his right arm.

Position 4: Officer Jesse Bell was responsible for securing and controlling the
          left leg.

Position 5: Officer Thomas Morris was responsible for securing and controlling
          the right leg.

Videographer: Officer Adam Kneitz.

---

[85]      See Bourgeois Aff., Ex. 19 & attached training material, "Forced Cell Movements", Bates # Lucas 1425-1463.

[86]      *Id*. See also Gordon Depo., p. 116:10-13, Ex. 27.

[87]      See Bourgeois Aff., Ex. 19 and attached training material, "Forced Cell Movements", Bates # Lucas 1425-1463.

[88]      Bourgeois Aff., Ex. 19; See also Gordon Depo., p. 116:10-13, Ex. 27.

29.     In addition, the Watch Commander, Lieutenant Lynette Anderson, was also present during the cell extraction.[89]

30.     As Team supervisor, Deputy Gordon was responsible for attempting to gain Lucas's compliance by having him relinquish the smoke detector weapon and exit his cell peacefully prior to resorting to a cell extraction.[90] Deputy Gordon was also responsible for overseeing the inmate and team during the cell extraction and transport to the medical clinic.[91] Although Harris County subsequently amended its DCCT policy to require the presence of a safety officer during cell extractions, Deputy Gordon fulfilled that role during Lucas's cell extraction.[92] Deputy Gordon is seen on the video periodically walking around and observing Lucas's condition.[93] As team leader, Officer Scott—who was the smallest and lightest member of the team—was responsible for issuing commands to the team and for maintaining control of Lucas's legs during transport to the clinic.[94]

31.     When dealing with a combative inmate who is armed with a weapon, the DCCT team is trained to line up in a single-file line, with the officer in the front carrying a plexiglass shield, and to enter the cell, secure the inmate, and apply handcuffs and leg irons.[95] The DCCT is trained to first secure handcuffs on the inmate, then secure ankle shackles on the inmate, and then

---

[89]     See Bourgeois Aff., Ex. 19. See also See HCSO Incident Report, Bates #2144-2149, Ex. 28.

[90]     See Bourgeois Aff., Ex. 19 and attached DCCT training manual, Bates # 1446. See also Thomas Depo., pp. 28:3-21; 29:2-25, Ex. 18; Anderson Depo., p. 131:19-23, Ex. 13.

[91]     See Bourgeois Aff., Ex. 19.

[92]     See Bourgeois Aff., Ex. 19. See also Anderson Depo., p. 133:16-134:19, Ex. 13.

[93]     See video, 5:34–9:03, Ex. 16 (showing Deputy Gordon in the forefront of the video while team trying to handcuff Lucas).

[94]     See Bourgeois Aff., Ex. 19, and attached DCCT training materials, Bates # LUCAS 1436-1437. See also Anderson Depo., p. 131:1-18; 131:24-132:13, Ex. 13.

[95]     See Bourgeois Aff., Ex. 19 and attached DCCT training materials, Bates # LUCAS 1432-1434.

remove the inmate from the cell and prepare him or her for transport.[96] At the time of Lucas's extraction, combative inmates were placed on a stretcher in the prone position with the smallest member of the team straddling the legs of the inmate so that pressure could be applied to the legs when necessary to keep the inmate from falling off the stretcher. [97] The inmate is transported directly to the medical clinic for evaluation by medical staff.[98]

## IV.    Harris County Policies and Procedures

32.    In February 2014, HCSO had the following relevant written policies:

### A.    Restraints (Policy D-239), Use of Force (Policy D- 307), & Separation (Policy D-219)

33.    HCSO's restraint policy expressly prohibited the use of a four-point restraint, commonly referred to as a hog tie, when restraining an inmate: "At no time is the inmate to be 'Hog-Tied' or the hands and feet bound together to prevent movement."[99] Consistent with HCSO's restraints policy, HCSO's use-of-force policy also expressly prohibits hog-tying: "Restraining a prisoner through a procedure commonly known as 'hog-tying' shall not be utilized."[100]

34.    HCSO's use-of-force policy provides that "the protection and sanctity of human life shall be a priority and that employees shall only use the amount of force necessary to protect themselves, another person, or to maintain the security of the detention facility, in accordance with

---

[96]    See Bourgeois Aff., Ex. 19 and attached DCCT training materials, Bates # LUCAS 1435-1449.

[97]    See Bourgeois Aff., Ex. 19 and attached DCCT training materials, Bates # LUCAS 1450–1453.

[98]    See Bourgeois Aff., Ex. 19 and attached DCCT training materials, Bates # LUCAS 1450–1453. See also Anderson Depo. p. 137:5-15, Ex. 13.

[99]    Policy D-239, Bates # 2706 (emphasis in original) (policy version revised Oct. 10, 2012, *id.* at Bates # 2709), Ex. 15.

[100]    Policy D-307, Bates # 2732 (policy version revised Apr. 10, 2012, *id.* at Bates # 2736), Ex. 15. This policy cited to the Commission on the Accreditation for Law Enforcement Agencies ("CALEA") Standard 70.2.1. *Id.* at Bates #2732.

state and federal law."[101] HCSO's use-of-force policy further provides non-exhaustive examples of types of use of force and situations in which force can be used, including to protect an inmate from self-harm and to maintain the security, integrity, or orderly running of the institution.[102]

35.     HCSO's restraint policy in general was that "the restraint of inmates with mechanical devices be accomplished to the degree, and for the length of time, necessary to achieve safety and security with regard to prisoners, inmates, staff, facilities, and the public."[103] Restraints must be used in a manner that minimizes the possibility of unusual discomfort or injury.[104] HCSO policy expressly prohibits restraining an inmate as punishment.[105]

36.     Inmates housed in administrative separation, such as Lucas, must be handcuffed from behind and leg ironed from the time they leave their cell until they return to it.[106] Officers must remove restraints "as soon as practical" and once secure in a cell, not posing an immediate threat to staff or facility security.[107] While inmates housed in administrative separation must be handcuffed and leg ironed while out of their cell, medical personnel may request removal of restraints if their use is harmful to the inmate or interferes with the medical needs of the inmate, in which case "extreme caution should be exercised while the inmate is unrestrained."[108]

---

[101]     Policy D-307, Bates # 2731, Ex. 15.

[102]     Policy D-307, Bates # 2731–32, Ex. 15.

[103]     Policy D-239, Bates # 2705, Ex. 15.

[104]     Policy D-239, Bates # 2705, Ex. 15.

[105]     Policy D-239, Bates # 2705, Ex. 15.

[106]     Policy D-239, Bates #2706; Policy D-219, Bates # 2671, Ex. 15.

[107]     Policy D-239, Bates # 2708, Ex. 15.

[108]     Policy D-239, Bates # 2708 (emphasis added), Ex. 15.

37.     Before going off duty, employees must timely report and properly document any use of force to an immediate supervisor.[109] The report is compiled in a use-of-force packet, which is forwarded to HCSO's Office of Inspector General, Internal Affairs Division ("IAD") for independent review to determine whether the report is complete, whether the amount of force was reasonable, and whether the force used violated any HCSO policy or state or federal law.[110] The use-of-force packet must include the use-of-force report, Inmate Offense Report, Incident Report, and/or ARS Report, and photographic and video photographic evidence, if any.[111] Inmates involved in a use of force must be allowed to submit a voluntary written statement and refusals must be documented in writing and witnessed by an independent officer.[112]

38.     Finally, any employee who *witnesses* what he or she believes is excessive force must immediately stop it by any reasonable means necessary, obtain any necessary medical attention for the involved parties, report the incident to a supervisor, and thoroughly document the incident and forward it to the Bureau Commander via chain of command.[113]

39.     HCSO's use-of-force policy requires, "All inmates involved in a use of force event must be presented to Health Services personnel for medical evaluation and/or treatment, regardless if injury is sustained, claimed or not."[114]

---

[109]     Policy D-307, Bates # 2733, Ex. 15.

[110]     Policy D-307, Bates # 2733, Ex. 15.

[111]     Policy D-307, Bates #2734–35, Ex. 15.

[112]     Policy D-307, Bates # 2734, Ex. 15.

[113]     Policy D-307, Bates # 2735, Ex. 15.

[114]     Policy D-307, Bates # 2735, Ex. 15.

**B.    Addressing Inmates with Mental Health Issues/CIRT Call-out Procedures (Policy D-301)**

40.     HCSO's policy D-301 ensures all inmates with mental health issues are treated in a professional manner and their psychological needs are timely reported and addressed.[115] All jail personnel are required to observe each inmate for symptoms commonly experienced by mentally ill persons.[116] Officers are required to attempt to de-escalate and stabilize inmates believed to be experiencing a mental health crisis.[117] An inmate experiencing a mental health crisis must be contained immediately in his present location or, if violent, transferred to a separation cell pending psychiatric evaluation.[118] Officers have options for dealing with inmates experiencing a mental health crisis, including submitting a psychiatric referral, contacting the Crisis Intervention Response Team ("CIRT"), and monitoring the inmate.[119] Psychiatric referrals must be hand carried to the on-duty Watch Commander, who must notify the jail's mental health provider of the incident.[120]

41.     If CIRT is deployed, CIRT personnel arrive "to implement specialized verbal strategies and techniques" and "it is imperative they be allowed to do so without unnecessary distractions or imposition by non-MHU personnel."[121] If CIRT is successful in verbally diffusing the crisis and stabilizing the inmate, officers continue monitoring the inmate and generate additional housing documentation as needed.[122] If unsuccessful, necessary steps are taken to ensure

---

[115]    Policy D-301, Bates # 2710 (policy version revised July 3, 2012, *id.* at Bates # 2715), Ex. 15.

[116]    Policy D-301, Bates # 2710, Ex. 15.

[117]    Policy D-301, Bates # 2710–11, Ex. 15.

[118]    Policy D-301, Bates # 2711, Ex. 15.

[119]    Policy D-301, Bates # 2711–12, Ex. 15.

[120]    Policy D-301, Bates # 2712, Ex. 15.

[121]    Policy D-301, Bates # 2713, Ex. 15.

[122]    Policy D-301, Bates # 2714, Ex. 15.

19

the safety of all personnel and the inmate is controlled and secured using only the amount of force necessary.[123] The division commander is notified to determine the most appropriate and available solution.[124] If CIRT is unavailable to make the scene, the requesting personnel will be advised as soon as possible and MHU personnel must offer recommendations and remain available by telephone.[125]

### C.    Detention Command Containment Team (Policy D-302)

42.    The purpose of Policy D-302 is to set "administrative and operational guidelines for the development, employment and maintenance of the [DCCT]." The mission of the DCCT is "to provide specially trained and equipped law enforcement and/or correctional employees to respond to special-threat situations," including cell extractions.[126] Policy D-302 defines "cell extraction" as "[t]he removal of an inmate from his or her cell, no known weapon involved."[127] As detailed above, this policy required DCCT members to successfully complete a three-day Basic Detention Command Containment Team School and to be certified jailers or peace officers.[128]

43.    The DCCT provides for a response to special-threat situations inside the jail.[129] The policy details the command and organization, including general responsibilities of the group, the chain of command, and team organization.[130]

---

[123]    Policy D-301, Bates # 2714, Ex. 15.

[124]    Policy D-301, Bates # 2714, Ex. 15.

[125]    Policy D-301, Bates # 2714, Ex. 15.

[126]    Policy D-302, Bates # 2716 (policy version revised Apr. 2, 2012, *id.* at Bates 2724), Ex. 15.

[127]    Policy D-302, Bates # 2716, Ex. 15.

[128]    Policy D-302, Bates # 2716, 2722, Ex. 15.

[129]    Policy D-302, Bates # 2716, Ex. 15.

[130]    Policy D-302, Bates # 2716–17, Ex. 15.

44.     The Watch Commander may deploy the DCCT to maintain control and custody of inmates and has command and authority over the DCCT during its missions.[131] The Watch Commander may also request additional support from other divisions if a greater level of response is required, for example in riot situations.[132]

45.     The policy also details the roles of the team supervisor, who is tasked with forming a response squad of available, qualified DCCT members upon approval from the Watch Commander.[133] In addition, the team supervisor manages the conduct and performance of the DCCT.[134]

46.     The team leader is one of the assigned DCCT members and has authority to direct team operations while performing as a member of the team.[135] The team leader is required to know each member's assigned task.[136]

### D.     Videotaping of Planned Use of Force Events (Policy D-308)

47.     HCSO Policy D-308 required all planned cell extractions to be videotaped and electronically preserved.[137] HCSO's Policy D-308 detailed the procedure for videotaping planned use of force events, including use of the video camera, recording the event, and storing the recordings.[138]

---

[131]     Bates 2718, 2720, Ex. 15.

[132]     Bates 2718, Ex. 15.

[133]     Bates 2718, 2719, Ex. 15.

[134]     Bates 2718, Ex. 15.

[135]     Bates 2719, Ex. 15.

[136]     Bates 2719, Ex. 15.

[137]     Bates 2737 (policy version revised June 16, 2012, *id.* at Bates 2739), Ex. 15.

[138]     Bates 2737–39, Ex. 15.

E.      **Americans with Disabilities Act (Policy D-202)**

48.      HCSO's Policy D-202 required "provid[ing] reasonable modifications to policies, practices, and procedures to facilitate equal access to HCSO's services, programs, or activities to inmates with disabilities" and prohibited "Sheriff's Office personnel, contract personnel or volunteers from discriminating against individuals with disabilities."[139]

## STATEMENT OF ISSUES

49.      Harris County raises the following issues:

**Whether or not Harris County is entitled to summary judgment because there is no evidence of a violation of Kenneth Lucas' constitutional rights which caused Lucas' alleged injury.**[140]

**Whether or not Harris County is entitled to summary judgment because there is no evidence of a policy or custom of constitutional violations which was the cause of Lucas' alleged injury.**

**Whether or not Harris County is entitled to summary judgment on Plaintiffs' failure to train claim.**

**Whether or not Harris County is entitled to summary judgment on Plaintiffs' failure to supervise claim.**

**Whether or not Harris County is entitled to summary judgment on Plaintiffs' claims of deliberate indifference to Lucas' serious medical needs.**
**Whether or not Harris County is entitled to summary judgment on Plaintiffs' claims under the Americans with Disabilities Act and the Rehabilitation Act.**

## SUMMARY OF ARGUMENT

50.      Harris County is entitled to summary judgment on Plaintiffs' claims arising under § 1983 because Plaintiffs cannot establish any *Monell* liability.  There is no Harris County policy that was the moving force behind any constitutional violation.  There is no pattern or practice of hogtying in the Harris County jail and no pattern or practice of excessive force used in extraction of inmates from their cells and transporting them to the medical clinic on a gurney in the prone position.

---

[139]      Bates 2648 (policy version revised Apr. 18, 2012, *id.* at Bates 2654), Ex. 15.

[140]      The standard of review for the claims brought against Harris County in this Motion will be determined under Fed. R. Civ. P. 56, which requires the movant, Harris County to show that there is no genuine issue of material fact, entitling it to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Plaintiffs cannot establish that any jail official used excessive force that violated Lucas's constitutional rights.

51.     Plaintiffs cannot establish any failure to train the officers that extracted and transported Lucas to the medical clinic because the officers complied with TCOLE certified training and policies, which have not been alleged or shown to be constitutionally inadequate.  Plaintiffs cannot establish Harris County's policymaker, the Sheriff, was deliberately indifferent in adopting any training policy, particularly in the absence of any prior instance of injury or death resulting from a cell extraction that would indicate the training was not adequate.

52.     Plaintiffs have failed to adequately allege and cannot establish there is a failure to supervise claim against Harris County.

53.     Plaintiffs cannot establish Harris County or its official policymaker were deliberately indifferent to Lucas' serious medical needs.  Lucas suffered a sudden cardiac death *while in the medical clinic*, surrounded by medical staff.  To the extent Plaintiffs seek to recover under a state-created danger theory, this is not a viable claim under Fifth Circuit precedent.

54.     Plaintiffs cannot establish a claim against Harris County under the ADA, AADA or RA for failing to accommodate Lucas' alleged disabilities.  Lucas's conditions do not demonstrate he is "disabled" under the ADA, the officers involved in the cell extraction had no knowledge of any alleged disabilities, Plaintiffs cannot establish Lucas was denied a reasonable accommodation, the extraction and transport are not a "program, service or activity" under the ADA, and Plaintiffs cannot meet the high burden to prove intentional discrimination.  Additionally, the ADA should not apply to this case because of exigent circumstances that existed – the officers were faced with an inmate wielding a weapon that was combative and threatening and was unwilling to cooperate with officers to get him to the medical clinic.  Plaintiffs' claims under the RA fail because the "program, activity or service" about which they complain is not federally funded.

55.     Finally, Plaintiffs have failed to adequately allege and cannot establish a claim under the ADA for "failure to monitor" and "refusal or failure to protect" detainees as these are not proper claims to be asserted under the ADA.

## STANDARD OF REVIEW

56.     Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[141] The Court reviews a summary judgment motion in the light most favorable to the nonmovant and draws all *reasonable* inferences in the nonmovant's favor.[142] Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment if the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[143] A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.[144] An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.[145]

57.     The movant need not prove an absence of a genuine issue of material fact.[146] But if the movant shows an absence of a genuine issue of material fact, the nonmovant must provide "specific facts showing the existence of a genuine issue for trial."[147] The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he [nonmovant] must come forward with 'specific facts showing that there is a genuine issue for

---

[141]     Fed. R. Civ. P. 56(a).

[142]     *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007) (citations omitted).

[143]     Fed. R. Civ. P. 56(a). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[144]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[145]     *Id.*

[146]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[147]     *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

trial.'"**148** Conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence will not satisfy the nonmovant's burden.**149**

58.     If, after an adequate time for discovery, the nonmovant fails to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial, then there is no genuine issue left for trial, and Rule 56 "*mandates*" the movant is entitled to judgment as a matter of law.**150**

## ARGUMENT

59.     Plaintiffs' amorphously pleaded live complaint fails to provide a short and plain statement of their claims in violation of Federal Rule of Civil Procedure 8.**151** Nevertheless, Harris County has made its best effort to address all of Plaintiffs' claims. To be clear, Harris County moves for summary judgment on all of Plaintiffs' claims and theories of recovery.**152**

## I.     Constitutional Standards

### A.     *Monell* liability in an episodic acts or omissions case

60.     A "'proper analysis requires us to separate two different issues when a section 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional

---

**148**     *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 (citations omitted).

**149**     *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**150**     *Celotex Corp.*, 477 U.S. at 322–23 (emphasis added). *See also Little*, 37 F.3d at 1075–76.

**151**      Fed. R. Civ. P. 8(a)(2).

**152**     To the extent the Court determines that Plaintiffs' live complaint states an additional cause of action, if any, Harris County requests leave to supplement this motion.

violation, and (2) if so, whether the [municipality] is responsible for that violation.'"[153] A municipality cannot be held liable under § 1983 if there is no underlying constitutional violation.[154]

61.    To show *Monell* liability in an episodic acts or omission case, such as this one, a plaintiff must establish *both* that a municipal employee acted with objective deliberate indifference *and* that the employee's act resulted from a policy or custom adopted or maintained by the municipality with deliberate indifference to the plaintiff's constitutional rights.[155] In *Hare v. City of Corinth, Mississippi*, the Fifth Circuit described Plaintiffs' burden:

> We separate the two issues: the existence of a constitutional violation simpliciter and a municipality's liability for that violation. Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with [objective] deliberate indifference. Once the detainee has met this burden, she has proved a violation of her rights under the Due Process clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights.[156]

62.    If and only if there is evidence of a constitutional violation, *then*, "under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983

---

[153]    *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Hale v. Bexar County,Tex.,* 342 Fed. App'x 921, 927 n.1 (5th Cir. 2009) (per curiam) (citing *Rios v. City of Del Rio, Tex*., 444 F.3d 417, 426 (5th Cir. 2006));

[154]    *E.g.*, *Lock v. Torres*, 694 Fed. App'x 960, 965 (5th Cir. 2017) (per curiam) ("The fact that an official policy may have led to police misconduct is not the test.") ("Municipal liability will not attach if the complaining party 'has suffered no constitutional injury' at the hands of a municipal employee.") (citation omitted).

[155]    *Nazerzadeh v. Harris Cnty.*, No. H-08-0499, 2010 WL 3817149, at *4 (S.D. Tex. Sept. 27, 2010) (Rosenthal, J.) (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)). *But see Kingsley v. Hendrickson*, --- U.S. ---, 135 S.Ct. 2466, 2472–73 (2015) (holding the excessive force standard is objective and "that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.").

[156]    *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648–49 (5th Cir. 1996) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). *See also Kingsley*, 135 S.Ct. at 2472–73.

requires proof of three elements: a <u>policymaker</u>**;** an <u>official policy</u>**[157]**; and a <u>violation of constitutional rights whose 'moving force' is the policy or custom.</u>"**[158]** "It is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."**[159]** Courts "have demanded a high standard of proof before imposing *Monell* liability on a municipality.**[160]**

### B.      No liability for employees' negligence or gross negligence

63.      Negligence or gross negligence, if any, that causes the deprivation of life, liberty, or property is not a constitutional violation and does not establish municipal liability under section 1983.**[161]** Harris County cannot be liable for its employees' negligence or gross negligence.

---

[157]      An "official policy" is either a policy statement, ordinance, or regulation, that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

[158]      *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)) (emphasis added); *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004); *Cox v. City of Dallas, Tex.*, 450 F.3d 734, 748 (5th Cir. 2005).

[159]      *Monell,* 436 U.S. at 694.

[160]      *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998), *cert. dismissed*, 526 U.S. 1083 (1999) (citing *Gonzalez v. Ysleta Ind. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir. 1993); *Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988)).

[161]      *Kingsley*, 135 S.Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.") (emphasis in original) (citation omitted); *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992). *See also Graham v. Connor*, 490 U.S. 386, 396 (1989).

### C.     No vicarious liability

64.     A local governmental unit cannot be liable under a theory of vicarious liability or *respondeat superior* for its employees' constitutional torts. Harris County is also not liable for the constitutional torts of its employees unless Harris County itself caused the constitutional violation.[162]

### D.     The Harris County Sheriff is the only official policymaker

65.     "[I]t has long been recognized that, in Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected."[163] As a matter of law, the sheriff is the official policymaker—and the only official policymaker—for the county in the area of law enforcement, including the care of inmates in the county jail.[164] The policymaker must have either actual or constructive knowledge of the alleged policy or custom.[165]

66.     Texas law authorizes a sheriff to delegate duties, but "the sheriff shall continue to exercise supervision and control over the jail."[166] Thus, the Harris County Sheriff—and only the Harris County Sheriff—is the official policymaker.

---

[162]     *Monell,* 436 U.S. at 691, 694.

[163]     *Baughman v. Garcia*, 254 F. Supp. 3d 848, 887 (S.D. Tex. 2017) (quoting *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990)).

[164]     *Baughman*, 254 F. Supp. 3d at 886–87 (citing Tex. Loc. Gov't Code § 351.041(a)).

[165]     *Piotrowski*, 237 F.3d at 579 ("Actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.1984) (en banc).

[166]     *Baughman*, 254 F. Supp. 3d at 887 (citing Tex. Loc. Gov't Code § 351.041(b)).

## II.    Harris County is not liable under Section 1983.

### A.    No Harris County policy was the moving force behind any constitutional violation

67.    A local government is liable under 42 U.S.C. § 1983 only when a deprivation of rights is inflicted pursuant to official policy.[167] It is incumbent on Plaintiffs to plead and prove a custom or policy of the governmental entity.[168]

68.    The Fifth Circuit has summarized the law of § 1983 liability for a county defendant:

To establish county/municipality liability under § 1983, however, a plaintiff must demonstrate a **policy or custom** which **caused the constitutional deprivation**. A municipality may not be held strictly liable for the acts of its non-policymaking employees under a *respondeat superior* theory. It cannot be held liable solely because it employs a tortfeasor. Rather, only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights, does liability under § 1983 result. (emphasis added).[169]

69.    Not only must Plaintiffs prove the existence of a constitutionally deficient official policy, they must also prove that the official policy was the "moving force" behind the alleged constitutional violation.[170] An official policy can either be a municipality's written policy statement or a "persistent, widespread practice" of employees which, "although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[171]

---

[167]    *Monell,* 436 U.S. at 694; *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989).

[168]    *Monell,* 436 U.S. at 691; *Edwards v. Harris Cnty. Sheriff's Dep't*, 864 F.Supp. 633, 636 (S.D. Tex. 1994).

[169]    *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 244 (5th Cir. 1993). *See also Campbell v. City of San Antonio*, 43 F.3d 973 (5th Cir. 1995); *Webster*, 735 F.2d at 841.

[170]    *See Bryan Cnty.*, 520 U.S. at 397 ("A plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). *See also, Benavides v. Cnty. of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).

[171]    *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Webster*, 735 F.2d at 841; *Bryan Cnty.*, 520 U.S. at 505–07).

###### i. *Plaintiffs do not point to an official policy.*

70.     Plaintiffs do not point to any official policy of Harris County that resulted in a violation of Lucas's constitutional rights. Instead, Plaintiffs contend that unofficial "de facto" policies and/or the customs and practices of Harris County violated Lucas's constitutional rights. Plaintiffs primarily complain of excessive force, alleging Lucas died while in a "hogtie position." Harris County has several policies that *all expressly (and with emphasis)* **prohibit** placing inmates in a hogtie.[172] Harris County likewise trains its employees not to hogtie.[173]

71.     It is undisputed that then-Sheriff Garcia was not personally involved in Lucas's cell extraction.

72.     Plaintiffs assert Harris County policies encourage or fail to discourage its officers from employing excessive and lethal force against pretrial detainees.[174] Harris County has policies that *expressly prohibit* excessive force.[175] Plaintiffs assert Harris County policies encourage or fail to discourage deliberate indifference to pretrial detainees' serious medical needs and hindering medical assistance.[176] In fact, Harris County has policies that *expressly require* its officers to provide access to medical care and are trained to recognize and respond to medical emergencies.[177] Plaintiffs assert Harris County has policies that encourage or fail to discourage using powerful

---

[172]     See Policy Nos. D-239,D-307, BATES 2706,2732 Ex. 15. See also the Martin Aff., Ex. 29. The term "hog-tie" has a very specific meaning and is a four-point restraint. Harris County does not hogtie.

[173]     See Bourgeois Aff., Ex. 19.

[174]     Doc. 77 at p. 23.

[175]     See Policy Nos. D-239 and D-307, Bates # 2699-2707, 2731-36, Ex. 15. See also Martin Aff., Ex. 29.

[176]     Doc. 77 at p. 23.

[177]     See Policy No. D-212, Bates # 2665–69, Ex. 15. See also Bourgeois Aff. HCSO also has a policy concerning the use of oleoresin capsicum ("OC") spray, specifically describing instances in which it can be used. See Policy Nos. D-304, Bates # 2725-2730. It is undisputed no OC spray was used on Lucas.

chemical restraints.[178] In fact, the practice of HCSO's Health Services Division prohibits the use chemical restraints.[179] This case is not about chemical restraints – Lucas was not chemically restrained.[180] He was given Ativan to treat what Dr. Sunder believed was Xanax withdraw or delirium tremens.[181] The use of medicine or "chemicals" is left to the professional medical judgment of the prescribing doctor.

73.     Plaintiffs assert Harris County has policies that encourage or fail to discourage causing serious medical conditions and refusing or failing to remedy them.[182] Not only is this contrary to the access to medical care policies, but it is contrary to the entire mission statement and core values of the Harris County Sheriff's Office to "enhance the safety and protect the trust of the citizens of Harris County by enforcing the law with integrity and professionalism."[183]

### ii.     *Harris County did not promulgate any unconstitutional policy with deliberate indifference to the known or obvious consequences that a constitutional violation would result*

74.     When a plaintiff claims that a facially lawful policy violated his or her constitutional rights, the plaintiff must show that the official policymaker adopted the policy "with 'deliberate indifference' as to its known or obvious consequences."[184] This showing of deliberate

---

[178]     Doc. 77 at p. 23.

[179]     Guice Aff., Ex. 11.

[180]     Sunder Depo., p. 240:7-15, Ex. 21

[181]     Sunder Depo., p. 238:21–239:4, Ex. 21

[182]     Doc. 77 at p. 23.

[183]     See Policy # 101 (Mission Statement/Core Values), Bates # 3579, Ex. 15.

[184]     *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Johnson*, 379 F.3d at 309; citing *Piotroswki*, 237 F.3d at 579). *See also Doe v. U.S.*, 831 F.3d 309, 318 (5th Cir. 2016).

indifference is "a stringent test," and "'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability."[185]

75.     Plaintiffs cannot show any Harris County policy is facially unconstitutional or was promulgated with deliberate indifference to the known or obvious consequences that a constitutional violation would result.

76.     The DCCT members are specially trained to safely and effectively respond to violent, unruly inmates who must be extracted from their cell. The known and obvious consequences of a cell extraction is that force will likely be used. The policies and training governing the procedure of a cell extraction and transport were not adopted with deliberate indifference, and Plaintiffs have no evidence to the contrary. Rather, HCSO ensures that DCCT procedures comply with state law, the training is approved by the Texas Commission on Jail Standards, and the procedures are consistent with the practices in other agencies around the country.[186] Plaintiffs have no evidence the state's requirements are unconstitutional.

77.     In this case, there is no evidence that HCSO's policies were even maintained with negligence or heightened negligence such that some other restraint may have made a difference in the outcome. Plaintiffs have no evidence that HCSO's official policymaker adopted policies that were deliberately indifferent to any inmate's rights. Since at least January 2009, there were *zero instances* of serious injury or death resulting from a cell extraction and transport of an inmate to the medical clinic.[187]

---

[185]     *Piotrowski*, 237 F.3d at 579 (quoting *Bryan Cnty.*, 520 U.S. at 407).

[186]     See Bourgeois Aff., Ex. 19; Pinkerton Aff., Ex. 30 (see opinion No. 10 – That DCCT procedures "are consistent with the Federal Bureau of Prisons Use of Force Team procedures for cell extractions;" see also his opinion/conclusion on the last page of his report – "I served as a member of the Smith County Sheriff's Office Jail Emergency Management Team [ ] from 1990 to 1993 and later served as the Commander from 1993 to 1997. The policy and procedures of Smith County were consistent with Harris County Sheriff's Office procedures for cell extractions.")

[187]     See Bourgeois Aff., Ex. 19; Anderson Depo., p. 30:24 – 32:6, Ex. 13.

78.     Further, the Harris County jail is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA") "for demonstrating a commitment to professional excellence in policy and practice."[188] CALEA certifications last for three years, during which time "the agency is required to maintain continuous compliance."[189] The Harris County jail was continuously accredited by CALEA from 2011 to 2017.[190]

79.     Plaintiffs have no evidence of any other complaints regarding cell extraction-related policies and procedures. Plaintiffs cannot impute lax policies to the official policymaker "without showing a pattern of abuses that transcends the error made in a single case."[191] Without any prior knowledge that its cell extraction-related procedures would result in any constitutional violation, Plaintiffs have no evidence to show Harris County was deliberately indifferent in maintaining unconstitutional policies.

80.     The same analysis applies to the provision of medical care. Plaintiffs have no evidence that HCSO's official policymaker adopted policies that were deliberately indifferent to any inmate's rights or abilities to receive medical care.

iii.    *There is no persistent, widespread pattern or practice of unconstitutional activity that amounts to custom fairly representing County policy*

81.     An official policy can either be a municipality's written policy statement or a "persistent, widespread practice" of employees which, "although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly

---

[188]     See Martin Aff., Ex. 29 and the attached CALEA accreditations.

[189]     See Martin Aff., Ex. 29 and the attached CALEA accreditations.

[190]     See Martin Aff., Ex. 29 and the attached CALEA accreditations.

[191]     *Piotrowski*, 237 F.3d at 582 (citing *Bryan Cnty.*, 520 U.S. at 410–11).

33

represents municipal policy."[192] Actual or constructive knowledge of a custom must be attributable to the municipality's official policymaker.[193]

82.     It is clear that one act cannot constitute a custom; there must be a "persistent, widespread practice."[194] In *Pineda v. City of Houston*, Houston police officers shot and killed a person after making a warrantless entry into an apartment to arrest a suspected drug dealer, and the victim's family sued the city under section 1983.[195] In discovery, the city produced more than 5,000 offense reports and Pineda's counsel relied on approximately 500 of those involving narcotics.[196] The district court, however, only allowed the plaintiffs to rely on 11 of the reports that had offense reports of a warrantless entry into residences.[197] Finding that those 11 reports were sufficient to show a persistent and widespread pattern or practice of unconstitutional action that established a custom, the district court denied the city's motion for summary judgment.[198]

83.     The Fifth Circuit reversed, however, finding that "11 incidents offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the nation's largest cities and police forces."[199] The court also found that Pineda could not rely on opinion evidence resting heavily on the offense reports: "Left without legs, the opinions were little more than suspicion, albeit by informed persons."[200]

---

[192]     *Pineda*, 291 F.3d at 328 (citing *Webster*, 735 F.2d at 841; *Bryan Cnty.*, 520 U.S. at 505–07).

[193]     *Piotrowski*, 237 F.3d at 579 (citing *Webster*, 735 F.2d at 842.

[194]     *Pineda*, 291 F.3d at 329 (citing *Piotrowski*, 237 F.3d at 581).

[195]     *Id.* at 327.

[196]     *Id.* at 329.

[197]     *Id.*

[198]     *Id.*

[199]     *Id.* at 329.

[200]     *Id.*

84.     In *Peterson v. City of Fort Worth*, the Fifth Circuit later found that even 27 complaints of excessive force filed in a four-year period were insufficient to establish a persistent, widespread pattern and practice of illegal conduct in the Fort Worth Police Department.[201] Although plaintiffs provided no evidence of the size of the police department, the court relied on its website stating it employs more than 1,500 officers and had more than 67,000 incidents of crime in the previous year alone.[202] Given its size and absent any evidence of the total number of arrests during the time period, 27 incidents of excessive force over a four-year period did not show an unconstitutional custom of condoning excessive force to hold the city liable.[203] Moreover, for each of the 27 complaints, the city conducted an internal investigation and only four of the 27 complaints were "sustained" after an investigation.[204] Even assuming error in the sustained investigations, 27 complaints did not support *Monell* liability.[205]

85.     Here, Plaintiffs have *no evidence of even one prior similar incident*, much less a persistent, widespread pattern or practice of constitutional violations similar to their allegations. Like the City of Houston and City of Fort Worth Police Departments, the Harris County Sheriff's Office is one of the largest law-enforcement agencies in the county and operating the third largest jail in the country. For the years 2012 to 2014, HCSO employed more than 4,000 officers.[206] The Harris County jail had an average daily population of 8,880 inmates in 2012, 9,087 inmates in 2013, and 8,693 inmates in 2014.[207] The Harris County jail processed 126,413 inmates in 2012,

---

[201]    *Peterson v. City of Ft. Worth*, 588 F.3d 838, 851 (5th Cir. 2009).

[202]    *Id.* at 861 n.5.

[203]    *Id.* at 851–52.

[204]    *Id.* at 852.

[205]    *Id.* at 851–52.

[206]    See Martin Aff., Ex.29.

[207]    See Martin Aff., Ex. 29.

123,771 inmates in 2013, and 120,274 inmates in 2014.[208] Plaintiffs cannot point to a single incident alleging excessive force while an inmate was restrained in a hog-tie or a four-point restraint in the jail, extracted from his or her cell by the DCCT, transported to the clinic, or while in the clinic for treatment following a cell extraction and transport on a gurney.

86.     Major Bryan Pair, head of HCSO's Office of Inspector General, Internal Affairs Division, reviewed all allegations of excessive use of force from January 2008 to December 2016 and found no such allegations.[209] Because there were no allegations of officers using excessive force during a cell extraction, including during transport to the clinic and while in the clinic for treatment, there are also no internal affairs investigations sustaining such allegations because there were none.[210] Had there been any such allegations, IAD would have investigated for excessive force.[211]

87.     Plaintiffs have no support for their conclusory allegation that the DCCT involved in Lucas's cell extraction had "previously exhibited a *tendency* to employ excessive force against pretrial detainees" and "to ignore pretrial detainees' serious medical needs."[212] Plaintiffs' "information and belief" is pure speculation unsupported by any evidence. To the contrary, there are *no findings* of excessive force against a single member of the DCCT team that have been sued in this case.[213] Indeed, *none* of these Defendants would have been allowed on the DCCT if they had *any* tendency to use excessive force.[214] There is no evidence that any of the Defendant DCCT

---

[208]     See Martin Aff., Ex. 29.

[209]     See Pair Aff., Ex. 31.

[210]     See Pair Aff., Ex. 31.

[211]     See Pair Aff., Ex. 31.

[212]     Doc. 77 at p. 25 ¶ 70 (emphasis added).

[213]     See Bourgeois Aff., Ex. 19.

[214]     See Bourgeois Aff., Ex. 19.

members had exhibited any previous "tendency" to ignore serious medical needs of pretrial detainees. Plaintiffs likewise offer no evidence to show how the Sheriff knew of any alleged "previously exhibited tendencies" and "intentionally" refused to take action on such knowledge.

### iv. The Sheriff had no knowledge of an alleged unconstitutional custom

88. Plaintiffs have the burden to demonstrate an official policymaker had actual or constructive knowledge of enforcement of an unconstitutional custom that caused Lucas's injuries.[215] Plaintiffs must—but cannot—show that HCSO employees' actions "occurred for so long or so frequently" that the course of conduct warrants the attribution to the official policymaker of knowledge that "the objectionable conduct is the expected, accepted practice of its employees."[216]

89. A plaintiff may show actual knowledge "by such means as discussions at council meetings or receipt of written information."[217] Plaintiffs have no evidence of actual knowledge by Sheriff Garcia of an unconstitutional custom or practice. Plaintiffs' contend the DOJ made Sheriff Garcia and "other high ranking County officials" aware that a "number of County employees" were "hogtying" detainees and exposing them to "serious injury and death."[218] The objectionable communication from the DOJ referenced by Plaintiffs did not provide notice of a persistent, widespread practice of hogtying in the Harris County jail. Sheriff Garcia testified he was not aware of any hog-tying during his tenue as Sheriff from 2009–2015, a practice wholly prohibited by HCSO policy.[219] Plaintiffs further have no evidence there were a "number of" County employees

---

[215]   *Piotroswki*, 237 F.3d at 579.

[216]   *Webster*, 735 F.2d at 842.

[217]   *Pineda*, 291 F.3d at 330 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)).

[218]   Doc. 77 at p. 23 ¶ 64.

[219]   See Garcia Depo., p. 44:2-11; 45:12-17, Ex. 26.

hogtying detainees or observing hogtying or that such actions were "well-documented in the press."[220]

90.     A plaintiff may show the official policymaker had constructive knowledge "on the ground that it would have known of the violations if it had properly exercised its responsibilities as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity."[221] While "sheer numerosity" of events can establish constructive knowledge, merely showing a pattern of unconstitutional conduct is not sufficient to show knowledge because this is functionally *respondeat superior*.[222]

91.     Plaintiffs have no evidence Sheriff Garcia had constructive knowledge of an unconstitutional custom or practice. As discussed above, Plaintiffs have no evidence of a persistent, widespread pattern or practice of unconstitutional actions sufficient to show a custom, much less that the official policymaker had constructive knowledge of such a custom. Sheriff Garcia testified that hogtying was prohibited in the Harris County jail because it was inconsistent with his law enforcement practices.[223] He also testified that he understood that hogtying is not recommended because it could lead to positional asphyxia.[224] Although Sheriff Garcia mistakenly believed this debunked myth, he prohibited the practice in order to protect inmates from potential injury. Dr. Tom Neuman, one of only a handful of physicians in the United States who has, through direct experimentation, investigated the physiological effects of restraint positions and specifically their effect upon ventilation, cardiac output and blood oxygen levels, has published peer-reviewed

---

[220]     Doc. 77 at p. 23 ¶ 64.

[221]     *Pineda*, 291 F.3d at 330 (quoting *Bennett*, 728 F.2d at 768).

[222]     *Pineda*, 291 F.3d at 330 & n.13.

[223]     See Garcia Depo., p.43;3-14; 43:22-44:1; 44:7-16, Ex. 26.

[224]     See Garcia Depo., p.47:1-21, Ex. 26.

papers that clearly demonstrate the prone restraint position does not result in changes in ventilation sufficient to cause asphyxia.[225] He opined asphyxia did not cause or contribute to Lucas's death.[226]

92.    Plaintiffs have no evidence that Sheriff Garcia was aware of any custom or practice that officers used excessive force in cell extractions, transport after a cell extraction, while receiving medical attention in the medical clinic following a cell extraction, or from any chemical sedatives.

93.    Plaintiffs have no evidence that HCSO's cell extraction-related policies were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity. Without any such evidence, Plaintiffs not only fail to show a persistent, widespread pattern or practice of constitutional violations, they also fail to demonstrate Sheriff Garcia had actual or constructive knowledge of the custom. Plaintiffs attempt to hold Harris County liable under a *respondeat superior* or vicarious liability theory, which is insufficient.

94.    Lucas had no clearly established right to be free from a four-point or lesser restraint, and neither are per se unconstitutional.[227] Lucas was *not* in a four-point restraint or hogtie. Because the Fifth Circuit has recognized that a finding of deliberate indifference to rights may require those rights be clearly established, and because such rights are *not* clearly established, Plaintiffs cannot show knowledge or intent on the part of the official policymaker.[228]

95.    Plaintiffs cannot show that an official policy, custom or practice was the moving force behind any constitutional violation. Without such a showing, Plaintiffs have failed to establish that Harris County is liable for any constitutional violation.

---

[225]    See Neuman Aff. and attached expert report, p. 2, 5, 8, 9, Ex. 32.

[226]    See Neuman Aff. and attached expert report, p. 2, 5, 8, 9, Ex. 32.

[227]    *Khan v. Normand*, 683 F.3d 192, 194, 195 (5th Cir. 2012); *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 235, 237 (5th Cir. 2009).

[228]    *Gonzalez*, 996 F.2d at 760.

> **v.** *Plaintiffs' complaint of HCSO's isolated acts does not trigger liability*

96.     "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."[229] "A customary policy cannot ordinarily be inferred from single constitutional violations."[230] As discussed above, Lucas is the *only* inmate who was injured or died following a cell extraction and transport to the clinic in the prone position on a gurney. HCSO's internal affairs division searched its records to find any instance in which allegations of excessive force were made in those instances, and could not find a single complaint, much less a sustained allegation of excessive force in these circumstances. There is further no evidence that the prospect of a constitutional violation should have been "highly predictable" or "patently obvious." Plaintiffs seek to hold Harris County vicariously liable for its employees' constitutional torts, if any, based on a single isolated incident. Plaintiffs' claims are insufficient to establish municipal liability against Harris County.

> **vi.** *No Harris County policy was the "moving force" behind any constitutional violation*

97.     Plaintiffs must show "a direct causal link between the municipal policy and constitutional violation."[231] This "high threshold of proof" requires Plaintiffs to show a HCSO policy was the "moving force" behind the constitutional violation.[232] Not only do Plaintiffs have no evidence to show any HCSO official violated any constitutional rights, Plaintiffs cannot show any HCSO policy was the "moving force" behind any such violation.

---

[229]     *Piotrowski*, 237 F.3d at 581 (quoting *Bennett*, 728 F.2d at 768 n.3 (citing cases)). *See also, e.g.*, *Fontenot v. City of Houston*, 647 Fed. App'x 402, 405–06 (5th Cir. May 2, 2016).

[230]     *Piotrowski*, 237 F.3d at 581 (citing *Webster*, 735 F.2d at 851). *See also Fontenot*, 647 Fed. App'x at 504–06.

[231]     *Piotrowski*, 237 F.3d at 580.

[232]     *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694).

98.     Plaintiffs' Complaint alleges that Lucas died as a result of suffocation or asphyxia, which is contradicted by the autopsy and the numerous studies conducted by Dr. Tom Neuman. Plaintiffs experts are not pulmonologists with the expertise to opine on positional asphyxia and any comments they make regarding difficulty breathing due to position is *ipse dixit* because they *cannot quantitatively assess* the effects of breathing and the oxygen requirements in any given situation.[233]

99.     Lucas died of a sudden cardiac event.[234] Although this sudden cardiac event occurred following the cell extraction, there is no inference that correlation equals causation. Lucas's unknown serious medical conditions, including his enlarged heart and severe heart disease, coupled with his history of hypertension, made him vulnerable to a sudden cardiac event.[235]

100.     Because Plaintiffs have no evidence of an official policymaker and an official policy that was the moving force behind any constitutional violation, the Court should grant summary judgment to Harris County.

**B.     Plaintiffs have no evidence any jail official used excessive force that violated Lucas's constitutional rights.**

101.     To establish that a governmental official used unconstitutionally excessive force, a plaintiff must show that an injury that resulted directly and only from the use of force that was excessive to the need and that the use of force was objectively unreasonable.[236]

---

[233]     See Neuman Aff. and Report, p. 7, Ex. 32.

[234]     See Autopsy report, Ex. 24.

[235]     See Autopsy report, Ex. 24; Ly Depo., p. 120:12-122:12, Ex. 33.

[236]     *E.g.*, *Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008); *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (citing *Goodson*, 202 F.3d 130, 740 (5th Cir. 2000)). *See also Kingsley*, 135 S.Ct. at 2472–73.

102.     Here, Plaintiffs generally allege that Defendants violated Lucas's Fourteenth Amendment right to be free from excessive force by hogtying him, which prevented Lucas from breathing, caused him to suffocate, suffer a cardiac event, and die. Against all the facts, Plaintiffs claim Lucas was "unarmed, nonviolent," "did not fight with the officers, was in a secure environment, was not resisting or threatening to resist, and was vastly outnumbered by the officers wearing full riot gear."[237] These assertions are not factually correct.

### i.     Lucas's injury did not result directly and only from a use of force that was excessive to the need

### a.     Lucas was not restrained in a four-point restraint, or "hogtie"

103.     Plaintiffs primarily complain that Defendants' use of a four-point restraint, or "hogtie," to restrain Lucas caused his death. Lucas was not hogtied. The Fifth Circuit defines a four-point restraint as "binding the arms and legs together behind the back with an additional set of handcuffs."[238] It is undisputed that Lucas did not have any rope, chain, string or any physical material connecting his hands and legs. As the video evidence shows and the DCCT members testified, Lucas's arms were handcuffed and his ankles were shackled, but there was nothing connecting his handcuffs to his ankle shackles.[239] The video also shows DCCT officers putting Lucas's left ankle behind his right knee and an officer straddling his legs on the gurney so they could control his legs by applying pressure as Lucas continued to kick and releasing pressure during his momentary lapses of attempting to assault the officers.[240] Hogtying inmates is *expressly prohibited* by several HCSO policies, including the restraints and use-of-force policies.[241] The DCCT followed HCSO policy and their training and did not hogtie Lucas.

---

[237]     Doc. 77 at p. 20 ¶ 55.

[238]     *E.g.*, *Hill*, 587 F.3d at 222–23 n.1.

[239]     *See* Video, Ex. 16. See also Gordon Depo., p. 47:15-48:1, Ex. 27.

[240]     See Video, Ex. 16.

[241]     *See supra* note 172.

42

104.    Because Plaintiffs cannot prove Harris County hogtied Lucas, they are attempting to wordsmith the term "hogtie" and accuse Harris County of "effectively" hogtying Lucas by placing him in a "hogtie position." The testimony is unequivocal by every single member of the DCCT, Deputy Gordon, Lt. Anderson and Sheriff Garcia that the DCCT *did not hogtie* Lucas.

### b.    *A four-point restraint is not per se unconstitutional*

105.    The Fifth Circuit has expressly stated that "the use of a four-point restraint does not constitute excessive force *per se*.**242** If a four-point restraint is not excessive force *per se*, it necessarily follows that whatever lesser restraint Plaintiffs complain about cannot be excessive force *per se*. Even if Lucas were placed in a four-point restraint, which he was not, that would not be *per se* unconstitutional excessive force. Plaintiffs cannot show a constitutional violation.

### c.    *The force required to restrain the assaultive Lucas was not excessive to the need*

106.    Lucas's violent, erratic, noncompliant behavior necessitated extracting Lucas from his cell and immediately transporting him to the medical clinic for evaluation and any necessary medical treatment. Lucas's combative behavior began the day before when he assaulted a fellow inmate. After complaining of chest pain, Lucas was sent to the hospital and was uncooperative when told he had to return to the jail. Upon returning to the jail, he grabbed at an officer attempting to move his handcuffs while walking Lucas back to his cell. By early the next morning, Lucas had clogged his toilet and flooded the cell. Lucas's defiant behavior continued when he ripped the large, metal smoke detector off the ceiling and banged it repeatedly and violently on his cell door and window. When jail officials and mental health staff could not calm him down and he refused to relinquish his makeshift weapon to the officers, there was no choice but to send in the DCCT team, who were specially trained to extract unruly inmates from their cells. Lucas gave jail officials no choice.

---

**242**     *Khan*, 683 F.3d at 194 (citing *Hill*, 587 F.3d at 237).

107.    Plaintiffs incorrectly allege that "Mr. Lucas did not fight with the Officers, was in a secure environment, was not resisting or threatening to resist, and was vastly outnumbered by the Officers wearing full riot gear."[243] The video evidence contradicts many of these assertions. The video shows that Lucas refused at least 23 requests to give up the smoke detector, that Lucas charged at the DCCT when they entered his cell, that he struggled with and actively resisted the officers placing handcuffs and ankle shackles on him in the cell,[244] that he continued to push against his restraints and kicked his legs while being placed on the gurney and transported to the medical clinic and that he continued to fight against his restraints and cuss while in the medical clinic.[245] Nurse Barton, who worked in the emergency room in New Orleans for 10 years and has seen numerous cases of individuals suffering from mental deficiencies, drug and alcohol overdose and withdrawal and that were physically combative and out of control, said she has never seen anything like Lucas and would not have felt safe if his restraints or position were changed:

> I recall inmate Kenneth Lucas being brought into the medical clinic on a gurney by the HCSO Detention Containment Team ("DCCT"). When inmate Lucas arrived in the clinic he was acting in a combative and wholly irrational manner. In my 16 years as a nurse, I had never seen anything like it. Because inmate Lucas was combative, cussing and forcefully pushing against his restraints, I would not have felt safe attending to inmate Lucas unless he were restrained in the manner in which he was restrained by the DCCT—handcuffed, shackled and a DCCT member straddling him and controlling his legs.[246]

Although Lucas was in a "secure" jail with security around him, the environment was highly unstable throughout the entire ordeal.

---

[243]    Doc. 77 at p. 20 ¶ 55.

[244]    HCSO policy D-219, Bates # 2670-72, Ex. 15, (requiring officers to handcuff and shackle an inmate housed in administrative separation anytime they are outside of their cell. Lucas was housed in administrative separation due to prior assaultive behavior).

[245]    See Video, Ex. 16; Barton Aff., Ex. 23; Affidavits of the DCCT attached to Doc. 145, (Docs. 145-3 to 145-7), which are attached and incorporated herein.

[246]    See Barton Aff., Ex. 23.

44

108.    Plaintiffs cannot genuinely argue that fewer officers without any protective gear should have entered Lucas's cell. Use of the plexiglass shield was necessary because of the threat of the weapon Lucas was waving around and refusing to surrender. The video shows Lucas charging at the DCCT as they entered his cell. Lucas actively resisted allowing the DCCT to place handcuffs and ankle shackles on him.[247] Even with the 5-member DCCT team, it took several minutes for them to gain control of Lucas to get handcuffs and ankle shackles on him.

109.    As stated above, the DCCT acted in accordance with their training and policy, having the smallest, lightest member ride atop the gurney and straddle Lucas's legs to maintain control of them, acting professionally toward Lucas and ordering him to stop resisting, and transporting him quickly to the medical clinic.[248]

110.    When Dr. Sunder, Lucas's attending doctor in the jail medical clinic, requested the DCCT to move off Lucas's legs, they immediately complied. When Dr. Sunder became concerned about Lucas's breathing and he asked the DCCT to turn him over, they immediately complied and assisted in resuscitation efforts. The force required to restrain combative Lucas was *not excessive* to the need to restrain and maintain control over him while in the medical clinic surrounded by civilian medical staff.

### d.    Lucas's injury did not result directly and only from his restraint and immediate transport to the medical clinic

111.    Plaintiffs have no evidence that Lucas died directly and only from the force used to gain compliance and maintain control over him. Plaintiffs' allegation that Lucas died from asphyxiation is not supported by any credible evidence. Rather, he died of a sudden cardiac event that was caused by his own bad health and actions.

---

[247]    *See* video, Ex. 16; *See also supra* Affidavits of the DCCT and the testimony previously cited herein, (Docs. 145-3 to 145-7).

[248]    See Bourgeois Aff., Ex. 19; Scott 2d Sworn Statement, p. 3, Bates # LUCAS 1517-1521, Ex. 20.

112.    According to the autopsy conducted by the Harris County Institute of Forensic Sciences, Lucas's cause of death was "[s]udden cardiac death due to hypertensive and atherosclerotic disease during physical restraint[.]"[249]Lucas had a history of heart disease, illegal drug use and was overweight.

113.    Moreover, the restraint techniques used to secure combative Lucas do not cause asphyxiation. Harris County's pulmonology expert, Dr. Tom Neuman, is the leading authority on so-called positional asphyxia and has conducted numerous studies discrediting an earlier theory that restraining an inmate in the supine position, including in a four-point restraint, can lead to asphyxia.[250] Prior to Dr. Neuman's studies on the subject, Dr. Arnold Reay had conducted a study for the San Diego Police Department concluding that hogtying may create a risk of serious injury or death "when a combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying . . . is present."[251] Every authority that has concluded a four-point restraint may lead to asphyxia was based on Dr. Reay's study.[252] Dr. Neuman proved that Dr. Reay's studies were flawed and eventually caused Dr. Reay to recant his findings.[253]

114.    The Fifth Circuit has discussed the constitutionality of a four-point restraint and referenced Dr. Neuman's studies in at least three cases. In its most recent case on the issue, *Khan v. Normand*, the Fifth Circuit held in 2012 that officers did not violate Khan's clearly established

---

[249]    See Autopsy Report, Ex. 24.

[250]    See Neuman Aff. and Report, Ex. 32.

[251]    *Hill*, 587 F.3d at 235 (citing study).

[252]    *Khan*, 683 F.3d at 195 n.4 (quoting *Price v. Cnty. of San Diego*, 990 F. Supp. 1230, 1238 (S.D. Cal. 1998) ("All of the scientists who have sanctioned the concept of positional asphyxia have relied to some degree on Dr. Reay's work.")); *Hill*, 587 F.3d at 236 (plaintiff's expert "relied heavily on [Dr. Reay's study] while acknowledging the existence of the later Neuman study that raises doubts about its conclusion . . . . [E]ven Dr. Reay acknowledges that four-point restraints are 'physiologically neutral.'").

[253]    *Khan*, 683 F.3d at 195 n.4 ("Dr. Reay himself had changed his position . . . . 'After Dr. Reay's retraction, little evidence is left that suggests the hogtie restraint can cause asphyxia.'") (citation omitted).

rights by hogtying him for a short period of time and constantly supervising him while hogtied.[254] Khan, who suffered from a mental illness, began running around a convenient store screaming that people were trying to kill him.[255] When police officers arrived, Khan resisted his removal from the store, thrashed his legs, attempted to bite the officers, and reached for an officer's gun belt. Outside the store, Khan continued to thrash and kick as officers moved his handcuffs from the front of his body to behind his body.[256] The officers hogtied Khan by hobbling his legs and linking the leg irons and handcuffs with an additional set of handcuffs.[257] Almost immediately afterwards, officers noticed Khan had stopped breathing, so they removed the restraints and administered CPR until an ambulance arrived.[258] Khan began breathing by the time he reached the hospital, but he died later that night.[259]

      115.    The district court dismissed Khan's constitutional claims, including for excessive use of force. The Fifth Circuit affirmed, and began its analysis by recognizing that the "court has held that a four-point restraint in a 'limited set of circumstances' may constitute excessive force."[260] The court discussed a previous Fifth Circuit case, *Gutierrez v. City of San Antonio*, in which the court reversed summary judgment in favor of the officers in a "very limited" holding:

> This court reversed summary judgment in favor of the officers with a "very limited" holding that "hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances." In doing so, the court emphasized the dangers of "hog-tying a drug-affected person in 'cocaine psychosis'" and

---

[254]   *Khan*, 683 F.3d at 195.

[255]   *Id.* at 193.

[256]   *Id.*

[257]   *Id.*

[258]   *Id.*

[259]   *Id.*

[260]   *Id.* at 194 (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 451 (5th Cir. 1998)).

distinguished other circuits that held the use of four-point and similar restraints to be objectively reasonable.[261]

116.    The *Khan* court distinguished the earlier *Gutierrez* opinion because of the brevity of Khan's restraint, the officers' constant supervision of Khan, and the officers' suspicion that Khan was suffering from a mental illness but lack of knowledge he was on methamphetamine.[262] Importantly, *Khan* distinguished *Gutierrez*'s finding that "hog-tying 'may present a substantial risk of death or serious bodily harm' to certain drug-affected people" because *Gutierrez* relied on Dr. Reay's studies that "(as this court subsequently noted) has been called into question by more recent scholarship," in particular "'[a] more recent study by Dr. Tom Neuman [that] casts doubt on the conclusions of [Dr. Reay's] San Diego Study.'"[263] The court cast doubt on its holding in *Gutierrez* because even *Gutierrez* "cites to Dr. Reay's studies to support the supposed dangers of hog-tying, while later observing that those same studies had been called into question and Dr. Reay himself had changed his position."[264]

117.    In a 2009 case, *Hill v. Carroll County, Mississippi*, the Fifth Circuit also affirmed a district court's grant of summary judgment to defendants, including the county, based on a plaintiff's claims of excessive force due to a four-point restraint.[265] There, sheriff's deputies

---

[261]    *Khan*, 683 F.3d at 193–94 (citing *Gutierrez*, 139 F.3d at 444, 450–51).

[262]    *Khan*, 683 F.3d at 195–96.

[263]    *Id.* at 195 (citing *Hill*, 587 F.3d at 235). Indeed, the Fifth Circuit recognized that "*Gutierrez* itself acknowledged that some more recent scholarship contradicted its holding—to the point that the author of the earlier studies had since conceded that hog-tying is 'physiologically neutral'—but would not consider that research because it 'is not part of the summary judgment record in this case.'" *Khan*, 683 F.3d at 195 n.4 (citing *Gutierrez*, 139 F.3d at 451).

[264]    *Khan*, 683 F.3d at 195 n.4 (citing *Price*, 990 F. Supp. 1230 ("After Dr. Reay's retraction, little evidence is left that suggests that the hogtie restraint can cause asphyxia. All of the scientists who have sanctioned the concept of positional asphyxia have relied to some degree on Dr. Reay's work. The [Dr. Neuman] study has proven Dr. Reay's work to be faulty, which impugns the scientific articles that followed it. Like a house of cards, the evidence for positional asphyxia has fallen completely.")).

[265]    *Hill*, 587 F.3d at 232–33, 238.

responded to a fight between two women.[266] One of the women, Debbie Loggins, refused to release the other woman from a headlock.[267] Loggins, who was five foot four inches tall and weighed 220 pounds, released the woman but attacked a deputy, grabbing his flashlight and "pummeling" him with it.[268] The deputies knocked the flashlight from her and eventually handcuffed her, but she continued to kick and curse at the deputies.[269] When deputies attempted to put Loggins in the back of the patrol car, she continued to kick, twist, and resist the deputies, so they placed her in a four-point restraint, or hogtie, "linking her leg restraints to her handcuffs with an additional set of handcuffs."[270] The deputies were finally able to put Loggins in the back of the patrol car and drove her 29 miles to the jail.[271] During the half-hour ride to the jail, Loggins became quiet at some point and stopped breathing.[272] The officers did not realize she quit breathing until after they arrived at the jail and went inside to request assistance removing her from the patrol car.[273] They found Loggins unresponsive and without a pulse, and began CPR and notified emergency medical services. Loggins was rushed to the hospital but she was pronounced dead.[274]

118.    Loggins's estate sued the deputies and Carroll County under section 1983 and the district court granted all defendants' motions for summary judgment.[275] The Fifth Circuit affirmed,

---

[266]    *Id.* at 232.

[267]    *Id.*

[268]    *Id.*

[269]    *Id.*

[270]    *Id.* at 232–33.

[271]    *Id.* at 233.

[272]    *Id.*

[273]    *Id.*

[274]    *Id.*

[275]    *Id.*

holding that "no reasonable jury could have found that the deputies used excessive force to subdue Loggins," a holding that absolved the deputies and the county of section 1983 liability.[276] The *Hill* court further explained its "holding should not be read to condemn or condone the use of four-point restraints."[277]

119.    The court began its discussion by finding no material facts were in dispute except the cause of Loggins's death.[278] Hill's expert witness opined based on the medical records and autopsy report that Loggins died from positional asphyxia (suffocation), although the autopsy diagnosis was fatal hyperthermia.[279] However, the court assumed her cause of death was positional asphyxia for purposes of its ruling.[280] The plaintiff attempted to rely on *Gutierrez*, Dr. Reay's study erroneously concluding that four-point restraints can cause asphyxia, and her experts' testimony.[281]

120.    As the *Hill* court explained Dr. Reay's study:

> The origin of concern about four-point restraints is a study conducted for the San Diego Police Department by Dr. Arnold Reay, which concluded that "hog-tying" may create a substantial risk of death or serious bodily injury when a *combination* of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke hold is present.[282]

121.    The court acknowledged that "*Gutierrez* does not hold [that a] four-point restraint [is] a per se unconstitutionally excessive use of force, nor does it extend beyond its facts as a mirror

---

[276]    *Id.* at 234

[277]    *Id.* at 237.

[278]    *Id.* at 234.

[279]    *Id.* at 233.

[280]    *Id.* at 234

[281]    *Id.* at 235.

[282]    *Id.* (citing *Gutierrez*, 139 F.3d at 446 and Dr. Reay's study cited therein) (emphasis added).

of the then-unchallenged San Diego Study."[283] According to the Fifth Circuit, "[a] more recent study by Dr. Tom Neuman casts doubt on the conclusions of the San Diego Study."[284] Because there was no evidence Loggins abused drugs or was in a drug-induced psychosis, the court determined that neither Dr. Reay's study nor *Gutierrez* raised a triable issue of fact.[285]

122.    Regarding one of plaintiffs' experts who opined that the deputies had other options available making the four-point restrain unnecessary, the court found that "[t]he mere existence of alternatives—admittedly more difficult for the officers or more risky for Loggins—is not probative of the excessiveness of four-point restraints."[286]

123.    The plaintiffs' other expert, a medical expert, relied heavily on Dr. Reay's study while acknowledging the existence of Dr. Neuman's studies raising doubts about the former studies.[287] He admitted there was no evidence Loggins abused drugs or was in a cocaine-induced psychosis, "two critical factors" in Dr. Reay's studies.[288] Importantly, the medical expert could not cite a single journal or report that four-point restraints were dangerous when applied to "a morbidly obese" woman, but had to concede that even Dr. Reay acknowledged that four-point restraints were "physiologically neutral."[289]

124.    The Fifth Circuit did not go so far in *Hill* as finding that four-point restraints are not excessive in general, but found "this case presents none of the additional contributing or

---

[283]    *Hill*, 587 F.3d at 235 (citing *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 n.6 (5th Cir. 2000) (citing cases where Fifth Circuit has upheld use of a choke-hold and chemical spray)).

[284]    *Hill*, 587 F.3d at 235 n.3.

[285]    *Id.* at 235.

[286]    *Id.* at 236.

[287]    *Id.* at 236.

[288]    *Id.*

[289]    *Id.*

associated factors that cast doubt on the propriety of the restraints."[290] The court found that the "deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force" judging from the perspective of an officer at the scene.[291] Loggins's behavior—fighting with the woman and refusing to turn her loose, fighting with a deputy, assaulting the deputy, "physically taxing" the deputies as they attempted to restrain her and put her in the patrol car that led to her four-point restraint—demonstrated a level of violence requiring stern control measures.[292] Thus, the court affirmed summary judgment for the deputies and, because the court found no evidence the deputies violated any of Loggins's constitutional rights, found no need to address the county's *Monell* liability.[293] Lucas's level of violence and combativeness required equally stern control measures, particularly since he was being transported down to the medical clinic where unarmed, civilian medical staff waited to treat him.

125.   Finally, it is worth noting another case, *Price v. County of San Diego*, a 1998 Southern District of California case cited in *Gutierrez*, *Hill*, and *Khan* and instructive here.[294] In *Price*, officers stopped Price driving his vehicle and, when they attempted to arrest him, "a violent scuffle, more properly characterized as a brawl, ensued."[295] Price assaulted the officers, tried to grab their guns, and struggled, yelled, and kicked at the officers.[296] Price continued to kick with both legs once leg shackles were put on him, so the deputies held Price down on his stomach with

---

[290]   *Id.* at 236–37. *Accord Wagner*, 227 F.3d at 323–24 (finding that plaintiff could not rely on the theory presented in Dr. Reay's study that supported the concept in *Gutierrez* that there was a substantial risk of harm from positional hypoxia because the required conditions in Dr. Reay's study were not met).

[291]   *Hill*, 587 F.3d at 237.

[292]   *Id.*

[293]   *Id.* at 238.

[294]   *Price v. Cnty. of San Diego*, 990 F. Supp. 1230 (S.D. Cal. 1998).

[295]   *Id.* at 1234.

[296]   *Id.* at 1234–35.

their body weight and connected his handcuffs to his leg shackles in a four-point restraint.[297] As he was in the four-point restraint, Price repeatedly smashed his face into the ground, so the deputies called for medical assistance.[298] While waiting, the deputies left Price on the ground nearby but did not closely monitor him.[299] At some point before the medics arrived, deputies noticed Price turning blue but did not release him from the hog tie or attempt CPR.[300] Medics arrived shortly thereafter, but Price had no pulse and had stopped breathing.[301]

126.    The court began by discussing four-point restraints in general:

Plaintiffs claim that the hogtie restraint can cause "positional asphyxia." Asphyxia is a decrease in blood oxygen levels or an increase in blood carbon dioxide levels— either of which can kill. Positional asphyxia is asphyxia that results from body position.

Plaintiffs argue that positional asphyxia can occur when a hogtied person lies prone with pressure on his back. Plaintiffs claim that hogtying poses an especially great danger to large-bellied persons, such as Price. Plaintiffs claim that if the deputies had closely monitored Price and/or placed him on his side, then the hogtie's dangers would have been reduced or eliminated.[302]

127.    In determining whether the hog-tie restraint constituted excessive force, the court explained that the plaintiffs primarily relied on testimony of Dr. Reay, who conducted the San Diego Study and determined that after exercise, including a violent struggle with deputies, blood oxygen levels decrease and the hogtie restraint prevents these oxygen levels from rising again because the hogtie restraint impairs the mechanical process of inhaling and exhaling.[303] The court

---

[297]    *Id.*

[298]    *Id.* at 1235.

[299]    *Id.*

[300]    *Id.*

[301]    *Id.*

[302]    *Id.* at 1237.

[303]    *Id.*

further explained that the plaintiffs also relied on testimony from a doctor that Price experienced lactic acidosis, "a natural bodily reaction to exercise in which the body produces lactic acid" causing the body to produce extra carbon dioxide.[304] This doctor based his opinions largely on Dr. Reay's studies and, "[i]n fact, it appears that every scientist who has sanctioned the idea that hogtying causes asphyxia has relied to some degree on Dr. Reay's studies," though "no scientist had ever critically examined Dr. Reay's methodology and logic—until recently."[305]

128.    The defendants hired Dr. Neuman to conduct "a sophisticated study of positional asphyxia and the hogtie restraint."[306] According to the court:

> Dr. Neuman found, contrary to Dr. Reay's findings, that blood oxygen levels do not decrease after exercise. Dr. Neuman also found that although the hogtie restraint impairs the mechanical process of inhaling and exhaling to an extent, the hogtie does not affect blood oxygen or carbon dioxide levels. In other words, the impairment is so minor that it does not lead to asphyxia, and in fact has no practical significance . . . .
>
> [Dr. Neuman's] study, which Dr. Reay concedes rests on exemplary methodology, eviscerates Dr. Reay's conclusions. [Dr. Neuman's] study refutes Dr. Reay's underlying premise—that blood oxygen levels decrease after exercise. Thus, [Dr. Neuman's] study refutes Dr. Reay's ultimate conclusion—that the hogtie restraint prevents the lungs from replenishing the blood's oxygen supply; according to [Dr. Neuman's] study, the blood needs no replenishment after exercise because it already has adequate oxygen.
>
> [Dr. Neuman's] study also refutes [plaintiffs' other medical expert's] opinion that the hogtie prevents the lungs from "blowing off" excess carbon dioxide. [Dr. Neuman's] study found no difference in carbon dioxide levels between subjects who had exercised and been hogtied, and subjects who had exercised and not been hogtied. Thus, Dr. Neuman testified and Dr. Reay now concedes, the hogtie restraint is "physiologically neutral."
>
> After Dr. Reay's retraction, little evidence is left that suggests that the hogtie restraint can cause asphyxia. All of the scientist who have sanctioned the concept of positional asphyxia have relied to some degree on Dr. Reay's work. [Dr.

---

[304]    *Id.*

[305]    *Id.*

[306]    *Id.*

Neuman's] study has proven Dr. Reay's work to be faulty, which impugns the scientific articles that followed it. <u>Like a house of cards, the evidence for positional asphyxia has fallen completely.</u>[307]

129.    Regarding the *Price* plaintiffs' claims that Price's large girth made the hogtie particularly dangerous for him, the plaintiffs had also relied on Dr. Reay's work, though Dr. Reay admitted "he has no empirical evidence that suggests that lying prone with a large belly can impair breathing to a significant extent."[308] On this point, the court again turned to Dr. Neuman, who had "studied individuals of Price's general size, shape, morphology, and body mass index."[309] Dr. Neuman's study included people with a body mass index of thirty, which admittedly does not include "extremely obese individuals."[310] Dr. Neuman could not conclude "that a person lying prone with a potbelly will asphyxiate to death while a slightly smaller person will have no physiological reaction whatsoever."[311]

130.    The court also found reasonable the deputies' application of modest pressure to Price's back as they handcuffed and hogtied him to control him from thrashing around.[312] The court found this action reasonable because the deputy did not apply significant pressure, though the plaintiffs failed to show that even applying more pressure would have impaired Price's breathing to a significant degree.[313] Thus, because "[t]he hogtie restraint did not inflict a constitutional injury on Price, *Monell* liability cannot attach" to the county.[314]

---

[307]    *Id.* at 1237–38 (emphasis added).

[308]    *Id.* at 1238.

[309]    *Id.* at 1239.

[310]    *Id.*

[311]    *Id.*

[312]    *Id.* at 1239–40.

[313]    *Id.* at 1239.

[314]    *Id.* at 1246.

131.     Dr. Neuman's studies credibly refute any opinions that Lucas died from positional asphyxiation. And Plaintiffs have no credible evidence to the contrary. Their current experts rely on basic medical principles learned in a medical school textbook and their own general experience. Their opinions are not credible and cannot refute the testimony and opinions of Dr. Neuman.

132.     Harris County's liability is even farther removed because Lucas was not hogtied. Rather, the officers restrained him on the gurney in a reasonable manner that would allow them to transport an inmate of his large size and with his violent behavior down to the jail medical clinic. The DCCT officers acted objectively reasonable according to HCSO policy, procedures, and training.[315] Thus, there is no credible evidence that Lucas was injured directly and only from a use of force that was excessive to the need.

133.     Because of Lucas's violent tendencies—as seen in the video immediately before and during his cell extraction—the DCCT properly used a reasonable amount of force to restrain and control him during the entire cell extraction, transport to the clinic, and while medical providers attended to him in the jail medical clinic.

134.     Plaintiffs' Complaint contends Lucas was injected with a "dangerous sedative."[316] However, Plaintiff's expert, Dr. Hall testified that, in his opinion, Ativan did not cause Lucas to stop breathing.[317] Dr. Hall testified that in his practice, he has used Ativan to calm down someone that needed their blood pressure taken and to someone going through Xanax withdrawal.[318] He further testified that he thought it was "perfectly reasonable" to administer Ativan to Lucas when

---

[315]     Indeed, the Fifth Circuit has held that there is no clearly established right to be free from hogtie and such a restraint is not per se unconstitutional. *Khan*, 683 F.3d at 194, 195; *Hill*, 587 F.3d at 235, 237. The Fifth Circuit has also recognized that a finding of deliberate indifference to rights may require those rights be clearly established. *Gonzalez*, 996 F.2d at 760.

[316]     Doc. 77 at p. 20 ¶ 55.

[317]     Hall Depo., p. 87:7-9, Ex. 34.

[318]     Hall Depo., p. 85:23 - 86:18, Ex. 34.

he is being aggressive and combative.[319] Dr. Sunder administered the Ativan to treat Lucas's suspected delirium and Xanax withdrawal.[320]

135.    Dr. Ly testified the Ativan did not play a role in Lucas's death because the drug was not detected in his blood during the autopsy.[321] Plaintiff's expert, Dr. Cohen, likewise acknowledged the lab reports did not indicate any Ativan in Lucas's blood.[322]

### ii.    The use of force was not objectively unreasonable

136.    To determine whether force used was objectively unreasonable, courts consider several factors, including (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the threat reasonably perceived by the officer; and (5) whether the plaintiff was actively resisting.[323] "Reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."[324] In determining whether the force used was excessive, courts "must measure the force used under the facts as a reasonable officer would perceive them, not against the historical facts."[325] First, the court

---

[319]    Hall Depo., p.86:25-87:6, Ex. 34.

[320]    Sunder Depo., p. 238:21-239:4, Ex. 21

[321]    Ly Depo., p. 42:13-17, Ex. 33.

[322]    Cohen Depo., p.78:3-17, Ex. 35.

[323]    *Kingsley*, 135 S.Ct. at 2473 (citing *Graham*, 490 U.S. at 396); *Hudson v. McMillian*, 962 F.2d 522, 523 (5th Cir. 1992) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

[324]    *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). *See also Kingsley*, 135 S.Ct. at 2473.

[325]    *Hill*, 587 F.3d at 234 (citation omitted).

construes the historical facts in the light most favorable to the nonmovant and then asks how a reasonable officer would have perceived those historical facts.[326]

137.    When considering the reasonableness of force used, courts must account for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in the[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."[327] Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.[328] Even the use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.[329] Further, courts "recognize that '[r]unning a prison is an inordinately difficult undertaking,' and that 'safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.'"[330]

138.    Here, the need for the use of force was reasonably related to the amount of force used. Prior to the cell extraction, Lucas was behaving violently by slamming the metal smoke detector against his cell door and window and refused to give it up and peacefully exit his cell

---

[326]    *Id.*

[327]    *Kingsley*, 135 S.Ct. at 2473 (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

[328]    *Graham*, 490 U.S. at 396–97.

[329]    *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Mace v. City of Palestine*, 333 F.3d 521, 624 (5th Cir. 2003)).

[330]    *Kingsley*, 135 S.Ct. at 2474, (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987); *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012)).

when ordered to do so by numerous jail officials. Indeed, the fact Lucas had a weapon that he refused to give up warranted extraction from his cell. There is no dispute that the cell extraction itself did not constitute excessive force. As the DCCT entered Lucas's cell, he swung the metal smoke detector at them, attempting to assault the officers.

139.    After struggling with Lucas and finally handcuffing him and shackling his ankles, the DCCT put him on a gurney as their only option to transport the uncooperative Lucas to the first-floor medical clinic. Again, the smallest member straddled Lucas's legs on the gurney to control his legs and keep him from falling off. Lucas was immediately transported to the medical clinic, where he continued resisting and trying to "buck off" Officer Scott as medical staff attempted to evaluate and treat him. The DCCT did all they reasonably could to protect themselves and civilian medical personnel from Lucas's assaultive actions.

140.    Dr. Sunder used his independent, professional medical judgment to administer Ativan to Lucas. Any fault in that decision amounts—at best—to negligence or disagreement with the course of treatment. According to Dr. Sunder's testimony, Lucas was injected with Ativan as treatment for his suspected Xanax withdrawal or delirium, not as a chemical restraint.[331] It is further against the practice of the medical clinic to utilize chemical restraints.[332] Plaintiffs have no evidence to the contrary. Thus, the force required to extract Lucas from his cell and transport him to the jail medical clinic was reasonably related to the need to use force, namely that Lucas possessed a makeshift weapon, refused to comply with orders to give it up, and behaved in an assaultive, violent manner.

141.    Any death in the jail is tragic and Lucas's death is no exception. However, Plaintiffs have no evidence that Lucas's death occurred as a result of excessive force and evidence supporting this motion contradicts any such conclusory theory.

---

[331]    Sunder Depo., p. 238:21 – 241:20, Ex. 21.

[332]    Guice Aff., Ex. 11.

142.    Also, as discussed above, the DCCT made several efforts to temper or limit the amount of force used. Lucas was given numerous opportunities—the video shows at least 23—to peacefully comply with officers' orders, and the DCCT treated Lucas with professionalism. No officer cursed, slapped or kicked Lucas. The DCCT repeatedly told Lucas to quit resisting and "relax." The restraint techniques used were minimally necessary to maintain control of Lucas's combativeness, especially in the clinic that is staffed with civilian medical personnel. As soon as Lucas calmed down—and immediately after Dr. Sunder ordered the officers to release Lucas and turn him over—the officers released Lucas and turned him over.

143.    Throughout the extraction and transport to the clinic, Lucas was continuously monitored by the DCCT and two supervisors, Deputy Gordon and Lieutenant Anderson. Once in the clinic, Lucas was further monitored by at least one doctor and several nurses. Nurse O'Pry can be seen numerous times on the video attending to Lucas and Nurse Barton was in the clinic with Lucas the entire time he was there until emergency paramedics arrived.[333] In addition to the nurses, Dr. Sunder can be seen monitoring Lucas. Officer Kneitz recorded the entire cell extraction, transport to the medical clinic, and the medical treatment provided to Lucas until shortly after Dr. Sunder gave instructions to call the Houston Fire Department. These monitoring efforts allowed officers to temper the force used when possible.

144.    At the time of the cell extraction and transport to the clinic, the DCCT officers reasonably perceived a serious threat. As is well documented in this motion, Lucas acted violently and combatively, attempting to assault the DCCT. The officers reasonably believed Lucas was likely to harm himself or staff members.

145.    While Plaintiffs may be able to point to a variety of measures that jail officials *could have taken* during the cell extractions, such "coulda, woulda, shoulda" views of the incident with the benefit of 20/20 hindsight is not the standard. Plaintiffs cannot point to anything that the DCCT

---

[333]    Barton Aff., Ex. 23.

60

or any Harris County staff reasonably should have done differently—or that would have affected the outcome—as the officers reasonably perceived the incident at the time they faced it.

146.    Jail staff have a legitimate interest in maintaining order and security inside county jails, which house inmates accused or convicted of criminal offenses, often violent and serious offenses. The DCCT was required to make split-second decisions when extracting Lucas. The DCCT acted professionally and calmly and relied on their training during the cell extraction and transport. The officers' use of force was objectively reasonable.

147.    Because Plaintiffs have no evidence that an officer, or medical staff member committed a constitutional violation, they cannot show that any constitutional violations were caused by Harris County, and therefore Harris County is entitled to summary judgment on Plaintiffs' claims of excessive force.

### III.    No failure to train

148.    Plaintiffs' amorphously pleaded failure-to-train claims are difficult to discern, but Harris County presumes Plaintiffs claim a failure to train on safe restraints, regarding drug withdrawal, and on the need to accommodate individuals with disabilities.[334]

149.    To establish a constitutional failure-to-train claim, a plaintiff must show: (1) the training procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury.[335]

150.    "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."[336] "[F]ailure-to-train liability is concerned with

---

[334]    Doc. 77 at pp. 24 ¶ 65, 25 ¶¶ 68–69.

[335]    *Conner v. Travis Cnty.*, 209 F.3d 794, 796 (5th Cir. 2000) (citation omitted).

[336]    *Connick v. Thompson*, 563 U.S. 51, 67 (2011) (citing *City of Canton*, 489 U.S. at 392).

the substance of the training, not the particular instructional format."[337] "The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."[338]

151.     According to the United States Supreme Court, "As our precedent makes clear, proving that a municipality itself caused a constitutional violation by failing to train the offending employee presents 'difficult problems of proof,' and we must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*."[339]

152.     As the Supreme Court has cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[340] The Supreme Court has repeatedly observed that "[a] less stringent standard of fault for a failure-to-train claim 'would result in de facto respondeat superior liability on municipalities . . .'"[341]

## A.     Each involved officer was TCOLE certified and licensed by the State of Texas

153.     Because the DCCT received training required by Texas law, Plaintiffs must—but cannot—show that the legal minimum of training was unconstitutional. All individual defendants who were involved in the cell extraction of Lucas were certified county jailers and/or peace officers licensed by TCOLE.[342] HCSO can rely on TCOLE certifications and licenses as evidence that its jailers

---

[337]     *Connick*, 563 U.S. at 68.

[338]     *Id.*

[339]     *Id.* at 70 (citing *Bryan Cnty.*, 520 U.S. at 406, 410; *City of Canton*, 489 U.S. at 391–92).

[340]     *Connick*, 563 U.S. at 61 (citing *City of Oklahoma v. Tuttle,* 471 U.S. 808, 822–823 (1985) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*")).

[341]     *Connick*, 563 U.S. at 62 (citing *City of Canton*, 489 U.S. at 392).

[342]     See TCOLE Aff. and the training records of each DCCT member, Ex. 25. See also Bourgeois Aff., Ex. 19.

and peace officers are sufficiently trained.[343] As the Fifth Circuit has explained, "[W]hen officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate."[344] Plaintiffs have not alleged the legal minimum of training was inadequate and has not sued the State of Texas complaining of it either.

154.    All jailers in Texas are required to complete hiring, training, and licensing requirements of TCOLE before serving as county jailers.[345] The standards established by TCOLE comply with constitutional requirements and are adequate to enable jailers to deal with usual and recurring situations that jailers encounter.[346] The Texas Legislature has mandated that TCOLE establish statewide education and training programs on civil rights, de-escalation and crisis intervention techniques that meets constitutional standards.[347] HCSO's compliance with TCOLE standards exceeds basic constitutional requirements for training.

155.    Lack of a specific type of training is not a constitutional violation. It is Plaintiffs' burden to show that the training they are complaining about was the moving force behind their damages. Plaintiffs have no evidence to show that HCSO's training is unconstitutional.

156.    Here, each DCCT officer involved in Lucas's cell extraction completed the state-mandated training for county jailers *and* completed special-situation training to be accepted into and continue their membership on the DCCT. Importantly, the DCCT specialized training is likewise TCOLE

---

[343]    *See, e.g.*, *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381–82 (5th Cir. 2010).

[344]    *Sanders-Burns*, 594 F.3d at 381–82 (citing *Benavides*, 955 F.2d at 973).

[345]    Tex. Occup. Code §§ 1701.301, 1701.307, 1701.310.

[346]    Course Curriculum Materials & Updates, Tex. Comm'n on Law Enforcement, available at http://www.tcole.texas.gov/content/course-curriculum-materials-and-updates-0 (last visited Feb. 7, 2019).

[347]    Tex. Occup. Code § 1701.253.

approved and certified.[348] Plaintiffs have no evidence that Texas's requirements are inadequate on any of their failure-to-train claims, and summary judgment is proper on these claims.

### B.     HCSO's training procedures are constitutionally adequate

157.    Plaintiffs have no credible evidence that HCSO's training procedures are constitutionally inadequate. As discussed above, every HCSO jailer must meet state training requirements. All jailers who worked in the Harris County jail in February 2014 were required to complete TCOLE's Basic County Corrections Courts ("BCCC"), a 7-week training program that taught new officers about HCSO policies, including at least 8 hours in use-of-force law and at least 16 hours of training in use-of-force concepts.[349]

158.    During BCCC, new jailers received and learned HCSO policies, including policies dealing with inmates with disabilities or in crisis, inmate conduct, inmate observation, and inmate rights and discipline and the entire HCSO Department Manual:

D-202 - Americans with Disabilities Act
D-208 - Inmate Conduct/Disruptive Inmate Conduct
D-219 - Separation Policy
D-220 - Inmate Observation
D-230 - Inmate Rights/Due Process
D-239 - Restraints Policy
D-301 - Addressing Inmates with Mental Health Issues/CIRT Call-out Procedures
D-307 - Use of Force and
D-210 - Inmates in Crisis[350]

The BCCC training included 24 hours of crisis intervention response training and certification in CPR and use of an AED.[351] TCOLE did not and does not require HCSO to provide training on "drug withdrawal" "accommodating detainees suffering from drug withdrawal," or

---

[348]     Bourgeois Aff., Ex. 19.

[349]     Bourgeois Aff., Ex. 19.

[350]     Bourgeois Aff., Ex. 19.

[351]     Bourgeois Aff., Ex. 19.

accommodating individuals with "prescription drug dependence, hypertension, or obesity" beyond that which Harris County jail school already provides.[352]

159.    All deputies and officers that have completed the BCCC continue to take additional in-service training to learn about new and revised HCSO policies.[353] HCSO Policy D-212, Inmate Health Care Access required all deputies and detention officers to be trained in how to recognize medical emergencies and how to respond to these emergencies.[354] The members of the DCCT as well as all deputies and detention officers in jail school went through this training, which incorporates this policy.[355] These individuals were trained to respond to a medical emergency and to take immediate action anytime they believed an inmate needed medical attention.[356]

160.    A jailer seeking to join the DCCT must take an additional 40-hour training course that is approved and certified by the State of Texas.[357] The HCSO DCCT uses the DCCT Basic Training Manual, which is approved by TCOLE.[358] This training includes a review of HCSO policies, including on restraints and the prohibition of "hogtying." The DCCT training also includes training on what a "hogtie" is, hands-on scenario-type cell extractions where each officer practices each of the five positions on the cell extraction team, transporting an inmate on a gurney following a cell extraction, decreasing the quantum of force used as the need for force decreases and training on monitoring the inmate during the cell extraction and transport.[359]

---

[352]    Bourgeois Aff., Ex. 19.

[353]    Bourgeois Aff., Ex. 19.

[354]    Bourgeois Aff., Ex. 19.

[355]    Bourgeois Aff., Ex. 19.

[356]    Bourgeois Aff., Ex. 19.

[357]    Bourgeois Aff., Ex. 19.

[358]    Bourgeois Aff., Ex. 19.

[359]    Bourgeois Aff., Ex. 19.

161.    Officers seeking admission to the DCCT must not have a history of using excessive force. None of the DCCT members sued in this lawsuit have a history of using excessive force.[360]

162.    The DCCT that extracted and transported Lucas to the medical clinic went through the training described above. There was no deficiency in training as evidenced by the fact that the cell extraction of Lucas followed HCSO policy, procedure, and training and state and federal law.

163.    The HCSO's training procedures are constitutionally adequate and there is no competent summary judgment evidence to the contrary.

### C.    HCSO's Sheriff, the official policymaker, was not deliberately indifferent in adopting any training policy

164.    Deliberate indifference is more than negligence or even gross negligence.[361] The Fifth Circuit has recognized that a finding of deliberate indifference to rights may require those rights be clearly established.[362] Plaintiffs must show that, "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to need.[363] Plaintiffs need more than expert testimony to prove a "municipality's malevolent motive."[364]

165.    The Fifth Circuit has determined that inmates do not have a clearly established right to be free from a four-point restraint, and such restraint is not unconstitutional *per se*.[365] Because there is no clearly established right to be free from a hogtie—or, necessarily, the lesser restraint

---

[360]    Bourgeois Aff., Ex. 19.

[361]    *Conner*, 209 F.3d at 796.

[362]    *Gonzalez*, 996 F.2d at 760.

[363]    *Conner*, 209 F.3d at 796–97 (quoting *City of Canton*, 489 U.S. at 390; *Benavides*, 955 F.2d at 972).

[364]    *Conner*, 209 F.3d at 798 (quoting *Snyder*, 142 F.3d at 799 and other cases).

[365]    *Khan*, 683 F.3d at 194, 195; *Hill*, 587 F.3d at 235, 237.

required to maintain control over Lucas—Plaintiffs cannot show the requisite culpability on the part of the official policymaker.[366]

166.    Nor can Plaintiffs show the need for more or different training is obvious and the inadequacy is so likely to result in constitutional violations that the official policymaker can reasonably be said to have been deliberately indifferent. There is no history of any inmate, prior to Lucas, becoming injured or dying as a result of a cell extraction and transport on a gurney to the medical clinic in the prone position with an officer riding atop the gurney and controlling an inmate's legs. Further, the DCCT training procedures utilized by the HCSO are consistent with Federal Bureau of Prisons Use of Force Team procedures for cell extractions and the policies and procedures of Smith County.[367]

167.    Plaintiffs complain the DCCT should have been trained how to safely restrain pretrial detainees like Lucas. The evidence proves that they receive this training. Not only must DCCT members complete TCOLE-certified and -approved Harris County jail school that specifically includes training on restraints and use of force, they also receive specialized training specific to carrying out cell extractions and transports.[368]

168.    Plaintiffs complain the DCCT should be trained regarding "drug withdrawal." While the members of the DCCT received training on recognizing medical emergencies and how to respond to these emergencies, there is no requirement by TCOLE that these officers receive

---

[366]    *Gonzalez*, 996 F.2d at 760.

[367]    See Pinkerton Aff. and attached Report, Ex. 30, Opinion No.10 and his opinion/conclusion on the last page of his report.

[368]    See Bourgeois Aff., Ex. 19 and attached DCCT Basic Training Manual; HCSO Policies D-302 (Detention Command Containment Team), D-239 (Restraints), D-307 (Use of Force), D-308 (Videotaping of Planned Use of Force), Bates # 2699-2704, 2716-24, 2731-39, Ex. 15.

specialized training on drug withdrawal, a medical condition that is diagnosable by a medical doctor.[369] Plaintiffs cannot hold Harris County to a standard higher than the law requires.

169.    Plaintiffs complain the DCCT should have been trained on the need to accommodate individuals with disabilities—particularly "including prescription drug dependence, obesity and hypertension."[370] While there is basic training on the ADA in the Harris County jail school, there is no requirement by TCOLE that these officers receive specialized training on recognizing medical conditions that would be diagnosable by a medical doctor.[371] Again, Plaintiffs cannot hold Harris County to a standard higher than the law requires.

170.    If the State of Texas has not recognized a need for more or different training on these areas, how can Plaintiffs possibly show that a need for such additional or different training is obvious or so likely to result in violations of constitutional rights?

**D.    No notice of a pattern of similar violations**

171.    Generally, there are two ways a plaintiff can attempt to show a municipality's deliberate indifference to the need for proper training. The first, and more typical approach, is to demonstrate the municipality had notice of a pattern of similar violations, which were fairly similar to a plaintiff's own alleged constitutional violations.[372] "The prior acts must be 'fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act must have

---

[369]    Bourgeois Aff., Ex. 19;  Policy D-212, Bates # 2665-69, Ex. 15.

[370]    Doc. 77 at p. 25 ¶ 69.

[371]    See Bourgeois Aff., Ex. 19; Policy D-202, Bates # 3648–54, Ex. 15.

[372]    *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 484 (5th Cir. 2014), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2472–73 (2015) (citing *Sanders-Burns*, 594 F.3d at 381).

involved injury to a third party.'"[373] Prior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.[374]

172.    "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. '[P]rov[ing] that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice."[375]

173.    Plaintiffs have no evidence of a pattern of violations from the restraint technique used to maintain control over Lucas. Plaintiffs' allegations regarding failing to train on safe restraints appears to have three subparts: (1) the "hogtie position"; (2) to discontinue the use of hogtie restraint techniques and otherwise decrease the quantum of force as the need for force decreases; and (3) to monitor hogtied detainees.[376]

174.    As discussed above, Plaintiffs erroneously allege that Lucas was put in a "hogtie position." There is no record of even one previous incident in which an inmate complained that their rights were violated or who was injured because of the restraint techniques used by the DCCT during a cell extraction or during transport to the medical clinic following a cell extraction. Nor is there any record of even one previous incident in which an inmate complained that their rights were violated or who was injured because officers failed to decrease or discontinue force used or failed to monitor an inmate's restraints following a cell extraction.[377] Plaintiffs cannot point to any

---

[373]    *Sanders-Burns*, 594 F.3d at 381 (quoting *Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 n.34 (5th Cir. 2005)).

[374]    *Davis*, 406 F.3d at 383.

[375]    *Connick*, 563 U.S. at 68 (quoting *City of Canton*, 489 U.S. at 391).

[376]    Doc. 77 at p. 24 ¶ 65.

[377]    See Pair Aff., Ex. 31.

pattern of similar violations that would put the Harris County Sheriff on notice of any failure to train.

175.    Likewise, Plaintiffs have no evidence of a similar pattern of violations with regard to the failure to train claims concerning drug withdrawal or failing to accommodate disabled individuals complaining of obesity, hypertension and prescription drug dependence.[378] Even if Plaintiffs' hyperbole regarding the dangers of drug withdrawal or failing to accommodate disabled individuals is true, there is no evidence Harris County's official policymaker had notice of a pattern of violations similar to those alleged by Plaintiffs.

### E.    No single incident liability

176.    There is also a limited exception for single-incident liability in a "narrow range of circumstances" where constitutional violations would result as the highly predictable consequence of a particular failure to train.[379] A single incident—even with expert testimony—is usually insufficient to sustain a failure-to-train claim.[380] The Fifth Circuit "has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat superior liability."[381]

177.    As discussed above, HCSO and the DCCT trained in the areas about which Plaintiffs complained, and the training is in compliance with state requirements. Plaintiffs can point to no particular failure to train that would highly and predictably cause a constitutional

---

[378]    According to the testimony of Anna Fonseca and his own family members, Lucas was not taking *prescription* drugs, but rather, he was obtaining the Xanax through illegal means. *See infra* note 473 & accompanying text.

[379]    *Kitchen*, 759 F.3d at 484 (citing *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008)); *Davis*, 406 F.3d at 385–86 ("[T]o rely on this [single-incident liability] exception, a plaintiff must prove that the 'highly predictable consequence of failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation.") (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)). *See also Connick*, 563 U.S. at 62, 63.

[380]    *E.g.*, *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *Conner*, 209 F.3d at 797.

[381]    *Roberts*, 397 F.3d at 287 (citing *Burge*, 336 F.3d at 373; *Pineda*, 291 F.3d at 334–35; *Monell*, 436 U.S. at 691).

violation. Lucas was not hog-tied. DCCT members took care to use only the amount of force necessary to restrain Lucas and keep him restrained. Plaintiffs can point to no particular failure to train with regard to drug withdrawal and the need to accommodate disabled individuals, in particular those with prescription drug dependence, obesity or hypertension. The DCCT immediately transported Lucas to the jail medical clinic for evaluation and treatment, where medical doctors could address any issues regarding drug withdrawal, obesity and hypertension. Moreover, the DCCT transported Lucas using extended-length handcuffs and on a gurney with the side rails down, holding his feet to secure him on the gurney.

178.     This case is not like the hypothesized example of possible single-incident liability in *Canton v. Ohio* "of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons *without training* the officers in the constitutional limitation on the use of deadly force."[382] HCSO trained its officers to properly and safely extract violent inmates from their cells, restrain them with the minimum force necessary, transport them to the clinic for evaluation, decrease the use of force as the need for force decreases, and to monitor inmates. There is no actionable failure to train claim.

### F.     No inadequate training policy caused Lucas's injury

179.     Lucas's poor medical health caused his injury. Lucas died from a sudden cardiac arrest that was caused by his unknown medical conditions—an enlarged heart and severe heart disease, among others—and likely contributing factors such his history of hypertension, his illegal drug use and being overweight.

180.     To the extent Lucas was experiencing Xanax withdrawal symptoms which caused the physical manifestations of raising his heart rate, causing delirum and increasing his breathing rate, Lucas contributed to his own untimely death. Lucas had numerous opportunities to avoid sending in the extraction team. His own irrational and violent behavior necessitated the DCCT activation and extraction. Lucas would not comply with officer's instructions to stop resisting

---

[382]     *Connick*, 563 U.S. at 63 (citing *City of Canton*, 489 U.S. at 390 n.10).

while he was in restraints, thereby further exacerbating his physical condition. The DCCT followed their training and there is no evidence that any different training would have had a different end result.

181.    To the extent Plaintiffs rely upon changes made by the County after this incident, the use of 20/20 hindsight is not the appropriate standard by which Harris County can be judged. The state approved and certified training, which includes the policies described throughout this Motion for the Harris County jail school and the DCCT has not been shown to be inadequate.

## IV.    No failure to supervise

182.    Plaintiffs do not state a failure-to-supervise claim because their live complaint only mentions a "duty to supervise" once and makes no mention of any of the elements or states any facts supporting this assertion.[383] Plaintiffs fail to make any allegations of any failure to meet a duty to supervise, establish any causal connection between a failure to supervise and any constitutional violation, or establish that any failure to meet a duty to supervise constituted deliberate indifference.[384] Thus, to the extent Plaintiffs' live complaint alleges a failure to supervise claim, if any, such a claim does not meet the *Iqbal* and *Twombly* pleading standard sufficient to state a plausible claim.[385] Thus, these claims, if any, should not be considered by the Court, and Harris County should be granted summary judgment on any such claim.

## V.    No deliberate indifference to serious medical needs

183.    Plaintiffs' medical needs claims are difficult to discern, both in substance and against whom the claims are alleged. In any event, Plaintiffs have no evidence that Harris County

---

[383]    Doc. 77 at p. 23 ¶ 63 ("Sheriff Garcia owed the duty to supervise, train, and direct the County jail officers and other staff.").

[384]    *Brumfield*, 551 F.3d at 329 (citing *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).

[385]    *See supra* Standard of Review.

or its employees were deliberately indifferent to any serious medical needs. Plaintiffs appear to allege that Defendants "failed to consult with medical staff before the extraction,"[386] "hogtied" and "prevented Lucas from breathing,"[387] "hindered the ability of medical professionals to assess and attend to Lucas's medical needs,"[388] and "us[ed] powerful chemical restraints."[389] Plaintiffs further allege, "on information and belief," that DCCT officers previously exhibited a tendency to ignore pretrial detainees' serious medical needs and that the Sheriff or his "delegates" knew of those tendencies and intentionally refused to prevent any harm.[390]

184.    Every *Monell* claim requires an underlying constitutional violation.[391] A plaintiff who establishes officials were deliberately indifferent to serious medical needs must then show that an official municipal policy was the moving force behind the constitutional violation.[392]

### A.    No municipal liability

185.    Plaintiffs have no evidence that Harris County's official policymaker acted with deliberate indifference in maintaining an unconstitutional policy or custom that was the moving force behind any constitutional violation.

186.    Plaintiffs have no evidence that any policy authorizes failing to consult with medical staff before a cell extraction. While HCSO's DCCT policy did not expressly require consulting with medical staff prior to a cell extraction, jail staff did communicate with medical

---

[386]    Doc. 77 at pp. 21 ¶ 56.

[387]    *Id.*

[388]    *Id.*; Doc. 77 at p. 23 ¶ 63.

[389]    Doc. 77 at p. 23 ¶ 63.

[390]    Doc. 77 at p. 25 ¶ 70.

[391]    *Kitchen*, 759 F.3d at 483 (citing *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013)).

[392]    *E.g.*, *Monell*, 436 U.S. at 690–91; *Fear v. Box*, 170 F.3d 184, 184 (5th Cir. 1999) (per curiam).

and mental health prior to Lucas's cell extraction.[393] Medical staff with knowledge of Lucas's medical history were aware of his medical conditions (anxiety and hypertension), aware he was being combative, aware he had a makeshift weapon and aware he was going to be brought to the clinic by the DCCT.[394] Further, the medical clinic had cleared out the clinic while waiting for Lucas and one of their gurneys was taken to Lucas's cellblock to transport him.[395] When Lucas was transported into the medical clinic, the video shows he was taken to the spot that had been cleared out for him.[396]

187.    The jail's mental health professionals were also aware of Lucas's condition prior to the cell extraction. Jail staff delivered a written psychiatric referral to the jail's mental health unit and Lucas was subsequently evaluated by a mental health professional prior to his cell extraction.[397]

188.    Moreover, Plaintiffs have no evidence that such a policy, if it existed, was promulgated with deliberate indifference to its known or obvious consequences or that there was a persistent, widespread pattern or practice of any unconstitutional custom or practice. Thus, *in this case*, HCSO jail staff consulted in some fashion with medical and mental health prior to extracting Lucas from his cell.

189.    Plaintiffs also have no evidence that any policy authorizes hogtying or any restraint that prevents an inmate from breathing. To the contrary, HCSO policies expressly prohibit

---

[393]    See Anderson Depo., p. 138:25-140:13, Ex. 13; Johnson Aff., Ex. 9.

[394]    O'Pry Depo., p. 42:2-44:24; 48:12-21; 49:11-24;57:5-8; 57:21-58:16; 85:20-86:3, Ex. 22; Sunder Depo., p. 28:8-33:4; 34:19 – 35:2, Ex. 21.

[395]    See Anderson Depo., p. 139:17-140:13, Ex. 13.

[396]    See video, Ex. 16.

[397]    See Johnson Aff., Ex. 9; Inmate Offense Report #2014-4633, Bates 180–81, Ex. 8. See also MH Progress Note, Bates # Lucas 115, Ex. 5.

hogtying.[398] It is also the written policy of HCSO that "the protection and sanctity of human life shall be a priority" and that inmates must be presented to the medical clinic following any use of force regardless if injury is sustained.[399] Plaintiffs have no evidence that these written policies are facially unconstitutional or adopted with deliberate indifference to known or obvious consequences. Moreover, Plaintiffs have no evidence of a persistent and widespread pattern or practice sufficient to establish an unwritten but official custom to hogtie and prevent inmates from breathing.

190.    Plaintiffs also have no evidence of any policy that authorizes jailers or DCCT members from hindering medical professionals from assessing and attending to inmates.[400] HCSO's policies require the DCCT to present inmates to the medical clinic following a use of force, including a planned cell extraction, whether or not injury is sustained.[401] As the video shows in this case, DCCT officers had to continue restraining Lucas in the clinic because he was still being combative. But the DCCT did not hinder any assessment and treatment of Lucas. The video shows Nurse O'Pry was not prevented from providing any treatment, including the Ativan injection, the blood pressure cuff, or the temperature and blood sugar readings. As soon as Dr. Sunder recognized a problem with Lucas's medical welfare, he ordered the DCCT to turn him over and they complied.[402] HCSO's policy required inmates housed in administrative separation, such as Lucas, to be restrained during the entire time they are out of their cellblock *unless* medical personnel requests removal of the restraints because they are harmful or interfere with the medical

---

[398]    See Policy Nos. D-239 and D-307, Bates # 2699-2704, 2731-36, Ex. 15. See also Martin Aff., Ex. 29.

[399]    Policy, D-307, Bates # 2375, Ex. 15.

[400]    See Bourgeois Aff., Ex. 19; Policy D-212, Bates # 2665–69, Ex. 15.

[401]    Policy, D-307, Bates # 2375, Ex. 15.

[402]    Video, at 26:50, Ex. 16.

needs of the inmate, in which case "extreme caution should be exercised while the inmate is unrestrained."[403] Thus, HCSO policy expressly authorized medical personnel to request removal of restraints if they interfered with medical treatment.[404] As the video shows, the officers removed the restraints and flipped Lucas over as soon as Dr. Sunder made his request. Plaintiffs have no evidence of any persistent, widespread pattern or practice of jail officials hindering medical professionals from assessing and attending to inmates.

191.    Plaintiffs also have no evidence that any HCSO policy requires or allows the use of "powerful chemical restraints." As an initial matter, no chemical restraints were used on Lucas. Based on his professional medical judgment, Dr. Sunder ordered Ativan to be administered to Lucas because he believed Lucas was suffering from Xanax withdrawal or delirium tremens.[405] Dr. Sunder did not prescribe Ativan to restrain Lucas, and no other "chemical" was given to Lucas. Plaintiffs have no evidence of any policy or persistent and widespread pattern or practice of chemically restraining inmates, including Lucas, that can be attributable to Harris County.

192.    Plaintiffs also have no evidence that the DCCT officers exhibited any "tendency" to ignore pretrial detainees' serious medical needs, or that any HCSO policy or custom authorized any such tendencies. As stated above, HCSO policies require and prioritize the protection and sanctity of human life. Moreover, Plaintiffs' statements are not true. There is no evidence of any disciplinary history of any member of the DCCT to ignore a detainee's serious medical needs. Plaintiffs' "information and belief" regarding any such tendency does not survive summary judgment.

193.    In addition to having no evidence of any policies, Plaintiffs cannot show such policies were the moving force behind such a violation. Plaintiffs have no evidence to meet their

---

[403]     Policy D-219, Bates # 2708, 2671, Ex. 15.

[404]     Policy D-219, Bates # 2708, 2671, Ex. 15.

[405]     Sunder Depo., p. 238:21 – 240:15, Ex. 21.

high threshold of proof of a direct causal link between any policy and any constitutional violation. Notably, Lucas did not suffer a sudden cardiac event during the cell extraction or during the transport to the medical clinic. Lucas arrived at the medical clinic at 15:32 and was in the clinic for over 10 minutes before Dr. Sunder became concerned Lucas was not breathing.[406]

### B.    No underlying constitutional violation

194.    Plaintiffs cannot establish an underlying constitutional violation. A "serious medical need" is one which is "so apparent that even laymen would recognize that care is required."[407] To show deliberate indifference, a plaintiff must show the official: (1) knows inmates face a substantial risk of serious bodily harm; and (2) disregards that substantial risk by failing to take reasonable measures to abate it.[408] Deliberate indifference has both an objective and subjective component: whether a risk is substantial and the threatened harm is serious is an objective inquiry; whether the official had the requisite knowledge of a substantial risk and disregarded it is a subjective inquiry.[409] "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[410]

195.    The deliberate indifference standard is "an extremely high standard to meet" and requires evidence of "egregious intentional conduct."[411] Deliberate indifference requires a plaintiff to show "that prison officials refused to treat him, ignored his complaints, intentionally treated him

---

[406]    See Video, at 26:53, Ex. 16,

[407]    *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[408]    *Farmer*, 511 U.S. at 834, 837; *Gobert*, 463 F.3d at 346; *Zaunbrecher v. Gaudin*, 641 Fed. App'x 340, 344 (5th Cir. Feb. 10, 2016).

[409]    *Farmer*, 511 U.S. at 837–38; *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015).

[410]    *Zaunbrecher*, 641 Fed. App'x at 344 (citing *Farmer*, 511 U.S. at 837).

[411]    *Gobert*, 463 F.3d at 346; *Zaunbrecher*, 641 Fed. App'x at 344.

incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs."[412]

196.    "Unsuccessful medical treatment, acts of negligence, or medical practice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment."[413] An incorrect medical diagnosis by medical personnel does not state a constitutional violation.[414] Constitutionally adequate care does not ensure that an inmate will agree with every treatment decision rendered.[415]

197.    The Fifth Circuit has consistently held that medical records of sick calls, examinations, diagnoses, and medications may rebut allegations of deliberate indifference to serious medical needs.[416] As long as jail medical personnel exercise professional medical judgment, their behavior will not violate an inmate's constitutional rights.[417] "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'"[418] Inmates are not entitled to the best medical treatment that money could buy.[419]

198.    Plaintiffs' cannot show Lucas had a "serious" medical need as defined by case law. It is clear from the video that a need for additional or different medical treatment was not even

---

[412]    *Zaunbrecher*, 641 Fed. App'x at 345 (quoting *Gobert*, 463 F.3d at 346).

[413]    *Gobert*, 463 F.3d at 347.

[414]    *E.g.*, *Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999).

[415]    *Estelle v. Gamble*, 429 U.S. 97, 107–08 (1976) (finding that a prison doctor's failure to order an x-ray of the plaintiff's lower back did not state an Eighth Amendment violation).

[416]    *Gobert*, 463 F.3d at 347 n.24; *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993).

[417]    *Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982); *Hare*, 74 F.3d at 646–48.

[418]    *Gobert*, 463 F.3d at 346 (citing *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107).

[419]    *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992).

immediately apparent to the medical professionals in the jail clinic, much less to the DCCT members, who are laymen not trained as medical professionals. While it is true the video evidence shows Lucas say he could not breathe during his brief transport to the medical clinic, he was cussing and thrashing around and exhibiting behavior and actions inconsistent with his words. It was not objectively apparent that Lucas could not breathe. Dr. Sunder is heard on the video telling Lucas to "relax, we are going to give you your medicines."[420] Lucas responded by saying "Fuck you" and then a few seconds later yelled "take this off me, I can't breathe" as he continued to fight against his restraints.[421]

199.    Likewise, Plaintiffs have no evidence to meet the "extremely high" deliberate indifference standard. Plaintiffs have no evidence that Lucas faced a substantial risk of serious bodily harm. His actions and behavior indicated a struggling, violent inmate intent on doing whatever he could to break free, including saying he could not breathe. Nurse Barton said she would not have felt safe if his restraints or position were changed while Lucas was in the medical clinic.[422]

200.    The DCCT had trained to extract and transport an inmate in the very way they executed Lucas's extraction and transport. Further, as Dr. Neuman testified and the Fifth Circuit has acknowledged, there is no risk of asphyxiation from a hog tie. Thus, there was no risk or substantial risk of Lucas suffocating from the lesser restraints employed against him, and there is no evidence the DCCT members knew there was such a risk of serious bodily harm. As soon as Dr. Sunder, a licensed medical doctor, realized there may be a risk of serious harm, he ordered the

---

[420]    Video, at 16:35, Ex. 16.

[421]    Video, at 16:43, Ex. 16.

[422]    See Barton Aff., Ex. 23.

doctors to release and flip Lucas over—as authorized by HCSO policy—and the officers complied.[423]

201.    Even if there was a substantial risk of serious harm, the DCCT officers did not disregard that risk or fail to take reasonable measures to abate any such risk. The DCCT was en route with Lucas to the medical clinic, where they reasonably believed he would receive any necessary treatment. All the while, Lucas continued to be combative in the medical clinic. No less amount of restraint would have allowed the officers to maintain control over Lucas.[424] As soon as Dr. Sunder observed that a risk of serious harm existed, he ordered the DCCT to release and turn Lucas over, and the DCCT complied. Plaintiffs have no evidence that any HCSO official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they also drew the inference—at least prior to Dr. Sunder ordering the DCCT to release and flip over Lucas.

202.    While Lucas's death is tragic, the video shows that the DCCT officers treated Lucas professionally and according to their training. The video does not show any officer acting with egregious intentional conduct. Plaintiffs cannot show that any official refused to treat Lucas, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct clearly evincing a wanton disregard for serious medical needs.[425] After he was extracted from his cell, Lucas was transported immediately to the medical clinic and monitored continuously by numerous officers, supervisors, and medical professionals. At least one doctor and several nurses evaluated and treated Lucas and kept records of same. At best, Plaintiffs challenge the unsuccessful medical treatment of Lucas. The medical professionals attempted to treat Lucas and resuscitate him when he fell unconscious. As the video documents, the medical staff did not egregiously and

---

[423]    Video, at 26:50, Ex. 16.

[424]    See Martin Aff., Ex. 29

[425]    Plaintiffs' experts likewise did not indicate any intentional withholding of medical treatment.

intentionally let Lucas die. No individual officer was deliberately indifferent to any of Lucas's medical needs.

### C.   No state-created danger theory recognized in the Fifth Circuit

203.    To the extent Plaintiffs complain about inadequate medical care under a state-created danger theory,[426] their complaint fails. The Fifth Circuit has consistently refused to recognize the state-created danger theory.[427]

204.    Plaintiffs have no evidence that Defendants used their authority to create a dangerous environment for Lucas or acted with deliberate indifference to Lucas's plight.[428] Thus, to the extent Plaintiffs intended to state a claim under the state-created danger theory, Harris County is entitled to summary judgment on the claim.

## VI.   This is an episodic acts or omission case, not a conditions of confinement case

205.    The standards for analyzing a pretrial detainee's constitutional claims depends on whether the detainee challenges the conditions of confinement or an episodic act or omission by jail personnel.[429] In a conditions of confinement case, the plaintiff attacks general conditions, practices, rules, or restrictions of confinement.[430] In such a case, "an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or

---

[426]    Doc. 77 at p. 21 ¶¶ 57–58 ("Defendants created Mr. Lucas's serious medical conditions . . . "); *id.* at p. 23 ¶ 63.

[427]    *Doe ex rel. MaGee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (2012) ("[W]e have not recognized the [state-created danger] theory."); *Kovacic v. Villareal*, 628 F.3d 209, 214 (5th Cir. 2010); *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 249 (5th Cir. 2003) ("We have never recognized state-created danger as a trigger of State affirmative duties under the Due Process clause.").

[428]    *Doe*, 675 F.3d at 865 (citations omitted) (recognizing the elements of the claim that is not recognized in the Fifth Circuit).

[429]    *Nazerzadeh*, 2010 WL 3817149, at *4 (citing *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).

[430]    *Hare*, 74 F.3d at 644.

restriction. A state's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction . . . ."[431] A conditions of confinement allegation challenges, for example, the number of bunks in a cell, television or mail privileges, 22–23 hour confinement, placement of mattresses, or inadequate food, heating, or sanitary conditions.[432] Thus, in a conditions of confinement case, courts inquire whether the challenged condition is reasonably related to a legitimate governmental interest, which is typically penological in jail cases.[433]

206.    In an episodic acts or omissions case, on the other hand, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act or omission by the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.[434] In episodic-acts-or-omissions cases, "intentionality is no longer a given."[435] The plaintiff must show subjective intent to cause harm, i.e., whether jail officials had gained actual knowledge of the substantial risk of harm and responded with deliberate indifference.[436] After showing a jail official's subjective deliberate indifference, the plaintiff must then show that the predicate act or omission resulted from a municipal policy or persistent, widespread pattern or practice adopted or maintained with objective deliberate indifference to the detainee's constitutional rights.[437]

---

[431]    *Id.*

[432]    *Scott*, 114 F.3d at 53 & n.2 (citing other examples).

[433]    *Hare*, 74 F.3d at 644–45, 646.

[434]    *Scott*, 114 F.3d at 53; *Hare*, 74 F.3d at 645.

[435]    *Hare*, 74 F.3d at 645.

[436]    *Id.* at 649, 650.

[437]    *Scott*, 114 F.3d at 54 (citing *Hare*, 74 F.3d at 649 n.4).

207.    Plaintiffs improperly attempt to cast their claims as attacking conditions of confinement in an attempt to subvert their burden to prove intentionality. Plaintiffs improperly attempt to cast their episodic-acts-or-omissions claims as conditions of confinement claims. But Plaintiffs are not challenging general conditions in the jail, they are challenging as episodic act or omission, i.e., the DCCT's planned cell extraction and immediate transport of Lucas to the jail medical clinic. Plaintiffs clearly complain about specific DCCT members' actions during the cell extraction, including the immediate transport of Lucas to the medical clinic. Plaintiffs are not attacking general policies of the jail. As discussed above, Harris County's policies are not facially unconstitutional. Restraining inmates, medically treating inmates, and monitoring inmates are not jail conditions. And Plaintiffs have no evidence that any Harris County staffing-related policy is a condition or restriction of confinement.

208.    Plaintiffs' complaints are far removed from conditions such as inadequate housing, food, or sanitation; practices or rules regarding numbers of mattresses in cells or phone and mail privileges; or restrictions such as 24-hour confinement. Even if Plaintiffs properly attacked the conditions of Lucas's confinement, they cannot show that such conditions are not reasonably related to a legitimate governmental interest in maintaining control over violent, combative, noncompliant inmates. Plaintiffs are inappropriately attempting to subvert their high burden to show the requisite intent by Harris County's official policymaker, and they do not properly challenge any conditions of confinement.

209.    To the extent, if any, Plaintiffs properly cast their claim as a conditions of confinement, extracting a violent inmate with a makeshift weapon from his cell is clearly and reasonably related to Harris County's legitimate governmental interest in maintaining order and the safety of inmates and staff inside the Harris County jail.

**VII.    Plaintiffs failed to establish a claim for violation of the ADA/RA/AADA.**

210.    This case is not about accommodating disabilities. The attempt to pigeon hole this case as such is an improper attempt to expand coverage of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") far beyond what Congress intended.

211.    Plaintiffs allege Lucas suffered from "obesity, hypertension, anxiety and depression" and assert these are "impairments" that "substantially limited Mr. Lucas's ability to breathe, to carry out normal operation of his cardiovascular system, to think, to focus, and to exert himself physically."[438] Plaintiffs further appear to allege these impairments are qualified "disabilities" that were obvious to Harris County and for which Harris County should know his "obvious" need for accommodations.[439]

212.    Plaintiffs assert these alleged disabilities made him "especially vulnerable" to "positional asphyxiation and dangerous restraint in a hogtie position."[440] Plaintiffs allege Harris County failed to accommodate Lucas's disabilities by intentionally and consciously refusing or failing to (1) "implement any plans or protocols," (2) employ any special effort, techniques or personnel, and (3) monitor the restraint of detainees with these type of disabilities.[441]

213.    Plaintiffs have failed to establish that Harris County and its officials intentionally discriminated against Lucas. To state a claim under the ADA, a plaintiff must allege that (1) he is a qualified individual with a disability within the meaning of the ADA; (2) who was excluded from participation in or denied meaningful access to services, programs, or activities, or that he was

---

[438]    Doc. 77 at p.26.

[439]    *Id*.

[440]    *Id*.

[441]    *Id*., at p. 27.

otherwise discriminated against; and (3) that the exclusion, denial of benefits, or discrimination was by reason of his disability.[442]

214.   A disability is "a physical or mental impairment that substantially limits one or more major life activities; ... a record of such an impairment; or ... being regard[ed] as having such an impairment."[443] Major life activities are "those activities that are of central importance to most people's everyday lives."[444] In order to survive summary judgment on an ADA claim, "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."[445]

215.   The ADA provides for compensatory damages only upon a showing of *intentional* discrimination on the basis of disability.[446] "The ADA prohibits discrimination *because of* disability, not *inadequate treatment for* disability."[447] Congress did not intend ADA or RA claims to create general tort liability for the government.[448]

---

[442]   *See Blanks v. Sw. Bell Commc'ns*, 310 F.3d 398, 400 (5th Cir.2002).

[443]   *Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) (citing 42 U.S.C. § 12102(1)).

[444]   *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007).

[445]   *Hoffman v. Baylor Health Care System*, No. 3:12-cv-3781-L, 2014 WL 772672 *15 (N.D. Tex. Feb. 27, 2014) (*quoting Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc) (citations omitted).

[446]   *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir.2002).

[447]   *Cheek v. Nueces Cnty., Tex.*, No. 2:13-cv-26, 2013 WL 4017132 at * 18 (S.D. Tex. Aug. 5, 2013) (quoting *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir.2010)).

[448]   *Estate of A.R. v. Muzyka*, 543 Fed. Appx. 363, 365 (5th Cir.2013).

### A.   Lucas's conditions do not demonstrate Lucas was disabled within the meaning of the ADA.

216.   To begin, Plaintiffs have not established that "obesity, hypertension, anxiety and depression" are "disabilities" under the ADA.[449] Plaintiffs do not appear to allege that Lucas, standing and yelling in his cell would be impaired by these alleged disabilities. Instead, Plaintiffs argue that Lucas's alleged disabilities make him "especially vulnerable" when in a hogtie position.

217.   "[N]either the Supreme Court nor [the Fifth Circuit] have recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies."[450] Standing alone, the diagnosis of a condition, such as high blood pressure, without any evidence that it substantially affects one or more major life activities, is insufficient to trigger the protections of the ADA.[451]

218.   "[C]ourts are to make an individualized determination of whether an individual's impairment constitutes a disability, taking into consideration measures taken by the individual to mitigate the effects of the impairment."[452] Courts should consider "'(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'"[453]

---

[449]   The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both" and that "[t]he RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Thus, Harris County will refer to them collectively as the ADA in this Motion except where a distinction is necessary.

[450]   *Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 223 (5th Cir.2011).

[451]   *Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (quotation omitted).

[452]   *Griffin,* 661 F.3d at 222.

[453]   *Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011).

219.    The ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.'"[454] But "a plaintiff must still show substantial limitation" under the ADAAA.[455] Contrary to the autopsy report, medical records and sound medical judgment, Plaintiffs' theory of the case is that Lucas died of asphyxia due to the restraints he was placed in following his cell extraction.

220.    Importantly, Plaintiffs' medical expert could not provide any medical opinion on how anxiety and hypertension *restrict* a person's ability to breathe. Plaintiffs have no expert opinions describing how depression restricts a person's ability to breathe. Dr. Kris Hall testified he is not a pulmonologist and could not describe how to quantify the impact of obesity or anxiety on one's ability to breathe.[456] He did not believe that Lucas's hypertension had "any kind of linear correlation" to his ability to breathe and he testified that the anxiety attacks he sees in the emergency room "usually have normal oxygen saturations even if they're breathing a bit fast."[457] He additionally testified, "[a]nxiety makes you *think* that you can't breathe, but again, I don't think it's affecting your ability to actually move air."[458]

221.    Dr. Hall had nothing but "basic training and medical school" to support his opinions regarding the effect of obesity on one's ability to breathe and could only *assume*, but not quantify how hog-tying would interfere with one's capacity to breathe:

> Q.    So it's not something that you would be able to – to quantify in terms of, well, if you're in a – in a hogtie, in a prone position, that that would – I

---

[454]    *Garner v. Chevron Phillips Chem. Co., L.P.,* 834 F. Supp. 2d 528, 529 (S.D. Tex.2011).

[455]    *Mann v. La. High Sch. Athletic Ass'n,* 535 F. App'x 405, 410 (5th Cir. 2013).

[456]    See Hall Depo., p. 112:22-114:1, Ex. 34.

[457]    Hall Depo., p. 109:21-111:5; 112:22-113:13, Ex. 34.

[458]    Hall Depo., p. 114:14-115:3 (emphasis added), Ex. 34.

mean, you wouldn't be able to quantify how much that would impact somebody's capacity to breathe?

A.   Right. I wouldn't be able to quantify that, but it's perfectly reasonable to assume that it would definitely compromise your ability to breathe.[459]

222.   Dr. Hall testified he is not relying upon any studies or literature about how obesity might affect someone's capacity to be able to breathe.[460] Dr. Robert Cohen, Plaintiffs' other medical expert, likewise did not have any opinions wherein he could quantify how anxiety, hypertension or obesity could impact one's ability to breathe:

Q.   With regard to Mr. Lucas's anxiety, do you have an opinion on whether -- how much the anxiety itself would affect his breathing capacity?

A.   No.

Q.   With regard to his obesity, how much does the obesity change his capacity to breathe?

A.   Well, it does. I don't know exactly what amount, but it does.[461]

223.   Dr. Cohen further testified he is not relying upon any data, literature or experimental studies concerning obesity and hypertension and its effect on someone's capacity to breathe.[462]

224.   Courts are split on whether obesity qualifies as a disability under the ADA. Prior to the ADAAA, the EEOC promulgated interpretive guidelines stating that except in "rare circumstances," obesity is not considered a disabling impairment.[463] Similarly, several courts

---

[459]   Hall Depo., p. 115:8-117:3 (emphasis added), Ex. 34. Harris County does not concede Lucas was hogtied. In fact, Harris County strongly denies that Lucas was hog tied. Even if the Court were to find that Lucas was in a "hogtie position," which he was not, Plaintiffs' still cannot show there was a constitutional violation or that the position he was in led to his death as a result of asphyxia.

[460]   Hall Depo., p. 115:8-22, Ex. 34.

[461]   Cohen Depo., p. 169:10-172:3 and 172:4-13, Ex. 35.

[462]   Cohen Depo., p. 171:10-172:3; 173:3-21, Ex. 35.

[463]   See *Melson v. Chetofield*, No. 08-3683, 2009 WL 537457, at *3 (E.D. La. Mar. 4, 2009).

found that obesity constituted a disability only if it was the result of a physiological condition.[464]
Plaintiffs' experts have opined that Lucas was obese, but not that he is morbidly obese.[465]

225.    Harris County's medical expert, Dr. Tom Neuman, is board certified in
pulmonology and internal medicine, and, until recently was also board certified in emergency
medicine.[466] Dr. Neuman testified asphyxia played no role in Lucas's death, but that he died from
sudden cardiac death.[467] This is further consistent with the findings by the medical examiner in
her autopsy report.[468]

226.    Plaintiffs complain that Lucas's alleged disabilities affected his ability "to think,
to focus, and to exert himself physically."[469] Plaintiffs contend Lucas was going through Xanax
withdrawal, causing him to experience "extreme agitation" and was seen "yelling, screaming,
rambling, incoherent, delirious and beating on his cell door."[470] Dr. Sunder testified the picture of
delirium for Xanax withdrawal is "hyperexcitable state, confusion, combativeness, sweating."[471] If
Lucas was suffering from Xanax withdrawal, this was brought about by Lucas's illegal use of Xanax.
The testimony by those close to Lucas is that, in 2014, he did not see a doctor for anxiety, did not

---

[464]    *EEOC v. Watkins Motor Lines, Inc*., 463 F.3d 436, 440-443 (6th Cir. 2007); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997).

[465]    See Dr. Cohen's deposition, 84:11-85:2, Ex. 35.

[466]    See Neuman Depo., p. 13:4-13, Ex. 36.

[467]    Neuman Depo., p.35:19-36:5, Ex. 36.

[468]    See autopsy report, p.1, Ex. 24.

[469]    Doc. 77 at p. 26. Lucas was being restrained to prevent him from harming the jail staff and the medical staff. Despite these restraints, Lucas can be seen on the video exerting himself physically against the restraints.

[470]    Doc. 77 at p.6.

[471]    Sunder Depo., p. 52:24-53:3, Ex. 21.

have a prescription for Xanax, but did obtain Xanax (illegally) from his friend, Anna Fonseca's ex-boyfriend in the months before he died.[472] Anna Fonseca testified:

> Q.    So, let me -- I'm going to take kind of a step back here. I'll represent to you that Mr. Lucas died on February 17, 2014. Does that date sound right to you?
>
> A.    Yes, ma'am.
>
> Q.    How long before he died did you know him?
>
> A.    Maybe four or five months.
>
> Q.    And so, during that four to five-month period, is that when your ex-boyfriend, Mr. Kelly, was helping him get Xanax?
>
> A.    Uh-huh. Yeah.
>
> Q.    Do you know what his source was for getting the Xanax?
>
> A.    What do you mean?
>
> Q.    Like who he would go to get it from.
>
> A.    My ex-boyfriend. I don't know who he would get it from. I think his mom had them at the time.
>
> <div align="center">* * * *</div>
>
> Q.    And so -- and you said Mr. Kelly, you thought he was getting it from another lady that had a prescription?

---

[472]    His wife Amber Lucas testified she didn't see Lucas having any mental health problems at all and that she was not aware of him being under a doctor's care in 2013-2014 or being prescribed any medication for anxiety after 2007 when his family doctor in Alvin passed away. Amber Lucas Depo., 17:9-18:9; 19:6-10; 26:20-27:23; 42:7-43:23, Ex. 37. Lucas's sister Shaneika testified Lucas was under a care of doctor for his anxiety before he came to live with her in 2008, but the only doctors she was aware of that he saw after he moved in, were in the emergency room – one of which prescribed Clonazepam. Gradney Depo., p. 48:8-49:14; 50:4-51:19;53:7-15, Ex. 38. Anna Chlamon, Lucas's girlfriend with whom he was living with at the time he died, testified that he took alprazolam and she understood he was obtaining the medication without a prescription. Chlamon Depo., 9:22-10:19; 35:22-36:14, Ex. 39.

A.     His mom had a prescription. So, I guess he was selling it to him. His mom knew them, too -- knew Caine for a while, too.[473]

227.     Lucas's purported ingestion of Xanax, a drug taken illegally and without a prescription is what allegedly led to his drug withdrawal symptoms that put Lucas in the physical condition in which he existed at the time of his cell extraction. In § 2114(a), the ADA provides in relevant part:

> For purposes of this title, the term "qualified individual with a disability" *shall not include* any employee or applicant who is *currently engaging in the illegal use of drugs*, when the covered entity acts on the basis of such use."[474]

228.     Because continuing drug use is not considered a disability under the ADA, Lucas is not entitled to its protections.[475] Harris County medical records note Lucas admitted to history or current use of illicit drugs and a lab report following his death indicated presumptive positive for marijuana metabolites.[476] Additionally, Harris County should not be liable for failing to accommodate Lucas because the jail staff were removing Lucas to take him to the medical clinic, where medical staff were standing by to treat him.

---

[473]     Fonseca Depo., p.12:14-23; 13:17-14:24 (emphasis added), Ex. 40. Ms. Fonseca testified Lucas would obtain about 30 pills of Xanax from her ex-boyfriend about twice a week. *Id.*, at p.17:16-18:7.

[474]     42 U.S.C. § 12114(a) (emphasis added).

[475]     *Hayden v. Trinity Railcar Repair, Inc*., No. 1:16-cv-2154, 2017 WL 1485499, at *5 n.5 (E.D. Tex., Mar. 30, 2017) (citing *Zenor v. El Paso Healthcare Sys., Ltd*., 176 F.3d 847, 853-55 (5th Cir. 1999) (citing 42 U.S.C. § 12114(a)) (""[F]ederal law does not proscribe an employer's firing someone who currently uses illegal drugs, regardless of whether or not that drug use could otherwise be considered a disability."). See also *Torello v. Sikorsky Aircraft Corp.*, No. 3:04CV848, 2006 WL 680508, at *3 (D. Conn, Mar. 14, 2006) (holding the plaintiff is not covered by the ADA due to undisputed evidence of plaintiff's admission of drug use and positive drug test that revealed plaintiff was engaged in illegal use of drugs at the time of his termination).

[476]     See medical record, Bates # Lucas 122-123, Ex. 5; HCIFS Laboratory Report, Bates # 991–93, Ex. 24 (part of autopsy report).

**B.      The DCCT was not aware of Lucas's alleged "disabilities."**

229.     Plaintiffs have not established that any member of the DCCT (or Lt. Anderson) were aware of or knew that Lucas had been diagnosed with obesity, hypertension, anxiety or depression.[477] Dr. Sunder and Nurse O'Pry, the individuals with knowledge of Lucas's medical history—in particular Lucas's hypertension and suspected drug withdrawal—were aware Lucas was being extracted from his cell, that he was being uncooperative and that he was to be brought down directly to the medical clinic.[478] Dr. Sunder testified that prior to Lucas being transported to the medical clinic, he spoke with LPHA intern LaMonica Kinch who told him that Lucas was being combative and having delirium.[479] Dr. Sunder also testified he was told that Lucas was dangerous and had some kind of weapon.[480] Prior to Lucas's transport to the medical clinic, Dr. Sunder pulled Lucas's chart and noted that he had a history of hypertension and anxiety and believed he may be going through Xanax withdrawal.[481]

230.     Nurse O'Pry testified that if it were medically necessary, she could provide medical information to officers.[482] There is no evidence either Nurse O'Pry or Dr. Sunder saw a need to communicate Lucas's medical history to any of the DCCT.[483]

---

[477]     See Green Depo., p. 15:6-16:16; 18:5-7; 21:6-18; 117:18-20, Ex. 41; Bell Depo., p. 48:7-9, Ex. 42; Thomas Depo., p. 51:6-13; 53:5-54:4, Ex. 18; Scott Depo., p. 122:22-24; 173:9-13, Ex. 43; Leveston Depo., p. 87:17-22, Ex. 44; Gordon Depo., 53:18-54:3, Ex. 27; Anderson Depo., p. 43:14-23; 57:8-10, Ex. 13. There is no evidence in the record that Lucas has ever been diagnosed with "depression" or that Harris County would be aware of any such diagnosis. While some of the DCCT testified Lucas was a big man, they have not testified that they were aware of any clinical diagnosis of obesity.

[478]     O'Pry Depo., p. 42:2-44:24; 48:12-21; 49:11-24;57:5-8; 57:21-58:16; 85:20-86:3, Ex. 22.

[479]     See Sunder Depo., p. 28:8-33:4, Ex. 21.

[480]     Sunder Depo., p. 34:19-35:7, Ex. 21.

[481]     Sunder Depo., p.28:8-24; 33:5-34:12, Ex. 21.

[482]     O'Pry Depo., p. 54:5-15; 55:16-21;74:75:7, Ex. 22.

[483]     O'Pry Depo., p. 52:12-18; 53:2-20; 55:16-56:24; 64:18-65:9 74:20-75:5; 76:6-77:1, Ex. 22.

### C.      Plaintiffs cannot show Lucas was denied a reasonable accommodation.[484]

231.     A claim for discrimination under Title II of the ADA and Section 504 of the RA can be supported by a showing that a plaintiff was denied a "reasonable accommodation."[485] While Harris County denies that Lucas had any disability for which an accommodation would be required, Harris County did make certain accommodations for the various medical conditions of which Plaintiffs complain.

#### i.      Lucas's hypertension

232.     After being admitted to the Harris County jail, Lucas was evaluated by medical personnel and treated for hypertension.[486] Indeed, within days of his admittance when Lucas complained of chest pain and had an increased pulse, he was sent to the hospital.[487] Dr. Sunder was aware of Lucas's hypertension prior to the cell extraction team bringing him to the clinic.[488]

#### ii.      Lucas's anxiety

233.     Lucas's anxiety was likewise documented and treated upon his admission to the jail.[489] Officer Jumall Johnson completed a psychological referral when he observed behavior he thought was irrational. Mental health staff LaMonica Kinch evaluated Lucas and she told both Dr. Sunder and Nurse O'Pry that she believed he was going through drug withdrawal. Although she found Lucas to be rambling and not understandable, he correctly identified his name, date of birth,

---

[484]     Although Lucas can be heard on the video saying "get off me" and was pushing against his restraints, Harris County denies these would be a request for an accommodation. See video, Ex. 16

[485]     Section 504 of the *Rehabilitation Act of* 1973, Pub. L. No. 93-112, 87 Stat. 394 (Sept. 26, 1973); 29 U.S.C. §794(a) (2015).

[486]     See medical records, Bates # 121–23, Ex. 5.

[487]     See medical records, Bates # 116, 125, Ex. 5.

[488]     Sunder Depo., p. 28:8-24; 33:5-34:12, Ex. 21.

[489]     See medical records, Bates # 118–20, Ex. 5.

and that the date was the "17th" (of the month).[490] Because of Lucas's combativeness and refusal to surrender the dangerous smoke detector, this impacted the timing and method of his transport to the medical clinic. Lucas was given numerous opportunities to cool down and cooperate, but he did not. Harris County was left with no reasonable alternative but to send in the DCCT to safely remove the weapon from Lucas and to get him to the clinic for immediate medical evaluation.

234.    Almost immediately upon arrival to the clinic, Dr. Sunder ordered Ativan be administered to Lucas. Nurse O'Pry administered at least two injections of Ativan.

### iii.    Lucas's depression

235.    There are no indications of a diagnosis of depression in the records. Lucas's girlfriend he was living at the time of his death, Anna Chlamon, testified she was not aware of Lucas having any mental health condition or any disability.[491] Lucas's wife, Plaintiff Amber Lucas, testified she was not aware of any mental health condition.[492] Lucas's former girlfriend, Plaintiff Casandra Salcido, testified she did not know if Lucas had ever been diagnosed with any kind of mental health condition.[493]

### iv.    Lucas's obesity

236.    When the DCCT placed handcuffs on Lucas, they utilized the "HT" extended length handcuffs, colloquially referred to as "big-boy cuffs" to accommodate Lucas's large size.[494] In

---

[490]    See MH Progress Note, Bates # Lucas 115, Ex. 5 (medical records).

[491]    See Chlamon Depo., p. 39:14-22, Ex. 39; Amber Lucas Depo., p. 17:24-19:10, Ex. 37.

[492]    See Amber Lucas Depo., p. 17:24-19:10, Ex. 37.

[493]    See Salcido Depo., p. 35:12-14, Ex. 45.

[494]    See Bourgeois Aff., Ex. 19; Scott Sworn Statement, at p. 3, Ex. 17.

addition, to further accommodate Lucas's size in transporting him to the medical clinic, the officers did not raise the side rails of the gurney.[495]

237.   Plaintiffs appear to assert that placing Lucas on his side was the reasonable accommodation that should have been made with regard to his transport to the medical clinic.[496] Plaintiffs have not established that the transport of a combative inmate to the medical clinic is a "service, program or activity" for which an accommodation should be made.[497]

238.   Case law recognizes that a public entity's failure reasonably to accommodate the *known limitations* of persons with disabilities can also constitute disability discrimination under Title II.[498] A critical component of a Title II claim for failure to accommodate, however, is proof that "the disability and its consequential limitations were known" by Harris County.[499] Mere knowledge of the disability is not enough; Harris County must also have *understood* the limitations the plaintiff experienced *as a result* of that disability.[500] Otherwise, it would be impossible for Harris County to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances.[501]

---

[495]   See Bourgeois Aff., Ex. 19.

[496]   Doc. 77 at p. 27.

[497]   To recover under the ADA, Plaintiffs must prove that Lucas was being denied the "benefits of services, programs, or activities" or is otherwise being discriminated against. Harris County submits Plaintiffs have no evidence to support this claim. *Hale*, 642 F.3d at 499.

[498]   *Windham v. Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017) (citing *Bennett-Nelson v. La. Bd. Of Regents*, 431 F.3d 448, 454 & n. 11 (5th Cir. 2005)).

[499]   *Windham*, 875 F.3d at 236 (citations omitted).

[500]   *Id.* (citations omitted).

[501]   *Id.* (citations omitted).

239.    The ADA places the burden on the plaintiff "to specifically identify the disability and resulting limitations," and to request an accommodation in "direct and specific" terms.[502] When a plaintiff fails to request an accommodation in this manner, he can only prevail by showing that "the disability, resulting limitation, and necessary reasonable accommodation" were "open, obvious, and apparent" to Harris County's agents.[503] There was no request for an accommodation by Lucas – at best, Plaintiffs would contend that he said he "could not breathe" at two separate instances in which he was talking, cussing and resisting his restraints while on the gurney.[504]

240.    Lucas was combative and resisting his restraints, even while in the medical clinic. When Dr. Sunder was asked if Lucas was in distress when he came into the clinic, his response was instead that Lucas was "combative."[505]

241.    Knowledge of a disability is different from knowledge of the *resulting limitation*.[506] And it certainly is different from knowledge of necessary accommodation.[507] Plaintiffs cannot show that Harris County had: (1) knowledge of the alleged disabilities, (2) knowledge of the resulting limitation, and (3) knowledge of the necessary accommodation.

---

[502]    *Id.* at 237 (citations omitted).

[503]    *Id*. (citations omitted).

[504]    The first instance occurred while the gurney was waiting at the elevator, Lucas said "I can't breathe you fucking bitch" to Lt. Anderson. See Anderson Depo., p.103:16-18, 104:3-11, Ex. 13. The second instance occurred in the medical clinic right after Dr. Sunder told Lucas he was going to give him his "medicines" to which Lucas replied "by saying "Fuck you" and then a few seconds later yelled "take this off me, I can't breathe" as he continued to fight against his restraints. Sunder Depo., p.96:19-97:10, Ex. 21; Video, Ex. 16.

[505]    Sunder Depo., p. 28:1-7, Ex. 21.

[506]    *Windham*, 875 F.3d at 238.

[507]    *Id*.

242.     At the time of Lucas's extraction and transport, the training and practice of the DCCT was to transport combative inmates to the clinic in the prone position on a gurney.[508] This method of transport had been used numerous times before with no resulting injury or death.[509] Indeed, Dr. Sunder testified he recalled at least one prior incident in 2014 in which an inmate was brought "from court" to the medical clinic in the same prone position on a gurney – with the inmate's hands cuffed behind their back, ankles shackled, legs crossed and folded over, just like Lucas.[510] Lt. Anderson testified she had been involved in five or six cell extractions prior to Lucas, with two involving a gurney. She testified that in both of those extractions with a gurney, the inmate was handcuffed, shackled, legs crossed and bent and in the prone position like Lucas and that there was no harm to either inmate.[511] She further testified that the DCCT's extraction and transport of Lucas was, like the two prior inmates, done according to her training and the policies and procedures of Harris County.[512]

### D.     The ADA should not apply to the cell extraction because of the exigent circumstances.

243.     The extraction and transport of Lucas is akin to the situation faced by law enforcement in the field when attempting to arrest a suspect in a dangerous environment. The Fifth Circuit holds that Title II of the ADA does not apply to situations when the police are attempting to arrest and contain a situation where the suspect is creating a dangerous situation and causing a threat to human life.[513] In *Hainze*, the Fifth Circuit stated the following:

---

[508]     See Bourgeois Aff., Ex. 19.

[509]     Bourgeois Aff., Ex. 19.

[510]     Sunder Depo. p. 79:17-82:13, Ex. 21.

[511]     Anderson Depo., p. 30:24-32:6, Ex. 13.

[512]     Anderson Depo., p. 31:23-32:16, Ex. 13.

[513]     *Hainze*, 207 F.3d at 802.

Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those cases involves subjects mental disabilities, prior to the officer securing the scene and ensuring there is no threat to human life. Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially-life threatening situations. To require the officers to factor in whether or not their actions are going to comply with the ADA in the presence of exigent circumstances and prior to the securing the safety of themselves, other officers, and nearby civilians would pose an unnecessary risk to innocents…[W]e do not think Congress intended that the fulfillment of that objected be attained at the expense of the safety of the general public.[514]

244.    Requiring officers to consider ADA compliance in dangerous, threatening situations risks the safety of the individual involved, as well as the officers and medical staff. "Reasonableness" in law is assessed in light of the totality of the circumstances, and exigency is one circumstance that bears materially into reasonableness of actions under the ADA.[515] Accommodations that might be expected when time is not a factor become unreasonable when time is of the essence.[516] "Exigency" itself is not confined to split-second circumstances but is applicable when officers face unstable situations.[517] Title II of the ADA does not contemplate requiring officers to hesitate and consider reasonable accommodations in unstable situations where quick decisions must be made.

245.    In the instant case, the officers were faced with a combative inmate who was not only wielding a weapon and charged at the officers, but who continued to resist his restraints throughout the transport to and while in the medical clinic. Certainly, the safety and security of the civilian medical team, who is not outfitted in any protective gear, should be considered.  The use of handcuffs and shackles on an inmate that is housed in administrative separation is required

---

[514]    *Id.* at 807.

[515]    *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009).

[516]    *See id.*

[517]    *Hainze*, 207 F.3d at 802–803.

by Harris County policy when transporting such inmates out of their cell due to the security risk imposed.[518]

246.     To say that the DCCT failed reasonably to accommodate Lucas because of his alleged disabilities and allude to the fact that they should have taken other actions that would be contrary to their training is to lean in the direction of impermissible hindsight. The evidence shows, and Plaintiffs have no competent evidence to controvert, that Lucas was refusing to turn over the large metal smoke detector with jagged edges, refusing to cooperate during the application of restraints, and continuing to resist throughout the transport and arrival in the medical clinic. These facts demonstrate that the situation was largely unstable. Because Plaintiffs rely on what actions "could" or "should" have been done differently in this situation, particularly in the absence of any indication that the restraint of Lucas would be dangerous, instead of providing evidence to prove that discriminatory actions were taken and reasonable accommodations were not made, Plaintiffs' arguments must fail.

**E.     Plaintiffs cannot meet the high burden to prove intentional discrimination by allegations sounding in negligence.**

247.     The Fifth Circuit defined the intentional discrimination standard to require proof *beyond* deliberate indifference. In *Delano-Pyle v. Victoria County, Texas*, the Court held that the standard for "intentional discrimination" was actually *higher* than deliberate indifference.[519]

---

[518]     See HCSO Policy D-219, Bates # 2671, Ex. 15.

[519]     *Delano-Pyle*, 302 F.3d at 575. It's also important to note the procedural posture of the Court's review in *Delano-Pyle*. The Fifth Circuit conducted a *plain-error* review of a jury verdict rendered in favor of an ADA plaintiff. The plaintiff, who was deaf, had been arrested by an officer who gave verbal instructions for a field sobriety test, and verbally gave *Miranda* warnings and other communications. The officer admitted that his verbal communications were not effective and admitted that he knew that the law required that certain Constitutional warnings must be continued to be repeated until they are understood.  The Court held that, based on this record, "we cannot conclude that there was no evidence produced to support the verdict." *Id.*, at 576.

Several courts have reaffirmed the notion that intentional discrimination requires proof beyond mere deliberate indifference.[520]

248.    The Fifth Circuit, in holdings regarding intentional discrimination by school districts, held that "[f]acts creating an inference of professional bad faith or gross misjudgment are necessary to substantiate a cause of action for intentional discrimination under §504 or the ADA."[521] In *Estate of A.R. v. Muzyka*, the parties disagreed over whether this was the applicable standard or if the standard was "deliberate indifference."[522] The Fifth Circuit declined to explore the issue, noting that the plaintiff had failed to meet either standard.[523]

249.    "The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the . . . officials were actually aware of the risk, yet consciously disregarded it."[524] "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants."[525] Thus, the "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference."[526] Just as important, prison officials who actually knew of a substantial risk to

---

[520]    *Taylor v. Richmond State Supported Living Ctr.*, No. 4:11-3740, 2012 WL 6020372, at *5 n.2 (S.D. Tex. Nov. 30, 2012) (noting that the Fifth Circuit requires more than "the lesser proof of deliberate indifference"); *Zaragoza v. Dallas Cnty.*, No. 3:07-cv-1704-K, 2009 WL 2030436, at *13 (N.D. Tex., July 13, 2009) ("(intentional discrimination) is a higher standard than deliberate indifference, which is not "applicable to public entities for purposes of the ADA or RA.").

[521]    *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.,* 629 F.3d 450, 455 (5th Cir.2010).

[522]    *Muzyka*, 543 Fed. Appx. at 365.

[523]    *Id.*

[524]    *Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002).

[525]    *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) (*quoting Farmer*, 511 U.S. at 834).

[526]    *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838).

inmate health or safety are not liable if they responded reasonably to the risk, even if the harm ultimately was not averted.[527]

250.     As noted above, deliberate indifference itself is "*an extremely high* burden."[528] The expansive body of case law regarding this extremely high burden, coupled with the notion that an ADA intentional discrimination claim requires proof *beyond* this standard, forces these Plaintiffs to seek a modification in law to lower the current standard because the allegations, taken as a whole, fail the established test.

251.     Plaintiffs' claims fail for the precise reason articulated by the Fifth Circuit in its recent holding in *Rodriguez v. Muzyka*. In *Rodriguez*, a child was enrolled in a public school-operated enrichment program that included swimming activities.[529] The child suffered from hearing impairment as well as a seizure disorder.[530]  The child suffered a seizure during the pool activities, fell into the pool, and drowned.[531] The parents filed an ADA claim asserting intentional discrimination.[532] They argued that "[the child]'s safe and meaningful access to the program was interrupted because of her disability" and "pointed out many things the school could have done to make the situation safer for her in the pool area: additional lifeguards, different types of alarm devices, and so on."[533]

252.     The Fifth Circuit held that this failed to state an ADA claim. Though there were measures the school *could have* implemented, this only stated a claim for negligence even where

---

[527]     *Farmer*, 511 U.S. at 844-45.

[528]     *Domino*, 239 F.3d at 756.

[529]     *Muzyka*, 543 Fed. Appx. at 364.

[530]     *Id*.

[531]     *Id*.

[532]     *Id*.

[533]     *Id*. at 365.

there were fact issues with regard to the extent and level of the knowledge of the supervising teachers about the child's level of impairment and medical issues, as well as fact issues regarding how long the child was in the water and how fast the supervising safety personnel responded.[534] The Fifth Circuit held that the child was in no way denied access to services, programs, and activities of the school, and the parents' claim that program was not made safe, sounded in negligence, not intentional discrimination.[535]

253.    In the correctional context, the Fifth Circuit likewise has been reluctant to extend ADA liability to claims where disabled inmates claim poor treatment or inadequate facilities, but also where any "discrimination" is not "by reason of" that inmate's disability.  The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners."[536] Although Plaintiffs contend Defendants "intentionally failed to make reasonable accommodations" for Lucas's needs by "causing him to suffer more pain and punishment than non-disabled detainees," their claim is really complaining about the failure to attend to his medical needs while he was in the clinic: "[b]ecause of Defendants' failures, Mr. Lucas could not breathe, fell unconscious, and died."[537] Lucas died several minutes after being in the medical clinic, while medical staff surrounded him.

254.    Plaintiffs' claims fall squarely within the Fifth Circuit's holding that "a prison's simply failing to attend to the medical needs of its disabled prisoners" does not state an ADA claim.[538]

---

[534]    *Id*.

[535]    *Id*.

[536]    *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012).

[537]    Doc. 77 at p. 27.

[538]    *Nottingham*, 499 F. App'x at 377.

255.    Plaintiffs would have to prove far more than the fact that Lucas had anxiety, depression, hypertension and obesity and died while in restraints in the medical clinic. Plaintiffs must prove, at a minimum, that Harris County not only had knowledge of Lucas's disabilities, but also that they had knowledge of the actual limitations on Lucas, that his conditions were actually interfering with his ability to breathe, and then intentionally chose to continue to restrain him knowing the effect of it. Plaintiffs have no evidence to support this. Once the DCCT team arrived in the medical clinic, the medical staff took over and the DCCT remained to maintain security, but moved out of the way to allow the medical staff to treat Lucas.[539] The evidence shows the DCCT complied with the instructions by Dr. Sunder in the medical clinic. When Dr. Sunder asked the DCCT to relieve pressure from Lucas's legs, Officer Scott got off the gurney and removed all pressure. When Dr. Sunder asked to turn Lucas over, the DCCT turned him over.[540]

256.    Plaintiffs' medical experts testified they did not believe the medical staff knew Lucas was in distress but intentionally injured or withheld medical treatment from him.[541] There is no evidence Harris County was aware that Lucas's alleged disabilities were actually interfering with his ability to breathe. In addition to the autopsy report which reflected the sudden cardiac death was caused by Lucas's enlarged heart and severe heart disease, Dr. Neuman noted the additional physical condition of Lucas that supported Lucas's predisposition to sudden cardiac death – structural heart disease, acute renal failure, lactic acidosis, hyperkalemia, hypertrophy and pericardial fibrosis.[542] Dr. Ly likewise looked at various

---

[539]    Video, Ex. 16.

[540]    Video, at 26:56, Ex. 16.

[541]    Hall Depo., p. 153:2-20, Ex. 34; Cohen Depo., p. 129:24-130:4, Ex. 35.

[542]    Neuman Depo., p. 53:1-55:1, Ex. 36.

medical conditions and likewise opined that Lucas died from a sudden cardiac event and not from a respiratory event.[543]

257.   Regardless of what definition is used to define "intentional discrimination," it still requires subjective awareness of the disability and its impact on the disabled individual along with knowledge of a denial of access to a program or service, and a corresponding failure to accommodate. Plaintiffs have no evidence of this.

> **F.    Plaintiffs have failed to prove Lucas was denied access to a program or service which imposed more pain and punishment on him than other similarly situated detainees.**

258.   In addition to failing to prove the requisite level of intent, Plaintiffs have failed to prove that Lucas was denied access to any programs or services necessary to support an ADA claim. "The ADA prohibits discrimination *because of* disability, not *inadequate treatment for* disability."[544]

259.   In *Hay v. Thaler*, the plaintiff filed suit under the ADA and RA alleging that he had several disabilities and chronic diseases, as well as a lack of natural teeth, and that he had been denied the provision of dentures by the TDCJ.[545] The Fifth Circuit held that the district court properly dismissed the plaintiff's claims under the RA and the ADA because he failed to claim "that this alleged discrimination was by reason of his disabilities, and such a claim [was] not supported by any evidence in the record."[546]

---

[543]    Ly Depo., p. 120:12-122:15, Ex. 33.

[544]    *Cheek*, 2013 WL 4017132 at *18; (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010)); *Nottingham*, 499 F. App'x at 377.

[545]    *Hay v. Thaler*, 470 Fed. Appx. 411, 413, 418 (5th Cir.2012).

[546]    *Id.* at 418 (*citing Hale*, 642 F.3d at 499; *Tuft v. Tex.*, 410 Fed. Appx. 770, 775 (5th Cir. 2011)). *See also*, *Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004) (rejecting an ADA claim regarding treatment for Hepatitis because the complained of treatment decision was not made *because of* any alleged disability); *see also Lee v. Valdez*, No. 3:07-cv-1298-D, 2009 WL 1406244, at *13 (N.D. Tex. May 20, 2009).

260.    Here, Plaintiffs' claims are not based on differential treatment or access. Like in *Nottigham*, there is no evidence Lucas was treated differently because of his disability.[547] In fact, the evidence is that he was treated exactly like every other inmate extracted from his cell and transported on a gurney to the medical clinic.[548] As held by the Court in *Tuft*, where disabled and non-disabled offenders are subjected to the same conditions, an ADA or RA claim is not stated.

261.    Several sister circuits have also addressed these issues and reached the same conclusions as the Fifth Circuit and Texas courts. As the United States Court of Appeals for the Seventh Circuit, speaking through the eminent Judge Posner explained,

> [T]he Act [i.e., the ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation…[H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice…Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person- a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder-must be content with the remedy that the state law of medical malpractice provides. Moreover, the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners. We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act.[549]

---

[547]    *Nottingham*, 499 Fed. App'x at 377. *See also*, *Tuft*, 410 Fed. App'x at 775 (disabled inmate-plaintiff failed to show "by reason of" discrimination in claim regarding overcrowding in the showers where all inmates were subjected to the same conditions).

[548]    Anderson Depo., p. 30:24-32:6, Ex. 13; Sunder Depo., p. 79:17-82:13, Ex. 21; See also Bourgeois Aff., Ex. 19; Garcia Depo., p. 27:5-28:6; 28:24-29:1, Ex. 26.

[549]    *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996). Several other courts have found similarly. *See Carrion v. Wilkinson,* 309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004) (dismissing diabetic prisoner's ADA claim based upon the denial of a diabetic diet); *see also Galvin v. Cook,* No. CV 00-29-ST, 2000 WL

262.    Finally, the "more pain and punishment than non-disabled prisoners" standard created in *McCoy v. Tex. Dep't of Crim. Justice* is not a viable legal standard.[550] The Fifth Circuit has not adopted this language, nor the test that it implies. The *McCoy* court appears to have conjured this concept out of thin air. The *McCoy* Court specifically held: "In the prison context, for example, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." As support for this proposition, the Court noted a law review article by Emily Alexander, *The Americans With Disabilities Act and State Prisons: A Question of Statutory Interpretation*.[551] A review of this article, however, shows the "more pain and punishment" standard proposed by the author also had no legal basis whatsoever.  The article cites a 1996 Western District of Michigan case, *Kaufman v. Carter*,[552] not for the legal standard, but, instead, for the facts.  The *McCoy* court failed to properly address and justify the "more pain and punishment" argument or the test it implies.

263.    The *McCoy* court also appears to have relied upon out-of-context statements contained in *United States v. Georgia* for the "suffer more pain and punishment" language.  A close reading of the language in *Georgia* shows that the liability under the ADA stems from the fact that the provision of services like hygiene and medical care are *"services, programs, or activities"* within the meaning of the ADA. The potential liability under the ADA stems from the denial of access to those *services and programs*. This standard is not based upon a comparison of the lives of disabled with non-disabled offenders. The ADA does not mandate —

---

1520231, at *6 (D. Or. Oct.3, 2000) (granting summary judgment on diabetic prisoner's ADA claim where prisoner alleged that he was given improper doses of medication and given inadequate treatment).

[550]    *McCoy v. Tex. Dep't of Crim. J.*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006).

[551]    *See McCoy*, 2006 WL 2331055, at n.6 (citing 66 Fordham L. Rev. 2233, 2283 (1998)).

[552]    *Kaufman v. Carter*, 952 F. Supp. 520, 523-24 (W.D. Mich. 1996).

nor could any government provide — an environment that will pose absolutely no challenges to a disabled person compared to a non-disabled person. The purported "more pain and punishment" standard seeks to do just that, which is far more than is required under the language of Title II or other courts' interpretation of it.

264.    Here, Plaintiffs have failed to tie their claim to any programs or services to which Lucas was denied access. To the extent Plaintiffs claim that Harris County failed to meet Lucas's medical needs, the ADA is not the appropriate vehicle to assert such a claim.

**G.    Harris County's jail does not receive federal funding for any program, service or activity alleged by Plaintiffs.**

265.    Plaintiffs contend "upon information and belief" that Harris County accepts federal funding for the "programs, divisions and personnel at issue in this lawsuit." To begin, the RA limits its coverage to the "program or activity" that "receives" federal financial assistance.[553] Congress limited the scope of section 504 to those who actually "receive" federal financial assistance because it sought to impose section 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds.[554]

266.    While Harris County contends that the cell extraction and transport to the medical clinic is not a "program or activity" under the ADA or RA, to the extent it is considered such, Plaintiffs have no evidence that this activity is federally funded. Even if Plaintiff were to show that Harris County received some federal funding (for some other program or activity) that alone is not enough – it must be the "program or activity" that directly benefits from federal financial assistance.[555]

---

[553]    *U.S. Dept. of Trans. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986). See also *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 427 (5th Cir. 1997).

[554]    *Paralyzed Veterans of Am.*, 477 U.S. at 605.

[555]    *Lightbourn*, 118 F.3d at 427.

267.    As evidenced by Major Martin and Lt. Bourgeois's Affidavit, neither the DCCT team, their training, their equipment, their activation, or their transport receives any federal funding.[556]  Because Plaintiffs have no competent evidence that the program or activity at issue in this case receives federal funding, Harris County is entitled to summary judgment on Plaintiffs' claims under the RA.

**H.    Failure to monitor is not an ADA claim.**

268.    Plaintiffs assert "on information and belief" that Defendants are liable under the ADA for intentionally failing "to monitor the restraint of detainees with Mr. Lucas's disabilities."[557] This argument appears to be misplaced and is not applicable to the ADA. Plaintiffs have not stated a claim under the ADA or provided the elements of this purported claim. Further, Plaintiffs have no credible evidence to support this conclusory allegation.

269.    To the extent Plaintiffs contend Lucas was "intentionally" not monitored, this is not supported by the evidence. As is evident on the video of the incident, Deputy Gordon can be seen walking around, checking on Lucas. In addition, Nurse O'Pry is seen taking vital signs and administering Ativan and Dr. Sunder is seen checking on Lucas and talking to him.

270.    The evidence to the contrary additionally shows that Harris County has no prior incident of injury or death with regard to prior cell extractions and transports to the medical clinic with an inmate on a gurney.

**I.    Refusal or failure to protect is not an ADA claim.**

271.    Similarly, Plaintiffs have alleged two additional claims that appear to be misplaced and not applicable to the ADA. Plaintiffs contend Defendants intentionally and consciously "refused to implement any plans or protocols" or to "employ any special effort,

---

[556]    See Bourgeois Aff., Ex. 19; Martin Aff., Ex. 29.

[557]    Doc. 77 at p. 27.

techniques or personnel" *to protect detainees* with Lucas's disabilities from injury and death caused by the same restraint.

272.    Plaintiffs have not stated a claim under the ADA or provided the elements of this purported claim. Again, Plaintiffs have no credible evidence to support these conclusory allegations. There is no evidence that Harris County intentionally refused to implement any plan or protocol or to employ special efforts, techniques or personnel.

273.    Harris County disputes the restraint caused Lucas to suffer a sudden cardiac event and die. The restraint used by the DCCT has been used in the past without incident. Harris County has not shown any intent to refuse to implement plans or protocols or to fail to employ special techniques or personnel. Indeed, Harris County took swift steps to modify its training, policies, techniques and personnel following a review of this incident to enhance it and make it better and to put into policy some of what was already being done in practice.[558] Former Sheriff Adrian Garcia testified that "you want to take every opportunity to find where there are opportunities for enhancements in your training . . . to make the program even better."[559] Plaintiffs have no competent evidence that Harris County was intentional or consciously indifferent in refusing to implement plans or protocols or in failing to employ special effort, techniques or personnel to protect "detainees" with Lucas's alleged disabilities.

## CONCLUSION & REQUEST FOR RELIEF

For these reasons, Defendant Harris County, Texas, respectfully requests the Court to grant this motion, to enter summary judgment in Harris County's favor on all of Plaintiffs' claims and all theories of recovery, to grant Harris County its attorneys' fees, and for such other and further relief, both general and special, at law and at equity, to which Harris County shows itself justly entitled.

---

[558]    Garcia Depo., p. 29:11-30:8; 30:19-31:16; 32:2-33:21; 130:16-25, Ex. 26.

[559]    Garcia Depo., p. 128:6-16, Ex. 26.

**Date: February 10, 2018**

Respectfully submitted,

By: */s/  Laura Beckman Hedge*
**LAURA BECKMAN HEDGE**
Assistant County Attorney
**Attorney-in-Charge**
Texas Bar No. 00790288
Southern District of Texas No. 23243

Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5137
Fax: (713) 755-8924
Email: Laura.Hedge@cao.hctx.net

**OF COUNSEL:**

VINCE RYAN
Harris County Attorney

KEITH A. TOLER
Assistant County Attorney
Texas Bar No. 24088541
Southern District of Texas No. 2599245

Harris County Attorney's Office
1019 Congress, 15th Floor
Houston, Texas 77002
Phone: (713) 274-5265
Fax: (713) 755-8924
Email: Keith.Toler@cao.hctx.net

**ATTORNEYS FOR DEFENDANT**
**HARRIS COUNTY, TEXAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2018, I electronically filed the foregoing motion on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all parties' counsel.

| **Plaintiffs' Counsel** | **Co-Defendants' Counsel** |
|---|---|
| W. Mark Lanier | F. Clinton Gambill, II |
| Lawrence P. Wilson | Mary E. Baker |
| Benjamin T. Major | Harris County Attorney's Office |
| The Lanier Law Firm | 1019 Congress, 15th Floor |
| 6810 FM 1960 West | Houston, Texas 77002 |
| Houston, Texas 77069 | |
| | Edward John Kroger |
| Jeffrey S. Edwards | Brian Campbell |
| Scott Medlock | Kroger Burrus |
| The Edwards Law Firm | 3100 Weslayan, Suite 300 |
| 1101 East 11th Street | Houston, Texas 77027 |
| Austin, Texas 78702 | |
| | |
| Roy W. Smith | |
| Jonathan D. Goins | |
| 2616 South Loop West, Suite 670 | |
| Houston, Texas 77054 | |

*/s/  Laura Beckman Hedge*
**LAURA BECKMAN HEDGE**
Assistant County Attorney

111