IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CASANDRA SALCIDO, AS NEXT FRIEND OF MINOR CHILDREN K.L. AND C.L., DENISE COLLINS, KENNETH LUCAS, AMBER LUCAS INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF KENNETH CHRISTOPHER LUCAS, DECEASED, AND DEIDRE MCCARTHY, AS NEXT FRIEND OF MINOR CHILDREN K.J.L. AND T.J.L *Plaintiffs* | § § § § § § § § § § § § | |
| V. | § § | CIVIL ACTION NO. H-15-2155 |
| HARRIS COUNTY, TEXAS, DEPUTY DAVID GORDON, DEPUTY XAVIER LEVINGSTON, DETENTION OFFICER BRODERICK GREEN, DETENTION OFFICER ALICIA SCOTT, DETENTION OFFICER JESSE BELL, DETENTION OFFICER MORRIS THOMAS, AND DETENTION OFFICER ADAM KNEITZ *Defendants* | § § § § § § § § § § § § | JURY DEMANDED |
| | | Judge Sim Lake |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

W. Mark Lanier
wml@lanierlawfirm.com
Lawrence P. Wilson
larry.wilson@lanierlawfirm.com
Benjamin T. Major
benjamin.major@lanierlawfirm.com
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas 77069
Tel: 713-659-5200
Fax: 713-659-2204

Jeff Edwards
jeff@edwards-law.com
Scott Medlock
scott@edwards-law.com
EDWARDS LAW
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel. 512-623-7727
Fax. 512-623-7729

Roy W. Smith
roy.w.smith@live.com
ROY W. SMITH
Attorney at Law
2616 South Loop West, Suite 670
Houston, Texas  77054
Tel. 713-759-9266
Fax: 713-759-9412

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................... vi

I.  SUMMARY OF THE ARGUMENT ................................................................... 1

II. FACTS – HARRIS COUNTY OFFICERS KILLED KENNETH LUCAS ........................... 5

    A.  *DRAMATIS PERSONAE*: THE HARRIS COUNTY EMPLOYEES WHO
        KILLED KENNETH .................................................................................. 5

    B.  "I CANNOT BREATHE" ........................................................................... 8

    C.  HARRIS COUNTY'S HISTORY OF HOGTYING PRETRIAL DETAINEES
        AND KNOWLEDGE OF THE DANGER ........................................................ 17

    D.  THE OFFICERS FOLLOWED HARRIS COUNTY'S POLICY, PRACTICE,
        AND CUSTOM BY IGNORING KENNETH'S PLEAS FOR HELP UNTIL
        HE WAS "ENTIRELY INCAPACITATED" ..................................................... 19

    E.  FOR FIFTEEN MINUTES, DEFENDANTS HOGTIED AN OBESE MAN
        SUFFERING FROM HEART PROBLEMS AND XANAX WITHDRAWAL
        IN A FACEDOWN POSITION AND APPLIED FORCE ON HIS CHEST
        UNTIL HE STOPPED BREATHING .............................................................. 23

    F.  THE OFFICERS' CONDUCT WAS UNREASONABLE THROUGHOUT
        THE ORDEAL ....................................................................................... 28

        1.  THE CELL EXTRACTION WAS WHOLLY UNNECESSARY AND EXCESSIVE ...... 28

        2.  THE OFFICERS APPLIED DEADLY FORCE AFTER KENNETH WAS CUFFED,
            SHACKLED, AND "UNDER CONTROL" .............................................. 31

        3.  THE OFFICERS' DEADLY FORCE WAS UNWARRANTED .................................. 33

        4.  THE OFFICERS SOUGHT TO PUNISH KENNETH AND HAVE NO REMORSE FOR
            KILLING HIM ................................................................................ 36

    G.  THE OFFICERS BELIEVE THEIR TREATMENT OF KENNETH WAS
        "PERFECT" OR "EXCEPTIONAL" IN LIGHT OF HARRIS COUNTY'S
        POLICIES, PRACTICES, AND CUSTOMS ..................................................... 38

    H.  THE OFFICERS WERE INDIFFERENT TO KENNETH'S SERIOUS
        MEDICAL CONDITION AND DISABILITIES ................................................ 39

I.   DEFENDANTS DISREGARDED KENNETH'S WITHDRAWAL
     SYMPTOMS AND MENTAL HEALTH CRISIS ............................................................ 42

J.   HARRIS COUNTY'S POLICIES, CUSTOMS, AND PRACTICES
     WERE THE MOVING FORCE THAT CAUSED KENNETH'S INJURIES,
     SUFFERING, AND DEATH ............................................................................................ 45

     1.  THE OFFICER DEFENDANTS' ACTS WERE ALL PURSUANT TO HARRIS
         COUNTY POLICIES OR WIDESPREAD CUSTOMS AND PRACTICES ................................... 45

     2.  DEFENDANT HARRIS COUNTY'S GROSSLY DEFECTIVE TRAINING EXUDES
         DELIBERATE INDIFFERENCE AND CAUSED KENNETH'S DEATH ...................................... 49

     3.  PROMPTED BY AN INDEPENDENT AGENCY'S REVIEW OF KENNETH'S
         DEATH AND OF COUNTY POLICIES AND TRAINING MATERIALS,
         DEFENDANT HARRIS COUNTY IMPLEMENTED CHANGES THAT WOULD
         HAVE SAVED KENNETH'S LIFE ...................................................................................... 52

K.   DEFENDANTS SUNDER AND O'PRY HAD THE KNOWLEDGE,
     OPPORTUNITY, AND AUTHORITY TO SAVE KENNETH, BUT
     LET HIM DIE INSTEAD ............................................................................................... 55

L.   DESPITE THEIR ABILITY AND DUTY TO PREVENT THE
     CONTAINMENT TEAM FROM KILLING KENNETH,
     DEFENDANTS SUNDER AND O'PRY MERELY STOOD BY
     AS KENNETH FELL UNCONSCIOUS, STOPPED BREATHING,
     AND DIED ...................................................................................................................... 60

     1.  DEFENDANTS SUNDER AND O'PRY CAUSED KENNETH'S DEATH
         BY REFUSING TO RESPOND TO KENNETH'S LABORED
         STATEMENT, "I CANNOT BREATHE" AND CLEAR SIGNS THAT HE
         WAS DYING ............................................................................................................... 60

     2.  DEFENDANTS SUNDER AND O'PRY DID NOT CARE ABOUT KENNETH'S
         HEALTH ..................................................................................................................... 63

     3.  EXPERT TESTIMONY CONFIRMS THAT DEFENDANTS SUNDER AND
         O'PRY'S CALLOUS TREATMENT OF KENNETH CAUSED HIS DEATH ............................. 65

III. MATERIAL FACTS IN DISPUTE ............................................................................. 68

IV.  STANDARD OF REVIEW ....................................................................................... 69

V.   ARGUMENT AND AUTHORITIES ......................................................................... 70

iii

A.  THE INDIVIDUAL DEFENDANTS VIOLATED KENNETH'S
    FOURTEENTH AMENDMENT RIGHTS ......................................................70

    1.  THE OFFICERS VIOLATED KENNETH'S PROTECTION FROM
        EXCESSIVE FORCE ...............................................................................71

        a.  The Officers Used Illegal Excessive Force.................................71

            i.    There was No Need for Any Force ..............................72

            ii.   The Officers' Force Killed Kenneth ..........................74

            iii.  The Officers Made No Effort to Temper or Limit the Force ..........................79

            iv.   Kenneth Posed No Threat to the Officers ....................80

            v.    Kenneth Stopped Resisting Once Hogtied.....................80

            vi.   Bell, Leveston, Green, Thomas, and Kneitz Apply the Wrong
                  Legal Standard ....................................................81

        b.  The Officers are Not Entitled to Qualified Immunity...........................84

    2.  THE OFFICERS, DR. SUNDER, AND NURSE O'PRY VIOLATED KENNETH'S
        RIGHT TO RECEIVE MEDICAL ATTENTION .....................................93

        a.  The Individuals Denied Kenneth Medical Attention ...............................93

        b.  The Individuals are Not Entitled to Qualified Immunity....................101

    3.  THE INDIVIDUAL DEFENDANTS' BYSTANDER LIABILITY ............................102

    4.  SUPERVISORY LIABILITY (OFFICER GORDON ONLY) ....................................105

B.  THE COUNTY'S POLICY, PRACTICE, OR CUSTOM VIOLATED
    KENNETH'S FOURTEENTH AMENDMENT RIGHTS ............................106

    1.  CONDITIONS OF CONFINEMENT LIABILITY: HARRIS COUNTY POLICIES
        AND PRACTICES CREATED A DANGEROUS CONDITION IN THE JAIL............................109

    2.  EPISODIC ACT OR OMISSION LIABILITY: THE OFFICERS' ACTIONS
        WERE CONSISTENT WITH POLICIES AND CUSTOMS OF HARRIS COUNTY ....................115

3. FAILURE TO TRAIN LIABILITY: THE COUNTY TRAINED THE
   OFFICERS TO USE EXCESSIVE, DANGEROUS FORCE WITH THE
   FACEDOWN HOGTIE POSITION, CHEST COMPRESSIONS, AND THE
   "CODE OF SILENCE" ........................................................................117

4. DIRECT POLICYMAKER LIABILITY ............................................124

C. THE COUNTY VIOLATED KENNETH'S RIGHTS UNDER THE
   ADA AND REHABILITATION ACT ...................................................125

1. KENNETH SUFFERED FROM SIGNIFICANT DISABILITIES ..............126

   a. Hypertension ...............................................................127

   b. Obesity .......................................................................129

   c. Anxiety/Xanax Withdrawal .........................................130

2. KENNETH WAS DENIED PARTICIPATION IN HARRIS COUNTY PROGRAMS
   AND SERVICES ..........................................................................135

3. LACK OF A REASONABLE ACCOMMODATION EXCLUDED KENNETH
   FROM PRETRIAL DETENTION ......................................................139

4. HARRIS COUNTY INTENTIONALLY DISCRIMINATED AGAINST KENNETH
   BY DENYING HIM REASONABLE ACCOMMODATIONS FOR HIS DISABILITIES ...............140

VI. CONCLUSION ....................................................................................148

# INDEX OF AUTHORITIES

## Cases

*Abdullahi v. City of Madison*,
423 F.3d 763 (7th Cir. 2005) ........................................................................... 81, 87

*A.G. v. Lower Merian School Dist.*,
542 Fed. App'x 194 (3rd Cir. 2013) ...................................................................... 145

*Anderson v. Branen*,
17 F.3d 552 (2d Cir. 1994) .................................................................................. 102

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................. 69

*Anderson v. Macy's, Inc.*,
943 F.Supp.2d 531 (W.D. Penn. 2013) ................................................................ 129

*Atteberry v. Nocona Gen. Hosp.*,
430 F.3d 245 (5th Cir. 2005) .............................................................................. 106

*Barber v. Colorado Dep't of Revenue*,
562 F.3d 1222 (10th Cir. 2009) .......................................................................... 145

*Bd. of Cty. Com'rs of Bryan Cty, Okla. v. Brown*,
520 U.S. 397 (1997) ........................................................................................... 120

*Bedford v. Michigan*,
--- Fed. App'x ----, 2018 WL 618479 (6th Cir. Jan. 30, 2018) ............................... 131

*Bell v. Wolfish*,
441 U.S. 520 (1979) ..................................................................................... 70, 109

*Bennett- Nelson v. La. Bd. of Regents*,
431 F.3d 448 (5th Cir. 2005) .............................................................................. 125

*Bishop v. Arcuri*,
674 F.3d 456 (5th Cir. 2012) ................................................................................ 86

*Blackmon v. Garza*,
484 Fed. App'x 866 (5th Cir. 2012) ...................................................................... 98

vi

*Borum v. Swisher Co.*,
2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ........................................................................ 141

*Bozeman v. Orum*,
422 F.3d 1265 (11th Cir. 2005) .......................................................... 81, 94, 98, 101

*Broadwater v. Fow*,
945 F.Supp.2d 574 (M.D. Penn. 2013) .............................................................. 138

*Brown v. Bryan Cty., Okla*,
219 F.3d 450 (5th Cir. 2000) .......................................................... 117, 118, 120, 121

*Brown v. Lamanna*,
304 Fed. App'x 206 (4th Cir. 2008) .............................................................. 102

*Bryant v. Madigan*,
84 F.3d 246 (7th Cir. 1996) .......................................................... 143, 144

*Burch v. Coca-Cola Co.*,
119 F.3d 305 (5th Cir. 1997) .............................................................. 148

*Burge v. St. Tammany Parish*,
336 F.3d 363 (5th Cir. 2003) .............................................................. 111

*Champion v. Outlook Nashville, Inc.*,
380 F.3d 893 (6th Cir. 2004) ................................................................ 87

*City of Canton v. Harris*,
489 U.S. 378 (1989) .......................................................... 116, 117, 118, 119, 120

*Clark v. Taylor*,
710 F.2d 4 (1st Cir. 1983) .............................................................. 102

*Cleveland v. Gautreaux*,
198 F.Supp.3d 717 (M.D. La. Aug. 1, 2016) ............................................... 141

*Coker v. Dallas Cty. Jail*,
No. 3:05–CV–005–M, 2009 WL 1953038 (N.D. Tex. Feb. 25, 2009) .................................... 141

*Colle v. Brazos Cty., Tex.*,
981 F.2d 237 (5th Cir. 1993) .......................................................... 5, 107, 108, 124

*Connick v. Thompson*,
563 U.S. 51 (2011) .............................................................. 120

*Contra Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) .................................................. 113

*Cook v. Rhode Island*,
10 F.3d 17 (1st Cir. 1993)....................................................... 129

*Cruz v. City of Laramie*,
239 F.3d 1183 (10th Cir. 2001) ..........................................76, 87

*Darden v. City of Ft. Worth, Tex.*,
880 F.3d 722 (5th Cir. 2018) .............................................78, 81

*DeBose v. Taser Int'l, Inc.*,
2011 WL 1807681 (E.D. Mo. May 12, 2011) ......................... 138

*Delano-Pyle v. Victoria County*,
302 F.3d 567 (5th Cir. 2002) ..........................................126, 146

*Domino v. Tex. Dep't of Crim. Justice*,
239 F.3d 752 (5th Cir. 2001) ............................................99, 145

*Drummond v. City of Anaheim*,
343 F.3d 1052 (9th Cir. 2003) ................................................. 88

*Duvall v. Co. of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) ............................................... 145

*Easter v. Powell*,
467 F.3d 459 (5th Cir. 2006) ........................... 93, 96, 98, 99, 101

*Edler v. Hockley Cty. Com'rs Ct.*,
589 Fed. App'x 664 (5th Cir. 2014) ...................................... 109

*E.E.O.C. v. Resources for Human Dev., Inc.*,
827 F.Supp.2d 688 (E.D. La. 2011)........................................ 129

*Estate of A.R. v. Muzyka*,
543 Fed. App'x 363 (5th Cir. Oct. 16, 2013)...................144, 147

*Estelle v. Gamble*,
429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976)............................. 98

*Farmer v. Brennan*,
511 U.S. 825 (1994)..............................................71, 94, 96, 115

viii

*Fickes v. Jefferson Cty.*,
900 F.Supp. 84 (E.D. Tex. 1995) .......................................................... 82

*Flores v. City of Palacios*,
381 F.3d 391 (5th Cir. 2004) ............................................................... 78

*Flores-Zelaya v. Las Vegas Metro. Police Dept.*,
2016 WL 697782 (D. Nev. Feb. 19, 2016) ........................................... 88

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004) ............................................................. 122

*Garner v. Chevron Phillips Chem. Co.*,
834 F.Supp.2d 528 (S.D. Tex. 2013) .................................................. 128

*Gaudreault v. Municipality of Salem*,
923 F.2d 203 (1st Cir. 1990) ............................................................... 93

*Giannetti v. City of Stillwater, Okla.*,
2006 WL 5100544 (W.D. Okla. Jan. 26, 2006) ................................... 76

*Gilmore v. Univ. of Rochester Strong Mem. Hosp. Div.*,
384 F.Supp.2d 602 (W.D. N.Y. 2005) ............................................... 133

*Gobert v. Caldwell*,
463 F.3d 339 (5th Cir. 2006) ............................................................... 71

*Gogos v. AMS Mech. Sys., Inc.*,
737 F.3d 1170 (7th Cir. 2013) ........................................................... 128

*Gogue v. City of Los Angeles*,
2010 WL 11549706 (C.D. Cal. June 15, 2010) .................................. 138

*Gonzalez v. Cecil Co., Md.*,
221 F.Supp.2d  611 (D. Md. 2002) ................................................. 89, 94

*Gonzalez v. Ysleta Indep. Sch. Dist.*,
996 F.2d 745 (5th Cir. 1993) ............................................................. 115

*Graham v. Connor*,
490 U.S. 386 (1989) ............................................................................ 71

*Grandstaff v. City of Borger, Tex.*,
767 F.2d 161 (5th Cir. 1985) ...................................................... 120, 125

ix

*Greeno v. Daley*,
414 F.3d 645 (7th Cir. 2005) ................................................................ 102

*Gutierrez v. City of San Antonio*,
139 F.3d 441 (5th Cir. 1998) ........................................................*passim*

*Haberle v. Troxell*,
--- F.3d ----, 2018 WL 1386431 (3d Cir. March 20, 2018)...................... 138

*Hacker v. Cain*,
No. 3:14-00063, 2016 WL 3167176 (M.D. La. June 6, 2016) .................. 141

*Hainze v. Richards*,
207 F.3d 795 (5th Cir. 2000) ......................................................... 137, 138

*Hale v. Townley*,
45 F.3d 914 (5th Cir. 1995) ........................................................... 102, 105

*Hamilton v. Kindred*,
845 F.3d 659 (5th Cir. 2017) ................................................................ 102

*Hanson v. Best*,
2017 WL 5891697 (D. Minn. Nov. 28, 2017) ........................................ 88

*Hare v. City of Cornith, Miss.*,
135 F.3d 320 (5th Cir. 1998) ................................................... 71, 93, 110

*Hay v. Thaler*,
470 Fed. App'x 411 (5th Cir. 2012) ..................................................... 143

*Hernandez v. Cty. of Monterey*,
110 F.Supp.3d 929 (N.D. Cal. 2015) ............................................ 132, 135

*Hernandez v. Mesa*,
137 S.Ct. 2003 (2017)........................................................................... 29

*Hicks-Fields v. Harris Cty., Tex.*,
860 F.3d 803 (5th Cir. 2017) ............................................................... 107

*Hill v. Carroll Cty., Miss.*,
587 F.3d 230 (5th Cir. 2009) ...................................................74, 75, 89

*Hinojosa v. Livingston*,
807 F.3d 657 (5th Cir. 2015) ............................................................... 116

x

*Hinojosa v. Livingston*,
994 F.Supp.2d 840 (S.D. Tex., Jan. 16, 2014) .................................................... 140, 141

*Hobart v. Estrada*,
582 Fed. App'x 348 (5th Cir. 2014) ........................................................ 116, 119, 121

*Hobart v. City of Stafford*,
784 F.Supp.2d 732 (S.D. Tex. 2011) ........................................................................ 137

*Holmes v. Godinez*,
311 F.R.D. 177 (N.D. Ill. Oct. 8, 2015) .................................................................... 140

*Hope v. Pelzer*,
536 U.S. 730 (2002) ...................................................................................................... 86, 91

*Jacobs v. N.C. Admin. Office of the Cts.*,
780 F.3d 562 (4th Cir. 2015) .................................................................................... 131

*Jacobs v. Trochesset*,
NO. 3:16-CV-65, 2016 WL 6518420 (S.D. Tex. Nov. 2, 2016) .............................. 141

*Jacobs v. West Feliciana Sheriff's Dept.*,
228 F.3d 388 (5th Cir. 2000) .................................................................................... 120

*Jaros v. Ill. Dep't of Corr.*,
684 F.3d 667 (7th Cir. 2012) ............................................................................ 143, 144

*Jauch v. Choctaw Cty, Miss.*,
874 F.3d 425 (5th Cir. 2017) .................................................................................... 107

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989) .................................................................................................... 108

*Johnson v. City of Cincinnati*,
39 F.Supp.2d 1013 (S.D. Ohio 1999) ........................................................................ 88

*Johnson v. Treen*,
759 F.2d 1236 (5th Cir. 1985) .................................................................................... 71

*Jones v. Cty. of Sacramento*,
2011 WL 3163307 (E.D. Cal. July 25, 2011) ............................................................ 88

*Kennedy v. City of Cincinnati*,
595 F.3d 327 (6th Cir. 2010) ...................................................................................... 88

*Khan v. Normand*,
683 F.3d 192 (5th Cir. 2012) ..................................................................... 74, 75, 89, 90

*Kiman v. New Hampshire Dep't of Corr.*,
451 F.3d 274 (1st Cir. 2006) ............................................................................. 144

*Kingsley v. Hendrickson*,
135 S.Ct. 2466 (2015) ................................................... 3, 71, 82, 92, 114, 115

*Kitchen v. Dallas Cty., Tex.*,
759 F.3d 468 (5th Cir. 2014) ...................................................................... *passim*

*Lewis v. Evans*,
440 F.App'x. 263 (5th Cir. 2011) ....................................................................... 94

*Liese v. Indian River Co. Hospital*,
701 F.3d 334 (11th Cir. 2012) .......................................................................... 145

*Lightbourn v. County of El Paso, Tex.*,
118 F.3d 421 (5th Cir. 1997) ........................................................................... 125

*Loeffler v. Staten Island Univ. Hospital*,
582 F.3d 268 (2nd Cir. 2009) ........................................................................... 145

*Lowe v. American Eurocopter, Inc.*,
2010 WL 5232523 (N.D. Miss. Dec. 16, 2010) ............................................... 129

*Martone v. Livingston*,
No. 4:13-CV-3369, 2014 WL 3534696 (S.D. Tex. July 16, 2014) .................... 140, 141

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................................... 69

*McCollum v. Livingston*,
2017 WL 608665 (S.D. Tex. Feb. 3, 2017) ................................................. *passim*

*McCoy v. Tex. Dep't of Crim. Justice*,
No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) .............. 70, 139, 140, 141

*McCue v. City of Bangor, Me.*,
838 F.3d 55 (1st Cir. 2016) ............................................................................... 87

*McNally v. Prison Health Services*,
46 F. Supp. 2d 49 (D. Me. 1999) ...................................................................... 144

*Meagley v. Little Rock*,
639 F.3d 384 (8th Cir. 2011) ...................................................... 145

*Melson v. Chetofield*,
2009 WL 537457 (E.D. La. Mar. 4, 2009) ................................... 129

*Melton v. Dallas Area Rapid Transit*,
391 F.3d 669 (5th Cir. 2004) ...................................................... 140

*Mendoza v. City of Palacios*,
962 F.Supp.2d 868 (S.D. Tex. 2013) ........................................... 128

*Mial v. Sherin*,
No. 1:11-cv-921, 2012 WL 2838424 (E.D. Va. July 9, 2012)................... 89

*Michaels v. Avitech, Inc.*,
202 F.3d 746 (5th Cir. 2000) ................................................. 70, 75

*Miller v. Chapman*,
No. 13–00367, 2014 WL 2949287 (M.D. La. June 30, 2014)................. 141

*Miller v. Tex. Tech Univ. Health Sci. Ctr.*,
421 F.3d 342 (5th Cir. 2005) ...................................................... 125

*Mohney v. Pennsylvania*,
809 F.Supp.2d 384 (W.D. Pa. 2011).............................................. 138

*Monceaux v. White*,
266 Fed. App'x 362 (5th Cir. 2008) ............................................... 99

*Monmouth Cty Corr. Institution Inmates v. Lanzaro*,
834 F.2d 326 (3rd Cir. 1987) ....................................................... 93

*Monell v. N.Y. City Dept. of Social Servs.*,
436 U.S. 658 (1978)................................................................ 106

*Montano v. Orange Cty., Tex.*,
No. 1:13-CV-611, 2015 WL 11110596 (E.D. Tex. Apr. 13, 2015),
*aff'd in part*, *vacated in part*, *remanded*, 842 F.3d 865 (5th Cir. 2016) ............. 107, 109, 110, 112

*Morris v. Dallas Cty., Tex.*,
960 F.Supp.2d 665 (N.D. Tex. 2013) ................................... 108, 117

*Morrissey v. King*,
2014 WL 4802436 (N.D. Tex. Sept. 26, 2014)................................... 92

*Mosley v. Quarterman*,
2008 WL 656887 (N.D. Tex. Mar. 6, 2008) ............................................................ 114

*Norfleet v. Walker*,
684 F.3d 688 (7th Cir. 2012) ................................................................................. 144

*Nottingham v. Richardson*,
499 Fed. App'x 368 (5th Cir. 2012) ....................................................................... 142

*ODonnell v. Harris Cty., Tex.*,
882 F.3d 528 (5th Cir. 2018) ............................................................................ 1, 108

*O'Neil v. Tex. Dep't of Crim. Justice*,
804 F.Supp.2d 532 (N.D. Tex. Apr. 7, 2011) .................................................. 140, 141

*O'Neill v. Krzeminski*,
839 F.2d 9 (2d Cir. 1988) ...................................................................................... 102

*O'Rourke v. Hayes*,
378 F.3d 1201 (11th Cir. 2004) ............................................................................... 89

*Osburn v. Anchor Labs., Inc.*,
825 F.d2 908 (5th Cir. 1987) ................................................................................... 70

*Oxford House, Inc. v. City of Baton Rouge, La.*,
932 F.Supp.2d 683 (M.D. La. 2013) ....................................................................... 133

*Owen v. City of Independence*,
445 U.S. 622 (1980) .............................................................................................. 115

*Pace v. Bogalusa City School Bd.*,
403 F.3d 272 (2005) .............................................................................................. 125

*Paine v. Bergland*,
2012 WL 67272431 (N.D. Ill. Dec. 28, 2012) ....................................................... 144

*Paine v. Johnson*,
No. 06 C 3173, 2010 WL 785397 (N.D. Ill. Feb. 26, 2010) .................................... 144

*Payne v. Arizona*,
2012 WL 1151957 (D. Ariz. Apr. 5, 2012) ............................................................ 144

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) .............................................................................................. 124

xiv

*Pennsylvania Dep't of Corr. v. Yeskey,*
524 U.S. 206 (1998) ........................................................ 128, 135, 138, 143

*Perez v. Doctors Hosp. at Renaissance, Ltd.,*
624 Fed. App'x 180 (5th Cir. 2015) ........................... 144, 145, 146, 147, 148

*Perry v. Meade,*
 --- Fed. App'x ----, 2018 WL 1494823 (4th Cir. Mar. 27, 2018) ............... 102

*Peterson v. City of Ft. Worth, Tex.,*
588 F.3d 838 (5th Cir. 2009) .................................................. 111, 112

*Porter v. Epps,*
659 F.3d 440 (5th Cir. 2011) ......................................................... 105

*Pratt v. Harris Cty., Tex.,*
822 F.3d 174 (5th Cir. 2016) .......................................................... 90

*Rachel v. City of Mobile, Ala.,*
112 F.Supp.3d 1263 (S.D. Ala. 2015) ................................................. 88

*Rankin v. Klevenhagen,*
5 F.3d 103 (5th Cir. 1993) ....................................................... 71, 91

*Reeves v. LeBlanc,*
No. 13–0586, 2014 WL 7150615 (M.D. La. Dec. 15, 2014) ......................... 141

*Richman v. Sheahan,*
512 F.3d 876 (7th Cir. 2008) .......................................................... 88

*R.K. v. Bd. of Educ. of Scott County, Ky.,*
637 Fed. App'x 922 (6th Cir. Feb. 5, 2016) ......................................... 145

*Romero v. Bd. of County Comm'n of County of Curry, NM,*
202 F.Supp.3d 1223 (D. N.M. Aug. 15, 2016) ...................................... 141

*Rouse v. Plantier,*
997 F.Supp. 575 (D. N.J. 1998) ..................................................... 144

*Saenz v. G4S Secure Sol'ns (USA),*
224 F.Supp.3d 477 (W.D. Tex. 2016) ............................................ 83, 141

*Sallenger v. Oakes,*
473 F.3d 731 (7th Cir. 2007) .......................................................... 87

*Scott v. Moore*,
114 F.3d 51, 53 (5th Cir. 1997) ........................................................... 115, 116, 145

*Shepherd v. Dallas Cty., Tex.*,
591 F.3d 445 (5th Cir. 2009) .................................................................. 109, 110

*Sibley v. Lemaire*,
184 F.3d 481 (5th Cir. 1999) ............................................................................ 97

*Simpson v. Hines*,
903 F.2d 400 (5th Cir. 1990) .................................................................. 73, 84, 87

*Staten v. City of Carrollton, Tex.*,
2012 WL 13028096 (N.D. Tex. Nov. 26, 2012) ............................................... 111

*Stewart v. Guzman*,
555 F.App'x. 425 (5th Cir. 2014) ......................................................... 94, 96, 98

*Swans v. City of Lansing*,
65 F.Supp.2d 625 (W.D. Mich. 1998) ............................................................. 88

*Tennessee v. Lane*,
541 U.S. 509 (2004) ....................................................................................... 135

*Thompson v. Upshur Cty., Tex.*,
245 F.3d 447 (5th Cir. 2001) ................................................................... 71, 117

*Tolan v. Cotton*,
134 S.Ct. 1861 (2014) ............................................................................... 69, 84

*Toland v. BellSouth Telecomm., LLC*,
2017 WL 6380641 (N.D. Ga. Aug. 9, 2017) ................................................. 128

*Trent v. Wade*,
776 F.3d 368 (5th Cir. 2015) ........................................................................ 115

*Turner v. Lt. Driver*,
848 F.3d 678 (5th Cir. 2017) ......................................................................... 86

*United States v. Traxler*,
764 F.3d 486 (5th Cir. 2014) ......................................................................... 74

*U.S. v. Kebodeaux*,
647 F.3d 137 (5th Cir. 2011) *rev'd on other grounds at* 133 S.Ct. 2496 (2013) ........................ 145

*Valencia v. Wiggins*,
981 F.2d 1440 (5th Cir. 1993) ............................................................................. 82, 83

*Valle v. City of Houston*,
613 F.3d 536 (5th Cir. 2010) ............................................................................. 108, 116

*Wagner v. Bay City, Tex.*,
227 F.3d 316 (5th Cir. 2000) ............................................................................. 79

*Watkins v. New Castle Cty.*,
374 F.Supp.2d 379 (D. Del. 2005) ..................................................................... 88

*Watson v. Ciena Healthcare Mgmt., Inc.*,
2013 WL 5435279 (E.D. Mich. Aug. 16, 2013). .................................................. 128

*Webster v. City of Houston*,
735 F.2d 838 (5th Cir. 1984) (en banc) ............................................................. 112

*Weed v. Sidewinder Drilling, Inc.*,
--- F. Supp.3d ----, 2017 WL 1164294, No. H-14-1658 (S.D. Tex. Mar. 29, 2017) .................. 127

*Weigel v. Broad*,
544 F.3d 1143 (10th Cir. 2008) ......................................................................... 87

*Whitley v. Albers*,
475 U.S. 312 (1986) ......................................................................................... 93

*Whittaker v. America's Car-Mart, Inc.*,
2014 WL 1648816 (E.D. Mo. 2014) ................................................................... 129

*Williams v. Widnal*,
79 F.3d 1003 (10th Cir. 1996) ........................................................................... 133

*Windham v. Harris Cty., Tex.*,
875 F.3d 229 (5th Cir. 2017) ............................................................................. 134

*Wolfe v. Fla. Dep't of Corr.*,
No. 5:10–CV–663, 2012 WL 4052334 (M.D. Fla. Sept. 14, 2012) ........................... 141

*Wright v. Tex. Dep't Crim. Justice*,
2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) ..................................................... 141

xvii

**Statutes**

28 C.F.R. § 35.130 .................................................................................................. 136

29 C.F.R. § 1630.2(j)(1) ......................................................................................... 127

Fed. R. Civ. P. 56(c) ............................................................................................... 69

Fifth Cir. Pattern Jury Charge 10.7A .................................................................... 83

Tex. Penal Code § 9.01(3) ...................................................................................... 33

42 U.S.C. § 1983 ................................................................................................. 2, 88

42 U.S.C. § 12102 ............................................................... 126, 1 27, 131, 132

**Miscellaneous Authorities**

American Psychiatric Assoc., Diagnostic and Statistical Manual of
Mental Disorders (5th ed.), 300.02 ............................................................... 130, 131

Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325
(Sept. 25, 2008) ...................................................................................... 2, 4, 51, 126

Nat'l Inst. of Health, *Classification of Overweight and Obesity by BMI*, *available
at*: https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_dis.htm ........................... 129

Texas Commission on Law Enforcement,
2011 Basic County Corrections (Chp. 19-21) at
http://www.tcole.texas.gov/content/course-curriculum-materials-and-updates-0. ..................... 122

U.S. Census Bureau, Quick Facts: Ft. Worth, Texas
(available at: https://www.census.gov/quickfacts/fact/table/fortworthcitytexas/INC110216) .... 113

Defendants' motions for summary judgment (Docs. 145-47, 150, and 152) should be denied.

# I.  <u>SUMMARY OF THE ARGUMENT</u>

Seven Harris County jail officers killed Kenneth Lucas, a pretrial detainee, because the County's policies and training instructed them to use a dangerous facedown hogtie restraint while pressing down on detainees' chests. When Kenneth begged, "I cannot breathe," the officers heard his cries but ignored him because the County trained them to enter a "code of silence" while restraining detainees. As a result, the officers continued sitting on Kenneth, and compressing his chest even after Kenneth was dead.

Kenneth was in the jail because he was too poor to pay bond[1] after he was charged with violating a child custody order. (Kenneth had kept his teenage children, Plaintiffs K.J.L. and T.J.L., longer than the order allowed). For years, Kenneth had suffered from serious disabilities, including severe anxiety (which he treated with daily Xanax), hypertension, and obesity. Because the County's medical providers did not prescribe him additional Xanax in the jail, Kenneth suffered serious withdrawal symptoms, becoming delusional, feeling chest pains, hallucinating, and exhibiting bizarre behavior. In his withdrawal-addled state, locked alone in his cell, Kenneth stuffed the shirt from his jail uniform into the cell's toilet (flooding the cell), then wrapped the soaking wet shirt around his head, and pulled the cell's smoke detector off the ceiling. Kenneth was obviously extremely sick, and in need of psychiatric and medical attention.

Instead of even having a psychiatric provider talk to him, the officers followed Harris County's policies and well-established training practices and decided to use calculated, excessive

---

[1] *See ODonnell v. Harris Cty., Tex.*, 882 F.3d 528, 538 (5th Cir. 2018) (affirming preliminary injunction finding Harris County unconstitutionally denied bond to impoverished detainees).

force and violence to retrieve the smoke detector. Five officers in body armor with a riot shield stormed into Kenneth's single-man cell, smashed him to the floor, dragged him out of the cell facedown, and applied handcuffs and leg irons – all within a matter of minutes. The officers then dropped him on a waiting gurney, in a facedown hogtie position, and Officer Scott climbed on top of Kenneth to sit on him and hold his legs into his chest as the other officers pinned him to the gurney and pressed down on his chest for a quarter hour. The County's own internal affairs investigator described the technique as a "basic hogtie position." Kenneth hallucinated visions of his children, screamed for "help!" twenty-five times, then thrice begged "I cannot breathe" – but the officers pushed down harder because Harris County's policy and training required them to "entirely incapacitate" a pretrial detainee before letting up. As a result of the dangerous restraint and their indifference to Kenneth's cries for "help!" and "I cannot breathe," Kenneth died – and incredibility the officers still continued sitting on him, holding him facedown on the gurney, in the "basic hogtie position."

Plaintiffs, Kenneth's surviving family, bring 42 U.S.C. § 1983 and Americans with Disabilities Act and Rehabilitation Act claims against Harris County, the officers, and the medical providers, seeking to hold Defendants accountable for the practices that caused Kenneth's death and their failure to accommodate his disabilities.

The Defendants motions for summary judgment should be denied for four reasons.

First, the Officer Defendants (Riley Scott, David Gordon, Jesse Bell, Xavier Leveston, Broderick Green, Morris Thomas, and Adam Kneitz) acted together using wholly unnecessary excessive force to restrain Kenneth in a facedown hogtie while compressing his chest. As Kenneth gasped "I cannot breathe," the officers either pushed down more or stood by and did nothing. A jury will need to resolve material fact issues, such as 1) was any force necessary at

all? and 2) did the officers continue to use objectively unreasonable force after Kenneth's alleged "resistance" completely stopped? This force was objectively unreasonable, and it was clearly established by the Fifth Circuit in cases with similar fact patterns that such force violated a pretrial detainee's Fourteenth Amendment rights. Thus, the officers are not entitled to summary judgment. *See*, *e.g.*, *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2470 (2015); *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468 (5th Cir. 2014).

Second, the officers and Defendants Dr. Laxman Sunder and Nurse Carrie O'Pry were deliberately indifferent to Kenneth's need for emergency medical attention, and watched him die in the jail's clinic instead of providing him with necessary emergency medical care. While in the clinic, under Dr. Sunder and Nurse O'Pry's care and observation, Kenneth again gasped "I cannot breathe." The video of the ordeal shows Kenneth's eyes roll back into his skull, and spittle form on his lips, but the officers and medical staff do nothing. But the officers kept pressing down on Kenneth's chest and sitting on him, and Sunder and O'Pry did nothing for several crucial minutes, not even taking Kenneth's vital signs or checking his respirations. Different witnesses tell different stories about what they heard – a jury will need to resolve the Defendants' subjective knowledge and intent. Thus, all the individual defendants were deliberately indifferent to Kenneth's right to receive care for a serious medical need, in violation of his Fourteenth Amendment rights. None of the individuals are entitled to summary judgment.

Third, the officers perfectly executed Harris County's training, and performed an "A"-grade cell extraction – even though they killed Kenneth. Harris County's cell extraction policies and training, known to the policymaker (Sheriff Adrian Garcia), caused the officers' to use excessive force and ignore cries that "I cannot breathe," killing Kenneth. Further, Sheriff Garcia knew the officers were being trained to use these hazardous techniques – and had even been

3

cautioned by the U.S. Department of Justice that the County's practices could kill detainees. Yet Sheriff Garcia and Harris County did nothing to address this known danger. Thus, Harris County violated Kenneth's Fourteenth Amendment rights under four distinct theories by: 1) creating a dangerous condition of confinement in the jail through its policies and training; 2) training officers to commit acts or omissions resulting in excessive force; 3) training officers to enforce a "code of silence" during cell extractions; and 4) its policymaker knowing about these dangerous conditions, policies, practices, and training but nonetheless approving the excessive force techniques and "entirely incapacitated" practice. Therefore, Harris County is not entitled to summary judgment on the Fourteenth Amendment claims.

Finally, Harris County was also completely indifferent to Kenneth's need for accommodations for his disabilities. Kenneth's mental illness and drug withdrawal required treatment – not the County's premeditated and calculated violence. And an obese and hypertensive detainee suffering from severe anxiety and prescription drug withdrawals was in even greater danger than an able-bodied detainee during the County's "basic hogtie position" practice. Indeed, Harris County made no reasonable accommodations to protect Kenneth – though several key changes (some as simple as waiting for a mental health professional to see the detainee first, or turning detainees on their side during restraint) were made as a result of his death and were completely feasible to have implemented in time to save Kenneth. Thus, Harris County violated Kenneth's rights under the Americans with Disabilities Act and Rehabilitation Act by deliberately failing to accommodate his disabilities, and is not entitled to summary judgment on these claims.

Accordingly, Defendants are not entitled to summary judgment.

4

## II.  FACTS – HARRIS COUNTY OFFICERS KILLED KENNETH LUCAS

### A. *DRAMATIS PERSONAE*: THE HARRIS COUNTY EMPLOYEES WHO KILLED KENNETH

Kenneth Lucas was arrested for violating a child custody order (almost three months after his children returned to their mother), and imprisoned at the Harris County jail until he could pay bond or face trial.[2] Tragically, Kenneth's family was too poor to pay the bond.

During all relevant times, Adrian Garcia served as the County sheriff, and in that capacity he was "the person in charge of the Harris County Jail."[3] Thus, Sheriff Garcia's relevant actions represent the actions of Defendant Harris County. *Colle v. Brazos Cty., Tex.*, 981 F.2d 237, 245 (5th Cir. 1993) ("The sheriff is without question the county's final policymaker in the area of law enforcement").

Defendant David Gordon was designated as the cell extraction team's "supervisor" during Kenneth's extraction and until Kenneth died.[4] Gordon's job required him to attempt a resolution that did not involve use of force and, during the use of force, to observe the containment team to keep the officers *and Kenneth* safe.[5] Prior to the day Kenneth died, Gordon had participated in approximately three "full-scale extractions."[6]

---

[2] The officers and County's motions attack Kenneth's character by reciting old assault charges and other previous convictions the officers were unaware of (and Kenneth had served his time for). *See*, *e.g.*, Doc. 145 p. 13 (reciting Kenneth's "past criminal history"); Doc. 152, p. 2 (section titled "History of violence"). These old convictions are inadmissible for any purpose, and evidence of such should be excluded. *See* Plaintiffs' Motion to Strike Officers Appendix Exhibits, filed contemporaneously with this Response.

[3] **Ex. 4** (Garcia dep.) at 7:12-17.

[4] **Ex. 5** (Anderson dep.) at 130:23-24, **Ex. 6** (Scott dep.) at 37:11-12.

[5] **Ex. 7** (Gordon dep.) at 7:19-21, 9:12-14, 16:6-10, 80:6-10, 117:13-15.

[6] **Ex. 7** (Gordon dep.) at 9:2-4.

Defendant Riley Scott[7] served as "team leader" and stood third in line when the containment team lined up in the single-file "stick" formation to enter the cell.[8] This was his first cell extraction following numerous training exercises. Scott's responsibility was to restrain Kenneth in a facedown hogtie position by climbing aboard the gurney and sitting on Kenneth's legs to pushing them into Kenneth's chest once they were crossed and folded back at the knee.

Defendant Xavier Leveston was the first containment team member to enter Kenneth's cell and held Kenneth's right arm into his back and pushed down on Kenneth's chest during the restraint.[9]

Defendant Broderick Green was the "number two guy" on the stick and applied pressure to Kenneth's left arm toward his upper body from the time that Defendants hogtied Kenneth until well after he stopped breathing.[10]

Defendant Jesse Bell was "number four" in the stick and restrained Kenneth's left leg throughout the ordeal.[11]

Defendant Morris Thomas was "number five" in the stick and restrained Kenneth's right leg until Kenneth died.[12]

---

[7] Defendant Scott is transgender, and transitioned from his female name (Alicia Scott) to his male name (Riley Scott) after Kenneth's death. Though the Plaintiffs, unaware of the transition until his deposition, sued "Alicia Scott," there is no dispute that "Riley Scott" is the same person, and Plaintiffs will use his new name and pronoun.

[8] **Ex. 5** (Anderson dep.) at 131:1-6; **Ex. 7** (Gordon dep.) at 116:10-13 (testifying the "stick" refers to the containment team's formation as they prepare to enter a cell).

[9] **Ex. 8** (Leveston dep.) at 21:14-16, 34:12-16.

[10] **Ex. 9** (Green dep.) at 23:2-3, 65:25-66:2, 159:9-11.

[11] **Ex. 10** (Thomas dep.) at 60:9-15.

[12] **Ex. 10** (Thomas dep.) at 60:9-15.

6

Defendant Adam Kneitz was the videographer.[13] As the video makes clear, Defendant Kneitz stood close to Kenneth in the minutes preceding Kenneth's death. Instead of intervening to help, Kneitz callously filmed Kenneth's last moments of suffering.[14]

Together, the Officer Defendants comprised the "containment team" that needlessly extracted Kenneth from his cell and ultimately killed him.[15]

David Ritchie is a sergeant supervising officers in the jail.[16] At the time Defendants killed Kenneth, Sergeant Ritchie worked for the jail's internal affairs department.[17] Sergeant Ritchie gathered information on the day Kenneth died and created an "initial packet" of investigative materials.[18]

Lieutenant Lynette Anderson served as "detention lieutenant" when Kenneth died.[19] On the day Kenneth died, Lieutenant Anderson was the watch commander who "activated" the containment team comprised of Officer Defendants.[20] Lieutenant Anderson accompanied Kenneth and Officer Defendants from the time of the extraction until Kenneth died, and can be seen in the video observing Kenneth's death – and ignoring his pleas that "I can't breathe."[21]

---

[13] **Ex. 11** (Kneitz dep.) at 23:11-12.

[14] *See, e.g.*, **Ex. 2-A** (video) at 16:54-17:00, 20:04-20:46.

[15] *See* **Ex. 7** (Gordon dep.) at 20:3-5, 116:4-13.

[16] **Ex. 12** (Ritchie dep.) at 7:25-8:3.

[17] **Ex. 12** (Ritchie dep.) at 9:18-23.

[18] **Ex. 12** (Ritchie dep.) at 26:16-27:1; **Ex. 34** (Ritchie report).

[19] **Ex. 5** (Anderson dep.) at 5:21-23.

[20] **Ex. 5** (Anderson dep.) at 6:12-15, 17:9-11, 17:23-25, 21:2-5.

[21] **Ex. 5** (Anderson dep.) at 70:2-5, 72:3-5.

Dr. Laxman Sunder was the supervising physician in the jail's clinic. Dr. Sunder was supposed to provide medical care to Kenneth when he arrived, hogtied and face down with five officers pushing his body down into the gurney, but ignored Kenneth for nine minutes (when it was too late). [22]

Nurse Carrie O'Pry, a licensed vocational nurse, was also employed in the jail's clinic. O'Pry also ignored Kenneth's condition in the clinic until he was dead.

Griffin Moseley Johnson & Associates (GMJA), a criminal justice consulting firm, was hired by the County to investigate Kenneth's death. GMJA produced a report finding several steps County officials should have taken to prevent Kenneth's death. [23]

## B.  "I CANNOT BREATHE"

Defendants ignored what they all agree was the most important thing Kenneth said on the last day of his life: "I can't breathe." [24] Kenneth's more than twenty-five pleas for help were equally unimportant to the officers, even though just "[a] few minutes without oxygen will result in permanent brain damage and even death." [25] Defendants' actions ultimately left Kenneth "completely without oxygen for a period of over 5 minutes and 18 seconds and possibly as long as 8 minutes and 9 seconds." [26] Despite the dire nature of Kenneth's cries for help, Defendants did nothing to determine whether Kenneth could breathe or to aid Kenneth's breathing. Instead,

---

[22] **Ex. 2-A** (video) at 16:28-25:34 (Dr. Sunder's dark blue scrubs are seen in the video shortly after Kenneth arrives in the clinic, but not again until after Kenneth was likely dead).

[23] **Ex. 15** (GMJA Report).

[24] **Ex. 9** (Green dep.) at 64:1-5; **Ex. 10** (Thomas dep.) at 96:11-24; **Ex. 8** (Leveston dep.) at 52:20-25.

[25] **Ex. 13** (Hall rep.) at 1.

[26] **Ex. 13** (Hall rep.) at 5.

they kept dangerously restraining Kenneth—and restricting his ability to breathe—all while listening to him beg for help.

Incredibly, ignoring inmates' complaints that they "can't breathe" was Harris County's policy, practice, and custom. According to Sheriff Garcia, jail officers were trained to ignore claims by a detainee that he cannot breathe so long as the detainee "was not entirely incapacitated."[27] It is therefore no surprise that the County employee in charge of Kenneth's extraction and transport, Lt. Anderson, actually heard Kenneth say he could not breathe and did nothing to ascertain the validity of his plea for help.[28] Lt. Anderson stated that she **assumed** he could breathe because he allegedly said something disrespectful to her after his cry for help.[29]

Lieutenant Anderson further testified:

> Q:    You did hear it on the video but I'm saying independent of the video, you actually have a recollection of having heard [Kenneth] say the words "I can't breathe," right?
>
> A:    Yes.
>
> Q:    And you heard [Kenneth] saying that, I believe, you described it as the holding area of the clinic; is that right? Or not—it wasn't in the clinic, right?
>
> A:    No. It was in the elevator lobby
>
> …
>
> Q:    The elevator lobby, is that on the same floor as the clinic or a different floor?
>
> A:    It's on the second floor.

---

[27] **Ex. 4** (Garcia dep.) at 180:11-181:14.

[28] *See, e.g.*, **Ex. 5** (Anderson dep.) at 103:25-104:2 ("Q. Did you try to talk with him . . . after you heard him say "I can't breathe"? A. I didn't. No.").

[29] **Ex. 5** (Anderson dep.) at 71:13-17, 102:13-19 (admitting that she "speculate[s]" that detainees can breathe if they add curse words after the statement "I can't breathe").

> Q:     And is that the floor that the clinic is on is the second floor?
>
> A:     No. The clinic is on the first floor.
>
> Q:     Okay. So, the elevator lobby is on the second floor and that's where you heard Kenneth Lucas say " I cannot breathe"?
>
> A:     Yes.[30]

Lieutenant Anderson is likewise "sure" that the Officer Defendants each heard Kenneth say he "can't breathe" while in the elevator lobby.[31]

Indeed, between 14:04 and 14:08 on the video, Kenneth gasps, "I can't breathe. I can't breathe."[32] And at 16:22 in the video, Kenneth's breathing is obviously labored as Defendants Green and Leveston push Kenneth's face into the tilted gurney headrest.[33]

Kenneth also cried out in the clinic that he could not breathe.[34] The video demonstrates that **after** several labored utterances, Kenneth very clearly states at 16:55 that "I cannot breathe."[35] Just seconds later, as Kenneth's speech becomes increasingly more difficult to understand and his breathing becomes even more labored, Kenneth tries to say again that he

---

[30] **Ex. 5** (Anderson dep.) at 67:3-24; *see also* **Ex. 2-A** (video) at 14:00-14:08.

[31] **Ex. 5** (Anderson dep.) at 71:22-25 ("And you did not tell the containment team members, hey, he just told me he couldn't breathe? A. No, because **I'm sure they heard him**. **He was loud enough**." (emphasis added)), 72:6-16; *see also* **Ex. 10** (Thomas dep.) at 91:20-25 (testifying that even though he was by Kenneth's feet, he could hear Kenneth say "I can't breathe" while in the clinic).

[32] **Ex. 2-A** (video).

[33] *Id.*

[34] **Ex. 10** (Thomas dep.) at 58:20-59:5.

[35] **Ex. 2-A** (video).

cannot breathe.[36] From this point until 19:05, Kenneth's ability to move sharply declines, and he can no longer speak clearly.[37]

Though many Defendants now deny it, the evidence demonstrates that the Officer Defendants heard Kenneth say "I can't breathe" as they contorted his body and compressed his chest. Defendants Leveston, Bell, Gordon, and other containment team members discussed Kenneth's cry for help during their debriefing meeting just after the incident (and before they saw the video).[38]

Defendant Thomas, who restrained Kenneth's right leg, admitted that he heard Kenneth say "I can't breathe" a second time while in the clinic.[39] Defendant Thomas further admits he "didn't do anything" in response to Kenneth's plea for help.[40]

Defendant Gordon was the containment team's "supervisor."[41] "[A]s the head of the team," Defendant Gordon should have told medical staff that Kenneth said, "I can't breathe."[42] But Defendant Gordon did not alert anyone to Kenneth's plea for help.[43]

---

[36] *Id.* at 17:10-17:20 ("I can't bro. I cannot . . . .").

[37] *Id.*

[38] **Ex. 10** (Thomas dep.) at 97:14-98:11, 103:13-20 ("Q. . . . Was Deputy Gordon one of those . . . who said at the debriefing 'I heard him say I can't breathe' A. Yes, sir. I believe so."); **Ex. 14** (Bell dep.) at 50:13-52:14 (remarkably, while Defendant Bell denies hearing Kenneth say "I can't breathe," he initially reported hearing Kenneth say a number of other things); *see also* **Ex. 4** (Garcia dep.) at 188:14-21 (testifying no one ever complained that helmets worn by containment team members hindered their ability to hear).

[39] **Ex. 10** (Thomas dep.) at 58:20-59:5.

[40] *Id.*; *see also* **Ex. 10** (Thomas dep.) at 89:15-25 ("Q. . . . when you heard [Kenneth] say "I can't breathe," did you try to talk to [him]? A. No, sir. . . . Q. So you actually thought about 'Maybe I ought to talk to him,' but you opted not to talk to him? A. Yes, sir . . . ."), 92:1-22 (admitting that he "didn't do anything" in response, including notifying any of the numerous officers and medical staff in the clinic).

[41] **Ex. 5** (Anderson dep.) at 130:23-24, **Ex. 6** (Scott dep.) at 37:11-12.

Similarly, after hearing Kenneth say, "I can't breathe," Defendant Leveston literally did nothing because, in his opinion, and consistent with his training from Sheriff Garcia, "[i]f you're talking, you're breathing."[44] Defendant Leveston did not even alert others of Kenneth's plea for help.[45]

As the videographer, Defendant Kneitz stood very near Kenneth's face and certainly heard Kenneth say he could "not breathe" at 16:55 in the video.[46] As the video confirms, Defendant Kneitz remained unfazed when Kenneth said "I can't breathe" just inches from Kneitz's camera.[47] Even when Kenneth's eyes roll back into his head at 20:05 on the video, Kneitz does nothing to help Kenneth or alert the medical personnel.

These Officer Defendants failed to alert medical staff of Kenneth's inability to breathe. This omission was cruel and wanton, but also complied with the County's "code of silence" practice, which precluded officers from speaking up when they learned that Kenneth could not breathe.[48]

---

[42] **Ex. 10** (Thomas dep.) at 103:10-104:15.

[43] *See* **Ex. 10**  (Thomas dep.) at 104:1-3; 104:19-21.

[44] **Ex. 8** (Leveston dep.) at 47:13-48:10.

[45] **Ex. 8** (Leveston dep.) at 48:14-18, 95:16-19.

[46] **Ex. 2-A** (video); **Ex. 11** (Kneitz dep.) at 100:21-101:14.

[47] *Id.*; **Ex. 11** (Kneitz dep.) at 100:21-101:14.

[48] **Ex. 14** (Bell dep.) at 11:5-12:11, 15:22-16:7 ("Q. Had you heard [Kenneth] cry out . . . I can't breathe, you would have reacted, correct? . . . A. "I was trained—I'm trained—if I heard it, I was trained that I could not, you know, react to it . . . ."), 17:20-18:6 ("Q. Okay. So do I understand you correctly that the training from Harris County is that even if you were to hear . . . someone cry out, I can't breathe or I need help, that person who's handling the leg shouldn't do anything other than maintain control over the leg? A. Well, that was then—that was . . . the way we were trained then because you have five members. That was then."), 18:19-25 ("Q. Now let's go to

Despite hearing Kenneth's pleas for help, Defendant Scott continued to straddle "over" Kenneth's feet, "hold[] his legs down," and apply pressure on Kenneth's back while the other Officer Defendants looked on.[49] And despite being well within earshot of Kenneth's cries for help, Defendant Scott did nothing but keep pushing Kenneth's legs forward until after Kenneth had quit breathing altogether.[50] At 17:45 in the video, as Kenneth is saying his final discernible words, Defendant Scott continues to bear down on Kenneth's legs and back.[51] Defendant Scott finally took the pressure off of Kenneth's motionless body when Dr. Sunder finally asked if Defendant Scott could "let [Kenneth] move [his legs] a little bit."[52]

Defendant Gordon, the containment team supervisor, testified that it would have been "wrong" for Defendant Scott to "straddle" Kenneth's legs **and** put pressure on his legs and back.[53] Yet, that is exactly what Defendant Scott did until Kenneth died, and according to several officers, exactly what the County trained Scott to do.[54]

---

that was then. . . . And even if somebody says, I need help; or, I can't breathe, you stayed with . . . your part, the leg. Correct? A. My position, yes, sir.").

[49] **Ex. 11** (Kneitz dep.) at 66:19-67:4; **Ex. 10** (Thomas dep.) at 63:7-25.

[50] **Ex. 6** (Scott dep.) at 51:9-13, 120:6-10 ("Q. When did you realize this had gone horribly wrong? . . . A. I guess when I got off the gurney."), 164:14-165:13, 169:6-18.

[51] *Id.*

[52] *Id.* at 25:10-25:40.

[53] **Ex. 7** (Gordon dep.) at 103:12-104:20, 109:6-14, 109:23-110:8.

[54] **Ex. 5**, (Anderson dep.) at 30:24-31:18, 32:7-16, 130:1-3. The video clearly shows that Defendant Scott placed all of his body weight on Kenneth's legs and back. **Ex. 2-A** (video) at 10:38-10:45, 10:57-12:16 (riding Kenneth with his body weight focusing pressure on Kenneth's bent legs and lower back), 14:05-14:10 (position unchanged as Defendants push Kenneth into elevator), 15:10-15:20, 17:23-17:51.

The independent consulting firm hired by the County to investigate Kenneth's death opined, "A review of the video showed Lucas's legs were restrained using leg irons. It did not appear necessary for [Defendant Scott] to ride on top of the gurney *pinning [Kenneth's] legs to his back*."[55] Throughout the ordeal, Defendants Bell and Thomas also applied pressure on Kenneth's legs "hard enough to where [Defendants] have control of it into his buttocks area."[56] This pressure intensified the already deadly risks posed by the hogtie restraint used against Kenneth.[57]

The video further reveals the lethal nature of the pressure the officers applied to Kenneth's body until he died. At 22:39-23:08, the video shows Defendants Leveston and Green continuing to pull Kenneth's hands up high on his back, placing additional pressure on Kenneth's chest and abdomen.[58] As noted above, Defendant Scott used his body weight to push Kenneth's legs forward and to apply pressure on Kenneth's back.[59] Between 12:15 and 13:12 on the video, Kenneth's breathing clearly becomes labored, and the tilted headrest further obstructs his breathing.[60] At 20:04 on the video, Kenneth's eyes roll to the back of his head or become fixed, and Kenneth appears to convulse or weakly cough, as spittle foams on his lips.[61] Despite

---

[55] **Ex. 15** (GMJA Rep.) at 6, Bates no. 2348 (emphasis added).

[56] **Ex. 10** (Thomas dep.) at 64:4-9.

[57] **Ex. 13** (Hall rep.) at 2, 5; **Ex. 16** (Cohen rep.) at §§ 26, 39, 44(g), 46(iv).

[58] **Ex. 2-A** (video).

[59] **Ex. 2-A** (video) at 10:38-10:45, 10:57-12:16, 14:05-14:10, 15:10-15:20, 17:48, 21:21, 25:10-25:40.

[60] **Ex. 2-A** (video).

[61] *Id.*

Kenneth's marked physical distress, Defendants continue to apply pressure on Kenneth's back, abdomen, and chest, further restricting his breathing.

While Defendants completely ignored Kenneth's pleas for help, Defendants knew restraining Kenneth in a manner that hindered his ability to breathe would endanger and could even kill him.[62] Defendants likewise knew that the health and well-being of a pretrial detainee "is just as important and as paramount a concern as the health and safety of the members of the [containment] team."[63]

Defendants also knew that the correct—and non-indifferent—response to Kenneth's plea for help was to take action to prevent Kenneth from suffocating, such as repositioning him. Indeed, Defendant Scott agreed with proposition that, "if somebody hears 'I cannot breathe,' they have a 100 percent of the time obligation to check out and make sure that the inmate's safe."[64] Other testimony makes clear that the entire containment team knew that Kenneth's pleas

---

[62] **Ex. 5** (Anderson dep.) at 101:1-6; **Ex. 6** (Scott dep.) at 16:5-19, 18:19-24, 152:21-25; **Ex. 9** (Green dep.) at 62:5-24; **Ex. 7** (Gordon dep.) at 68:9-17 (acknowledging that detention employees should assume that a complaint about an inability to breathe is "life threatening"), 130:9-25; **Ex. 10** (Thomas dep.) at 65:13-24 (admitting he heard Kenneth say "I can't breathe" while in the clinic and that it signaled a "potential emergency"), 93:6-10 ("Q. Okay. If somebody can't breathe, what can happen to them? . . . A. They can possibly die."), 93:21-23 ("Q. . . . If you can't breathe for long enough, what's going to happen to you? A. You die."); **Ex. 14** (Bell dep.) at 14:13-18 (admitting that hearing Kenneth say "I can't breathe" on the video "cause[d] [him] concern"), 22:22-23:14 (admitting that a detainee who cannot breathe is in danger and that County policy preventing him from helping an inmate who says he cannot breathe was "idiotic"), 25:5-14; **Ex. 8** (Leveston dep.) at 44:9 ("Of course, if they stop breathing, they die."), 45:11-46:6, 49:20-23 (agreeing that detainee who cannot breathe should be repositioned).

[63] *See* **Ex. 10** (Thomas dep.) at 23:9-13.

[64] **Ex. 6** (Scott dep.) at 44:18-22.

for help required immediate action.[65] Yet, the evidence shows that no one considered Kenneth's safety, even as he begged for help breathing.

To the extent certain Defendants deny hearing Kenneth say "I can't breathe," those denials, at most, create a material factual dispute. Further, their denials are inconsistent with Defendants' undisputed duty to monitor Kenneth for signs of trouble and to listen for sounds of distress from Kenneth.[66] Defendants' self-serving denials are also inconsistent with reality, considering that Defendants could hear other things, including statements by Kenneth, and even discussed his inability to breathe in debriefing.[67] Defendants Kneitz and Scott attempt to excuse their inaction by claiming that, after they arrived at the clinic, they did not have a duty to monitor whether Defendants' use of force was killing Kenneth.[68] But in actuality, Officer Defendants knew they still owed the duty to care for Kenneth even after they arrived at the clinic, and the

---

[65] **Ex. 6** (Scott dep.) at 12:23-13:22, 18:19-19:1; **Ex. 11** (Kneitz dep.) at 41:2-42:2, 85:11-13, 89:9-11 (characterizing one's inability to breathe as "an emergency"); **Ex. 9** (Green dep.) at 59:25-60:6 (proper response would be to "adjust the scenario to where it benefits [Kenneth] and his breathing problems"), 60:14-18 (testifying proper response was to "order[] the team to release their hold on [Kenneth]"), 101:11-14; **Ex. 7** (Gordon dep.) at 66:17-67:3, 67:20-68:2, 77:22-78:10, 128:2-11 (testifying that the right thing to do would have been to turn Kenneth over or put him on his side); **Ex. 10** (Thomas dep.) at 65:13-66:7 (admitting he heard Kenneth say, "I can't breathe" and admitting that no officer responded), 110:1-5 (admitting that the team "could have" taken "immediate action [to] change [Kenneth's] position").

[66] **Ex. 6** (Scott dep.) at 43:14-17, 73:12-14 ("Q. Do you know how important it is to respond to even an inmate calling out for help? A. Yes, sir."); **Ex. 9** (Green dep.) at 59:2-14, 94:16-21; **Ex. 7** (Gordon dep.) at 117:25-118:15 ("Q. You were supposed to be listening to your whole team and the inmate, right? A. And the inmate.").

[67] **Ex. 6** (Scott dep.) at 43:14-17, 113:14-19 (reciting what nurse said in clinic), 115:18-24, 121:8-10 (acknowledging that he could hear others speaking); **Ex. 10** (Thomas dep.) at 97:14-98:11 (testifying Defendants Bell and Leveston initiated conversation in debriefing), 103:13-20 ("Q. . . . Was Deputy Gordon one of those . . . who said at the debriefing 'I heard him say I can't breathe'? A. Yes, sir. I believe so.").

[68] **Ex. 11** (Kneitz dep.) at 85:25-86:15, **Ex. 6** (Scott dep.) at 40:24-41:3 ("We're not medical personnel, so we can't dictate what goes on [in the clinic].").

video shows no one actually worried about Kenneth's health until he had been restrained in the clinic and unable to breathe for over ten minutes.[69]

Defendants also knew Kenneth was in danger of serious injury or death, and despite knowing that they should have changed his position or otherwise done something to make sure Kenneth could breathe, Defendants ignored Kenneth's numerous cries for help and continued to apply deadly force against Kenneth until he died. Defendants' treatment of Kenneth prompted the following reaction from Plaintiffs' correctional medicine expert, Dr. Robert Cohen, M.D., the former chief physician for Rikers Island:

> I have worked in jails as a physician, administrator, and monitor for thirty-five years. I have monitored medical care for state and federal courts in jails and prisons. I have overseen the conditions and care for prisoners as a member of the NYC Board of correction for the past seven years. I have reviewed thousands of medical records. *Rarely, however, have I seen the degree of violence and callousness displayed by the medical and correctional staff at Harris County Jail.*
>
> . . . .
>
> The actions of the medical, nursing, and Sheriff's Office staff at Harris County Jail caused the death of Kenneth Lucas. Mr. Lucas' death was completely preventable. His death was unnecessary. *The manner of death, the homicide as indicated by the Medical Examiner, was shocking.*[70]

## C. HARRIS COUNTY'S HISTORY OF HOGTYING PRETRIAL DETAINEES AND KNOWLEDGE OF THE DANGER

In June 2009, years before Kenneth's tragic death, the U.S. Department of Justice warned Harris County and Sheriff Garcia to stop hogtying pretrial detainees because doing so could be lethal. Criticizing "inherent systemic problems with Jail procedures or resources," the DOJ found

---

[69] **Ex. 6** (Scott dep.) at 41:5-21; **Ex. 2-A** (video) at 15:30-26:10.

[70] **Ex. 16** (Cohen rep.) at §§ 49-50 (emphasis added).

"the Jail lacks necessary systems to ensure compliance with constitutional standards."[71] The DOJ

warned Sheriff Garcia that "the jail lacks … a minimally adequate system for deterring excessive

use of force."[72]

> We have serious concerns about the use of force at the Jail. The Jail's use of force policy is flawed in several regards. First, neither written policy nor training provide staff with clear guidance on prohibited use of force practices. For example, **Harris County Jail does not train staff that hogtying and chokeholds are dangerous, prohibited practices**. Indeed, we found a significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors. Second, use of force policies fail to distinguish between planned use of force (e.g. for extracting a detainee from a cell) and unplanned use of force (e.g., when responding to a fight). In many planned use of force situations [such as cell extractions], staff should be consulting with supervisors, and possibly medical staff, before using force. … As a result of systemic deficiencies including a lack of appropriate policies and training, the Jail exposes detainees to harm or risk of harm from excessive use of force.[73]

In fact, the DOJ found that officers killed detainees before in the same way Kenneth died.

"In a particularly troubling January 2008 case, staff applied a choke hold to a detainee, who

subsequently died. The autopsy report identified the manner of death as homicide."[74] "Such

improper force technique is being used with troubling frequency."[75] The DOJ likewise warned

Harris County that officers "forcibly placed [a detainee] on the ground" and "appl[ied] pressure

to [his] neck and [the] small of his back."[76] "These and similar incidents suggest that staff use

---

[71] **Ex. 3** (DOJ report) at 2, 3.

[72] *Id.* at 14 (emphasis added).

[73] *Id.* at 16

[74] *Id.* at 15.

[75] *Id.*

[76] *Id.* at 15-16.

18

hazardous restraint and force techniques without appropriate guidance or sanction."[77] The DOJ ultimately recommended the County "prohibit the use of chokeholds and hogtying" and "alter its procedures for cell extractions and other use of force situations to ensure that staff are utilizing appropriate force techniques."[78]

The DOJ's report also catalogs incidents where Harris County ignored inmates suffering alcohol and drug withdrawal.[79]

Even after the DOJ warned Harris County about using excessive force in 2009, jail officers continued to abuse pretrial detainees. From 2008 to February 22, 2016, Harris County officers were involved in 108 incidents where officers were *disciplined* for abusing pretrial detainees in the jail.[80]

### D. THE OFFICERS FOLLOWED HARRIS COUNTY'S POLICY, PRACTICE, AND CUSTOM BY IGNORING KENNETH'S PLEAS FOR HELP UNTIL HE WAS "ENTIRELY INCAPACITATED"

Shockingly, cell extractions remained dangerous and deadly as a matter of County policy, even after the DOJ's report. Indeed, the chief policymaker for the County testified that "even hearing . . . about [containment team members] not doing things when people say they can't breathe [he] would still say '[that] these officers were following the training and policies in place

---

[77] **Ex. 3** (DOJ report) at 16.

[78] *Id.* at 22-23.

[79] *Id.* at 10-11.

[80] **Ex. 30** (Use of Force Related Disciplinary Actions Against HCSO Jail Personnel) at Bates nos. LUCAS 2024-25). Plaintiffs file exhibit 30 and others under seal pursuant to this Court's Protective Order, Doc. No. 119, without waiving arguments raised in their motion to unseal, doc. no. 174.

at . . . Harris County.'"[81] Sheriff Garcia indicated that he approved suffocating detainees until they become "entirely incapacitated."[82]

Despite the Officer Defendants' actions being consistent with Harris County policy, independent criminal justice experts hired by the County acknowledged obviously dangerous practices and criticized Defendant Scott for "pinning [Kenneth's] legs to his back" and concluded that "[t]he manner and position coupled with the length of time in which [Kenneth] was placed on the gurney appeared to result in Lucas having difficulty breathing."[83] GMJA's conclusions are consistent with Plaintiffs' expert opinions in this case.[84]

Not only did Kenneth say he could not breathe, he literally yelled for "help!" more than fifteen times from when the officers placed him on the gurney until the breath was pressed out of him. For instance, at 13:20-13:40 in the video, Kenneth's breathing is obviously labored as he repeatedly pleads, "Help me. Please help me."[85] Indeed, Kenneth made pleas for help throughout ordeal. At 8:25-8:30 in the video, Kenneth says, "Help me . . . . Help me please."[86] At 9:32-9:40, Kenneth says, "Help me Jesus. Stop hurting me."[87] Between 10:28 and 10:40 in the video,

---

[81] **Ex. 4** (Garcia dep.) at 211:23-212:4.

[82] **Ex. 4** (Garcia dep.) at 180:11-181:14.

[83] **Ex. 15** (GMJA) at 6, Bates 2348.

[84] *See* **Ex. 16** (Cohen rep.) at §§ 2, 5, 26, 27, 39, 44(g)-(h), 46(iv), 52; **Ex. 13** (Hall rep.) at 2 ("Between the officer straddling the legs and putting pressure on feet and potentially back, breathing would have been further compromised.").

[85] **Ex. 2-A** (video).

[86] *Id.*

[87] *Id.*

20

Kenneth says "help me" twice.[88] In all, Kenneth cries out for help more than twenty-five times.[89] Defendants ignored these pleas for help just as they did Kenneth's inability to breathe.

Defendants' total disregard for Kenneth's life and safety went beyond ignoring his cries for help and his inability to breathe. As Kenneth lost consciousness, Defendants, including Nurse O'Pry and Dr. Sunder, did nothing to confirm that he could breathe.[90] Indeed, the Officer Defendants did not reduce their force until after Kenneth had died and Dr. Sunder finally instructed them to roll Kenneth over.[91] According to Plaintiffs' correctional medicine expert, Dr. Cohen, Kenneth had stopped breathing for **five minutes** while "correctional staff continued to sit on his legs and apply pressure."[92]

Plaintiffs' emergency medicine expert, Dr. Kris Hall, M.D., also studied the video carefully. Discussing the approximately two minutes and ten seconds after the *last* time Defendants heard Kenneth say "I cannot breathe," Dr. Hall opines, "The dying process is in full swing."[93] At that same time, 19:05 in the video, "[w]e also see the last visible movement of the torso of [Kenneth]."[94] At the twenty-minute mark, Kenneth's eyes "had ether rolled up into his

---

[88] *Id.*; *see also id.* at 11:50-12:00 ("help me"); 13:20-13:30 ("Help me. Help me. Please help me. Please."), 1425:-14:30.

[89] At least twenty pleas for help are discernible on the video. But because many of Kenneth's statements are unintelligible, there are likely more pleas for help from Kenneth.

[90] **Ex. 11** (Kneitz dep.) at 59:21-60:17 (admitting that he knew Kenneth's speech began to slur in the elevator or the clinic and that Kenneth appeared to be going to sleep, well before Kenneth was injected in the clinic), 62:5-63:3 (admitting he alerted no one regarding Kenneth's slurred speech); **Ex. 2-A** (video) at 16:50-26:25.

[91] **Ex. 2-A** (video) at 16:50-27:00.

[92] **Ex. 16** (Cohen rep.) at § 39; *see also id.* at §§ 42, 44(h).

[93] **Ex. 13** (Hall rep.) at 3.

[94] *Id.*

head or . . . they had become fixed directly forward."[95] At 20:20 in the video, Kenneth makes his last sound, comprised of involuntary, light coughing, and his eyes remain rolled in his head or fixed.[96] At 20:27 Kenneth's eyes move for the last time.[97] At 20:31, Kenneth's mouth moves for the last time.[98] At 22:00, it has become quite obvious that Kenneth completely lost consciousness.[99]

Still, the Officer Defendants have Kenneth in a self-described hogtie position exerting additional pressure on his legs, back, and diaphragm as if Kenneth were attempting to fight.[100] But by 25:10, Kenneth had gone over three minutes without making any voluntary or involuntary movements whatsoever.[101] But the Officer Defendants are still callously holding Kenneth in a facedown hogtie position, and are exerting additional pressure on his legs, back, and diaphragm as if Kenneth were resisting.[102] At 25:30, Defendants finally release Kenneth's body from the hogtie position – eight minutes and thirty-four seconds *after* Kenneth last said "I cannot breathe."[103] Release came approximately five-and-a-half minutes *after* Kenneth's eyes rolled to the back of his head or became fixed forward, and visible spittle formed on his lips. It came approximately five minutes and ten seconds *after* Kenneth made his last sound. It came five

---

[95] **Ex. 13** (Hall rep.) at 3.

[96] **Ex. 13** (Hall rep.) at 3.

[97] **Ex. 13** (Hall rep.) at 3.

[98] **Ex. 13** (Hall rep.) at 4.

[99] **Ex. 13** (Hall rep.) at 4.

[100] **Ex. 2-A** (video) at 22:00.

[101] **Ex. 13** (Hall rep.) at 4.

[102] **Ex. 2-A** (video) at 25:10.

[103] *See* **Ex. 13** (Hall rep.) at 4; **Ex. 2-A** (video).

minutes *after* Kenneth's mouth last moved. And it came at least three-and-a-half minutes *after* Kenneth last moved a muscle.

Defendants' decision to release Kenneth from the facedown hogtie-plus-pressure position came far too late.[104] And Sheriff Garcia testified this was a deliberate practice of the County – detainees were held down until "entirely incapacitated," which for Kenneth meant "dead."[105]

### E. FOR FIFTEEN MINUTES, DEFENDANTS HOGTIED AN OBESE MAN SUFFERING FROM HEART PROBLEMS AND XANAX WITHDRAWAL IN A FACEDOWN POSITION AND APPLIED FORCE ON HIS CHEST UNTIL HE STOPPED BREATHING

Hogtying pretrial detainees has been a Harris County practice for years—regardless of what the **written** policies state. Although written County policies "prohibited" hogtying prior to June 2009, it is clear that County employees continued to utilize the restraint method.[106] And even after the DOJ instructed Defendant County in June 2009 **not** to hogtie pretrial detainees (despite the alleged policy prohibiting the practice at the time), the County continued to train its employees to restrain pretrial detainees by placing them in the "basic hogtie position."[107]

---

[104] **Ex. 13** (Hall rep.) at 3 ("Given the extended time that passed after [the 19:05 mark on the video] with no corrective actions, the later interventions and attempted interventions after this point were pointless and even inappropriate.").

[105] **Ex. 4** (Sheriff Garcia dep.) at 180:11-181:14.

[106] **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1; **Ex. 34** (Ritchie report); **Ex. 4** (Garcia dep.) at 39:23-40:10, 42:1-10, 42:25-43:2, 62:16-63:6,163:5-165:24, 167:2-4; **Ex. 3** (DOJ report) at 15, 22, 23 (discussed by Sheriff Garcia in his deposition and attached thereto as deposition exhibit 1); *see also infra* Parts II.J and V.B.

[107] *Id.*; **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1, deposition exhibit 1 at Bates no. LUCAS 00420; **Ex. 4** (Garcia dep.) at 39:23-40:10, 42:1-10, 42:25-43:2, 62:16-63:6,163:5-165:24, 167:2-4.

The Officer Defendants and Lt. Anderson generally define "hogtie" as a restraint technique where the detainee's hands are bound behind his back, his feet are bound, and his feet are drawn toward his hands.[108] Remarkably, Defendants acknowledge that a hogtie could be accomplished by merely connecting the ankle shackles and handcuffs with "string" or "whatever," but they claim that being bound in the same position with human muscle actively pushing on a pretrial detainee's chest and legs somehow does not constitute a "hogtie" or a "hogtie position."[109]

---

[108] *See, e.g.*, **Ex. 5** (Anderson dep.) at 92:24-93:7.

[109] **Ex. 5** (Anderson dep.) at 93:3-96:5, 98:18-99:14 ("Q. . . . My question to you was, the shackles of his feet—his feet were drawn up on his—toward his back, correct? A. Yeah."), 99:18-22 ("And that's what would be the case also—that would be the position of the feet if somebody was hogtied, correct? . . . A. There is no hogtie position. Either they're hogtied or they're not."), 100:10-25 (admitting that the sole difference in her opinion between a hogtie and the position in which Kenneth was restrained was the lack of string or metal connecting the cuffs and shackles); **Ex. 11** (Kneitz dep.) at 28:16-24 (testifying that hogtying involved leg irons and handcuffs being connected by "something" or "whatever"), 30:5-24 (refusing to admit that someone restrained by cuffs and shackles and then drawn by human force into the same position was hogtied); **Ex. 6** (Scott dep.) at 63:15-22 (defining hogtie as being "bound at the hands, bound at the feet, and the feet and hands are connected"), 64:18-66:17 (acknowledging that restraint is still a prohibited "hogtie" whether "string [connecting shackles to cuffs] is one foot long, two feet long, three feet long, or four feet long" but refusing to agree that someone could be held in a hogtie position by human force); **Ex. 9** (Green dep.) at 40:1-6 (defining hogtie), 40:18-20, 49:16-50:3, 50:17-25, 51:20-23; **Ex. 7** (Gordon dep.) at 40:24-41:10, 44:10-13 (agreeing that the length of the binding would not disqualify a restraint from being deemed a "hogtie"), 47:21-48:1 (admitting that the "only" reason he denies having hogtied Kenneth is the lack of device connecting Kenneth's shackles and cuffs), 108:3-10; **Ex. 14** (Bell dep.) at 30:20-32:24 (agreeing that pushing lower legs toward the buttocks is key component to a "hogtie" but nonetheless disagreeing that Defendants held Kenneth in the same position), 57:18-59:6 (admitting that Kenneth's "legs and . . . arms were in essentially the same position they would be in for a hogtie" but refusing to deem the restraint a "hogtied position"); **Ex. 4** (Garcia dep.) at 174:15-175:17 (testifying that the use of human force to restrain someone in the exact same position as hogtie restraints is simply placing that person in the "prone position").

24

Defendants' expert, Dr. Tom Neuman, would disagree. Dr. Neuman explained that a "hogtie" is represented by Figure 1 in his initial study.[110] The essential features of a "typical hogtie position," according to Dr. Neuman, are "your arms are handcuffed behind your back and your knees are flexed and your ankles are brought to the handcuffs."[111]



**Ex. 32, Dep. Ex. 10, p. 3 - Figure from Dr. Neuman's Study**

---

[110] **Ex. 33** (Neuman dep.) at 105:10-107:5 and Dep. Ex. 10, p. 3.

[111] *Id*. at 106:6-9.



**Ex. 2 - Cell Extraction Video (14:53)**

The "typical hogtie position" Dr. Neuman studied is identical to the position the Officer Defendants held Kenneth in.

While Defendants take the disingenuous, dogmatic mantra that physical force cannot be used to hogtie an inmate or detainee, Sgt. Ritchie, immediately following Kenneth's death, referred to the restraint used as the "basic hogtie position."[112] Defendant Scott ultimately admitted that one "can be in a hogtie position without actually having [one's] feet and arms tied together."[113] Even Defendant Thomas ultimately agreed that Defendants held Kenneth in a manner that "accomplish[ed] through the officers what a restraint might otherwise have accomplished."[114]

---

[112] **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1; **Ex. 34** (Ritchie report). Even Sgt. Ritchie mislabeled this position as a "basic hogtie" – given the officers applied additional force to Kenneth's chest, this use of force was much deadlier.

[113] **Ex. 6** (Scott dep.) at 110:2-8.

[114] **Ex. 10** (Thomas dep.) at 102:22-25.

26

Sheriff Garcia, the Officer Defendants and Lt. Anderson all knew hogtying was dangerous.[115] Defendant Green admits that "[o]ne danger … [is] you place somebody in this position is the potential for breathing problems."[116]

Despite all the known and obvious dangers of hogtying, Defendants kept Kenneth facedown in a "basic hogtie position" for fifteen minutes *plus* applied force on his legs and back until he died.[117] Given the axiomatic fact that human muscle can be used to restrain individuals as well as "string" or "whatever," and considering that Defendants actually knew the dangers posed by hogtying, a jury could certainly conclude that Defendants knew that physically restraining Kenneth facedown in a "basic hogtie position" while compressing his chest could cause serious bodily injury or death.

---

[115] **Ex. 5** (Anderson dep.) at 96:6-97:5, 97:19-98:5; **Ex. 11** (Kneitz dep.) at 29:22-24, 31:24-32:6, 75:23-76:6, 77:3-14; **Ex. 9** (Green dep.) at 38:14-20,92:17-93:15; **Ex. 7** (Gordon dep.) at 106:23-107:2, 110:17-23; **Ex. 10** (Thomas dep.) at 16:20-17:2, 17:14-17, 19:3-5; **Ex. 14** (Bell dep.) at 25:24-26:1 (admitting that he knew before Kenneth died that the "hogtied position" was dangerous), 29:5-18; **Ex. 4** (Garcia dep.) at 47:1-48:22 (agreeing that hogtying a detainee was "prohibited" because it could cause the detainee to die from positional asphyxiation); **Ex. 8** (Leveston dep.) at 64:13-17 ("Q. Okay. And you understood the rationale for not hogtying or not placing people in hogtied positions. We don't [do] that because . . . A, against policy and, B, it's incredibly dangerous to do that to somebody? A. Yes.").

[116] **Ex. 9** (Green dep.) at 94:22-25.

[117] *See* **Ex. 11** (Kneitz dep.) at 66:19-67:4; **Ex. 10** (Thomas dep.) at 63:7-25; **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1; **Ex. 15** (GMJA rep.) at 6, Bates 2348 (experts hired by County opined that "[i]t did not appear necessary for a DCCT member to ride on top of the gurney pinning [Kenneth's] legs to his back" because his "legs were restrained using leg irons"); **Ex. 16** (Cohen rep.) at §§ 2, 5, 26, 27, 39, 44(g)-(h), 46(iv), 52; **Ex. 13** (Hall rep.) at 2 ("Between the officer straddling the legs and putting pressure on feet and potentially back, breathing would have been further compromised."); **Ex. 2-A** (video) at 10:25-25:35.

## F. THE OFFICERS' CONDUCT WAS UNREASONABLE THROUGHOUT THE ORDEAL

### 1. THE CELL EXTRACTION WAS WHOLLY UNNECESSARY AND EXCESSIVE

From the perspective of the Officer Defendants and other County employees, Kenneth did not actually pose any risk to himself or others before Defendants violently extracted him from his cell.[118] There is no testimony or other evidence that Kenneth ever used the smoke detector to harm himself (or even threaten to harm himself). Indeed, from 2:40 to 4:34 in the video, we can see that Kenneth is simply banging an object on the table or wall and is not threatening himself or anyone else.[119] There were no injuries to Kenneth's body caused by the smoke detector,[120] and the County's psychiatrist had recently determined he was not a suicide risk.[121] During that same period of time, Kenneth could have attacked Defendant Gordon multiple times through the door hatch—especially when Gordon had turned around to talk to the containment team.[122] But Kenneth did not. The evidence, especially when viewed in the light

---

[118] **Ex. 5** (Anderson dep.) at 15:13-24, 47:2-7, 120:20-25 (indicating that Kenneth was merely considered as "acting up" while in his cell); **Ex. 11** (Kneitz dep.) at 17:5-10 (Kenneth not a threat to anyone outside of his cell), 91:25-92:1 ("Q. Did you perceive [Kenneth] to be actively suicidal . . . such that you had to go in right away? A. No."); **Ex. 10** (Thomas dep.) at 32:5-11 (acknowledging that Kenneth did not pose a risk to anyone outside of his cell), 72:3-5 ("Q. . . . Mr. Lucas wasn't posing a danger to the officers when he was in the clinic, right? A. No, sir."); **Ex. 8** (Leveston dep.) at 36:9-21 (testifying that there was no indication whatsoever that Kenneth intended to harm himself while in the cell); **Ex. 6** (Scott dep.) at 29:8-11 (team leader testifying the real reason Defendants entered the cell was "just to get the smoke detector out of [Kenneth's] hands"); **Ex. 15** (GMJA Rep.) at 2, Bates 2344 (at time of booking, County records show that Kenneth was not suicidal).

[119] **Ex. 2-A** (video).

[120] *See*, *e.g.*, **Ex. 1** (Autopsy) at 4-5 (cataloging various abrasions to back and extremities, without identifying any lacerations caused by "cutting" with the smoke detector).

[121] **Ex. 21** (Harris Cty. Medical Records) at Bates No. LUCAS 00615.

[122] **Ex. 2-A** (video).

28

most favorable to the Plaintiffs, demonstrates that Kenneth did not actually seek to harm himself or anyone else.[123]

While inside the cell, Kenneth obviously could not have done any harm to those outside of his cell.[124] Further, Kenneth never had a weapon, including the smoke detector.[125] Ultimately, Kenneth was the only one involved in his extraction suffering any injuries.[126] Indeed, Kenneth did not hurt anyone before, during, or after his extraction on the day he died.[127]

In their briefing, Defendants go out of their way to paint Kenneth as a violent person, but as set forth below, the Officer Defendants' conduct is judged against what those individuals knew at the time of their misconduct. *Hernandez v. Mesa*, 137 S.Ct. 2003, 2007 (2017) (only relevant facts are "the facts that were knowable to the defendant officers at the time they engaged in the conduct"). The Court should therefore disregard Defendants' disparaging allegations of prior violence by Kenneth because none of the Officer Defendants or other County employees

---

[123] At worst, there is a material fact dispute about whether Kenneth tried to "cut" Defendant Gordon though the food tray as Gordon was screaming "pass it to me." *See* **Ex. 10** (Thomas dep.) at 40:9-14. In reality – and certainly when drawing all inferences in the Plaintiffs' favor – Kenneth never attempted to injure anyone.

[124] *See, e.g.*, **Ex. 10** (Thomas dep.) at 32:9-11.

[125] **Ex. 5** (Anderson dep.) at 46:23-47:1 ("Q. . . . Other than ripping it off the ceiling or the wall, had [Kenneth] done anything else to change the smoke detector? A. Not that I know of at the time, no."); **Ex. 19** (photos of smoke detector). And of course once Defendants restrained Kenneth with leg irons and handcuffs, they were "in control of the situation." **Ex. 10** (Thomas dep.) at 47:23-48:3; **Ex. 2-A** (video) at 10:15.

[126] *See* **Ex. 1** (medical examiner report) at 4-5. In addition to dying, Kenneth's body was covered in bruises from the extraction. *Id*.

[127] **Ex. 6** (Scott dep.) at 147:25-148:6; **Ex. 10** (Thomas dep.) at 81:4-9; **Ex. 8** (Leveston dep.) at 32:17-33:1 (first containment team member to enter Kenneth's cell testifying that Kenneth never struck anyone with the smoke detector and did not injure any Defendants during the extraction and transport).

who killed Kenneth were aware of Kenneth's background or of allegations that he had acted violently before.[128]

Pursuant to County policy, the Officer Defendants did not know that Kenneth had only been arrested for failing to return his children to their mother's house at the time required by a civil custody order.[129] Had the Officer Defendants taken a moment to learn anything about Kenneth, they would have realized that he was not dangerous and, instead, was delusional because he was suffering from Xanax withdrawals, experiencing deadly physical symptoms from withdrawal, and was substantially limited by significant mental health problems.[130]

Not storming the cell was never considered.[131] Even though there were times "it looked like [Kenneth] was going to hand over the [smoke detector] through to Deputy Gordon," the Officer Defendants did not consider continuing efforts to have Kenneth voluntarily surrender the cover and to transport Kenneth the clinic peacefully.[132] Nobody ever asked Kenneth "if he would prefer to walk out" of his cell and peaceably walk to the clinic rather than being violently removed from his cell and transported while hogtied face down on a gurney.[133] Defendants

---

[128] **Ex. 5** (Anderson dep.) at 120:4-19; **Ex. 11** (Kneitz dep.) at 57:18-58:12; **Ex. 9** (Green dep.) at 13:21-14:3; **Ex. 8** (Leveston dep.) at 10:15-11:4 (conceding he knew nothing about Kenneth before the extraction), 19:19-20:8, 26:18-22. *See also* Plaintiffs' Motion to Strike Officers Appendix Exhibits, filed contemporaneously with this Response.

[129] **Ex. 5** (Anderson dep.) at 56:14-57:4; **Ex. 11** (Kneitz dep.) at 57:13-15; **Ex. 9** (Green dep.) at 14:1-3; **Ex. 8** (Leveston dep.) at 26:18-22.

[130] *See, e.g.*, **Ex. 16** (Cohen rep.) at §§ 3-4, 10-11, 13, 23-24. 44(b); **Ex. 17** (O'Pry dep.) at 156:24-157:5 (admitting Kenneth was in visible medical distress when he entered the clinic).

[131] *See id.*; **Ex. 11** (Kneitz dep.) at 20:2-10 (no defendant considered use of "OC spray"), 51:16-53:9 (explaining that OC spray was available and may have resulted in Kenneth placing his hands through the pan hole and allowing the officers to cuff him).

[132] **Ex. 11** (Kneitz dep.) at 22:13-23:3.

[133] **Ex. 6** (Scott dep.) at 90:19-21.

violently entered Kenneth's cell without even considering whether lesser force or no force would safely achieve the same result. Though Defendants repeatedly cite the "23 orders" Defendant Gordon gave to Kenneth to surrender, they conveniently ignore that those alleged orders all take place in a span of just over a minute and a half.[134] A reasonable jury could decide screaming "Pass it to me! Pass it to me!" is not reasonable de-escalation, but actually aggravated the situation.

### 2. THE OFFICERS APPLIED DEADLY FORCE AFTER KENNETH WAS CUFFED, SHACKLED, AND "UNDER CONTROL"

Even assuming the Officer Defendants employed reasonable force when they forcibly entered the cell and placed Kenneth in restraints—and there is at least a material fact dispute on these points—their use of force quickly became excessive and deadly as they lifted him on to the gurney and began pushing down on his chest. After Kenneth was completely restrained, he yelled for "help!" at least fifteen distinct times over the next eight minutes (until he became unconscious), and Kenneth told officers "I can't breathe" three times.[135] Defendant Thomas opined that once the five containment team members—who all wore extensive body armor—restrained Kenneth with leg irons and handcuffs, they were "in control of the situation."[136] Defendant Thomas suggested that the team could have walked Kenneth to the clinic even if he was struggling, but that Defendants Scott and Gordon, the team leader and supervisor

---

[134] **Ex. 2-A** (video) at 2:43 – 4:12.

[135] **Ex. 2-A** (video) at 17:13-17:17, 14:04, 15:22, 16:54.

[136] **Ex. 10** (Thomas dep.) at 47:23-48:3.

respectively, decided to place Kenneth on a gurney in what Sgt. Ritchie deemed the "basic hogtie position" because they were following County policy.[137]

Once Kenneth was on the gurney, the Officer Defendants testified they could control Kenneth's hands by "holding his hand with one hand."[138] Sitting on him and pressing down on his chest with their forearms was unnecessary. Certainly, there is no need to use *deadly* force against a person whose feet and hands are bound behind him and who can be controlled with "one hand"—especially when a jury could decide from viewing the video that Kenneth had stopped resisting by the first time he told officers "I can't breathe." Once in the clinic, the scene was secure given that other inmate patients had already been evacuated.[139]

Defendant Green admits that "within five minutes" after the nurse successfully first injected Kenneth with Ativan, "[Kenneth] got calm" and "relaxed."[140] While the video conclusively demonstrates that Kenneth was subdued long before the time represented by Defendant Green, it is also clear that Defendant Green and Officer Defendants *never* monitored or adjusted their use of force until long after Kenneth became subdued, calm, unconscious, and ultimately, dead.[141]

---

[137] **Ex. 10** (Thomas dep.) at 48:14-49:21; **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1.

[138] **Ex. 9** (Green dep.) at 113:20-24.

[139] **Ex. 5** (Anderson dep.) at 140:17-23.

[140] **Ex. 9** (Green dep.) at 162:19-163:5 (emphasis added); *see also* **Ex. 2-A** (video) at 24:50-25:00 (Dr. Sunder observing that Kenneth had "calmed down a lot" while Officer Defendants continue to apply deadly force against Kenneth).

[141] **Ex. 2-A** (video) at 16:55-25:35; **Ex. 16** (Cohen rep.) at § 39; *see also id.* at §§ 42, 44(h), 52; **Ex. 13** (Hall rep.) at 3-5 (describing video from perspective of emergency medicine expert and opining, "Given the extended time that passed after [the 19:05 point in the video] with no corrective actions, the later interventions and attempted interventions after this point were pointless and even inappropriate").

All the officers agree the situation did not justify deadly force.[142] One reason Defendant Scott did not adjust the pressure he put on Kenneth's legs and back is that Scott did not care that Kenneth was no longer breathing.[143] When viewed in a light most favorably to the Plaintiffs, the video confirms that Defendants simply did not care whether Kenneth could breathe.[144]

### 3.   THE OFFICERS' DEADLY FORCE WAS UNWARRANTED

The Officer Defendants all understood that deadly force is that quantum of force which may cause death or serious bodily injury.[145] The Officer Defendants and Lt. Anderson admit that the use of deadly force or force that would cause serious injuries was never appropriate.[146]

---

[142] *See* **Ex. 5** (Anderson dep.) at 101:1-6; **Ex. 6** (Scott dep.) at 18:19-19:1, 152:21-25; **Ex. 9** (Green dep.) at 38:14-20, 62:5-24, 94:22-25; **Ex. 7** (Gordon dep.) at 68:9-17 (acknowledging that detention employees should assume that a complaint about an inability to breathe is "life threatening"), 130:9-25; **Ex. 10** (Thomas dep.) at 65:13-24 (admitting he heard Kenneth say "I can't breathe" while in the clinic and that it signaled a "potential emergency"), 93:6-10 ("Q. Okay. If somebody can't breathe, what can happen to them? … A. They can possibly die."), 93:21-23 ("Q. … If you can't breathe for long enough, what's going to happen to you? A. You die."); **Ex. 14** (Bell dep.) at 14:13-18 (admitting that hearing Kenneth say "I can't breathe" on the video "cause[d] [him] concern"), 22:22-23:14 (admitting that a detainee who cannot breathe is in danger and that County policy preventing him from helping an inmate who says he cannot breathe was "idiotic"), 25:5-14; **Ex. 8** (Leveston dep.) at 44:9 ("Of course, if they stop breathing, they die."), 45:11-46:6, 49:20-23 (agreeing that detainee who cannot breathe should be repositioned).

[143] *See* **Ex. 6** (Scott dep.) at 137:5-138:3.

[144] **Ex. 2-A** (video) at 16:55-26:40.

[145] **Ex. 10** (Thomas dep.) at 20:10-16; **Ex. 4** (Garcia dep.) at 99:2-9; **Ex. 11** (Kneitz. dep.) at 68:2-4; **Ex. 8** (Leveston dep.) at 112:22-25; *see also* TEX. PENAL CODE § 9.01(3) (defining "deadly force").

[146] **Ex. 5** (Anderson dep.) 73:8-17, 85:23-86:3; **Ex. 6** (Scott dep.) at 101:5-16; **Ex. 9** (Green dep.) at 12:1-6 (defining "deadly force"), 37:23-38:2 ("Q. . . [D]id Kenneth Lucas do anything that . . . would have justified the use of deadly force? A. No, sir."); **Ex. 10** (Thomas dep.) at 40:9-14 (even though he falsely claims that Kenneth tried to cut Defendant Gordon with a bent smoke detector, he admits that even then deadly force would not have been appropriate), 40:15-17 (testifying that all containment team members should have known that deadly force was not

33

Indeed, Defendant Leveston, the **very first** containment team member to enter Kenneth's cell for extraction—and therefore the most at risk of any theoretically aggressive act by Kenneth—readily admits that no deadly force was justified against Kenneth:

> Q:     In this instance, was there anything that Kenneth Lucas was doing that, in your mind, would have justified the use of deadly force?
>
> A:     No, sir.
>
> . . . .
>
> Q:     At any time from the moment you first laid eyes on Kenneth Lucas until the time that he died, was there anything you saw him do that would have justified the use of deadly force?
>
> A:     No, sir.[147]

Ritchie, the internal affairs sergeant who first reviewed the circumstances leading to Kenneth's death, testified that there was nothing he "saw in the video that Kenneth Lucas was doing that would justify" use of deadly force.[148] Sgt. Ritchie went on to testify that preventing

---

appropriate); **Ex. 14** (Bell dep.) at 43:13-23 ("Q. . . . [A]t any point during the cell extraction process up until [Kenneth's] death . . . would it have been permissible for you or any other member of the containment team to utilize deadly force on Mr. Lucas? A. No, sir. Q. And that's not a close question, right? No, sir."), 43:25-44:7; **Ex. 4** (Garcia dep.) at 104:1-5 ("Q. . . . In the exact same situation that you saw and read about Kenneth Lucas, any point in his cell where you would say to the jury 'You know what, my officers didn't use deadly force, but they could have'? A. No." (followed by objected-to nonresponsive testimony)), 104:13-16, 149:25-150:5 (after the Court had to compel Garcia to respond to the question, this exchange occurred: "Q. Following the cell extraction, at any point following that was deadly force warranted or justified? A. No deadly force was justified."); **Ex. 8** (Leveston dep.) at 112:22-25, 113:9-114:3 (admitting hogtying is deadly force), 130:20-131:1, 131:15-132:3 ("Q. . . . [Y]ou would agree that deadly force was completely inappropriate for Kenneth Lucas, right? . . . A. They used deadly force on him. Q. It would have been inappropriate to use it as well, correct? . . . A. Yes.").

[147] **Ex. 8** (Leveston dep.) at 31:2-10, 32:2-7.

[148] **Ex. 12** (Ritchie dep.) at 60:4-61:7.

someone from breathing for extended periods of time constitutes deadly force.[149] Sgt. Ritchie thus came to the obvious conclusion that "it wouldn't be right" for a detention officer "to keep … an inmate from breathing."[150]

Other evidence reveals that deadly force was inappropriate even during extraction. Defendant Kneitz testified that the Officer Defendants merely needed to conduct the extraction because Kenneth "was destroying property and was acting bizarrely," but that it was not an "emergency" situation.[151] While Defendant Kneitz also shockingly testified that deadly force was appropriate, he limits the timing of that justification to the moment when Kenneth allegedly "swung the object at the officers" (which the video that Kneitz recorded does not show).[152] While Defendant Kneitz claims that the smoke detector was fashioned as a "weapon," Lt. Anderson, Kneitz's supervisor who was in a better position to determine the danger posed by the cover, testified that that she was only concerned that Kenneth may injure himself by banging the cover against the wall.[153] And again, as the first officer entering the cell, Defendant Leveston would have faced the greatest "risk" of "harm" from the smoke detector, and he testified that the

---

[149] **Ex. 12** (Ritchie dep.) at 61:8-25.

[150] **Ex. 12** (Ritchie dep.) at 65:1-7.

[151] **Ex. 11** (Kneitz dep.) at 89:15-21.

[152] **Ex. 11** (Kneitz dep.) at 16:7-13, 28:6-9, 71:23-24, 73:6-25.

[153] **Ex. 5** (Anderson dep.) at 15:7-22.

use of deadly force would have been wholly inappropriate.[154] Further, Defendant Kneitz admits that Kenneth no longer possessed the cover after extraction.[155]

At some point, Defendants broke Kenneth's left finger (likely Defendant Green who was "controlling" Kenneth's left hand).[156] But Lieutenant Anderson testified that it was not even necessary to break Kenneth's fingers.[157] If breaking Kenneth's fingers was excessive, then certainly killing him was grossly excessive by any standard.[158]

### 4. THE OFFICERS SOUGHT TO PUNISH KENNETH AND HAVE NO REMORSE FOR KILLING HIM

The Officer Defendants understood that "[e]xcessive force is more force than needed to control a person."[159] While on the gurney, Defendants could control Kenneth's hands by "holding his hand with one hand."[160] There is evidence that Defendant Green needlessly applied so much force on Kenneth's left hand that Kenneth's finger broke.[161] Defendant Scott revealed his sadistic views on restraining detainees when he refused to agree that "it is excessive force to place someone in a position where they can't breathe or have difficulty breathing."[162]

---

[154] **Ex. 8** (Leveston dep.) at 131:15-132:3 ("Q. . . . [Y]ou would agree that deadly force was completely inappropriate for Kenneth Lucas, right? . . . A. Then used deadly force on him. Q. It would have been inappropriate to use it as well, correct? . . . A. Yes.").

[155] **Ex. 11** (Kneitz dep.) at 26:24-27:4.

[156] **Ex. 16** (Cohen rep.) at § 43.

[157] **Ex. 5** (Anderson dep.) at 81:11-13.

[158] Lieutenant Anderson's concession alone justifies denying summary judgment as to the Estate's claims for survival damages.

[159] **Ex. 10** (Thomas dep.) at 19:12-16.

[160] **Ex. 9** (Green dep.) at 113:20-24.

[161] **Ex. 9** (Green dep.) at 159:18-21; **Ex. 16** (Cohen rep.) at § 43.

[162] **Ex. 6** (Scott dep.) at 14:5-23.

36

Defendants and other Harris County employees claim that, once Kenneth arrived at the clinic, the medical staff was in charge, and their hands were wiped clean.[163] So, also according to the Officer Defendants, they owed a duty to comply with requests by medical personnel. But once Defendants dragged Kenneth into the clinic hogtied and face down, Nurse O'Pry asked Defendants "[i]f we could roll him over."[164] Nurse O'Pry claims she raised the issue of rolling Kenneth over because she recognized he was in medical distress.[165] But when Nurse O'Pry asked the officers to roll Kenneth over, Lieutenant Anderson responded, "No."[166] Nurse O'Pry testified that she deferred to Lieutenant Anderson's rejection of her accommodation request because Nurse O'Pry believed that Defendants were in charge of Kenneth's restraints.[167] Some evidence demonstrates that the "team leader" on the containment team—Defendant Scott in this case— "makes the decision on whether or not to continue to hold the inmate once they are in the clinic."[168] The written County policies were vague at best regarding who was "in control" of a detainee in the clinic.[169] Still, regardless of who was in charge at the clinic, the Officer Defendants do not dispute that "any competent detention officer" would have turned Kenneth

---

[163] **Ex. 5** (Anderson dep.) at 38:10-17; **Ex. 4** (Garcia dep.) at 154:13-23.

[164] **Ex. 17** (O'Pry dep.) at 108:1-6, 119:25-120:3, 133:8-25; **Ex. 10** (Thomas dep.) at 72:6-73:3 (testifying that Defendant Gordon or Lieutenant Anderson acknowledged, "The nurse may be possibly asking to turn [Kenneth] to his side").

[165] **Ex. 17** (O'Pry dep.) at 156:24-157:5, 158:13-20 ("I asked for [Kenneth] to be rolled over so we could assess him better.").

[166] **Ex. 17** (O'Pry dep.) at 119:25-120:12. Notably, there is a fact dispute about whether these events ever took place, as they are not documented on the video.

[167] **Ex. 17** (O'Pry dep.) at 118:24-119:8, 120:16-121:8.

[168] **Ex. 5** (Anderson dep.) at 131:24-132:9.

[169] **Ex. 4** (Garcia dep.) at 186:5-24.

37

over if a nurse or doctor asked them to.[170] But in this case, when viewed in the Plaintiffs' favor, Defendants rejected Nurse O'Pry's request because they simply did not care whether Kenneth died or because they were angry that Kenneth had been disrespectful in his delusional state.

There is other evidence that Defendants intended to punish Kenneth for being "combative" and for "acting up." Defendants express no remorse for Kenneth's loss of life. Defendant Green and other Defendants are certainly not sorry for their participation in killing Kenneth.[171] Neither is Defendant Gordon.[172] After Defendants killed Kenneth, they convened to discuss how Kenneth's death might affect *Defendants* and how to move on with *their* lives, but they did not discuss whether they had safely restrained Kenneth.[173] And Lt. Anderson's testimony suggests that she ignored Kenneth's pleas for help because Kenneth disrespected her ("I can't breathe [unintelligible] bitch") —not because she sincerely doubted him.[174]

### G. THE OFFICERS BELIEVE THEIR TREATMENT OF KENNETH WAS "PERFECT" OR "EXCEPTIONAL" IN LIGHT OF HARRIS COUNTY'S POLICIES, PRACTICES, AND CUSTOMS

Despite killing Kenneth, Officer Defendants give themselves exemplary marks for a job well done.[175] The officers are seen on the video congratulating themselves even as Kenneth was

---

[170] **Ex. 5** (Anderson dep.) at 41:3-16; **Ex. 10** (Thomas dep.) at 70:11-71:1.

[171] **Ex. 9** (Green dep.) at 150:11-18.

[172] **Ex. 7** (Gordon dep.) at 145:9-16 (even with the updated policies prohibiting Defendants' treatment of Kenneth, Gordon testifies he "wouldn't say any of it was wrong").

[173] **Ex. 10** (Thomas dep.) at 38:8-39:3.

[174] **Ex. 5** (Anderson dep.) at 8:4-10, 45:4-14, 70:23-71:3, 104:11. *See* Ex. 2-A (video) at 14:07.

[175] **Ex. 6** (Scott dep.) at 130:15-131:1 ("I'd give us an A . . . because we followed policy.")); **Ex. 9** (Green dep.) at 25:10-23, 138:10-17; **Ex. 7** (Gordon dep.) at 32:2-16; **Ex. 8** (Leveston dep.) at 41:10-42:8 (giving the containment team an "A" because it is the "best" and because there is nothing that the containment team "should have done differently in the case of Kenneth Lucas").

dying beneath their hands.[176] Indeed, Defendant Green opined that Officer Defendants did their job "perfectly."[177] Defendant Thomas believes Defendants did a "good job" extracting and transporting Kenneth and would do it "exactly the same way on a person just like Mr. Lucas" – even though Kenneth died.[178]

According to the Officer Defendants' grading scale, even officers who heard Kenneth cry out that he could not breathe would get an "A" or a "B" from their team leader and supervisor even though they ignored Kenneth's cries for help, and even knowing Kenneth died.[179] Interestingly, Defendant Thomas is the only Defendant who would give Officer Defendants a B grade, and that deduction stems from the team's failure to place Kenneth on his side or back sooner.[180]

## H. THE OFFICERS WERE INDIFFERENT TO KENNETH'S SERIOUS MEDICAL CONDITION AND DISABILITIES

The Officer Defendants knew that a person's health is significant in a jail setting and bears directly on a pretrial detainee's ability to withstand a physical confrontation such as a cell extraction or use of hogtie restraints.[181] They knew that detainee safety may improve if

---

[176] **Ex. 2-A** (video) at 18:58, 19:12.

[177] **Ex. 9** (Green dep.) at 136:19-21.

[178] **Ex. 10** (Thomas dep.) at 36:11-37:1.

[179] **Ex. 6** (Scott dep.) at 132:20-133:4, 176:6-24, **Ex. 7** (Gordon dep.) at 72:3-73:13.

[180] **Ex. 10** (Thomas dep.) at 109:9-25.

[181] **Ex. 11** (Kneitz dep.) at 34:3-8, 34:23-35:2, 37:19-38:9; **Ex. 10** (Thomas dep.) at 52:4-7 ("Q. You know how significant [going through Xanax withdrawals] is and . . . how much that can potentially endanger someone, though, when they are in jail, right? A. Yes, sir."), 55:6-10 (agreeing that heart disease and hypertension place one at heightened risk during physical exertion), 54:19-20.

containment team members have pertinent information regarding a detainee's health.[182] Yet, despite this understanding, at no time did the Officer Defendants or other Harris County employees involved in Kenneth's extraction even contact the clinic to ascertain Kenneth's health risks or otherwise try to determine whether a violent extraction was appropriate given Kenneth's diagnosed mental and physical conditions.[183] Evidence demonstrates that Officer Defendants and Lieutenant Anderson did not alert the clinic regarding their intent to violently extract Kenneth from his cell and hogtie him on a gurney.[184] Nor did Officer Defendants or any other detention employee care to ask Kenneth about his health risks.[185]

Had the Officer Defendants cared about Kenneth's safety at all, information regarding Kenneth's risk factors was readily available. From Kenneth's initial health assessment, the Officer Defendants would have learned that Kenneth "had high blood pressure, anxiety, bi-polar disorder[, and] a history of Xanax usage."[186] County records would have revealed that on the day

---

[182] **Ex. 9** (Green dep.) at 14:24-15:5, 109:6-22.

[183] **Ex. 5** (Anderson dep.) at 50:19-24; **Ex. 11** (Kneitz dep.) at 35:13-15 ("Q. What did you know about the health of Kenneth Lucas prior to this? A. Nothing."), 38:10-25; **Ex. 6** (Scott dep.) at 29:17-20, 29:25-30:7; **Ex. 9** (Green dep.) at 14:7-10, 15:9-16:25, 108:14-110:5; **Ex. 7** (Gordon dep.) at 87:1-7; **Ex. 10** (Thomas dep.) at 24:2-19 (acknowledging it would "be reasonable to take 15 . . . minutes to contact the medical staff to determine if the prisoner has any medical issues" before violently removing him from a cell but admitting that he never checked with the medical staff for such information), 25:13-15 (acknowledging he "could have checked" Kenneth's health issues beforehand but did not because it was not "his job"), 51:8-13; **Ex. 8** (Leveston dep.) at 27:2-22 (admitting there was a way to determine what Kenneth's health risks were prior to extraction).

[184] **Ex. 5** (Anderson dep.) at 43:24-44:1; **Ex. 2-A** (video) at 15:30-15:36.

[185] *See generally* **Ex. 2-A** (video).

[186] **Ex. 15** (GMJA Rep.) at 2, Bates 2344; **E 21** (medical records) at Bates No. LUCAS 00615.

before Kenneth died, he was transported to a hospital due to complaints of "chest pains."[187] Chest pains are consistent with Xanax withdrawal and possible decompensating heart disease.[188] The County records would have further revealed that (1) Kenneth's body mass index placed him "well within the 'obese' range";[189] (2) Kenneth had a long history of Xanax usage and was withdrawing from Xanax (hence his bizarre behavior);[190] (3) on the day before his death, Kenneth had been admitted to the hospital for chest pains with a resting pulse rate exceeding 200 beats per minute;[191] and (4) Kenneth suffered from hypertension and had a recent very high blood pressure reading of 167/108.[192] But Officer Defendants and Lieutenant Anderson did not care about Kenneth's ability to survive the violent extraction Defendants had in store for him.[193] Of course, according to these individuals, this inaction was called for by Defendant County's policy and procedures.[194]

---

[187] **Ex. 15** (GMJA Rep.) at 3, Bates 2345; **Ex. 21**, Harris Cty. Medical Records (Bates No. 00612).

[188] **Ex. 16** (Cohen rep.) at ¶ 13.

[189] **Ex. 16** (Cohen rep.) at § 5; **Ex. 1**  (medical examiner report) at 3 (noting height and weight).

[190] **Ex. 16** (Cohen rep.)  at §§ 4, 7, 11.

[191] **Ex. 16** (Cohen rep.) at § 13; **E 21** (medical records) at Bates No.  LUCAS 612.

[192] **Ex. 16** (Cohen rep.) at §§ 4, 8.

[193] *See* **Ex. 5** (Anderson dep.) at 43:24-44:1.

[194] **Ex. 5** (Anderson dep.) at 51:4-11 ("Q. And so, if somebody had disabilities, you-all just had to find that out on your own, right? A. I guess."), 52:11-14, 60:19-61:1; **Ex. 11** (Kneitz dep.) at 35:25-36:4.

41

## I. DEFENDANTS DISREGARDED KENNETH'S WITHDRAWAL SYMPTOMS AND MENTAL HEALTH CRISIS.

It was clear to Defendants that Kenneth was suffering from Xanax withdrawal, a mental health crisis, or both. Kenneth's "initial health assessment, at the time of booking, states that [Kenneth] had . . . anxiety [and] bipolar disorder."[195] The County's records for Kenneth also indicated that he had a "history of Xanax usage."[196] Other documents reveal that the County knew that, on the day he died, Kenneth intentionally stopped up his cell's toilet with the shirt from his jail uniform, then "ha[d] placed his wet jail clothing on his head," and was being "irrational, loud and uncooperative in a rambling and agitated state."[197] According to Sheriff Garcia, Kenneth was "incoherent and rambling" prior to Defendants' violent use of force to extract Kenneth from the cell.[198] Lt. Anderson recalled, during the few minutes she talked with Kenneth while he remained in his cell, Kenneth would randomly "look[] off at some points" rather than focus on her.[199] Defendant Gordon, the containment team's supervisor, heard Kenneth say "stuff that really wasn't making any sense."[200] Defendant Green noticed that Kenneth randomly said, "I'm going to get my little boy back. You can't take him from me."[201] Green further admits that Kenneth continued to "yell[] out things of that nature" after he was

---

[195] **Ex. 15** (GMJA rep.) at 2, Bates 2344.

[196] *Id.*

[197] **Ex. 15** (GMJA Rep.) at 3, Bates 2345.

[198] **Ex. 4** (Garcia dep.) at 204:16-17.

[199] **Ex. 5** (Anderson dep.) at 47:12-16.

[200] **Ex. 7** (Gordon dep.) at 126:16-24.

[201] **Ex. 9** (Green dep.) at 104:9-12.

violently pulled from his cell.[202] And in their initial written statements (which they had conveniently forgotten by their depositions), Defendants Scott and Bell admit they thought Kenneth was suffering from drug use – that he was "on something."[203] These observations are completely consistent with the County records showing that Kenneth was experiencing serious Xanax withdrawal symptoms and anxiety.[204] Based on the video, Kenneth was obviously experiencing psychological distress and likely hallucinating, which Kenneth highlights by asking the guards to "[w]atch the baby" and not to "do this in front of [the kids]."[205]

Even though Kenneth's behavior clearly called for intervention by a mental health professional, Defendants never even considered Kenneth's medical and psychological state when they decided to violently remove him from the cell and restrain him in a manner that prevented him from breathing.[206] In fact, they specifically noted the "crisis intervention team" which was trained to deal with pretrial detainees in distress, was unavailable at the moment Kenneth needed it.[207] Unfortunately for Kenneth and the Plaintiffs, the Officer Defendants and Harris County

---

[202] **Ex. 9** (Green dep.) at 104:18-105:2, **Ex. 10** (Thomas dep.) at 51:19-25 ("Q. Now, you did think that [Kenneth] had mental health issues, though, right? A. Yes, sir.").

[203] **Ex. 20** (Internal Affairs Division Investigation, Death of Kenneth Lucas (Supplement #2)) at Bates no. LUCAS 0025 (statement of Off. Scott), Bates No. LUCAS 0027 (statement of Off. Bell) ("I would say that Kenneth Lucas was on something").

[204] *See, e.g.*, **Ex. 16** (Cohen rep.) at §§ 3-4, 10-11, 13, 23-24. 44(b).

[205] **Ex. 2-A** (video) at 5:50-6:30; *see also id.* at 6:40-6:55 (Kenneth stating, "In front of the kids, you do this . . . .").

[206] **Ex. 5** (Anderson dep.) at 121:15-19, 122:5-10 ("Q. Did you think that Inmate Lucas was thinking rationally at that time? . . . A. Actually, I didn't think."); **Ex. 9** (Green dep.) at 20:12-17 (describing lack of mental and medical health personnel at extraction); **Ex. 10** (Thomas dep.) at 35:13-19 (testifying that there was no reason why trained mental health professionals already employed at the jail did not intervene pre-extraction).

[207] **Ex. 5** (Anderson dep.) at 24:6-25:1, 25:18-20, 114:21-23, 116:12-117:1 (refusing to involve the crisis intervention team because the team allegedly was not available to **immediately** report

elected against using the specialized "crisis intervention" team to accommodate Kenneth's obvious disability. Instead, they decided to skip crisis intervention entirely, and escalate to the "next level."[208]

None of the officers involved in killing Kenneth had received the eighty-hour training offered by the County for crisis response.[209] Defendant Bell was the only team member with special training on managing detainees suffering from mental health issues, but Defendants did not allow Bell to try to peaceably retrieve the smoke alarm cover and remove Kenneth from the cell.[210] Instead, it was Gordon screaming "Pass it to me! Pass it to me!" while Bell stood by silently in the "stick" formation. While it is undisputed that Kenneth's pronounced withdrawal symptoms and psychological dysfunction called for intervention by a trained mental health professional, County policy allowed Defendants to violently extract him without first waiting for the crisis response team to try nonviolent strategies.[211]

---

to Kenneth's cell, despite lack of immediate threat to anyone from Kenneth); 119:12-18, 123:5-8 ("Actually, I didn't think that CIT wasn't necessary. I had already been told that they were unavailable. So, then we take it to the next level and I activated the [containment] team.").

[208] *Id.*

[209] **Ex. 5** (Anderson dep.) at 23:20-24:3, 27:22-25, 119:1-4.

[210] **Ex. 6** (Scott dep.) at 34:7-35:14; **Ex. 7** (Gordon dep.) at 9:12-14 (testifying he was the officer tasked with "trying to talk [Kenneth] down" pre-extraction).

[211] **Ex. 5** (Anderson dep.) at 114:21-23, 116:12-20.

### J. HARRIS COUNTY'S POLICIES, CUSTOMS, AND PRACTICES WERE THE MOVING FORCE THAT CAUSED KENNETH'S INJURIES, SUFFERING, AND DEATH

#### 1. THE OFFICER DEFENDANTS' ACTS WERE ALL PURSUANT TO HARRIS COUNTY POLICIES OR WIDESPREAD CUSTOMS AND PRACTICES.

All the Officer Defendants and other detention officers vehemently claim that Harris County policies, procedures, practices, and training guided each and every action, inaction, response, and decision made by the containment team.[212] There is no evidence that disputes the Officer Defendants' testimony. They were not rogue actors – they were following orders. Indeed, Sheriff Garcia, the jail's policymaker, watched containment teams training for extractions well before Kenneth's death, and approved the very same techniques used against Kenneth.[213]

_____

[212] **Ex. 5** (Anderson dep.) at 20:1-15, 30:24-31:18, 32:7-16 ("Q. All of that was according to the policies and procedures for extraction and transport, correct? A. It was."), 35:13-14 ("I felt like what we did a textbook extraction, what we were trained to do."), 35:23-36:9, 53:3-8. **Ex. 11** (Kneitz dep.) at 10:2-11:3 (based on his experience working at least five extractions, everything seen on the video was "by the book"), 31:11-16; **Ex. 6** (Scott dep.) at 10:21-12:14, 40:13-14 ("We did everything according to policy."), 47:12-48:4 (testifying team members pushed Kenneth's legs toward his buttocks pursuant to their training), 48:25-49:50:7, 51:14-17; **Ex. 9** (Green dep.) at 33:24-25 ("We did everything we [were] supposed to do following policy."), 53:18-21, 54:11-12 ("What you seen us do on the video is what we was trained to do."), 137:3-21, 144:13-25; **Ex. 7** (Gordon dep.) at 111:18-112:2 ("We did it the way we were trained."); **Ex. 10** (Thomas dep.) at 59:24-60:5 (explaining that, pursuant to the County's training, Defendants "crossed [Kenneth's] legs and pushed them down like towards his back there, toward the buttocks"), 87:19-87:21 (testifying that Defendants put Kenneth in what Sergeant Ritchie referred to as a "basic hogtie position" according to County policy); **Ex. 14** (Bell dep.) at 11:5-12:11, 17:10-12; **Ex. 8** (Leveston dep.) at 42:22-43:2 (testifying there is nothing the containment team should have done differently because they "did everything the way [they] were supposed to do it based on [their] training"), 50:14-51:1 (Officer Defendants' decision to do nothing in response to Kenneth's crying out that he could not breathe was consistent with County policy and training), 61:19-62:17, 63:10-17, 97:18, 151:19-152:12; **Ex. 15** (GMJA Rep.) at 5, Bates 2347 (independent consulting agency hired by the County opining that Officer Defendants "acted in accordance with existing policy at the time of the incident").

[213] **Ex. 4** (Garcia dep.) at 39:23-40:10, 42:1-10, 42:25-43:2, 62:16-63:6,163:5-165:24, 167:2-4.

45

Defendant County's policies, customs, and practices proved deadly for Kenneth. For instance, Defendant Bell testified that Harris County enforces a "code of silence," that required all containment team members except for the team leader (Defendant Scott) to remain silent during the extraction, even when Kenneth cried out "I cannot breathe."[214] Other evidence corroborates Defendant Bell's characterization of Harris County policy.[215] While the County's chief policymaker over the jail concedes that the proper reaction to hearing a detainee say "I can't breathe" is to "notify medical personnel," he enforced the "code of silence" that led Officer Defendants to believe they could not notify medical personnel when Kenneth said that he could not breathe.[216] The Sheriff also condoned ignoring a pretrial detainee's inability to breathe until the detainee was completely incapacitated.[217] As noted above, the evidence demonstrates that **all** Officer Defendants heard Kenneth cry out, "I can't breathe" at least twice.[218] But according to

---

[214] **Ex. 14** (Bell dep.) at 11:5-12:11, 15:22-16:7 ("Q. Had you heard [Kenneth] cry out . . . I can't breathe, you would have reacted, correct? . . . A. "I was trained—I'm trained—if I heard it, I was trained that I could not, you know, react to it . . . ."), 17:20-18:6 ("Q. Okay. So do I understand you correctly that the training from Harris County is that even if you were to hear . . . someone cry out, I can't breathe or I need help, that person who's handling the leg shouldn't do anything other than maintain control over the leg? A. Well, that was then—that was . . . the way we were trained then because you have five members. That was then."), 18:19-25 ("Q. Now let's go to that was then. . . . And even if somebody says, I need help; or, I can't breathe, you stayed with … your part, the leg. Correct? A. My position, yes, sir.").

[215] *See, e.g.*, **Ex. 11** (Kneitz dep.) at 85:25-86:15 (testifying that, "based on [his] training," he did not believe he had to react to Kenneth's plea that he could not breathe once they arrived at the clinic); **Ex. 6** (Scott dep.) at 40:24-41:3 ("We're not medical personnel, so we can't dictate what goes on [in the clinic].").

[216] **Ex. 4** (Garcia dep.) at 150:22-152:17 (testifying he did not take issue with officers' decision to ignore Kenneth's statement that he could not breathe), 73:14-17, 180:11-181:14 (testifying he approved of disregarding detainee's statement that he cannot breathe so long as detainee "was not entirely incapacitated.").

[217] **Ex. 4**, (Sheriff Garcia dep.) at 180:17-181:14.

[218] *Supra* Part II.B., "I Can't Breathe."

County employees in charge of Kenneth's safe transport, they kept quiet following the County's policy and practice. As a result, no one tended to Kenneth's inability to breathe (not even when they reached the infirmary), and he died.[219]

As other evidence demonstrates, the key component to a "hogtie" is the positioning of the restrained person's legs. Officer Defendants were specifically trained to "straddle the legs" of detainees who were shackled and cuffed and face down on the gurney after extraction.[220] Even criminal justice experts hired by the County opined that Defendant Scott was "riding on top of the gurney and *pinning [Kenneth's] legs toward his back*."[221] That same expert opined that "[i]t did not appear necessary for a DCCT member to ride on top of the gurney pinning his legs to his back" because Kenneth's "legs were restrained using leg irons."[222] Kenneth died because he was held facedown in a hogtie position for an extended period of time while he could not breathe and while Defendants applied additional pressure to his legs, back, and diaphragm.[223] Officer Defendants testify that they held Kenneth in a "basic hogtie position" according to County policy and training. Had the County trained the Officer Defendants to avoid forcefully compressing a

---

[219] **Ex. 16** (Cohen rep.) at §§ 39, 42, 44(g)-(h), 52; **Ex. 13** (Hall rep.) at 5 ("In reasonable medical probability, the extreme handling of Mr. Lucas (i.e., keeping him in a hogtied position and face down on a gurney with its head piece elevated while straddling Mr. Lucas and keeping pressure on his back and buttocks even after declarations by Mr. Lucas that he could not breathe) during the transport of Mr. Lucas and while he was in the medical room was a proximate cause of his death.").

[220] **Ex. 5** (Anderson dep.) at 130:1-3; **Ex. 11** (Kneitz dep.) at 66:19-67:4; **Ex. 10** (Thomas dep.) at 63:7-25.

[221] **Ex. 15** (GMJA rep.) at 5-6, Bates 2347-48. Although GMJA described this as "[t]he one policy deviation," Defendants all agree that Defendant Scott, the officer pinning Kenneth's legs toward his back, did exactly what the County trained her to do according to County policy.

[222] *Id.* at 6, Bates 2348.

[223] *See* **Ex. 16** (Cohen rep.) at §§ 2, 5, 26, 27, 39, 44(g)-(h), 46(iv), 52; **Ex. 13** (Hall rep.) at 2, 5.

detainee's chest while using the deadly facedown "basic hogtie position" to restrain detainees, Officer Defendants would not have killed Kenneth.[224]

County policy also called for and allowed the violent removal of a detainee like Kenneth even though he was going through Xanax withdrawals and experiencing a mental health crisis—without even consulting medical staff or mental health staff. County policy and practice "prevented [the containment team] from getting medical or mental health information about a detainee or inmate they were going to extract."[225] Only County policy prevented the presence of medical staff during Kenneth's violent extraction from his cell and transport to the clinic.[226] Although the whole extraction and transport occurred exactly according to County policy—including the lack of involvement by the mental health providers — Harris County knew that detainees often suffered from mental health issues.[227] Indeed, Lieutenant Anderson admits that she requested assistance from mental health personnel but proceeded without their intervention when they were "unavailable" according to County policy.[228]

---

[224] **Ex. 14** (Bell dep.) at 56:18-22, 57:18-23.

[225] *See id.*; **Ex. 6** (Scott dep.) at 84:5-13; **Ex. 4** (Garcia dep.) at 86:22-87:11 (conceding it was "possible" for "officers to be made aware of Mr. Lucas' medical conditions" and admitting that "the policy and the practice [allowing that] was not in place"); **Ex. 8** (Leveston dep.) at 27:2-28:16 (conceding containment team could have called the clinic to ascertain Kenneth's health risks but failed to because "that's not part of [their] training and it's not [County] procedure that [they] take").

[226] **Ex. 5** (Anderson dep.) at 113:20-114:5.

[227] **Ex. 11** (Kneitz dep.) at 98:6-14, 99:9-13 (testifying that County should have considered relevant changes to its policies and procedures before Kenneth died); **Ex. 9** (Green dep.) at 20:12-17 (describing lack of mental and medical health personnel at extraction).

[228] *See* **Ex. 5** (Anderson dep.) at 116:12-117:2 (CIRT team allegedly was not available to **immediately** report to Kenneth's cell); 119:12-18, 123:5-8 ("Actually, I didn't think that CIRT wasn't necessary. I had already been told that they were unavailable. So, then we take it to the next level and I activated the [containment] team.").

Harris County also ratified the misconduct of Lt. Anderson and Officer Defendants after they killed Kenneth. Despite the heinous actions by County employees that caused Kenneth's death, the County refused to discipline any of those employees.[229] And even though Sergeant Ritchie, an internal affairs officer, characterized the restraint employed against Kenneth as a "basic hogtie position," Defendant County never informed Officer Defendants that they placed Kenneth in a "basic hogtie position."[230]

### 2. DEFENDANT HARRIS COUNTY'S GROSSLY DEFECTIVE TRAINING EXUDES DELIBERATE INDIFFERENCE AND CAUSED KENNETH'S DEATH.

There is no dispute the officers did everything exactly as Harris County trained them to – including putting Kenneth facedown, in a hogtie position, and holding him there while he begged for "help!" and told officers he "can't breathe." Kenneth died because of the training that jail employees received from Harris County.

In this case, Harris County also had "no documentation to support that monthly training requirements had been met by any of the [containment] team members," even though those training requirements are essential "to make sure that the officers involved in the extraction don't deviate from policy."[231] The containment team members were supposed to complete eight hours of training per month that included instruction on extractions and use of non-lethal options.[232] But the evidence indicates that none of the Officer Defendants met these training

---

[229] **Ex. 5** (Anderson dep.) at 5:24-25; **Ex. 11** (Kneitz dep.) at 107:4-8; **Ex. 6** (Scott dep.) at 57:3-7, 57:23-58:10; **Ex. 9** (Green dep.) at 9:4-11; **Ex. 10** (Thomas dep.) at 76:15-77:6, 80:1-5.

[230] **Ex. 14** (Bell dep.) at 56:8-17.

[231] **Ex. 4** (Garcia dep.) at 111:3-17.

[232] **Ex. 15** (GMJA Rep.) at 5, Bates 2347.

requirements.[233] GMJA also reported that the training materials made available by the County "contained no basis for facts stated" and "could be construed as personal opinion and conjecture, lacking sufficient references."[234] GMJA also criticized Harris County policy and training materials as failing "to avoid or reduce possible positional asphyxiation" and failing to "address intermediate options such as use of intervention by mental health practitioners, hostage negotiators, or clergy."[235]

There is some evidence that Defendant County did not train detention employees regarding excessive force.[236] There is also evidence that Defendant County did not train its detention employees to take steps to stop the use of excessive force by other employees.[237]

The County further did not train its detention employees regarding the proper response to a detainee who claims he cannot breathe.[238] The County did not provide training regarding positional asphyxia prior to Kenneth's death.[239] The County failed to train its detention employees regarding the risks posed to detainees by the method of restraint employed on Kenneth.[240] Indeed, the chief policymaker for the County jail did not even bother to educate

---

[233] **Ex. 15** (GMJA Rep.) at 7, Bates 2349.

[234] **Ex. 15** (GMJA Rep.) at 8, Bates 2350.

[235] *Id.*

[236] **Ex. 11** (Kneitz dep.) at 53:10-23.

[237] **Ex. 11** (Kneitz dep.) at 111:8-11.

[238] **Ex. 11** (Kneitz dep.) at 51:6-8.

[239] **Ex. 6** (Scott dep.) at 123:23-124:6.

[240] **Ex. 16** (Cohen rep.) at § 52; **Ex. 13** (Hall rep.) at 5; **Ex. 11** (Kneitz dep.) at 78:12-23, 79:18-22; **Ex. 6** (Scott dep.) at 60:15-20; **Ex. 9** (Green dep.) at 21:22-25, 52:7-11; **Ex. 10** (Thomas dep.) at 82:19-21 ("Q. Okay. So Harris County never told you what a hogtie is. A. No, sir."), 100:21-23 ("Q. If you had been trained that what you all were doing was a hogtie, you wouldn't have done it, correct? A. Correct."); **Ex. 14** (Bell dep.) at 27:1-5 ("Q. . . . Did you get any

*himself* on the dangers of using the "basic hogtie position" as a restraint technique at any time during his thirty-year career in law enforcement.[241]

The County did not provide the Officer Defendants or Lieutenant Anderson training regarding Xanax (or other drug) withdrawals.[242] Of course, at the time Defendant County's policy did not require the Officer Defendants or Lieutenant Anderson to ascertain whether Kenneth was suffering drug withdrawals (even though that was an obvious explanation for his bizarre behavior).[243] These failures by Defendant County are indeed tragic in light of the fact that the chief policymaker for Harris County admits that "Xanax withdrawal is potentially medically serious."[244]

At the time Defendants killed Kenneth, the County offered no training regarding the Americans with Disabilities Act or how to safely manage detainees with disabilities.[245] It is therefore no surprise that Defendant Leveston testified that County policy on violent cell extractions and transporting detainees uniformly applied to all detainees, regardless of "body

---

training whatsoever about what a hogtied position was from Harris County? A. no, sir. No, sir. No, sir.").

[241] *See* **Ex. 4** (Garcia dep.) at 65:21-66:1.

[242] **Ex. 5** (Anderson dep.) at 59:4-60:8; **Ex. 11** (Kneitz dep.) at 102:8-10; **Ex. 6** (Scott dep.) at 29:12-16; **Ex. 7** (Gordon dep.) at 131:15-18; **Ex. 10** (Thomas dep.) at 52:1-15; **Ex. 8** (Leveston dep.) at 61:15-18.

[243] **Ex. 5** (Anderson dep.) at 59:11-13; **Ex. 14** (Bell dep.) at 48:18-21.

[244] **Ex. 4** (Garcia dep.) at 210:1-4.

[245] **Ex. 5** (Anderson dep.) at 108:16-20, 109:4-19; **Ex. 14** (Bell dep.) at 36:18-20; **Ex. 4** (Garcia dep.) at 23:15-19, 25:6-11 ("Q. . . . [M]any officers testified they didn't get any training about the Americans with Disabilities Act, okay? Would you have any reason to dispute that?" . . . A. No, sir.").

size" or the "physical condition" of a detainee.[246] No accommodations were made for obese inmates with documented heart conditions suffering drug withdrawals, like Kenneth. It is likewise no surprise that Defendant County did not train its detention employees how to safely restrain obese detainees, or detainees with heart problems, or depression, or severe anxiety, or hypertension.[247]

### 3. PROMPTED BY AN INDEPENDENT AGENCY'S REVIEW OF KENNETH'S DEATH AND OF COUNTY POLICIES AND TRAINING MATERIALS, DEFENDANT HARRIS COUNTY IMPLEMENTED CHANGES THAT WOULD HAVE SAVED KENNETH'S LIFE.

Shortly after killing Kenneth, the County employed GMJA to review Kenneth's death.[248] The County also employed GMJA "to assess the [County's] policy on forced cell movements" in light of Kenneth's death and "to provide recommendations for improvements if deemed necessary."[249] To perform its review, GMJA considered a plethora of materials, including the video of Kenneth's extraction, transport, and death.[250] Based on its review of Defendant County's policies, procedures, and training materials, GMJA made recommendations to the County to protect future pretrial detainees from suffering the same fate as Kenneth.[251]

After killing Kenneth, the County finally made several changes to its policies and procedures in order to avoid killing more pretrial detainees suffering from withdrawal and mental health crises by hogtying them face down. For instance, the County now requires that,

---

[246] **Ex. 8** (Leveston dep.) at 29:14-30:1.

[247] **Ex. 11** (Kneitz dep.) at 32:23-33:15; **Ex. 6** (Scott dep.) at 122:25-123:4, **Ex. 9** (Green dep.) at 17:1-18:4, 21:19-21; **Ex. 10** (Thomas dep.) at 54:5-18; **Ex. 14** (Bell dep.) at 48:10-21; **Ex. 4** (Garcia dep.) at 27:5-28:6, 85:13-18; **Ex. 8** (Leveston dep.) at 30:10-13.

[248] **Ex. 4** (Garcia dep.) at 113:24-114:6.

[249] **Ex. 15** (GMJA Rep.) at 1, Bates 2343 (emphasis added).

[250] **Ex. 15** (GMJA Rep.) at 1, Bates 2343.

[251] **Ex. 4** (Garcia dep.) at 114:7-9.

when inmates are restrained on a gurney, they must be placed on their sides rather than hogtied and pushed facedown.[252] Had this policy been in place when Defendants killed Kenneth, Defendants could have easily complied and transported Kenneth safely on his side.[253] Defendant County's policy change reflects one of the "lessons" Officer Defendants learned from watching the video—that they should not have placed Kenneth facedown.[254] Although internal affairs Sgt. Ritchie described the restraints used on Kenneth as a "basic hogtie position," he testified that restraining a detainee on his side pursuant to the new policy could not be described the same way.[255] And it is obviously easier to breathe without a gurney being pushed into one's face.

Pursuant to new County policy, no one rides atop the gurney except for the pretrial detainee being transported.[256] This obviously supersedes previous policy and training that instructed jail employees like Defendant Scott to apply additional pressure on detainees and suffocate them by riding on top of their restrained bodies.

---

[252] **Ex. 5** (Anderson dep.) at 30:2-5; **Ex. 11** (Kneitz dep.) at 50:5-14, 81:18-82:18 (admitting that this technique is "much safer" and acknowledging that Defendants could have used the same technique with Kenneth), 83:1-9; **Ex. 9** (Green dep.) at 151:19-22 (testifying that containment team could have easily transported Kenneth on his side "if [he] was trained to do so"); **Ex. 7** (Gordon dep.) at 101:14-102:3, 102:24-103:4; **Ex. 14** (Bell dep.) at 33:24-34:21 (agreeing previous policy was not safe compared to new policy), 36:3-7 (same); **Ex. 8** (Leveston dep.) at 70:10-71:13.

[253] *Id.*; **Ex. 10** (Thomas dep.) at 55:24-56:2; **Ex. 14** (Bell dep.) at 44:22-45:5; **Ex. 8** (Leveston dep.) at 77:11-15.

[254] **Ex. 6** (Scott dep.) at 144:8-145:24.

[255] **Ex. 12** (Ritchie dep.) at 36:22-39:1, 73:11-14.

[256] **Ex. 6** (Scott dep.) at 174:4-5.

Harris County now requires its employees to allow a lengthy "cool-down period" for detainees with mental disabilities before violently extracting them from cells.[257] During the cool-down period, members of the mental health unit must assess the detainee's mental state and attempt to resolve the issue peaceably.[258] Had this policy been in place for Kenneth, Lt. Anderson would not have had the latitude to simply forgo the involvement of mental health professionals (and ignore an obvious accommodation for Kenneth's mental disability) merely because they were not immediately available.

Now, the County allows its employees to "look at [detainees'] mental health and their physical [health] as well" in determining whether a violent cell extraction is safe or necessary.[259] Now, the County trains its detention employees on managing pretrial detainees suffering from drug withdrawals like those exhibited by Kenneth.[260] Under new policies, "the medical team has to be there" when the County extracts a pretrial detainee.[261] Had these policies been implemented on February 17, 2014, Defendants would have considered Kenneth's mental and physical health

---

[257] **Ex. 5** (Anderson dep.) at 29:16-17, 110:13-22, 118:20-25; **Ex. 4** (Garcia dep.) at 32:2-7; **Ex. 9** (Green dep.) at 154:1-156:5 (acknowledging that there was nothing that would have prevented the team from giving Kenneth fifteen minutes to calm down); **Ex. 8** (Leveston dep.) at 135:8-17 (defining cool down and engaging in the following exchange: "Q. Was there a cool-down period for Kenneth Lucas? A. No, sir, not to my knowledge.").

[258] **Ex. 11** (Kneitz dep.) at 95:4-21.

[259] **Ex. 11** (Kneitz dep.) at 89:25-90:13, 92:16-19; **Ex. 6** (Scott dep.) at 84:5-13 (agreeing that County policy no longer "prevent[s] [the containment team] from getting medical or mental health information about a detainee or inmate they [are] going to extract"); **Ex. 7** (Gordon dep.) at 89:20-90:13 (testifying there was no reason this policy could not have been in place on the day Kenneth died); **Ex. 8** (Leveston dep.) at 85:17-19.

[260] **Ex. 6** (Scott dep.) at 31:2-32:25.

[261] **Ex. 7** (Gordon dep.) at 11:7-14.

54

issues **before** they violently extracted him in order to determine whether such violence was appropriate.[262]

In Kenneth's case, Defendants ignored his many pleas for "help!" and multiple statements that he could not breathe. Under new policies, at least one person must ensure that detention employees do not suffocate pretrial detainees. Specifically, Defendant Harris County now requires that a "safety officer" monitor a detainee's health at all times.[263] If the policy had been implemented on February 17, 2014, a safety officer would have monitored Kenneth's condition throughout the time period captured on video and would have easily heard him say, "I can't breathe."[264] Sheriff Garcia admits that County policy could have required an officer to watch for signs of distress from Kenneth during his extraction and transport.[265] The County now makes sure that the medical staff on the scene of an extraction have the appropriate equipment to assist a detainee who cannot breathe.[266] And now, use of the containment team really is the "last resort."[267]

### K. DEFENDANTS SUNDER AND O'PRY HAD THE KNOWLEDGE, OPPORTUNITY, AND AUTHORITY TO SAVE KENNETH, BUT LET HIM DIE INSTEAD

It is undisputed that Defendants Dr. Sunder and Nurse O'Pry were County employees on

---

[262] **Ex. 11** (Kneitz dep.) at 93:3-23; **Ex. 8** (Leveston dep.) at 86:20-22.

[263] **Ex. 5** (Anderson dep.) at 29:17-21; **Ex. 8** (Leveston dep.) at 79:5-80:5.

[264] **Ex. 5** (Anderson dep.) at 135:8-13; **Ex. 7** (Gordon dep.) at 13:13-19, 65:5-9.

[265] **Ex. 4** (Garcia dep.) at 39:4-9.

[266] *See* **Ex. 5** (Anderson dep.) at 111:5-14 (explaining that the County now requires medical staff, mental health specialists, supervisors, and oxygen tanks "on the scene" of an extraction).

[267] **Ex. 5** (Anderson dep.) at 111:8-14.

the day Defendants killed Kenneth.[268] Defendant O'Pry, a licensed vocational nurse since 1999, began working for the County in 2009.[269] On the video, Defendant Sunder is wearing navy scrubs, while Defendant O'Pry is wearing light blue scrubs and does most of the talking on behalf of the clinic staff.[270]

Evidence indicates that the medical staff, including Defendants Sunder and O'Pry, controlled Kenneth and the containment team once Kenneth arrived at the clinic, and that the containment team would have followed the medical personnel's commands to alter Kenneth's position or take other actions to help Kenneth breathe.[271] But as set forth below, Defendant Sunder and Defendant O'Pry exercised that authority only after they stood by as Kenneth struggled to breathe, became unconscious, stopped breathing altogether, and died.

During all relevant times, Defendants Sunder and O'Pry knew Kenneth's ability to breathe was compromised. At approximately 16:55 in the video, Kenneth clearly states, "I cannot breathe" while in their clinic.[272] Just ten seconds earlier, Sunder is in the video frame, on the same side Kenneth was facing. Considering Defendants O'Pry's and Sunder's proximity to Kenneth and the volume with which he spoke, there is at least an inference that they both heard Kenneth wheeze "I cannot breathe."[273] Indeed, of the containment team members who admit to

---

[268] **Ex. 4** (Garcia dep.) at 117:2-11, 139:3-17; **Ex. 17** (O'Pry dep.) at 39:9-13; **Ex. 18** (Sunder dep.) at 13:9-24. Defendant Sunder served as a "staff physician" for the County. **Ex. 18** (Sunder dep.) at 13:22-24.

[269] **Ex. 17** (O'Pry dep.) at 9:18-22, 11:21-23.

[270] *See, e.g.*, **Ex. 2-A** (video) at 25:35; **Ex. 18** (Sunder dep.) at 251:4-12.

[271] **Ex. 10** (Thomas dep.) at 70:11-71:1.

[272] **Ex. 2-A** (video).

[273] **Ex. 10** (Thomas dep.) at 89:18-90:1 (explaining that he did not react to Kenneth's statement, I can't breathe" because "[t]he medical staff was right there").

hearing Kenneth say "I can't breathe," one held Kenneth's right leg, one was supervising from a distance, and a third restrained Kenneth's right hand.[274] Other evidence suggests that all containment team members heard Kenneth say "I can't breathe" and discussed the statement at their debriefing.[275] Considering that Kenneth faced toward his left side when he uttered, "I can't breathe" and that the individuals who admittedly heard him were either roaming or were positioned on Kenneth's right side, there is a strong inference that Defendants O'Pry and Sunder also heard Kenneth say that he could not breathe. Notably, *Defendants Sunder and O'Pry admit hearing Kenneth say "I can't breathe" when they viewed the video.*[276] Defendants O'Pry and Sunder also knew that an officer was sitting on top of Kenneth to restrain him, intensifying the danger posed by the already-deadly hogtie restraint.[277]

Defendants Sunder and O'Pry concede that Kenneth's inability to breathe presented a life-threatening emergency. Defendant O'Pry was "really familiar" with handling life-threatening emergencies and has known since 1999 that "[a] complaint of an inability to breathe" presented just such an emergency.[278] Defendant O'Pry also acknowledged that "[i]f a physician or a nurse suspects a breathing problem, they've got to deal with it."[279] Defendant O'Pry knew that physical

---

[274] **Ex. 10** (Thomas dep.) at 91:20-25, 97:14-98:11, 103:13-20 ("Q. . . . Was Deputy Gordon one of those . . . who said at the debriefing 'I heard him say I can't breathe' A. Yes, sir. I believe so."), 58:20-59:5; **Ex. 8** (Leveston dep.) at 47:8-48:10; **Ex. 7** (Gordon dep.) at 118:17-23 (testifying he was "not standing right next to [Kenneth]" when Kenneth said, "I cannot breathe").

[275] **Ex. 10** (Thomas dep.) at 97:14-98:11, 103:13-20.

[276] **Ex. 17** (O'Pry dep.) at 16:14-16; **Ex. 18** (Sunder dep.) at 91:24-92:4.

[277] **Ex. 17** (O'Pry dep.) at 62:16-19; **Ex. 2-A** (video) at 14:05-14:10, 14:52, 15:10-15:20, 17:48, 21:21, 25:10-25:40; **Ex. 13** (Hall rep.) at 2, 5; **Ex. 16** (Cohen rep.) at ¶¶ 26, 39, 44(g), 46(iv).

[278] **Ex. 17** (O'Pry dep.) at 13:13-25, 92:21-22 ("Q. . . . You considered this an emergency, right? A. Yes, sir.").

[279] **Ex. 17** (O'Pry dep.) at 15:9-12.

manifestations of anxiety also create difficulty breathing and present a "serious symptom which needs to be dealt with."[280] Dr. Sunder agreed that it is obviously inappropriate "do nothing" when a patient complains about an inability to breathe – though that is what the video shows him and O'Pry doing for several minutes after Kenneth gasps "I cannot breathe."[281]

Although Defendants Sunder and O'Pry conveniently now deny hearing Kenneth say, "I cannot breathe," and deny knowing that Kenneth had faded into unconsciousness and died several minutes before they actually pay him any attention, they agree they owed a duty to monitor Kenneth to ensure that he did not lose consciousness and die.[282] To that end, Defendant O'Pry acknowledged that obtaining Kenneth's blood pressure and pulse was essential to treating him.[283] Even if it were true that Defendants Sunder and O'Pry did not recognize that Kenneth was rapidly dying due to his inability to breathe, the video evidence makes clear that their "ignorance" arose from their callous disregard for Kenneth's life.

Even before Kenneth cried out that he could not breathe, Defendants Sunder and O'Pry knew that Kenneth's health could be severely compromised after a violent cell extraction. Before the officers violently dragged Kenneth from the cell, Defendant Sunder knew that Kenneth suffered from hypertension, anxiety, delirium tremens, and Xanax withdrawals.[284] Prior to Kenneth's arrival at the clinic, mental health professionals had informed Defendant O'Pry and

---

[280] **Ex. 17** (O'Pry dep.) at 16:23-17:10, 18:14-22, 19:18-21.

[281] **Ex. 18** (Sunder dep.) at 101:7-21.

[282] **Ex. 17** (O'Pry dep.) at 143:15-23; **Ex. 18** (Sunder dep.) at 23:11-14 (describing his job as "to take care of the patients that come to the clinic").

[283] **Ex. 17** (O'Pry dep.) at 113:18-24, 114:11-17.

[284] **Ex. 18** (Sunder dep.) at 28:8-14, 29:11-30:9, 33:14-34:1, 46:23-47:11, 52:18-53:3.

Defendant Sunder that Kenneth "was probably detoxing" and would need medical attention.[285] Defendant Sunder admits that he knew that Xanax withdrawals "can be dangerous" and likely caused Kenneth's confusion and perceived "combativeness."[286] Defendant O'Pry also knew that Kenneth had recently visited the clinic complaining of chest pains and other symptoms.[287] Defendant O'Pry knew "that [Kenneth] had a serious medical need, and that was why he was brought to the clinic."[288] Defendants O'Pry and Sunder's knowledge of Kenneth's health risks were confirmed when he entered the clinic, hogtied, prone, with an officer sitting on top of him. Defendant O'Pry knew immediately Kenneth "was in medical distress."[289] And she acknowledged that Kenneth's movements perceived by some as "resisting" were likely caused by his medical condition as he struggled to breathe.[290] Defendant Sunder knew from the moment Kenneth entered the clinic that he was "confused."[291]

Defendants Sunder and O'Pry cannot deny knowing of Kenneth's serious health risks. Indeed, County records revealed that (1) Kenneth's body mass index placed him "well within the 'obese' range";[292] (2) Kenneth had a long history of Xanax usage and was withdrawing from Xanax;[293] (3) on the date before his death, Kenneth had been admitted to the hospital for chest

---

[285] **Ex. 17** (O'Pry dep.) at 42:2-19, 43:8-17, 44:6-9, 48:12-16, 49:11-19.

[286] **Ex. 18** (Sunder dep.) at 34:13-18, 52:18-53:3.

[287] **Ex. 17** (O'Pry dep.) at 171:12-22.

[288] **Ex. 17** (O'Pry dep.) at 124:21-24, 125:1-3 ("Q. It was serious, and you knew it was serious, right? A. Yes, sir.").

[289] **Ex. 17** (O'Pry dep.) at 156:24-157:5, 158:13-20.

[290] **Ex. 17** (O'Pry dep.) at 161:20-162:4.

[291] **Ex. 18** (Sunder dep.) at 143:15-17.

[292] **Ex. 16** (Cohen rep.) at § 5.

[293] *Id.* at §§ 4, 7, 11.

pains with a resting pulse rate exceeding 200 beats per minute;[294] and (4) Kenneth suffered from hypertension and, on the day before he died, registered a dangerously high blood pressure of 167/108.[295] Defendants Sunder and O'Pry also knew that a containment team would violently extract Kenneth from his cell and transport him to the clinic hogtied and facedown on a gurney.[296]

### L. DESPITE THEIR ABILITY AND DUTY TO PREVENT THE CONTAINMENT TEAM FROM KILLING KENNETH, DEFENDANTS SUNDER AND O'PRY MERELY STOOD BY AS KENNETH FELL UNCONSCIOUS, STOPPED BREATHING, AND DIED.

Despite knowing the risks faced by Kenneth, and despite having the duty and ability and skill to save Kenneth, Defendants Sunder and O'Pry refused Kenneth even the most basic care. Despite knowing that Kenneth was in "medical distress" when he entered the clinic, these defendants ignored Kenneth's cries for help and the obvious signs that he was dying. Their blasé attitude continued until several minutes after Kenneth had stopped breathing.

#### 1. DEFENDANTS SUNDER AND O'PRY CAUSED KENNETH'S DEATH BY REFUSING TO RESPOND TO KENNETH'S LABORED STATEMENT, "I CANNOT BREATHE" AND CLEAR SIGNS THAT HE WAS DYING.

As noted above, the evidence supports a strong inference that Defendants O'Pry and Sunder heard Kenneth cry out "I cannot breathe" at approximately 16:55 in the video. Defendant Sunder knew that he must do something to help Kenneth breathe—such as order the containment team to roll him over—if Kenneth honestly complained about an inability to breathe.[297] But not

---

[294] *Id.* at § 13.

[295] *Id.* at §§ 4, 8.

[296] **Ex. 5** (Anderson dep.) at 139:17-21; **Ex. 18** (Sunder dep.) at 28:20-24.

[297] **Ex. 18** (Sunder dep.) at 101:16-21, 105:14-21; *see also* **Ex. 2-A** (video) at 26:50 (ordering containment team to roll Kenneth over).

until the 24:50 mark did Defendant Sunder *finally* notice that Kenneth had become quiet, and Defendant Sunder ordered the containment team to release pressure on Kenneth's legs.[298] And not until nearly the 26:45 mark did Defendant Sunder finally order the containment team to roll Kenneth over because Kenneth was not breathing.[299] By then, the damage was done because Kenneth had stopped breathing several minutes before this point.[300] The video demonstrates that Defendant Sunder had ample reason long before the 26:45 mark to order the containment team to let Kenneth breathe. Emergency medicine expert, Dr. Hall, M.D., carefully studied the video and observed that two minutes and ten seconds after Kenneth cried out "I cannot breathe," "The dying process is in full swing."[301] At that same time, 19:05 in the video, "[w]e also see the last visible movement of the torso of [Kenneth]."[302] At 20:00, Kenneth's eyes "had either rolled up into his head or . . . they had become fixed directly forward."[303] At 20:20 in the video, Kenneth makes his last sound: an involuntary, light coughing, and his eyes remain rolled in his head or fixed.[304] At 20:27 Kenneth's eyes move for the last time.[305] At 20:31, Kenneth's mouth moves for the last time.[306] By 22:00, it was readily apparent that Kenneth had completely lost

---

[298] **Ex. 2-A** (video).

[299] *Id.*

[300] **Ex. 16** (Cohen rep.) at ¶ 39; *see also id.* at ¶¶ 42, 44(h).

[301] **Ex. 13** (Hall rep.) at 3.

[302] *Id.*

[303] **Ex. 13** (Hall rep.) at 3.

[304] **Ex. 13** (Hall rep.) at 3.

[305] **Ex. 13** (Hall rep.) at 3.

[306] **Ex. 13** (Hall rep.) at 4.

consciousness.[307] Still, Defendants Sunder and O'Pry permitted the containment team to hold Kenneth in a hogtie position while exerting additional pressure on his legs, back, and diaphragm.[308] Despite the obvious signs that Kenneth was dying, Defendant Sunder did not care to even consider Kenneth's status until approximately 24:50 in the video, when Defendant Sunder observed that Kenneth had "calmed down a lot."[309] And it was not until 26:10 that Defendant Sunder checked Kenneth's ability to breathe.[310] Defendant O'Pry refused to monitor Kenneth or confirm that he could breathe, despite her acknowledgement that he was in medical distress when he first arrived at the clinic and despite the conspicuous signs that he was dying between 19:00 and 27:00. By 25:10 when Defendant Sunder finally asked the containment team to release pressure on Kenneth's legs, Kenneth had gone over three minutes without making any voluntary or involuntary movements whatsoever.[311]

After Kenneth died, Defendant Sunder eventually requested that the containment team roll Kenneth over and allow him to breathe.[312] However, his request came ten minutes after Kenneth said he could not breathe. It came nearly seven minutes after Kenneth's eyes rolled to the back of his head or became fixed forward. It came approximately six minutes and thirty seconds after Kenneth made his last sound. It came over six minutes after Kenneth's mouth last

---

[307] **Ex. 13** (Hall rep.) at 4.

[308] **Ex. 2-A** (video) at 22:00.

[309] **Ex. 2-A** (video).

[310] **Ex. 2-A** (video).

[311] **Ex. 13** (Hall rep.) at 4; **Ex. 2-A** (video).

[312] **Ex. 2-A** (video) at 26:45.

moved. And it came at least five minutes after Kenneth last moved a muscle. Defendant Sunder's decision to concern himself with Kenneth's ability to breathe came far too late.[313]

## 2. DEFENDANTS SUNDER AND O'PRY DID NOT CARE ABOUT KENNETH'S HEALTH.

Defendant O'Pry never showed any concern for Kenneth's life. At approximately 25:00 in the video—several minutes after Kenneth fell unconscious—she speculated that Kenneth had become "calm" simply because he "realizes [the guards are] not going to move."[314] When Defendant Sunder asks the containment team if they can "let [Kenneth] move a little bit," Defendant O'Pry objects by saying "no."[315] At 25:30 in the video, Defendant O'Pry attempts to slow Defendant Sunder's efforts to move Kenneth to a better position, and she further confirms that she cared more about obtaining her blood pressure reading than attempting to ascertain whether Kenneth was still alive at all.[316] At 25:45, despite having heard Defendant Sunder ask the containment team to move Kenneth to a better position, Defendant O'Pry interrupts the containment team and asks them to refrain from moving Kenneth until she can get her blood pressure reading.[317] Between 26:45 and 27:00, Defendant Sunder ordered the containment team to turn Kenneth over because he is not breathing, and Defendant O'Pry still attempts to interfere.[318]

---

[313] **Ex. 13** (Hall rep.) at 3 ("Given the extended time that passed after [the 19:05 mark on the video] with no corrective actions, the later interventions and attempted interventions after this point were pointless and even inappropriate.").

[314] **Ex. 2-A** (video).

[315] **Ex. 2-A** (video) at 25:12-25:20.

[316] **Ex. 2-A** (video).

[317] **Ex. 2-A** (video).

[318] **Ex. 2-A** (video).

Defendants O'Pry and Sunder made no real effort to ascertain Kenneth's vital signs until after he died—despite recognizing he was in medical distress when he entered the clinic and severely at risk of a cardiovascular event. According to one containment team member, no one in the clinic recommended checking Kenneth's vital signs until after they injected him with Ativan, a sedative.[319] Efforts to check Kenneth's vital signs did not begin until after the nurse administered all Ativan shots.[320] Still, at no time before Kenneth died did Defendant O'Pry confirm Kenneth's blood pressure or his pulse.[321] Although Defendant O'Pry alleges that Kenneth's placement in a hogtie position prevented her from obtaining his vital signs, she never ordered the containment team to change his position.[322] The evidence indicates that Defendant O'Pry meekly asked the containment team to roll Kenneth over, and she never informed Defendant Sunder of the team's refusal even though she knew that it was necessary.[323]

Other evidence shows that Defendants Sunder and O'Pry simply did not care whether Kenneth died. They allegedly injected Kenneth with Ativan to help with his Xanax withdrawals. Despite being fully aware that the Ativan should have taken "15 minutes to 20 minutes" to have "very mild" effects on Kenneth, and despite Kenneth's total loss consciousness within *two minutes* after the first dose of Ativan, these defendants did nothing to help Kenneth breathe or to

---

[319] *See* **Ex. 11** (Kneitz dep.) at 66:8-16.

[320] **Ex. 11** (Kneitz dep.) at 108:22-109:10; **Ex. 18** (Sunder dep.) at 123:7-24.

[321] **Ex. 17** (O'Pry dep.) at 113:11-12; **Ex. 18** (Sunder dep.) at 124:12-14.

[322] **Ex. 17** (O'Pry dep.) at 103:14-20, 111:13-112:25.

[323] *See* **Ex. 17** (O'Pry dep.) at 120:13-15; **Ex. 2-A** (video) at 17:55-18:05.

even monitor his health and consciousness.[324] They did not bother to figure out why Kenneth had become motionless and nonverbal long before the Ativan would have affected him.

Defendants Sunder and O'Pry also have no regrets about killing Kenneth. Even today, knowing how Kenneth died, Defendant Sunder testified that he may still have ignored Kenneth's cry of "I can't breathe."[325] Indeed, *even though Kenneth died*, Defendant Sunder would change nothing about "his care and treatment of Kenneth."[326] Despite Defendant O'Pry's callous disregard for Kenneth's life from the time preceding his extraction until after he died, she characterized her conduct that day as "excellent."[327]

### 3. EXPERT TESTIMONY CONFIRMS THAT DEFENDANTS SUNDER AND O'PRY'S CALLOUS TREATMENT OF KENNETH CAUSED HIS DEATH.

While it is readily apparent that Defendants Sunder and O'Pry did not lift a finger to save Kenneth's life until it was much too late, expert testimony bolsters this fact. Dr. Hall concluded Kenneth's medical conditions put him "at risk of serious medical problems if he became part of a prolonged physical altercation."[328] Dr. Hall also noted that the EKG Kenneth Harris County providers obtained for Kenneth the day before he died showed "significant tachycardia" and because it went unaddressed, Kenneth was "more vulnerable to the effects of the oxygen deprivation experienced during the cell extraction."[329] Dr. Hall also opined that Kenneth's obesity—combined with his placement in a hogtie position, the pressure that other defendants

---

[324] **Ex. 18** (Sunder dep.) at 211:9-24; *see* **Ex. 2-A** (video) at 20:40, 22:00.

[325] **Ex. 18** (Sunder dep.) at 93:4-96:5.

[326] **Ex. 18** (Sunder dep.) at 27:10-13.

[327] **Ex. 17** (O'Pry dep.) at 149:22-25.

[328] *Id.*

[329] **Ex. 13** (Hall rep.) at 2.

placed on his back and legs, and the angle of the gurney—greatly restricted Kenneth's ability to breathe.[330]

Discussing the 19:05 mark of the video, when "the dying process was in full swing," Dr. Hall opines that Defendants Sunder and O'Pry "fail[ed] to recognize impending death" and that Defendants Sunder and O'Pry should have taken corrective action:

> Correct actions at this point would include releasing all restraints, rolling Mr. Lucas onto his back, starting 100% oxygen with bag valve mask supplementation, initiation of CPR followed very soon by two amps of IV or IO sodium bicarb and one amp of epinephrine together with successful intubation and correct ACLS protocol. A correct protocol of action at this point would more likely than not yielded a return of spontaneous circulation and respirations.[331]

Dr. Hall also commented on the decision to inject Kenneth with Ativan:

> Ativan was completely inappropriate medication. What little drive to breathe remained was in all likelihood wiped out by the Ativan. Ativan alone can decrease a person's drive to breathe. The combination of preexisting hypoxia and Ativan is an extremely deadly combination.[332]

Even if the Ativan never took effect, the decision to inject Kenneth with a powerful sedative while his breathing was compromised is callous and indifferent. As noted above, neither Defendant Sunder nor Defendant O'Pry monitored Kenneth's health until after he died, including by checking his breathing before administering the Ativan. Dr. Hall opined, "if either Dr. Sunder or Nurse O'Pry had actually been monitoring [Kenneth's] vitals, they would have likely seen [Kenneth] required medical intervention" when Kenneth's eyes "either rolled up into his head or . . . had become fixed directly forward."[333]

---

[330] **Ex. 13** (Hall rep.) at 2.

[331] **Ex. 13** (Hall rep.) at 3.

[332] **Ex. 13** (Hall rep.) at 3.

[333] **Ex. 13** (Hall rep.) at 3.

Through their indifference, Defendants Sunder and O'Pry, who were supposed to be the medical experts in the room, forced Kenneth to go "completely without oxygen for a period of over 5 minutes and 18 seconds and possibly as long as 8 minutes and 9 seconds."[334] Dr. Hall opines that Defendants Sunder's and O'Pry's refusal to help Kenneth at any point proximately caused his death.[335]

Likewise, Dr. Cohen, the former chief physician at Rikers Island, opined that Kenneth's placement facedown in a hogtie position, along with his obesity and hypertension, prevented him from breathing.[336] Agreeing with Dr. Hall, Dr. Cohen opined that Defendants Sunder's and O'Pry's attempts to resuscitate Kenneth after he died came far, far too late.[337] Dr. Cohen further opined that, "[h]ad [Kenneth's] vital signs been taken immediately and monitored throughout [his] time in the infirmary, and had the hog-tie position been changed promptly, [Kenneth] would in all probability have survived without neurologic and cardiac compromise due to a lack of oxygen, [as] demonstrated on the autopsy."[338] Dr. Cohen also opined that "[t]he actions of the medical [and] nursing . . . staff at Harris County Jail caused the death of Kenneth Lucas" and that his death was "completely preventable" and "unnecessary."[339] From his perspective as a physician, and drawing on his this thirty-five years' experience working in correctional medicine at one of the nation's largest jails, Dr. Cohen concluded, "Rarely … have I seen the degree of …

---

[334] **Ex. 13** (Hall rep.) at 5.

[335] **Ex. 13** (Hall rep.) at 5.

[336] **Ex. 16** (Cohen rep.) at ¶¶ 2, 5.

[337] **Ex. 16** (Cohen rep.) at ¶ 41.

[338] **Ex. 16** (Cohen rep.) at ¶ 48.

[339] **Ex. 16** (Cohen rep.) at ¶ 50.

callousness displayed by the medical … staff at Harris County Jail."[340] Despite having seen a lot in his career, Dr. Cohen found the manner of Kenneth's death "shocking."[341]

### III. <u>MATERIAL FACTS IN DISPUTE</u>

1. Did Officers Scott, Green, Leveston, Thomas, Bell, Gordon, and Kneitz use excessive force when they restricted Kenneth Lucas' ability to breathe by "hogtying" him while simultaneously holding him facedown and compressing his chest?

2. Did Officers Scott, Green, Bell, Kneitz, and Gordon hear Kenneth gasp "I can't breathe"?[342]

3. Did Officer Scott sit on top of Kenneth and press down on his legs into his chest?

4. Did Officers Scott, Green, and Leveston press down into Kenneth's chest?

5. Did the officers know Kenneth was likely under the influence of drugs, or "on something," due to his bizarre behavior?

6. Was the broken smoke detector in Kenneth's cell a "weapon"?

7. Was Kenneth being "combative" when he twice begged officers "I can't breathe"?

8. Was Kenneth "trying to kick out with his legs" when he told officers and the medical providers "I cannot breathe"?[343]

---

[340] **Ex. 16** (Cohen rep.) at ¶ 49.

[341] **Ex. 16** (Cohen rep.) at ¶ 50.

[342] Lt. Anderson and Officers Gordon, Thomas, and Leveston acknowledge hearing Kenneth say, "I can't breathe."

[343] *Compare* **Ex. 4** (Sheriff Garcia dep.) at 181:9-14, *with* **Ex. 2-A**, Video 16:55.

9.  Did Kenneth "stop resisting" at any point after the officers deposited him facedown on the gurney before he died?

10. Was entering the cell to violently retrieve the smoke detector a "last resort," or a completely unnecessary use of force given the circumstances?

11. Did Harris County intentionally discriminate against Kenneth by training its officers to use hogtie and compression techniques against inmates with obvious disabilities?

12. Did Harris County fail to reasonably accommodate Kenneth's disabilities?

13. Were Kenneth's obesity, hypertension, and anxiety-related withdrawal symptoms substantially limiting disabilities?

There are disputes as to each of these material facts that, at the summary judgment stage, when viewed in the light most favorable to the non-movant, must be resolved in favor of the Plaintiffs.

## IV. STANDARD OF REVIEW

Summary judgment is only proper when there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party – here, the Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is only to determine if there is a genuine issue for trial – not weigh the evidence or determine its truthfulness. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if a reasonable fact finder, viewing all the evidence in favor of the plaintiff, could reasonably find for the plaintiff. *Id*. Even cases regarding qualified immunity are not appropriately resolved at summary judgment when a dispute exists regarding the facts. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014)

69

(*per curiam*, reversing opinions of Fifth Circuit and Southern District of Texas). Here, different witnesses tell materially different stories, some of which are in conflict with the video recording – such as if everyone heard Kenneth say "I can't breathe." Thus, for many individual defendants, a jury will have to resolve facts and make credibility determinations to decide their alleged entitlement to qualified immunity. *Id.*

This case is particularly inapt for summary judgment dismissal, as the ultimate factual issues will require weighing a large body of documentary evidence, determining the Defendants' intent, resolving contradicting testimony, and deciding a "battle of the experts." These are each material factual disputes a jury must decide. *See McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, *9 (S.D. Tex. Aug. 9, 2006) ("[T]he reasonableness of an accommodation [for a disability] is generally a question of fact inappropriate for resolution on summary judgment.") (collecting cases); *Michaels v. Avitech, Inc.*, 202 F.3d 746, 752 (5th Cir. 2000) ("battle of the experts" to be decided by a jury); *Osburn v. Anchor Labs., Inc.*, 825 F.d2 908, 916 (5th Cir. 1987).

## V. <u>ARGUMENT AND AUTHORITIES</u>

Because there are multiple material factual disputes when the evidence is viewed in the light most favorable to the Plaintiffs, the Court should deny Defendants' motions for summary judgment.

### A. THE INDIVIDUAL DEFENDANTS VIOLATED KENNETH'S FOURTEENTH AMENDMENT RIGHTS

Pretrial detainees, of course, are "to be treated as innocent until proven guilty." *Bell v. Wolfish*, 441 U.S. 520, 530 (1979). Thus, pretrial detainees are protected by the Fourteenth Amendment from excessive force and denial of medical care while detained awaiting trial or

bond. *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 477 (5th Cir. 2014) (reversing district court order granting summary judgment in cell extraction death case); *Hare v. City of Cornith, Miss.*, 135 F.3d 320 (5th Cir. 1998) (denial of medical care).

### 1. THE OFFICERS VIOLATED KENNETH'S PROTECTION FROM EXCESSIVE FORCE

#### a. The Officers Used Illegal Excessive Force

To prevail in an excessive force claim, "[a] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2470 (2015). "[O]bjective reasonableness turns on the facts and circumstances of each particular case." *Id.* at 2470 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Id.* at 2473. In weighing whether force was objectively excessive, Courts should consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the threat reasonably perceived by the officers; and whether the plaintiff was actively resisting." *Id.* at 2473. This is a "fact-sensitive" inquiry, ill-suited for summary judgment resolution. *See*, *e.g.*, *Rankin v. Klevenhagen*, 5 F.3d 103, 107 (5th Cir. 1993).[344]

---

[344] "Subjective deliberate indifference" is not an element of an excessive force claim, contrary to Defendants Leveston, Bell, Green, Thomas, and Kneitz's motion. Doc. 145, pp. 21-22. They cite no authority for this novel proposition. The authorities they do discuss are not excessive force cases. *See Farmer v. Brennan*, 511 U.S. 825 (1994) (failure to protect inmate from violence by other prisoners); *Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006) (inmate denial of medical care); *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447 (5th Cir. 2001) (same); *Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) (same).

Each of these objective factors strongly favors Plaintiffs.

      i.   <u>There was No Need for Any Force</u>

First, there was no need to enter the cell to confiscate the smoke detector, much less to hogtie and compress Kenneth's chest after it could be safely retrieved. Though some of the officers ludicrously (and repeatedly) characterize the smoke detector as a "weapon," there are no allegations Kenneth actually ever used (or attempted to use) the broken fixture to harm anyone (including himself). At worst, the video shows Kenneth, in his delirium, taunting the officers with the smoke detector by repeatedly slapping it against the cell's plexi-glass window and on the cell door's food slot.[345] Breaking the smoke detector and mocking the officers with it did not warrant a violent cell extraction. *See Kitchen*, 759 F.3d at 475 (officers not entitled to summary judgment where inmate "showed the detention officers his middle finger and urinated on the floor"). Kenneth was locked in a secure cell by himself, and being closely observed by correctional officers. The only person he could have even theoretically harmed was himself (but there is no allegation he was ever doing so, and the County's mental health staff had already determined he was not a suicide risk).[346] Indeed, in *Kitchen* the inmate actually was hurting himself by bashing his head against the cell bars – but the Fifth Circuit still reversed the district court's order granting summary judgment. 759 F.3d at 474-75. The objectively appropriate

---

[345] **Ex. 2-A** (Video at 2:43-4:00). *See also* **Ex. 20** (Internal Affairs Division Investigation, Death of Kenneth Lucas, Bates No. LUCAS006) (Kenneth had "flooded his individual cell," "tampered with and removed the smoke detector," and "was banging on the window to his individual cell with the metal smoke detector").

[346] *See* **Ex. 24** (Warden McAndrew Report) at 5; **Ex. 21** (Harris Cty. Medical Records (Bates No. 00615)).

response to a delusional inmate who could not harm anyone while refusing to surrender a broken fixture was to get him psychiatric care and simply wait.[347]

The fact Kenneth had a piece of contraband (the broken smoke detector) did not justify the use of deadly force. By "subduing and searching [a detainee known to have contraband] … [the officers] maliciously used force … grossly disproportionate to the need." *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990). A reasonable jury could certainly disagree with the officers' position that by screaming "Pass it to me! Pass it to me!" twenty-three times in approximately ninety seconds was an attempt to "cooperate with safety and de-escalation." Doc. 150, p. 29 (Gordon motion).

But even if retrieving the smoke detector did justify violence, the officers removed Kenneth from the cell at 9:11 on the video, then proceeded to hold him facedown in a "basic hogtie position" and compress his chest for the next sixteen minutes.[348] Dr. Hall opines that the officers continued restraining Kenneth *even after he became unconscious and then died*.[349] Presumably, the smoke detector could have been safely retrieved at any time after Kenneth was out of the cell without subjecting Kenneth to any further violence. Indeed, the officers only used *deadly* force against Kenneth *after* any legitimate need to use any force had passed.

As Officer Thomas explained, the containment team's purpose is "to control custody and, you know, try to keep inmates from hurting themselves or hurting anyone else."[350] Because

---

[347] **Ex. 14** (Warden McAndrew Report) at 5 & 8.

[348] **Ex. 2-A** (video) at 9:12-25:32.

[349] **Ex. 13** (Dr. Hall rep.) at 4

[350] **Ex. 10** (Thomas dep.) at 21:11-13.

Kenneth was not "hurting himself" or "anyone else," using the team was unnecessary and hazardous.

This factor strongly favors the Plaintiffs.

ii.   The Officers' Force Killed Kenneth

Hogtying human beings and compressing their chests is recognized as deadly force.[351] *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 443 (5th Cir. 1998). "[H]og-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances – i.e., when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position" – like the officers did to Kenneth. *Id.* at 451 (denying summary judgment to officers). In the Fifth Circuit, it is long-recognized that detainees suffering from drug-related symptoms can die when hogtied in the prone position. *Id.* The panel opinion in *Gutierrez* is controlling – neither the Fifth Circuit sitting en banc nor the U.S. Supreme Court have overruled it, and its facts are extremely similar to this case. *See United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014); *cf. Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012) (officers did not know arrestee under influence of drugs); *Hill v. Carroll Cty., Miss.*, 587 F.3d 230 (5th Cir. 2009) (same). Every officer testified hogtying was prohibited by the jail because it was dangerous. *Supra* n. 115. P. 27.

And, of course, the officers didn't just hogtie Kenneth. They also pressed down on his chest for a quarter hour, including after he twice complained he could not breathe, and ignored

---

[351] **Ex. 24** (Warden McAndrew Report) at 8; **Ex. 16** (Dr. Cohen Report) at 8, ¶ 27 ("Hog-tie positions are well-known to be dangerous in jails and prisons, especially for patients with known underlying medical conditions like anxiety, hypertension, and obesity"); **Ex. 13** (Dr. Hall Report) at 5.

his pleas for help.[352] In the inapposite hogtie cases where the Fifth Circuit found officers did not use excessive force, the officers simply hogtied the victims and left them alone without also pushing down on their chest cavities or otherwise preventing them from breathing. *See Khan*, 683 F.3d at 193 (victim died "almost immediately" after hogtie applied); *Hill*, 587 F.3d at 232-33 (victim left on his side in back seat of squad car, untouched by officers, and found dead when they reached the police station). Of course, in *Khan* and *Hill* there was also no indication the deceased detainee complained "I can't breathe" after they were hogtied. Here, the officers used even more force than a simple hogtie – they effectively hogtied Kenneth, placed him on the gurney facedown, then repeatedly pushed down on his chest until his breathing was compromised.

To the extent the defense experts disagree with the plaintiffs' doctors (and even the officers' testimony) that hogtying disabled detainees and compressing their chests is dangerous, this merely creates a "battle of the experts" that cannot be resolved at summary judgment. *Michaels*, 202 F.3d at 752 ("battle of the experts" to be decided by a jury). Notably, other courts

---

[352] *See*, *e.g.*, **Ex. 2-A** (video) at 10:30 (Green's knee in back), 10:41 (Green pushing through chest to move gurney), 10:44 (Scott pushing into chest), 10:59 (Leveston holding chest down, Scott leaning in to chest), 11:26 (Scott leaning in to chest), 11:42 (Green holding down neck, pushing in to chest, Scott leaning forward in to chest), 11:46 (Scott leaning in to chest), 12:13 (Scott pushing down in to chest, Leveston pushing down on chest), 12:22-25 (Green and Leveston pushing down on chest), 12:30 (Leveston shoving chest down), 12:40 (Green and Leveston pushing down on chest), 12:48 (Leveston pushing down on chest), 12:54 (Green leaning down into chest), 12:59 (Green pressing forearm into back and shoulder), 13:02 (Leveston pushing down on chest), 13:05 (Green and Leveston pushing down on chest), 13:07 (Green pressing down on chest), 13:23 (Scott pressing down on chest), 14:52 (Scott leaning forward into chest, Leveston pushing down), 15:02 (Green pushing down on shoulder), 15:31 (Scott leaning forward into chest), 16:11 (Scott pushing down on chest), 16:23 (Green pushing down on shoulder), 16:45 (Thomas pushing down on leg), 17:08 (Leveston pushing down on shoulder, immediately after Kenneth gulps "I cannot breathe"), 17:11 (Green pushes down on shoulder), 17:14 (Scott pushing down on legs), 17:19 (Green and Leveston pushing down on shoulder, Scott pushing down on legs), 17:46-18:05 (Green, Thomas, and Scott pushing down).

have correctly noted that defense expert Dr. Neuman's study on positional asphyxiation is inapplicable here, because it only addresses the danger from hogties in "healthy adult males" – which Kenneth in his withdrawal-addled, anxious, hypertensive, and obviously obese state was not. *Cruz v. City of Laramie*, 239 F.3d 1183, 1189 (10th Cir. 2001); *see also Giannetti v. City of Stillwater, Okla.*, 2006 WL 5100544, *3 (W.D. Okla. Jan. 26, 2006) (declining to exclude testimony of expert testimony in conflict with Dr. Neuman's work).

Likewise, there are significant credibility issues with Dr. Neuman's studies and opinions that must be evaluated by the jury.  The genesis of his work in the area of positional asphyxia, and his "foundational" study, were litigation-driven, beginning only after he was retained as a defense expert in an asphyxia death case against the County of San Diego.[353] He was approached by an attorney for San Diego County and asked to critique a study published by the plaintiff's expert in the case regarding positional asphyxia during law enforcement transport.[354] Prior to that time, he had never heard of or dealt with the issue of positional asphyxia.[355] Dr. Neuman then performed a study to be used in the case, with the majority of funding provided by San Diego County.[356]

Predictably, San Diego County got what it paid for: Dr. Neuman's study concluded that a restraint position could not cause asphyxia.[357] Of course, he selected healthy, non-obese subjects between the ages of 18 and 40, with no compression of the abdomen performed to simulate

---

[353] **Ex. 33** (Neuman Depo.) at 89-96.

[354] *Id*. at 90, 93.

[355] *Id*.

[356] *Id.* at 94-95 and Depo. Ex. 10.

[357] *Id.* at 102.

pressure actually applied by law enforcement officers during detention, and without the type of struggle or psychological stress that often occur during detention by law enforcement officers in the field.[358] And notably, the "hogtie" position used in the study left the subject's shoulders and knees on the mat, rather than bend them up (as the officers did to Kenneth).[359] Nevertheless, Dr. Neuman opined that this study was "a pretty good replication of Mr. Lucas' circumstances."[360]

Dr. Neuman subsequently performed additional studies, always on young and healthy subjects, including more funded by a law-enforcement organization, and always finding no possibility of asphyxia.[361]   Indeed, in one study, the subjects were very athletic exercise physiology majors at San Diego State University.[362] In each study, Dr. Neuman selectively added additional variables such as weight on the shoulder blades, struggling, different positions, and obese subjects, but never all of those factors in combination.[363] For example, he has never performed a study combining the common factors of obesity, weight (or pressure) on the back, and struggling while the subject it in a maximum restraint position.[364] And he admitted that the limitations on his subsequent studies included the absence of underlying medical conditions, absence of psychological stress, even distribution of weights, short duration of struggle when performed, the ability to opt of the study due to fear of restraint, and the placement of weights in

_____

[358] *Id.* at 98, 125-7.

[359] *Id.*, Depo. Exhibit 10, Figure 1.

[360] *Id.* at 128:19-20.

[361] *Id.* at 224-25.

[362] *Id.* at 186-87.

[363] *Id.* at 138-9, 142-3, 156, 167, 170, 218-220.

[364] *Id.* at 156, 170.

some positions, but not others.[365]   The jury could conclude there is an obvious reason why Dr. Neuman never combined these factors – doing so could kill his subjects.

In short, credibility problems for the jury abound regarding Dr. Neuman's opinions and studies. His studies cannot replicate actual field conditions. And his work in this area and foundational study were birthed in bias during work as a defense expert, and in subsequent studies he has carefully cherry-picked the protocols to avoid combining all factors that can be studied, predictably reaching conclusions favorable to the defense every time.[366]

Likewise, "[w]hether a particular use of force is 'deadly force' is a question of fact, not one of law." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). Indeed, the Fifth Circuit recently reversed a district court that granted summary judgment based on a similar argument – that survivors of an obese detainee restrained in a prone position during an altercation with police presented sufficient expert testimony that his death would not have occurred but for the officers' use of force. *Darden v. City of Ft. Worth, Tex.*, 880 F.3d 722, 728 (5th Cir. 2018).

But even if the Plaintiffs had no conflicting expert testimony, in this case, a contrary expert opinion is not even required. "A reasonable jury could conclude that the use of pepper spray, combined with the fact that the officers repeatedly pushed [the detainee] face-first to the ground, could have resulted in [the detainee] stopping breathing. … [C]ommon sense compels the conclusion that [the detainee's] injuries resulted from his altercation with the police, and

---

[365] *Id.* at 206, 210-13.

[366] That Dr. Neuman is a pulmonologist, and Plaintiffs' experts (Dr. Cohen and Dr. Hall) are not, goes to the weight of the evidence, and should evaluated by the jury.

there is no requirement that medical testimony be presented to establish causation." *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 n. 3 (5th Cir. 2000).

This factor also strongly favors the Plaintiffs.

### iii.   The Officers Made No Effort to Temper or Limit the Force

The officers also did not temper their force, even after Kenneth repeatedly begged for "help!" and wheezed "I'm gonna pass out"[367] (Video, 7:15) and "I can't breathe" (three times).[368] When the only possible objective of the cell extraction was completed – retrieving the smoke detector – the officers used *more* force by holding Kenneth facedown in a hogtie rather than "temper" their force. Even after the officers reached the infirmary – where Nurse O'Pry remarked quickly "would it be better for y'all if we rolled him over?" – the officers continued to sit on Kenneth and push his face and chest into the gurney.[369] The officers kept periodically pressing down on Kenneth's body until long after he stopped moving – when he was dead.[370] The video – and thus Officer Kneitz – even recorded Kenneth's eyes rolling back as he foams at the mouth while the officers still keep Kenneth's body contorted in the hogtie position.[371] Even as Nurse O'Pry struggles to take Kenneth's blood pressure, the officers do not let up.[372] There is certainly substantial video evidence to disprove that "when [Kenneth] stopped resisting, [Defendant] Scott would decrease the pressure" he applied to Kenneth's legs and torso. *Contra*

---

[367] **Ex. 2-A** (video) at 7:15.

[368] **Ex. 2-A** (video) at 14:04 & 16:56.

[369] **Ex. 2-A** (video) at 18:00.

[370] *See* **Ex. 13** (Hall Report) at 5 (Kenneth had been "without oxygen for 5 to 8 minutes before Dr. Sunder said 'bag him'" at 28:40 on the video); Ex. 2-A, Video, 20:17-28:40.

[371] **Ex. 2-A** (Video) at 20:07-36 & 21:41 (Scott still leaning forward into Kenneth's chest).

[372] **Ex. 2-A** (video) at 23:22.

Doc. 150, p. 32. The officers finally release Kenneth's lifeless body only when Dr. Sunder asks them to "let him move a little bit on the leg" after he had not moved for several minutes (and had likely died moments before).[373]

       This factor additionally strongly favors the Plaintiffs.

       iv.    <u>Kenneth Posed No Threat to the Officers</u>

       Likewise, Kenneth never posed any threat to the officers until they entered the cell. Even after they stormed through the door, Kenneth was little match for the (at least)[374] eight assembled officers (Green, Leveston, Scott, Bell, Thomas, Gordon, Kneitz and their supervisor, Lt. Anderson) who quickly subdued him. The officers were armed with a riot shield they used to tackle Kenneth to the ground, and protected with gloves, elbow pads, knee and shin guards, groin protection, chest protectors, and helmets with face shields[375] (while Kenneth was only wearing jail issued pajama pants). The video shows numerous other officers were close by to intervene and further increased their odds if Kenneth had ever gained the upper hand (though he never did). No reasonable officer could have believed Kenneth posed a serious threat to anyone.

       v.    <u>Kenneth Stopped Resisting Once Hogtied</u>

       A reasonable jury could view the video and determine Kenneth presented little resistance once he was subdued on the gurney. Each time Kenneth moves, he is attempting to reposition his face from where the officers were pushing it into the gurney. When officers tell him to "calm

---

[373] **Ex. 2-A** (video) at 25:17.

[374] The video shows at least one other unidentified officer present, presumably the "weapons" officer described in the training who was supposed to be armed with pepper spray. **Ex. 2-A** (video) at 4:42; **Ex. 29** (Harris Cty. Academy Lesson Plan Mini Team Cell Extraction) at 8.

[375] **Ex. 22** (Cell Extraction Team Lesson PowerPoint) at Bates nos. Lucas00743-45.

down" or "relax," a jury could conclude the only reason he doesn't is because he is having extreme difficulty drawing breath – Kenneth told the officers "I can't breathe" and when told to "relax" explained "I can't, bro. I cannot."[376] *See Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) (reversing district court order granting summary judgment when detainee's "undisputed attempts to squirm or arch his back upward while he was being restrained may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress"). Likewise, the longer the officers pushed Kenneth down into the gurney, the less he resisted – because they were killing him. *See Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (affirming denial of qualified immunity to officers who restrained detainee, face down, during cell extraction even after the detainee "surrendered"); *Darden*, 880 F.3d at 726 n. 3 (denying police officers qualified immunity when obese detainee pushed face down into the floor "pushed himself up on his hands because he was trying to get into a position where he could breathe"). After Kenneth is lifted onto the gurney, the officers even stop telling him to "stop resisting" (and instead only tell him to "relax" as they press the breath out of him). A reasonable jury could certainly conclude that, if some force was necessary when Kenneth was first dragged out of the cell, that his alleged "resistance" subsided as the officers pressed the life out of him, and their use of force became unreasonable and excessive.

> vi.    Bell, Leveston, Green, Thomas, and Kneitz Apply the Wrong Legal Standard

Officers Bell, Leveston, Green, Thomas, and Kneitz (but not even Gordon and Scott) ask the Court to apply the overruled "malicious and sadistic" application of force standard. Doc. 145, p. 36. This is no longer the law for measuring excessive force used against a pretrial detainee.

---

[376] **Ex. 2-A** (video) at 17:12.

*See Kingsley*, 135 S.Ct. at 2470. "[T]he relevant standard is objective not subjective." *Id.* at 2472. This old standard that Bell, Leveston, Green, Thomas, and Kneitz cite only applies in cases "brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishment Clause, not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause" who are presumed innocent while awaiting bond or trial. *Id.* at 2475 (2015). Unlike a convicted criminal, Kenneth was only incarcerated when the officers killed him because his friends and family were too poor to pay his bond.

But even under the wrong standard, the officers are not entitled to summary judgment. If *Kingsley* were never decided, Fifth Circuit authority in *Kitchen* under the officers' proposed (no longer correct) standard would still require denying the officers' motion. *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468 (5th Cir. 2014). "[W]hether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm" is still a "highly fact-specific inquiry" that a reasonable jury could resolve in Plaintiffs' favor. *See Fickes v. Jefferson Cty.*, 900 F.Supp. 84, 91 (E.D. Tex. 1995). The jury could easily conclude continuing to press down on Kenneth's chest as he screamed for "help!" 25 times and begged "I can't breathe" is sadistic and malicious. Even under this old, more-demanding standard, the Fifth Circuit reversed the *Kitchen* district court when it granted summary judgment on less-damning facts. *Kitchen*, 759 F.3d 468; *see also Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (officers not entitled to summary judgment when using a "choke hold" during a cell extraction that "render[ed] [the detainee] momentarily unconscious" after detainee refused to stop "singing and making noise").

Moreover, under the old case law, even if hogtying and compressing the chest of a man who "can't breathe" were not textbook sadism and malice, jurors should still evaluate objective

factors in determining if the force was excessive. "Often … there will be no evidence of the detention facility officer's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Valencia*, 981 F.2d at 1446. The jury will consider factors almost identical to the (correct) objective reasonableness standard in assessing the officers' conduct: "the need for the application of force," "the threat reasonably perceived by the detention facility official," whether the officer "had to act quickly and decisively," and "any efforts to temper the severity of a forceful response." *Id.* at 1446 (5th Cir. 1993); Fifth Cir. Pattern Jury Charge 10.7A (convicted prisoner excessive force charge). The old standard even called on jurors to evaluate "the extent of the injury suffered by an inmate." *Valencia*, 981 F.2d at 1446. These factors similarly favor the Plaintiffs – there was virtually no "need for the application" of any force, no reasonable officer would perceive a serious threat from a broken smoke detector, rather than "act quickly and decisively" the officers could have safely waited indefinitely, and even when Kenneth moaned "I can't breathe" three times the officers did not "temper the severity of [their] forceful response." *Id.* Under the old, incorrect standard, in the factually-similar cases the Defendants cite, the Fifth Circuit still upheld findings that officers used excessive force (even when the prisoner survived). *Valencia*, 981 F.2d at 1447. If summary judgment is inappropriate under the overturned malice standard, it certainly should be denied when "objective reasonableness" is the guiding principle. And if summary judgment is inappropriate under the old malice standard, it certainly should be denied under the current "objective reasonableness" standard. *See also Saenz v. G4S Secure Sol'ns (USA)*, 224 F.Supp.3d 477, 485 (W.D. Tex. 2016) (denying motion for summary judgment).

83

### b.  The Officers are Not Entitled to Qualified Immunity

Here, qualified immunity does not protect the officers because they violated Kenneth's clearly established constitutional rights. To defeat Defendants' claims to immunity, Plaintiffs must only demonstrate "the facts taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right," and that "the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014) (internal citations omitted). Courts can address these two prongs in either order, but "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S.Ct. at 1866. Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).

Sufficient evidence shows jurors could conclude the officers violated Kenneth's federal rights, satisfying the first prong. *See supra*. Parts II.A-I. Though officers would ordinarily be entitled to each have their actions reviewed individually in the immunity inquiry, that parsing of the facts is unnecessary here because the officers all acted pursuant to a common plan to restrain Kenneth, and jointly held him facedown in the "basic hogtie position" while compressing his chest. Joint liability is appropriate where "the officers discussed beforehand how to handle the situation and functioned as a unit once inside [the] cell." *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990).

Each officer separately, however, used excessive force against Kenneth:

**Scott** sat on top of Kenneth's legs, pushing his legs into his chest cavity, for almost a quarter hour.[377] Though Scott denies putting any pressure on Kenneth's body as he straddled him, the video shows Scott's weight pushing into Kenneth's

---

[377] **Ex. 2-A** (Video) at 10:35 to 25:32.

body on multiple occasions.[378] Thomas even testified that Scott "sat on [Kenneth's] back."[379]

**Green**, controlling Kenneth's left arm, also repeatedly pressed down on Kenneth's chest, neck, and shoulder.[380] Shortly after Kenneth was placed face down on the gurney, Green even put his knee into Kenneth's back.[381] Green helps propel the gurney forward by pushing down and through Kenneth's back and chest.[382] When Kenneth exclaims "I cannot breathe!" and "I can't [relax], bro, I cannot," Green responds by pressing down into Kenneth's shoulder.[383]

**Leveston**, controlling Kenneth's right arm, similarly presses down on Kenneth's chest throughout the ordeal.[384] When Kenneth gulps "I cannot breathe," Leveston responds by immediately pushing his shoulder into the gurney.[385]

**Thomas**, controlling Kenneth's right leg, can also be seen on the video pressing the leg into Kenneth's chest shortly after hearing "I can't breathe."[386]

**Bell**, controlling Kenneth's left leg, held Kenneth down on the gurney in the hogtie position.

**Gordon**, the "team leader," directed the officers to restrain Kenneth in the basic hogtie position, and allowed them to compress Kenneth's chest.

---

[378] *Compare* Doc. 150, p. 22 (Scott's motion, alleging he sat in a "semi-squat" position without applying any pressure to Kenneth's legs and torso) *with* **Ex. 2-A**, Video at 10:44, 10:59, 11:26, 11:42, 11:46, 12:13, 13:23, 14:52, 15:31, 16:11, 17:14, 17:19, & 17:46-18:05. Whether Scott was "semi-squatting" or actually sitting on Kenneth is a material fact dispute.

[379] **Ex. 10** (Thomas Dep.) at 62:1-4, 63:7-9.

[380] **Ex. 2-A** (video) at 11:42, 12:22-25, 12:40, 12:54, 12:59, 13:05, 13:07, 15:02, 16:23, 17:11, 17:19, 17:46-18:05. Force is obviously being applied at these times because Kenneth's skin "dimples" in under the pressure from the officer's force.

[381] **Ex. 2-A** (video) at 10:30.

[382] **Ex. 2-A** (video) at 10:41.

[383] **Ex. 2-A** (video) at 17:18.

[384] **Ex. 2-A** (video) at 10:59, 12:13, 12:22-25, 12:30, 12:40, 12:48, 13:02, 13:05, 14:52, 17:46-18:05.

[385] **Ex. 2-A** (video) at 17:08.

[386] **Ex. 2-A** (video) at 17:46-18:05.

And, of course, the officers charged into the cell together in the "stick," crashing into Kenneth and slamming him into the floor, solely because he had pulled a smoke detector off the ceiling. Violently tackling Kenneth to the floor was also excessive force because no force at all was justified. Acting together, the officers held Kenneth down on the gurney, preventing him from moving to a position where he could breathe – Green and Leveston held down his arms, Bell and Thomas held down his legs, and Scott sat atop his hogtied feed. Bell agreed "the arms of Kenneth Lucas and the legs of Kenneth Lucas were essentially where they would be if he was hogtied."[387] And continuing to force Kenneth's chest into the gurney in the clinic was excessive because he did not pose any danger to anyone at that point.[388]

Likewise, under any view of "clearly established" law, the officers had "fair warning" that hogtying Kenneth and compressing his chest violated his Fourteenth Amendment rights. *Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002) (purpose of qualified immunity is to provide "fair warning" to defendants' that their conduct would violate plaintiffs' rights). Controlling authority, or a "robust consensus" or persuasive authority, create "clearly established" law. *Turner v. Lt. Driver*, 848 F.3d 678, 687 (5th Cir. 2017). "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012) (internal citations omitted).

Controlling authority, *Gutierrez v. City of San Antonio*, provided "fair warning" to the officers that facedown hogtying a drug-addled detainee was excessive force. 139 F.3d 441 (5th

---

[387] **Ex. 14** (Bell dep.) at 58:4-7
[388] **Ex. 10** (Thomas dep.) at 72:3-5.

Cir. 1998).[389] The facts of *Gutierrez* are extremely similar – officers hogtied a suspect, placed him facedown in the back of their patrol car (while he was kicking the back seat), and drove him to the hospital, only to discover he died during transport. *Id.* at 443. Summary judgment was denied to the officers when they raised a qualified immunity defense. *Id.* "[H]og-tying" combined with "drug use" and "positional asphyxia" "would have violated law clearly established" at the time of Kenneth's death. *Id.* at 446-47. *See also Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (jail officers subduing pretrial detainee by sitting "astraddle him" and applying pressure to his chest, while detainee "screams and [made] repeated cries for mercy" denied qualified immunity when detainee asphyxiates).

A "robust consensus" of persuasive authority agrees. *Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1188 (10th Cir. 2001) ("officers may not apply [hogties] when an individual's diminished mental capacity is apparent"); *Weigel v. Broad*, 544 F.3d 1143, 1148 (10th Cir. 2008) (officers restrain detainee by "applying pressure to [prone detainee's] upper body" while also "straddling [his] upper thighs and buttocks and [holding] [his] arms in place" not entitled to qualified immunity); *McCue v. City of Bangor, Me.*, 838 F.3d 55, 64 (1st Cir. 2016) ("it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position … constitutes excessive force"); *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007) (hogtying "an individual after he had ceased resisting arrest could be objectively unreasonable" as is "[f]ailing to place [a detainee] in the proper position" – on his side – "after [hogtying] him"); *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) (restraint in prone position with chest compression); *Champion v.*

_____

[389] Thomas, Bell, Leveston, Green, and Kneitz's motion tellingly does not even address *Gutierrez*.

*Outlook Nashville, Inc.*, 380 F.3d 893, 903-04 (6th Cir. 2004) ("putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued … constitutes excessive force"); *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008) (Posner, J.) (denying courtroom deputy qualified immunity because "a reasonably trained police officer would know that compressing the lungs of a morbidly obese person can kill the person"); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003). *See also Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999); *Flores-Zelaya v. Las Vegas Metro. Police Dept.*, 2016 WL 697782, *5 (D. Nev. Feb. 19, 2016); *Swans v. City of Lansing*, 65 F.Supp.2d 625 (W.D. Mich. 1998); *Rachel v. City of Mobile, Ala.*, 112 F.Supp.3d 1263, 1291 (S.D. Ala. 2015); *Jones v. Cty. of Sacramento*, 2011 WL 3163307 (E.D. Cal. July 25, 2011); *Watkins v. New Castle Cty.*, 374 F.Supp.2d 379, 390 (D. Del. 2005); *Hanson v. Best*, 2017 WL 5891697, *8 (D. Minn. Nov. 28, 2017).

Gordon and Scott repeatedly suggest – without ever coming out and arguing – that their conduct should be excused because they were doing what Harris County trained them to. They cite no authority to support this proposition. In fact, there is substantial authority to the contrary because officers cannot seek the protection of qualified immunity for "just following orders." "[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (denying qualified immunity to police officer "following orders" when he excluded citizen from public swimming pools without due process). "[T]hough [defendants] [were] not the mastermind[s] behind the violation of constitutional rights that occurred here, [they] must take responsibility for [their] actions, and may be held

accountable in a court of law." *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004). *See also Gonzalez v. Cecil Co., Md.*, 221 F.Supp.2d 611, 616 (D. Md. 2002); *Mial v. Sherin*, No. 1:11-cv-921, 2012 WL 2838424, *10 (E.D. Va. July 9, 2012).

The post-*Gutierrez* hogtying cases in the Fifth Circuit are factually dissimilar. Unlike in *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 238 (5th Cir. 2009), where the plaintiff had "no evidence [the officers] possessed subjective knowledge that their chosen method of transporting [the detainee] posed a substantial risk of medical harm," here Kenneth cried out for "help!" twenty-five times, and twice begged "I can't breathe!" The Circuit distinguished *Hill* from *Gutierrez* because *Hill* lacked a critical fact that exists here – "evidence of drug abuse or drug-induced psychosis." *Hill*, 587 F.3d at 235. Here, a jury could conclude the officers knew Kenneth's behavior was affected by drug use – immediately after Kenneth's death, Officer Scott told investigators "If I was asked of my opinion of the mental state of Kenneth Lucas, I would say that he was on something, some drug."[390]

*Khan* suffers similar flaws for the Defendants. The Fifth Circuit distinguished *Khan* from *Gutierrez* based on facts that also exist here. *Khan v. Normand*, 683 F.3d 192, 195 (5th Cir. 2012). First, the victim in *Khan* "almost immediately" stopped breathing after being placed in the four-point restraint. The "brevity of the restraint" distinguished *Khan* from *Gutierrez*, but not from this case where the officers actively pushed down on Kenneth's chest and listened to him beg for mercy for a quarter hour until he died. *Cf. Khan*, 683 F.3d at 195. Second, the officers in *Gutierrez* and here, but not in *Khan*, knew the detainees were under the influence of drugs

_____

[390] **Ex. 20** (Internal Affairs Division Investigation, Death of Kenneth Lucas (Supplement #2)) at Bates No. LUCAS 0025) (statement of Off. Scott), Bates No. LUCAS 0027 (statement of Off. Bell) ("I would say that Kenneth Lucas was on something"). Scott takes a different position in his motion. Doc. 150, p. 27.

(which contributed to their deaths). *Id.* at 195. Third, unlike in *Khan*, the officers' actions here were not a "split second decision" where they acted spontaneously to restrain a detainee who was "thrashing his legs, attempting to bite, and … reaching for an officer's gun belt" only to discover their typical restraint techniques weren't working. *Id.* at 193. Here, hogtying Kenneth and sitting on him was the standard practice – the officers received significant training and instruction that during a cell extraction long before they encountered Kenneth, and knew that in the Harris County jail you hogtie an inmate and compress their chest by sitting on them. *Supra* n. 220, Parts II.C., D., and J.. Sheriff Garcia testified the officers actions' were "carry[ing] out a very methodical, very disciplined process … [to] get them contained, controlled, and then transported."[391] And even if it were necessary to momentarily hogtie Kenneth for a "split second," the officers continued to hogtie him, compress his chest, and force his face into the gurney for a quarter hour after removing him from the cell.

 *Pratt* follows the same distinctive line of reasoning. The critical difference remains "that Gutierrez" – unlike the *Pratt* deceased – "had told the arresting officers he was on drugs." *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 182 (5th Cir. 2016). "[T]he officers who hog-tied Pratt were unaware of his use of drugs." *Id.* at 184. And Pratt, unlike Kenneth, "broke free from the officers' grips, and kicked at officers attempting to restrain him (eventually kicking one officer in the groin twice)." *Id*. Finally, like the detainee in *Khan*, but unlike Kenneth, "Pratt was only restrained for a very brief period" – not a quarter hour as he begged "I can't breathe." *Id*.

 The officers' argument that Kenneth was not "hog-tied" because officers' muscles (as opposed to a "rope," "string," or "whatever") connected the handcuffs to the leg-irons, is

---

[391] **Ex. 4** (Sheriff Garcia dep.) at 168:6-14.

particularly unavailing. The Supreme Court rejected a similar argument in *Hope v. Pelzer*. There, prison officers who handcuffed a man to a "hitching post" for seven hours argued that clearly established law only prohibited "handcuffing inmates to [a] fence … for long periods of time." 536 U.S. 730, 742 (2002). Adopting this type of reasoning, which the officers advocate, "exposes the danger of a rigid, over reliance on factual similarity," which the Supreme Court explicitly rejected. *Id.* at 742. "[T]he very action in question" need not have been previously deemed "unlawful" to deny officers qualified immunity. *Id.* at 739. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. Indeed, "earlier cases involving fundamentally similar facts" – like *Gutierrez* and the robust consensus of persuasive cases – "can provide especially strong support for the conclusion the law is clearly established." *Id.* at 741. Both the DOJ findings letter and the County's written – but unenforced – prohibition on hogtying detainees also informed the officers their conduct was illegal. *Id.* at 744-45 (considering prison policy and DOJ findings letter as source of notice to officers). Even Harris County's written description of hogties recognizes the technique is prohibited when "the employee connects the hand restraints and the leg/feet restraints *in any manner*."[392] That it was officers' muscles instead of a chain or rope contorting Kenneth's body is of no constitutional significance.

The Fifth Circuit applies the standard "as it existed at the time of the conduct in question" for measuring excessive force retrospectively in assessing the state of "clearly established law." *Rankin v. Klevenhagen*, 5 F.3d 103, 107 (5th Cir. 1993). Thus, the Court should apply the old,

---

[392] **Ex. 23** (HCSO Policy # CJC-307 "Use of Force") at Bates LUCAS 1890. *See also* **Ex. 4** (Sheriff Garcia Dep.) at 158:22-24 ("Q: [I]f you connect the hands and legs, according to this definition, you have a hogtie, right? A: Yes").

pre-*Kingsley* pre-trial detention excessive force standard only in assessing the "clearly established law prong" of the qualified immunity test. *Id*. The Court should apply the law as it exists today – the "objective reasonableness" standard – when determining if the officers violated Kenneth's constitutional rights. *Id.* at 108. Only then should the Court turn to the pre-*Kingsley* standard to determine if the illegality of the officers' conduct was "clearly established." In other words, the first prong of Plaintiffs' claim – whether Kenneth's constitutional rights were violated – is made with reference to current "objective reasonableness" law, applied retroactively. Only the second prong, whether the officers' actions were "objectively reasonable" with reference to Kenneth's "clearly established" rights in February 2014 applies the old standard. *See Morrissey v. King*, 2014 WL 4802436, *4 (N.D. Tex. Sept. 26, 2014).

But even under the old, more demanding standard, the officers are not entitled to qualified immunity. The Fifth Circuit addressed virtually identical facts in *Kitchen v. Dallas County, Texas*, 759 F.3d 468 (5th Cir. 2014) shortly after the officers killed Kenneth, under the pre-*Kingsley* standard. In *Kitchen*, officers pulled a delusional pretrial detainee who was "banging his head against the bars" from his cell. *Id.* at 475. When officers entered the cell, the inmate "turned around abruptly and raised his hands" as if to fight, and the officers "physically brought the deceased down onto the floor" before restraining him in handcuffs and leg-irons. *Id*.

> While still lying on the floor shortly after being restrained, the deceased became unresponsive, stopped breathing, and died. According to the autopsy report, the death was a homicide caused by 'complications of physical restraint including mechanical asphyxia' due to 'neck restraint during struggle' and the fact that 'one officer was kneeling on the decedent's back during restraint. Other factors included 'physiologic stress,' and 'morbid obesity and cardiomegaly.'

*Id*. The officers were not entitled to qualified immunity. *Id*.

Perhaps recognizing the power of *Kitchen*, the officers only attempt to distinguish it by weakly arguing that the "major difference between the cases is that in the *Kitchen* case there was no video evidence actually showing the events during the Kitchen incident." Doc. 145, p. 35. But the existence of a videotape here only objectively *confirms* the similarity of the facts in this case to the facts the Circuit found did not warrant summary judgment or qualified immunity in *Kitchen*. A jury could conclude the officers' actions were sadistic and malicious – Officer Scott even testified that stopping a detainee from breathing did not constitute excessive force:

> Q: Do you agree that it is excessive force to place someone in a position where they can't breathe or have difficulty breathing?
>
> A: No, I do not.[393]

### 2. THE OFFICERS, DR. SUNDER, AND NURSE O'PRY VIOLATED KENNETH'S RIGHT TO RECEIVE MEDICAL ATTENTION

#### a.   The Individuals Denied Kenneth Medical Attention

The Fourteenth Amendment also protects pretrial detainees from jail officials' deliberate indifference to their serious medical needs. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998). "Deliberate indifference" requires the jail official must both (1) know about the inmate's serious medical condition, and (2) disregard a substantial risk to the inmate. *See, e.g.*, *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). "An express intent to inflict unnecessary pain is not required." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

A "serious medical need" includes any condition "so obvious that even a lay person would easily recognize the necessity of a doctor's attention." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (citing *Monmouth Cty Corr. Institution Inmates v.*

---

[393] **Ex.** 6 (Scott dep.) at 14:5-15 (objections omitted).

*Lanzaro*, 834 F.2d 326, 247 (3rd Cir. 1987)); *see also Stewart v. Guzman*, 555 F.App'x. 425, 431 (5th Cir. 2014) (citing *Lewis v. Evans*, 440 F.App'x. 263, 264 (5th Cir. 2011)). And a prisoner's death is, at the very least, evidence for a jury his medical problem was objectively "serious." *Gonzalez v. Cecil Cty., Md.*, 221 F.Supp.2d 611, 616 (D. Md. 2002). Whether the defendants knew about the serious danger Kenneth faced "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994).

Here, the officers, Dr. Sunder, and Nurse O'Pry each denied Kenneth emergency medical attention. During an emergency, even short delays can violate detainees' constitutional rights. After a violent cell extraction, failing to "call for medical assistance" to actually examine a detainee for even a short period of time can violate his right to receive emergency medical attention. The Eleventh Circuit denied qualified immunity to jailers in a factually similar case – a detainee stopped breathing and was ignored for fourteen minutes after a violent cell extraction. *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005). "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes. … When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Id.* at 1273.

Officers Thomas and Leveston admit they heard Kenneth gasp "I can't breathe," and the video shows they did nothing to assist him. Thomas candidly admits that when he heard Kenneth

say "I can't breathe," that "I didn't do anything."[394] Likewise, Bell and Gordon told other officers they heard "I can't breathe" at the debriefing immediately after learning Kenneth died (but later denied hearing "I can't breathe" at their depositions).[395] The video shows Kenneth's eyes roll back as he foams at the mouth[396] while Kneitz, the videographer, does nothing. When asked "did any officer do anything to make sure that [Kenneth] could in fact breathe?" Officer Thomas responded "no, we did not."[397] Though Gordon and Scott's motion (Doc. 150, p. 14) states they "moved out of the way to allow the medical staff to treat [Kenneth]," the video shows them doing nothing of the sort until Kenneth was already dead.[398] Objective evidence suggests all the officers knew Kenneth was suffering a "serious medical condition" but responded with indifference.

Likewise, because the video clearly shows Kenneth saying "I can't breathe" at least twice, and clearly call for "help!" twenty-five times, a reasonable jury could conclude the other officers (Scott and Green) knew he was in distress as well. And a jury could conclude that if Thomas and Leveston (as well as Lt. Anderson) heard "I can't breathe," the other officers must have as well. Indeed, the evidence demonstrates all the officers discussed Kenneth's plea for help during their debriefing.

---

[394] **Ex. 10** (Thomas Dep.) at 59:2-3.

[395] *Compare* **Ex. 10** (Thomas Dep.) at 98:1-6 *with* **Ex. 8** (Leveston Dep.) at 47:8-24 and **Ex. 10**, (Thomas Dep.) at 103:13-20 *with* **Ex. 7** (Gordon Dep.) at 13:5-9 and **Ex. 14** (Bell Dep.) at 11:5-9. Gordon and Scott also deny hearing "I cannot breathe" in their motion. Doc. 150, p. 15.

[396] **Ex. 2-A** (video) at 20:18.

[397] **Ex. 10** (Thomas Dep.) at 66:5-7.

[398] **Ex. 2-A** (video) at 16:28 (Green standing between Dr. Sunder and videographer Kneitz).

A jury is not required to accept the officers' self-serving statements that they did not appreciate the severity of Kenneth's condition. A jury could, for example, disregard Leveston's testimony that "if you're talking, you're breathing"[399] by watching Kenneth's breath become more labored as he actually stops talking.[400] A jury could conclude the officers were all subjectively aware Kenneth "can't breathe" – Officers Leveston, Thomas, and Lt. Anderson even admit they heard Kenneth's two exclamations he "can't breathe" and a jury could certainly believe all the officers heard at least one of his twenty-five calls for "help!" One of the officers callously tells Kenneth he will be able to breathe if he just "relaxes" – while three officers push down on Kenneth's chest or sit on him.[401] "If the risk [of harm] is obvious … we may infer knowledge." *Stewart*, 555 Fed. App'x at 431 (citing *Easter*, 467 F.3d at 463). The Supreme Court specifically rejected the defendants' argument in *Farmer* – if an officer's testimony "I didn't know he was sick" was always sufficient, the Eighth and Fourteenth Amendments' protections would have no content because the officers' testimony would always be dispositive. *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, including inference from circumstantial

---

[399] **Ex. 8** (Leveston Dep.) at 47:14-18, 95:16-19.

[400] *Compare* Doc. 145, pp. 46 (Leveston: "I heard [Kenneth] say that he could not breathe but at the time he said that he was still resisting, talking and moving around which indicated to me that he was in fact breathing), p. 47 (Green: "[Kenneth] was resisting, struggling and often talking much of the time until the doctor began CPR so I did not believe he had any problem"), p. 48 ("[Kenneth] was talking and cursing and struggling most of the time so I did not believe he actually had a problem until the doctor told the nurse to begin CPR"), p. 49 (Thomas: "I did hear [Kenneth] once say 'I can't breathe.' However, he was … talking and struggling most of the time so I did not believe he actually had a problem breathing until they began CPR"), p. 50 (Kneitz: "I did not hear [Kenneth] say 'I can't breathe.' [Kenneth] was talking and cursing and struggling much of the time") *with* **Ex. 2-A** (video) at 16:57-28:38 ("I cannot breathe" to when rescue breathing begins).

[401] **Ex. 2-A** (video) at 17:17.

evidence"). And here, as described above, everyone who claims they did not hear "I can't breathe" testified that, if they had heard the exclamation, they would have reacted immediately – because they knew someone who "can't breathe" could die.[402]

The officers' reliance on *Sibley v. Lemaire* is unavailing. In *Sibley*, where a severally mentally ill inmate "pluck[ed] out his [own] eyes," there was "no suggestion of any potentially self-harming behavior" prior to the tragic self harm. 184 F.3d 481, 484 (5th Cir. 1999). Though the inmate's behavior was "erratic" and "bizarre," the jail officials had no reason to believe he would harm himself in such a grotesque fashion. *Id*. "There [was] no evidence in the record that anyone communicated to [jail officials] information that might lead them to think [the inmate] posed a risk to himself." *Id*. at 485. The *Sibley* officers "could have only concluded" the inmate was not a threat to harm himself because there was no evidence that he would. The facts are much different here, where Kenneth told the officers "I can't breathe," then involuntarily stopped breathing when they ignored him.

Here, there is substantial evidence each officer, the doctor, and the nurse knew of the severe danger to Kenneth and that he required immediate medical attention. A jury could determine every Defendant heard Kenneth say "I cannot breathe" in the clinic – the video clearly captured his lamentation, and an officer actually responded by telling him "you relax, and you'll be able to breathe."[403] When Kenneth exclaimed "I cannot breathe," Nurse O'Pry "was standing

---

[402] **Ex. 6** (Scott dep.) at 18:13-16 ("if the inmate itself said they were – they couldn't breathe or we noticed that they could not breathe, then we would stop doing whatever was transpiring"). *See also* Doc. 150, p. 37 (Gordon and Scott's motion: "If [Defendants Gordon and Scott] had heard [Kenneth] say he couldn't breathe at any time, or observed him gasping, each would have evaluated the validity of his claim and used their judgment and discretion to the extent of ordering the [team] to release their hold and turn [Kenneth] over immediately").

[403] **Ex. 2-A** (video) at 16:59.

right in front of his face."[404] The officers' allegedly exhaustive training told them hogties were dangerous and prohibited. *See, e.g., supra* n. 115. p. 27. When the individuals ask the Court to conclude as a matter of law that they did not grasp the gravity of the situation, they require the fact finder to disregard everything they learned in their alleged training to assess their subjective knowledge. The Fifth Circuit rejects this approach: "training making [officers] aware of the potential danger" can allow a jury to decide the risk was obvious. *Blackmon v. Garza*, 484 Fed. App'x 866, 873 (5th Cir. 2012).

Delaying a prisoner's access to medical care violates his Fourteenth Amendment rights when the delay results in "substantial harm." *See*, *e.g.*, *Easter*, 467 F.3d at 464 (delaying care for "chest pain" for several hours, though the prisoner survived). As the Supreme Court makes clear, deliberate indifference to an inmate's serious medical need is manifest when "prison guards . . . intentionally deny[] or delay[] access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). In an obvious emergency, minutes become unconstitutional delay. *See*, *e.g.*, *Bozeman*, 422 F.3d at 1273 (delaying care after violence cell extraction); *Stewart*, 555 F.App'x at 432 (delay during asthma attack). Indeed, when Officer Thomas heard Kenneth gasp "I cannot breathe" he knew people who cannot breathe "can possibly die."[405]

Though the officers took Kenneth to the clinic after the cell extraction, they did nothing to ensure he actually received care once he arrived. They did not tell Dr. Sunder or Nurse O'Pry that Kenneth had begged for "help!" or exclaimed "I can't breathe." No one said anything approaching "This man needs a doctor!" The officers did not encourage Sunder and O'Pry to

---

[404] **Ex. 10** (Thomas dep.) at 66:18.

[405] **Ex. 10** (Thomas dep.) at 93:6-10.

examine their patient as these medical professionals lollygagged and ignored Kenneth during the emergency. In fact, the officers even continued to press down on Kenneth's chest in the presence of the medical staff. Even as Kneitz recorded Kenneth foam at the mouth and his eyes roll back into his skull,[406] he does not alert Sunder and O'Pry that Kenneth's condition is rapidly deteriorating in front of his face.

Sunder and O'Pry's conduct is equally callous. Their medical training includes subjective knowledge placing a patient in a prone position and compressing his chest is very dangerous. Ex. 16 (Dr. Cohen rep.) p. 8, ¶ 27; *See Monceaux v. White*, 266 Fed. App'x 362, 366 (5th Cir. 2008) (jury could infer nurses' knowledge of infection based on their training and experience); *McCollum v. Livingston*, 2017 WL 608665, *13 (S.D. Tex. Feb. 3, 2017). O'Pry acknowledged Kenneth was in distress from the moment she saw the officers wheel his prone body into the clinic. Though O'Pry testified at her deposition that "I asked for [Kenneth] to be rolled over," the video tells another story.[407] (Of course, if O'Pry's testimony were true but somehow not recorded on the video, then the officers denied Kenneth medical attention when they refused to follow her directions.) Sunder and O'Pry recognize deliberate indifference can include "ignoring [a detainee's] complaints" – which a reasonable jury could conclude is exactly what the video shows they did when Kenneth gasps "I cannot breathe." Doc. 146 & 147, p. 15 (citing *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). The Fifth Circuit considered similar facts in *Easter v. Powell* – where a nurse ignored an inmate complaining of chest pains – and denied the nurse qualified immunity. 467 F.3d 459, 464 (5th Cir. 2006) ("refus[ing] to

---

[406] **Ex. 2-A** (video) at 20:18.

[407] *Compare* **Ex. 17** (O'Pry dep.) at 156:24-157:5, 158:13-20 *with* **Ex. 2-A** (video) at 18:00 (Nurse O'Pry: "Would it be better for y'all if we rolled him over and … okay, never mind.").

provide any treatment, and ignor[ing] the complaints of, a patient suffering from severe chest pain … meets the 'deliberate indifference' threshold" – even where the prisoner survived with minimal injuries).

Likewise, without checking his vital signs – which Dr. Hall opined would have revealed Kenneth "required medical intervention"[408] – they injected him with a sedative (Ativan). The Ativan was ordered seconds after Kenneth arrived in the clinic – well before Dr. Sunder or Nurse O'Pry even attempted to check Kenneth's respiration.[409] For someone with compromised respiration, Ativan "was a completely inappropriate medication," according to Dr. Hall, because it also "can decrease a person's drive to breathe."[410] Even if Ativan were appropriate to treat Xanax withdrawal (*see* Doc. 146, p. 16), using the drug was dangerous for a patient with compromised respiration. While the officers likely killed Kenneth before the Ativan could take effect (as there was none found in his blood at autopsy), the fact Dr. Sunder and Nurse O'Pry administered it demonstrates their indifference as it is a medication well-known to suppress respiration that was administered to a patient complaining "I cannot breathe." Dr. Sunder never checked Kenneth's respirations before ordering the Ativan, or until several moments after he stopped breathing. Under some circumstances giving Kenneth the Ativan was an appropriate

---

[408] **Ex. 13** (Dr. Hall rep.) at 3.

[409] **Ex. 2-A** (video) at 15:42 (Dr. Sunder: "Give him 2 dose of Ativan, 4 milligrams" and Nurse O'Pry: "4 milligrams of Ativan now!").

[410] **Ex. 13** (Dr. Hall rep.) at 3. Even if the Ativan were appropriate treatment for Xanax withdrawal, it created a "deadly combination" with Kenneth's "preexisting hypoxia" caused by the officers hogtying him and compressing his chest). Likewise, even if the Ativan never had the chance to take effect, the act of injecting Kenneth with a sedative demonstrates the medical providers' indifference because they gave a drug that compromised "the drive to breathe" to a person who was already telling them "I cannot breathe."

treatment – but not here where Kenneth was begging "I cannot breathe" as the injection was prepared.

Instead, Kenneth's eyes roll back into his skull and he foams at the mouth – objectively serious symptoms – in the clinic, before the eyes of the indifferent doctor and nurse.[411] Even as Kenneth relaxes and his minimal movement ends, neither provider ever says a word to him. Though Kenneth says "I cannot breathe" and begs "please, just let me go" while in the clinic, neither Dr. Sunder nor Nurse O'Pry bother to check his respiration until it is too late.

### b.  The Individuals are Not Entitled to Qualified Immunity

The individual defendants clearly denied Kenneth medical attention during the crucial ten minutes after he arrived in the clinic – when the "dying process" began "full swing"[412] – until Dr. Sunder finally examined him. Detainees' rights to receive medical attention under these circumstances is clearly established – "the assumed circumstances here are stark and simple, and the decisional language … obviously and clearly applies to these extreme circumstances: the officers knew [a detainee] was unconscious and not breathing and – for fourteen minutes – did nothing." *Bozeman*, 422 F.3d at 1274. This is a clearly established, objectively unreasonable denial of a detainee's right to receive emergency medical attention. *Easter*, 467 F.3d at 463 ("The mere delay of medical care can also constitute an Eighth Amendment violation but only if there has been deliberate indifference that results in substantial harm") (internal citations omitted).

---

[411] **Ex. 2-A** (video) at 20:18.

[412] **Ex. 13** (Dr. Hall rep.) at 3.

101

That the officers had brought Kenneth to the clinic does not matter, because a jury could conclude the officers still knew Kenneth was not receiving any actual medical attention. (Obviously, his mere presence in the clinic does not help Dr. Sunder or Nurse O'Pry's argument at all). *See Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (knowledge detainee is receiving "blatantly inappropriate" treatment sufficient to create deliberate indifference); *Perry v. Meade*, --- Fed. App'x ----, 2018 WL 1494823, *2 (4th Cir. Mar. 27, 2018) (denying motion to dismiss based on qualified immunity where doctors examined patient but his "condition deteriorated to the point that he required hospitalization"); *Brown v. Lamanna*, 304 Fed. App'x 206, 208 (4th Cir. 2008) (reversing order granting prison officials qualified immunity where officials "contacted prison medical staff" about inmate's complaints, but nothing more).

Defendants are not entitled to qualified immunity on the denial of medical care claims.

### 3.   THE INDIVIDUAL DEFENDANTS' BYSTANDER LIABILITY

The officers, Dr. Sunder, and Nurse O'Pry are also liable to the Plaintiffs for standing by and doing nothing as they heard Kenneth suffer and die. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). *See also Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (bystander liability for excessive force); *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (same); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988).  Bystander liability may be established where an officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 480 (5th Cir. 2014). Plaintiffs' evidence satisfies each element.

102

First, each of the individual Defendants knew the officers were using excessive force to restrain Kenneth. Each officer was present through the entire ordeal (which Kneitz recorded on video). Dr. Sunder and Nurse O'Pry watched the officers wheel Kenneth into the clinic[413] and heard Kenneth beg, "I cannot breathe," less than ninety seconds later.[414] Everyone knew hogtying was dangerous and prohibited, but watched as the technique killed Kenneth.

Kneitz's conduct is especially shocking. As the videographer, he recorded the entire ordeal. As the officers restrain Kenneth facedown in the basic hogtie position, shortly after telling the officers in the clinic "I cannot breathe," Kneitz aims the camera directly at Kenneth's face as he gasps involuntarily, begins to foam at the mouth, and his eyes roll back into his skull.[415] Kneitz – who undoubtedly saw this gruesome scene in his camera's digital viewfinder – merely kept recording, without even saying a word to the officers, nurse, or doctor.

Second, each of the individuals had a reasonable opportunity to intervene to stop Kenneth's death. The officers who admitted at their depositions to hearing Kenneth gasp "I can't breathe" (Leveston and Thomas) did nothing even after hearing his cry.[416] The video shows one officer tell Kenneth "relax and you'll be able to breathe" even as Green, Leveston, and Scott are all still pushing down on Kenneth's chest and legs.[417] Instead, the officers exert more pressure, and do not let up or reposition Kenneth (or even discuss the possibility of doing so).

---

[413] **Ex. 2-A** (video) at 15:30.

[414] **Ex. 2-A** (video) at 16:54.

[415] **Ex. 2-A** (video) at 20:18.

[416] Officers testified that during the "debriefing" immediately after Kenneth died, Gordon mentioned he heard Kenneth gasp "I can't breathe," but Gordon denied hearing "I can't breathe" when he was deposed.

[417] **Ex. 2-A** (video) at 16:59-17:14.

103

Gordon's conduct is especially callous. Gordon's responsibility during the extraction was to ensure Kenneth's "safety" – he was not tasked with restraining any body part, his role was simply to observe, command, and watch for hazards. Gordon initiated the extraction by throwing open the cell door and commanding the officers to rush in, and was "in charge" of the team until Kenneth's death. If anyone had "a reasonable opportunity to prevent the harm, it was Gordon.

Likewise, the video shows Dr. Sunder standing next to the gurney seconds before Kenneth exclaims "I cannot breathe," but he does nothing. The video shows Nurse O'Pry surmise – without actually examining Kenneth – that he has stopped moving not because he was dying, but because "he's realized that [the officers are] not gonna move" off of his body, after moments earlier explaining "my Ativan's not that good" to guess why Kenneth became motionless.[418] When Dr. Sunder finally does ask the officers to first "loosen him up just a smidge"[419] then at last to "turn him around" off his chest[420] the officers comply. If Dr. Sunder and Nurse O'Pry had actually examined their patient earlier – perhaps when they heard him gasp "I cannot breathe" – Kenneth would have survived as the officers eventually followed the medical providers' directions.

Third, a reasonable jury could infer the individual defendants deliberately chose not to act to save Kenneth's life. There is no evidence that anything other than their indifference prevented the individuals from stopping the assault on Kenneth or attempting to relax the pressure on his

---

[418] **Ex. 2-A** (video) at 22:27 and 25:10.

[419] **Ex. 2-A** (video) at 22:47.

[420] **Ex. 2-A** (video) at 22:56.

back that was killing him. The officers testified that once Kenneth was on the gurney, minutes before the first "I can't breathe," he was "under control."[421]

Again, the facts in *Kitchen* are nearly identical. A group of officers entered a cell, assaulted a pretrial detainee, dragged him out of his cell, and restrained him until he died. *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 475 (5th Cir. 2014). Granting qualified immunity to the officers on these facts was inappropriate under the bystander theories. *Id*. The law in the Fifth Circuit was clearly established at the time Kenneth died that officers who stand by and allow constitutional violations to occur would also be liable for any resulting injuries. *Id*.; *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

### 4.   SUPERVISORY LIABILITY (OFFICER GORDON ONLY)

A supervisor, like Gordon, can be liable when either (1) "he affirmatively participates in the acts that cause the constitutional deprivation," or (2) "acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). Gordon's actions satisfy both theories.

First, as the "team supervisor," Gordon directed the officers' actions. *See* Doc. 150, p. 14 (Gordon's motion: "Gordon gave the order for the [team] to enter the cell and restrain [Kenneth]"). It was Gordon's decision to place Kenneth prone on the gurney in the basic hogtie position rather than simply walk him to the clinic.[422] It was also Gordon's decision to continue to keep restraining Kenneth in the clinic – even after he gasped "I cannot breathe" the second

---

[421] *See supra* at Part II.F.2.

[422] **Ex. 19** (Thomas Dep.) at 48:14-49:21; **Ex. 12** (Ritchie dep.) at 36:8-37:21, 38:7-39:1.

time.[423] Though he may have never touched Kenneth, Gordon directed his subordinates' actions, and was plainly "affirmatively participating" in the constitutional violation.

Second, Gordon also witnessed his subordinates violating Kenneth's constitutional rights, but stood by and did nothing. Gordon is present throughout the ordeal – from throwing Kenneth's cell door open as his team charges in, to observing Kenneth's face shortly after he made his last, unintelligible gasp.[424] For a quarter hour, Gordon watched his subordinates hold Kenneth facedown in a "basic hogtie position" while compressing Kenneth's chest. Even when Kenneth became "calm" and "relaxed," Gordon did not tell his subordinates to let up.[425] Thus, Gordon acted (or failed to act) with deliberate indifference to the excessive force and denial of medical attention taking place before him.

Supervisory liability has long been "clearly established" in the Fifth Circuit. *See, e.g.*, *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 256-57 (5th Cir. 2005).

## B. THE COUNTY'S POLICY, PRACTICE, OR CUSTOM VIOLATED KENNETH'S FOURTEENTH AMENDMENT RIGHTS

The County's policy, practice, and training instructed the officers to restrain Kenneth in a "basic hogtie position," compress his chest, and ignore his cries for help. *Supra* Parts II.B.-J.. Thus, the County is not liable to the Plaintiffs under a *respondeat superior* theory, but because Harris County's policymakers deliberately selected policy options that violated Kenneth's Fourteenth Amendment rights and caused his death. *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978). A municipality will be liable for violating citizens' civil rights

---

[423] **Ex. 5** (Anderson dep.) at 131:24-132:3.

[424] **Ex. 2-A** (video) at 4:49 and 18:18.

[425] *See* **Ex. 9** (Green dep.) at 162:19-163:5; *see also* **Ex. 2-A** (video) at 24:50-25:00.

when: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Jauch v. Choctaw Cty, Miss.*, 874 F.3d 425, 435 (5th Cir. 2017). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent as to practically have the force of law." *Hicks-Fields v. Harris Cty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017).

Even if an officer is granted qualified immunity because the law was not "clearly established" at the relevant time, a municipality can still be liable for violating civil rights that were not "clearly established." *Montano v. Orange Cty., Tex.*, No. 1:13-CV-611, 2015 WL 11110596, at *2, n.5 (E.D. Tex. Apr. 13, 2015), *aff'd in part*, *vacated in part*, *remanded*, 842 F.3d 865 (5th Cir. 2016).

Element one – the "official policies" – are addressed below. Unconstitutional conditions of confinement and episodic acts and omissions resulted from the following Harris County policies, practices, and customs:

1.    Using the "basic hogtie position" with chest compressions during cell extractions;

2.    Keeping detainees in the prone, face-down position on the gurney;

3.    Not requiring medical providers observe the extraction and transport;

4.    Enforcing a "code of silence" that ignored complaints by a restrained detainee until the detainee was "entirely incapacitated";

5.    Failing to define prohibited force (like a "hogtie");

6.    Failing to consult with medical providers before and during a cell extraction.

As to element two, it is well-settled that Texas county sheriffs, like Sheriff Garcia, are policymakers for purposes of operating the county jail. *Colle v. Brazos Cty., Tex.*, 981 F.2d 237,

244 (5th Cir. 1993). "Because the sheriff sets the goals for the county and determines how they will be achieved, a governmental unit such as [the] County can be held accountable for the illegal or unconstitutional actions of its sheriff." *Morris v. Dallas Cty., Tex.*, 960 F.Supp.2d 665, 684 (N.D. Tex. 2013) (Kinkeade, J.) (citing *Colle*, 981 F.3d at 244). Here, there is no dispute Sheriff Garcia was aware of the relevant practices – he personally observed and failed to correct the training, and knew it was highly likely his officers would use this dangerous restraint technique. Unlawful policies include policymakers' "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure" of the County. *ODonnell v. Harris Cty., Tex.*, 882 F.3d 528, 538 (5th Cir. 2018) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

As to element three, the County's practice of restraining detainees prone in the hogtie position then compressing their chest was the moving force behind the violation of Kenneth's constitutional rights. The County's practice of restraining detainees dangerously during cell extractions in the basic hogtie position caused Kenneth to suffer from excessive force. *See Valle v. City of Houston*, 613 F.3d 536, 546-47 (5th Cir. 2010) (deficient officer training sufficient "moving force" causation). Even Sheriff Garcia agreed that "the practice and technique of hogtying [and positional asphyxia] are routinely seen as one contributing to the other, and so that is why hogtying is prohibited."[426]

A County jail's policies can violate a pretrial detainee's rights in two ways: by creating a dangerous "condition or confinement" or by officers following policy during an "episodic act or

---

[426] **Ex. 4** (Sheriff Garcia dep.) at 48:16-22.

omission." *Shepherd v. Dallas Cty., Tex.*, 591 F.3d 445, 452 (5th Cir. 2009). Plaintiffs' evidence here satisfies both theories.

### 1. CONDITIONS OF CONFINEMENT LIABILITY: HARRIS COUNTY POLICIES AND PRACTICES CREATED A DANGEROUS CONDITION IN THE JAIL

"Conditions of confinement" liability is rooted in pretrial detainees', like Kenneth, "right to be free from punishment." *Montano v. Orange Cty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016) (citing *Bell v. Wolfish*, 441 U.S. 520, 534 (1979)).

> A condition is usually the manifestation of an explicit policy or restriction ... In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice. … [T]o constitute impermissible punishment, the condition must be one that is arbitrary or purposeless or, put differently, not reasonably related to a legitimate goal.

*Shepherd v. Dallas Cty., Tex.*, 591 F.3d 445, 452 (5th Cir. 2009) (internal citations omitted). A "conditions of confinement" plaintiff thus must prove existence of "(1) a rule or restriction, an intended condition or practice, or a de facto policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated his constitutional rights." *Edler v. Hockley Cty. Com'rs Ct.*, 589 Fed. App'x 664, 668 (5th Cir. 2014).

First, the officers' use of force was plainly "the manifestation of an explicit policy" – they were trained to place detainees in a hogtie position during a cell extraction, to compress their chests for as long as they "resisted," and to ignore cries for help (even if they were obese and suffered from heart conditions). *See supra* Parts II.B.-J. The officers here were not rogue actors: they were doing "A"-grade work according to the County. Though the County's written policy prohibited hogties, the *de facto* policy the officers were actually trained to follow required

109

them to restrain detainees prone in a "basic hogtie position" during cell extractions. "A formal, written policy is not required to establish a 'condition or practice.'" *Montano*, 842 F.3d at 874. A "de facto policy" can be "reasonably inferred through a county-commissioned report, a United States Department of Justice report, jail officials' affidavits, and other documentary evidence" – all of which exists here. *Montano*, 842 F.3d at 875. Plaintiffs plainly are "attacking general policies of the jail." Doc. 152, p. 97.

Simply stated, Harris County's intent to impermissibly punish Kenneth "may be inferred from [its] decision to subject pretrial detainees to an unconstitutional punishment." *Montano*, 842 F.3d at 874 (citing *Shepherd*, 591 F.3d at 452). Hogtying and sitting on a detainee while he begs "I can't breathe" serves no legitimate governmental purpose – and is certainly grossly disproportionate to any need to use force that ever existed in this case. "A showing of express intent to punish is not required," and "such intent may be presumed where a policy is otherwise senseless." *Shepherd*, 591 F.3d at 454. The policy is reviewed objectively. "[J]ail officials individual states of mind" including "deliberate indifference," "are not a disputed issue in [conditions of confinement] cases." *Shepherd*, 591 F.3d at 454.

> A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. … [E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.

*Shepherd*, 591 F.3d at 454-55 (citing *Hare*, 74 F.3d at 644-45). Here, there is no dispute the officers acted completely as Harris County trained them. Though Harris County prohibited hogties on paper, the officers' supervising lieutenant (Anderson), Dr. Sunder, and numerous

unidentified bystanding officers on the video did not object when they saw the officers subduing Kenneth in a "basic hogtie position."[427]

That other detainees were not *killed* by the County's dangerous *de facto* policy and dangerous training is irrelevant. A policy of violating constitutional rights can be established either through "deliberate indifference [to other incidents] *or* knowledge on the part of the Sheriff" of a specific practice or policy. *Burge v. St. Tammany Parish*, 336 F.3d 363, 371 (5th Cir. 2003) (emphasis added). Other incidents are only necessary (1) to establish the challenged policy existed, or (2) to show policymakers should have known about the dangerous condition. It is knowledge by the policymakers that is the "*sine qua non* of municipal liability." *Burge*, 336 F.3d at 370. "[P]ractices and customs," unlike well-known *de facto* policies or training, create liability because "they fester over time and are so commonplace to put policymakers on notice." *Staten v. City of Carrollton, Tex.*, 2012 WL 13028096, *8 (N.D. Tex. Nov. 26, 2012) (Solis, J.). Thus, even when there is only a single reported incident, when the officers are affirmatively trained to use unlawful force, an unlawful policy exists. *Staten v. City of Carrollton, Tex.*, 2012 WL 13028096, *9 (N.D. Tex. Nov. 26, 2012) (deposition testimony that officers were trained to use "takedown" technique sufficient to create fact dispute regarding existence of official policy).

As the County's authority recognizes, municipal liability is created by both "written policy statements, ordinance, or regulations" or "a widespread practice that is so common and well-settled as to constitute custom that fairly represents municipal policy." *Peterson v. City of Ft. Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). The municipal liability claims failed in

---

[427] The Caucasian woman seen supervising the officers throughout the cell extraction is Lt. Anderson. *See*, *e.g.*, **Ex. 2-A** (video) at 13:35. *See also id*. at 11:40 (bystanding officers), 11:48 (same),

*Peterson*, however, only because "there [was] no official written or otherwise specifically articulated policy," while there is no doubt both conditions are satisfied here. *Cf. Peterson*, 588 F.3d at 847. The *Peterson* plaintiff, instead, relied on "a pattern of excessive force" by the police department during arrests, and his evidence was insufficient to prove unjustly assaulting suspects was "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id*. at 850 (citing *Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) (en banc)). The purpose of this "widespread practice" evidence, however, is to demonstrate "actual or constructive knowledge … attributable to the governing body." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Though there are no other known "basic hogtie position" *deaths* in the Harris County Jail, there is no dispute that using the technique was the County's official practice, known to the policymaker (Sheriff Garcia). The Department of Justice had even cautioned Sheriff Garcia against it. Sheriff Garcia knew the "basic hogtie position" was how inmates were removed from their cells in the Harris County jail – he even personally observed the officers' training to use the technique. *Supra* n. 213. The testimony is undisputed that the officers acted pursuant to policy and their training – instructions the policymakers had actual (or constructive) knowledge of.

Thus, specific examples of "other instances of detainees who suffered" "are not required to meet the 'condition or practice' element." *Montano*, 842 F.3d at 874. A jury could decide the County knowingly implemented a dangerous policy even without other detainees dying during restraint. Similar incidents can assist a plaintiff in establishing an unwritten policy exists, but are not the only possible source of proof. *Id.* at 876. Nor does the law demand similar injuries as the County suggests. Though a single incident "standing alone" can be sufficient to establish a *de facto* policy, that is not even the case here. Every officer testified the County's policy, practice,

and custom was to subdue detainees in the hogtie-type restraint used on Kenneth. *See, e.g.*, *supra* Part II.J. The "striking uniformity of the jail employees' testimony" is sufficient evidence of an unwritten policy or practice. *Id.* at 876.

But even if other examples were required, numerous such incidents occurred at the Harris County jail. Officers at the jail were disciplined 108 times for using excessive force (or failing to report excessive force) between January 1, 2008 and February 22, 2016.[428] On 108 occasions in just over eight years, Harris County officials confirmed inappropriate force was used. This is far more than the 27 sustained complaints in the entire City of Fort Worth (a city of over 850,000 people).[429] Likewise, during the same time period, 2,299 prisoners filed grievances alleging officers physically abused them (which the County did not later substantiate).[430] *Contra Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (eleven improper searches conducted by City of Houston police insufficient).

Second, using deadly force to subdue Kenneth was not related to any legitimate governmental objective. The only possible objective of forcibly removing Kenneth from his cell was to retrieve the broken smoke detector – all force after the fixture was retrieved was illegitimate. Officers Bell, Leveston, Green, Kneitz, and Thomas concede their "number one priority was to bring [Kenneth] under control and stop his disruptive behavior." Doc. 145, p. 42. If the legitimate purpose was to ensure Kenneth received medical attention for his Xanax

---

[428] **Ex. 30** (Use of Force Related Disciplinary Actions Against HCSO Jail Personnel) at Bates Nos. LUCAS 2024-25).

[429] U.S. Census Bureau, Quick Facts: Ft. Worth, Texas (available at: https://www.census.gov/quickfacts/fact/table/fortworthcitytexas/INC110216).

[430] **Ex. 30** (Harris County Grievance Table, Physical Abuse) at BATES LUCAS 2026.

withdrawal, using deadly force to do so was plainly inappropriate.[431] And a jury could easily conclude the officers took Kenneth to the clinic not because they were concerned for his welfare, but because the policy required them to document any injuries they may have caused.[432] Kenneth had voluntarily attended several medical appointments over the previous three days – and there is no evidence the officers even attempted to provide medical care to Kenneth without using force. *See also Saenz*, 224 F.Supp.3d at 486 (denying officer's motions for summary judgment where force was allegedly used to provide medical attention to detainee). A reasonable jury could easily conclude screaming "Pass it to me! Pass it to me!" is not "would you like to see a doctor?"

Third, as discussed above, a reasonable jury has ample evidence to the officers violated Kenneth's constitutional right to be free from excessive force. *Supra* Parts II.B.-I. Even if the Court were to decide the officers were entitled to qualified immunity (though they are not), the County would still be liable because whether or not Kenneth's rights were clearly established, hogtying Kenneth and compressing his chest while ignoring his cries for help was objectively unreasonable under *Kingsley. See also Kitchen*, 759 F.3d at 479-80.

Thus, a reasonable jury could find the "conditions of confinement" in the Harris County jail violated Kenneth's constitutional rights.

---

[431] Killing Kenneth in order to save him is "an implausible story deserving no credence." *Mosley v. Quarterman*, 2008 WL 656887, *6 n. 11 (N.D. Tex. Mar. 6, 2008) (citing unnamed American army major that "we had to destroy the village in order to save it" following destruction of Vietnamese village of Ben Tre).

[432] **Ex. 29** (Harris Cty. Academy Lesson Plan Mini Team Cell Extractions) at 10 ("Inmate will be immediately taken to the clinic and medically examined. Any injury to the inmate … will be evaluated and photographed."). *See also* Doc. 150, p. 6 (Gordon and Scott's motion: Kenneth "was removed from the cell to be transported to the medical clinic … as prescribed by Sheriff's Office training and protocol"); Doc. 152 (County's motion: policy requires "all inmates involved in a use of force even must be presented to Health Services … regardless if [sic] injury is sustained, claimed or not").

## 2. EPISODIC ACT OR OMISSION LIABILITY: THE OFFICERS' ACTIONS WERE CONSISTENT WITH POLICIES AND CUSTOMS OF HARRIS COUNTY

To establish Harris County's liability under an "act or omission" theory, the Plaintiffs must show "the complained of harm is a particular act or omission of one or more officials" then "point derivatively to a policy, custom or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). The plaintiff must first prove "an underlying constitutional violation" (here, excessive force and deliberate indifference to the need for medical care) and then "that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights." *Id.* (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).

First, ample evidence, discussed *supra* Parts II.B.-I., establishes the officers committed an "underlying constitutional violation" by restraining Kenneth in a "basic hogtie position," compressing his chest, sitting on him, and ignoring his cries for "help!" and pleas that "I can't breathe." Again, this does not require the officers to have violated law "clearly established" at the time – "objectively unreasonable" force under *Kingsley* will suffice. *Owen v. City of Independence*, 445 U.S. 622 (1980) (municipalities not entitled to qualified immunity). *See also Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir. 1993) ("While qualified immunity shield's a city's officers from damages caused by their transgressions of rights not 'clearly established' at the time of their conduct, the city itself is 'strictly liable' for all constitutional violations committed pursuant to its policies") (internal citations omitted); *Trent v. Wade*, 776 F.3d 368, 388 (5th Cir. 2015).

Second, Plaintiffs have "put[] forth facts sufficient to demonstrate that the predicate episodic act or omission" – here the excessive force – "resulted from municipal custom, rule, or policy adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights." *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997) (en banc) (emphasis in original). "Objective" deliberate indifference may be "premised on obviousness or constructive notice." *Id.* at 54 (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). A plaintiff can demonstrate objective deliberate indifference by showing "proof that a municipal actor disregarded a known or obvious consequence of his action." *Hobart v. Estrada*, 582 Fed. App'x 348, 357 (5th Cir. 2014) (citing *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010)).

In this case, the facedown "basic hogtie position" and chest compression "resulted from" the officers' explicit training. So did holding the detainee down until "complete incapacitation" while enforcing the "code of silence." A reasonable jury could conclude this training regimen was objectively indifferent to a serious risk of harm to Kenneth – the DOJ had warned the County five years earlier that hogtying detainees "exposes detainees to harm or risk of harm from excessive use of force."[433] *See Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (deliberate indifference is "know[ing] disregard[] [of] an excessive risk to inmate health or safety"). The DOJ even informed Sheriff Garcia that a detainee had died due to officers using dangerous force techniques.[434] But even if the DOJ had never explicitly warned Sheriff Garcia, the danger of restricting the breathing of an obese, hypertensive man then ignoring his pleas "I can't breathe" is obvious. Sheriff Garcia knew that hogtying detainees was dangerous because of

---

[433] **Ex. 3** (DOJ Report) at 16

[434] *Id.* at 15.

the risk of "positional asphyxia," which could result in death.[435] A jury could easily conclude that Sheriff Garcia's knowledge of the dangers from the "basic hogtie position," plus his personal observation of the cell extraction training, combined with his utter failure to stop his officers from using this dangerous technique constituted objective deliberate indifference by the County's policymaker.

### 3. FAILURE TO TRAIN LIABILITY: THE COUNTY TRAINED THE OFFICERS TO USE EXCESSIVE, DANGEROUS FORCE WITH THE FACEDOWN HOGTIE POSITION, CHEST COMPRESSIONS, AND THE "CODE OF SILENCE"

A County can also be liable when it failures to adequately train officers result in violations of constitutional rights. A Plaintiff proves a "failure to train" claim when "1) the county failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001). "[F]ailure to properly train may be a 'policy' if 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Morris v. Dallas Cty., Tex.*, 960 F.Supp.3d 665, 684 (N.D. Tex. 2013) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Even "a single decision not to train an individual officer" can create liability, and even when "there has been no pattern of previous constitutional violations." *Brown v. Bryan Cty., Okla*, 219 F.3d 450, 460 (5th Cir. 2000). When the "inadequacy of training [is] so likely to result in a violation of constitutional

---

[435] **Ex. 4** (Sheriff Garcia dep.) at 47:1-48:22.

117

rights" a municipality is "deliberat[ely] indifferen[t] to the rights of persons whom the police come[] into contact [with]." *Brown*, 219 F.3d at 459. "[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Plaintiffs easily satisfy these elements.

First, the County trained the officers to use a dangerous restraint technique. *See*, *e.g.*, Doc. 150, pp. 10 & 13 (Gordon and Scott's motion to dismiss: "Defendants … performed the cell extraction and transport of [Kenneth] in the manner in which they had been trained"). The U.S. Department of Justice warned the County that the hogtie technique its officers were using could kill pretrial detainees. Instead of eliminating the practice, however, the County misled the Justice Department and continued training its officers to affirmatively place detainees in the "basic hogtie position." *See supra* Parts II.C., II.J.

In a typical failure to train case, the municipality failed to provide training to refrain from certain conduct (do not shoot fleeing felons, for example, *City of Canton*, 489 U.S. at 390 n. 10). Harris County's conduct is worse because it taught officers to use prohibited force. Here, there is no dispute the officers did "receive[] extensive, scenario-based training from the Sheriff's Office on a monthly basis" that included "the manner in which [officers were] to transport a resisting [detainee] to the medical clinic after a cell extraction." Doc. 150, p. 5. The problem is the training actually instructed the officers to use a technique the County's policymakers knew was extremely dangerous (and potentially fatal). *See supra* n.115 (Sheriff Garcia knew hogtying could result in positional asphyxia). This is a case where "the highly predictable consequence of a failure to train would result in the specific injury suffered, and that a failure to train represented

118

the moving force behind the constitutional violation." *Hobart v. Estrada*, 582 Fed. App'x 348, 357 (5th Cir. 2014). Thus, a reasonable jury could decide Harris County policymakers "fail[ed] to provide adequate training in light of the foreseeable serious consequences that could result." *Hobart*, 582 Fed. App'x at 357 (citing *City of Canton*, 489 U.S. at 390).

Likewise, officers testified that, even if they hear a detainee beg "I can't breath," they were trained "not to react" because they had entered a "code of silence."[436]

> Q:    Had you heard [Kenneth] cry out … 'I can't breathe,' you would have reacted, correct?
>
> A:    I was trained … if I heard it, I was trained that I could not … react to it because I was still focused on taking away from my part of the leg because I have to still hold him in his position.[437]

This training was equally (and obviously) dangerous. Officers Thomas and Leveston testified they did nothing when they heard Kenneth gasp "I can't breathe" because of the "code of silence." But Officer Scott testified that, had other officers told him Kenneth was pleading for help, he would have changed tactics.[438] The "code of silence" training prevented the officers from telling each other that Kenneth was in distress.

Second, there is no dispute that but for the officers' faulty training, they would not have used the dangerous restraint technique. The officers followed their training to the letter.[439] "Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city

---

[436] **Ex. 14** (Bell dep.) at 11:19-24.

[437] **Ex. 14** (Bell dep.) at 15:22-16:7.

[438] **Ex. 6** (Scott dep.) at 18:13-16.

[439] **Ex. 10** (Thomas dep.) at 87:7-21.

policymakers, the affirmative link/moving force requirement is satisfied." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 170 (5th Cir. 1985). A jury could certainly conclude the training was "causally connected" to the constitutional violation.

Third, Sheriff Garcia was deliberately indifferent to Kenneth's rights when he continued to train his officers to place detainees facedown on gurneys and use the "basic hogtie position." Instructing officers to place a detainee facedown, hogtie him, compress his chest, and ignore his calls for help is "a particular[ly] glaring omission in a training regiment" that it is "obvious in the abstract" would violate constitutional rights. *See Bd. of Cty. Com'rs of Bryan Cty, Okla. v. Brown*, 520 U.S. 397, 411 (1997).[440] *Cf. Connick v. Thompson*, 563 U.S. 51, 63 (2011) ("in the absence of training, there is no way for novice officers to obtain the legal knowledge they require" in using lethal force). If a policymaker "knows or should know" the policy is dangerous, he "should be liable when the inevitable occurs." *Grandstaff*, 767 F.2d at 170. Here, Sheriff Garcia testified the officers' actions "conform[] very, very closely to what I saw in the training,"[441] and "they were following their training."[442] And Sheriff Garcia testified he knew hogties were prohibited because they could kill detainees. This is the height of indifference – Sheriff Garcia knew of a "substantial and significant risk," "but effectively disregarded it." *Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 395 (5th Cir. 2000).

Thus, this is also not a true "single incident exception" case. Though other deaths during cell extractions are only described generally in the findings letter, the Department of Justice had

---

[440] *See also Brown v. Bryan Cty*, 219 F.3d 450, 459 (5th Cir. 2000) (opinion after remand, citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 & 387 (1989)).

[441] **Ex. 4** (Sheriff Garcia dep.) at 62:22-23.

[442] **Ex. 4** (Sheriff Garcia dep.) at 79:14, 163:1-165:15.

warned the County to end the hogtying practice. Courts are wary to apply the "single incident exception" because "[d]eliberate indifference flows from knowledge of the effects of decisions or conditions and taking no steps to correct the shortcomings." *Hobart*, 582 Fed. App'x at 358. Here, Sheriff Garcia had knowledge of the dangerous training from two sources: 1) his own personal observations of the training, and 2) the Department of Justice's findings letter that stated officers were hogtying pretrial detainees. Ignoring the Department of Justice's directive, however, made it "highly predictable" that detainees would die during a hogtie restraint. *Id.* at 358.

Likewise, the need for training about what to do when a detainee claims "I can't breathe" during a cell extraction is "highly predictable." *Brown,* 219 F.3d at 458. A need for this training is "so obvious that the failure to train is deliberate indifference to constitutional rights." *Brown*, 219 F.3d at 460. Sheriff Garcia knew that cell extractions would occur periodically, and officers would need to be trained to conduct extractions safely.[443] Sheriff Garcia knew injuries were an obvious, inevitable consequence of violent cell extractions.[444] Sheriff Garcia even "watched some of the training that the extraction team would go through," and knew officers were putting detainees facedown in a hogtie position for transport to the clinic.[445] And he knew hogtying, or "when someone is on their stomach … and … hands and feet are connected making it very difficult for an individual to breathe," was "recommended against" because of "positional

---

[443] **Ex. 14** (Sheriff Garcia dep.) at 26-27.

[444] **Ex. 14** (Sheriff Garcia dep.) at 37:12-38:23.

[445] **Ex. 14** (Sheriff Garcia dep.) at 39:14-43:2.

asphyxia."[446] But despite this knowledge, there was no training about what to do should an inmate have difficulty breathing during this dangerous restraint.

That the officers' training exceeded the requirements of the Texas Commission on Law Enforcement is irrelevant, as the Fifth Circuit has repeatedly held. First, "it is absurd to suggest that the federal courts should subvert their judgment as to alleged [constitutional] violations" to a regulatory agency that has relevant standards. *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).[447] Second, the TCOLE standard curriculum instruct officers to use the hazardous, facedown "basic hogtie position" that Harris County trained its officers to employ – for obvious reasons. This dangerous training was Harris County's "special-situation" instruction, training above and beyond the state required minimum. *Cf.* Doc. 152, p. 63. Indeed, Sheriff Garcia testified there was nothing in the County's training about preventing positional asphyxiation because, under the TCOLE guidelines, "it may not have been required."[448] The TCOLE "basic corrections" curriculum the County relies upon does not even prohibit hogtying detainees.[449] This is evidence the TCOLE curriculum is inadequate. The Harris County training does not even define a hogtie for officers – it just told them not to do it.[450] The officers in this case testified they were likewise never told that cell extractions specifically endangered obese people, people

---

[446] **Ex. 14** (Sheriff Garcia dep.) at 47:1-21.

[447] The County faulting Plaintiffs for "not su[ing] the State of Texas complaining" about the TCOLE curriculum is absurd. Doc. 152, p. 77. The State of Texas is immune from suit – requiring parties to file pointless lawsuits is an odd way to establish failure to train liability.

[448] **Ex. 14** (Sheriff Garcia dep.) at 126:18-19.

[449] **Ex. 35** (TEXAS COMMISSION ON LAW ENFORCEMENT, 2011 BASIC COUNTY CORRECTIONS) Chs. 19-21. The complete curriculum is available on TCOLE's website, at http://www.tcole.texas.gov/content/course-curriculum-materials-and-updates-0.

[450] **Ex. 10** (Thomas dep.) at 82:17-21.

with high blood pressure, or people suffering from anxiety – other topics not addressed by TCOLE training.[451] And, even if the TCOLE training was sufficient (though it was not), and even if Harris County's curriculum adopted the relevant portions (though it did not), the County's own consulting firm found "no documentation to support that monthly training requirements had been met by any of the [containment] team members."[452] Thus, there is, at a minimum, a material fact dispute about the adequacy of the County's training regimen as actually implemented.

But Harris County's training was explicitly dangerous. Harris County – without input from TCOLE or other agencies – trained officers that after handcuffing a detainee they were to "lower the target [detainee] to the floor, or turn him over *with his back facing up*. … Once this is done, the restraints will be applied. Now the Team will lift on the command from the [Team Leader]. … Once out the team should place the target [detainee] on a stretcher."[453] Though the County's cell extraction training specifically prohibits "strikes" to specified body parts (like the head) and placing "pressure" on the detainee's throat, *it does not prohibit*, and in fact *mandates*, the facedown "basic hogtie position."[454] The training specifically instructs officers to "move the [detainee] into a prone, face down position" before "handcuffing" and "bend[ing] the legs and

_____

[451] **Ex. 10** (Thomas dep.) at 54:5-22.

[452] **Ex. 4** (Sheriff Garcia dep.) at 111:3-17

[453] **Ex. 31** (Harris County Sheriff's Office Forced Cell Movement Training PowerPoint) at Bates nos. LUCAS 00502-03).

[454] *Compare* **Ex. 27** (Harris County Sheriff's Office Forced Cell Movement Training PowerPoint) at Bates no. LUCAS00518, LUCAS 00523 *with* **Ex. 22** (Harris County Sheriff's Office Cell Extraction PowerPoint) at LUCAS 00738 *et seq. See also* **Ex. 28** (Harris County Sheriff's Office Lesson Plan, Forced Cell Movements) at Bates nos. LUCAS00919-30).

cross[ing] the feet" before applying leg-irons.[455] The GMJA consulting firm found the training actually said nothing about "reduc[ing] possible positional asphyxiation."[456] None of the training materials discuss the danger facedown hogtying poses to detainees, while explicitly instructing officers to restrain detainees facedown and apply handcuffs and leg-irons.

### 4. DIRECT POLICYMAKER LIABILITY

Finally, the County is liable for constitutional violations when the policymaker (here, Sheriff Garcia) is directly involved in the unconstitutional actions. Though there is no dispute Sheriff Garcia was absent during the cell extraction, there is also no dispute that long before Kenneth's death he observed the officers' training and whole-heartedly endorsed it. "[M]unicipal liability may be imposed for a single decision by municipal policymakers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

> If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Thus, Harris County is liable for the inaction of Sheriff Garcia. *Colle v. Brazos Cty., Tex.*, 981 F.2d 237, 244 (5th Cir. 1993).

There is no dispute that Sheriff Garcia both knew "hogtying" could be lethal (due to "positional asphyxiation") and that his officers were using a restraint reasonable jurors could decide was a hogtie, in tandem with chest compression that aggravated the risk posed by a

---

[455] **Ex. 27** (Harris County Sheriff's Office Forced Cell Movement Training PowerPoint) at Bates nos. LUCAS00551 and 554; **Ex. 29** (Harris County Sheriff's Academy Lesson Plan: Mini Team Cell Extractions) at LUCAS00790-805).

[456] **Ex. 15** (GMJA Rep.) at 8, Bates 2350.

facedown hogtie restraining. Sheriff Garcia personally observed training where officers role-played a cell extraction, and the officers' mock restraint perfectly mirrored their actual abuse of Kenneth. *Supra* n. 213. When the policymaker knows officers are likely to use deadly force due to his policy or training, "the [municipality] should be liable when the inevitable occurs and the officers do so." *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985). Though he personally observed training a jury could determine was dangerous, Sheriff Garcia did nothing to correct it – classic deliberate indifference.

### C. THE COUNTY VIOLATED KENNETH'S RIGHTS UNDER THE ADA AND REHABILITATION ACT

To prove a claim under the ADA and Rehabilitation Act, a plaintiff must show: (1) that he is a qualified individual within the meaning of the acts; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).[457] To recover compensatory damages, a plaintiff must also show defendants intentionally denied accommodations to the

---

[457] The Rehabilitation Act follows the same standards, adding only the requirement that the entity also receive federal funding, as Harris County does. *See* Doc. 46, Plaintiffs' Third Amended Complaint, ¶ 70 and Doc. 54, Harris County's Amended Answer, p. 9 (admitting allegations in ¶ 70). Courts thus interpret the ADA and Rehabilitation Act under the same body of law. *See*, *e.g.*, *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005).

The County's argument that the Rehabilitation Act does not apply because it does not receive federal funds for "cell extraction and transport to the medical clinic" is frivolous. Accepting any federal funds, for any program, creates Rehabilitation Act liability. *See*, *e.g.*, *Bennett- Nelson v. La. Bd. of Regents*, 431 F.3d 448, 453-54 (5th Cir. 2005); *Pace v. Bogalusa City School Bd.*, 403 F.3d 272 (2005) (en banc); *Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005).

person with a disability. *See Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002). Plaintiffs' evidence easily raises material fact issues on every element.[458]

### 1. KENNETH SUFFERED FROM SIGNIFICANT DISABILITIES.

To qualify for protections under the ADA and Rehabilitation Act, a person with a disability must show he or she suffers from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" include limitations on "the operation of a major bodily function," such as the brain, cardiovascular system, and circulatory system, 42 U.S.C. § 12102(2)(B), in addition to "standing," "walking," "breathing," "concentrating," and "thinking," 42 U.S.C. § 12102(2)(A).

The standard to qualify as a person with a disability under the Acts is expansive. Congress amended the ADA in 2008 specifically to broaden the definition of disability because some courts erroneously "narrowed the broad scope of protection intended to be afforded by the ADA" by "incorrectly f[inding] in individual cases that people with a range of substantially limiting impairments are not people with disabilities" and requiring "an inappropriately high level of limitation necessary to obtain coverage under the ADA." Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325 (Sept. 25, 2008).

In regulations implementing the ADA amendments, the Department of Justice clarified "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to

---

[458] Plaintiffs agree that ADA and Rehabilitation Act suits can only be brought against entities, not individuals. Though the complaint does not allege Dr. Sunder and Nurse O'Pry are liable for ADA/Rehabilitation Act violations (as their motions contend, Doc. 146, p. 21 & Doc. 147, p. 21), Plaintiffs' agree that, if the complaint did allege these claims against them, they would be entitled to summary judgment.

the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1).

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, *not whether an individual's impairment substantially limits a major life activity*. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(iii) (emphasis added). To be "substantially limited" merely requires the person with the disability "be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it." *Weed v. Sidewinder Drilling, Inc.*, --- F. Supp.3d ----, 2017 WL 1164294, *4, No. H-14-1658 (S.D. Tex. Mar. 29, 2017) (Harmon, J.) (denying motion for summary judgment); *see also* 29 C.F.R. § 1630.2(j)(1)(ii).

### a. Hypertension

Kenneth's hypertension was a qualifying disability. Hypertension, by definition, affects the operation of the circulatory system. *See* 42 U.S.C. § 12102(2)(B). Kenneth's autopsy showed significant blockage of his arteries, and his family testified he had been diagnosed with high blood pressure for years and took medication to control it since at least 2000.[459] Harris County concedes Kenneth had "several serious medical conditions." Doc. 152, pp. 15 & 85 (Kenneth suffered from "an enlarged heart and severe heart disease"). Shortly after arriving in the jail, County physicians prescribed Kenneth Clonidine and HCTZ,[460] two blood pressure medications. The day before his death, Harris County's jail medical staff saw Kenneth when he reported

---

[459] *See* **Ex. 1** (Autopsy) at 5-6; **Ex. 25** (Gradney dep.) at 45:8-46:8.

[460] **Ex. 21** (Harris Cty. Medical Records (Bates No. 00658)).

"chest pain," and observed his body was sweating heavily ("diaphoretic") while his pulse rate (206) and blood pressure (156/109) were dangerously high.[461] Doctors in the jail diagnosed him with "tachycardia," an abnormally high heart rate, the day before his death, and sent him to the local emergency room.[462] Significantly, people with hypertension are at much greater risk of death when placed in a "hogtie" position.[463] Indeed, hogtying and compressing Kenneth's chest caused him to suffer a fatal cardiac arrest.[464] Under Defendants' theory of Kenneth's death, his heart was so vulnerable it simply stopped beating (when Scott climbed on top of his prone body and pushed his bent legs into his abdomen while Green and Leveston pushed down on his chest). *See* Doc. 152 (Kenneth died due to "his own bad health and actions"). A jury, like the County's medical examiner, could certainly conclude Kenneth's hypertension substantially impaired the operation of his cardiovascular system.

In the corrections context, even under the previous (and more-rigorous) definition, the Supreme Court recognized hypertension is a "disability." *See, e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998); *see also McCollum v. Livingston*, 2017 WL 608665, *33 (S.D. Tex. Feb. 3, 2017) (prison context); *Mendoza v. City of Palacios*, 962 F.Supp.2d 868, 872 (S.D. Tex. 2013); *Garner v. Chevron Phillips Chem. Co.*, 834 F.Supp.2d 528, 539 (S.D. Tex. 2013); *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013); *Toland v. BellSouth Telecomm., LLC*, 2017 WL 6380641, **1-4 (N.D. Ga. Aug. 9, 2017); *Watson v. Ciena Healthcare Mgmt., Inc.*, 2013 WL 5435279, **5-6 (E.D. Mich. Aug. 16, 2013).

---

[461] **Ex. 21** (Harris Cty. Medical Records (Bates No. 00612)).

[462] **Ex. 21** (Harris Cty. Medical Records (Bates No. 00658-59)).

[463] **Ex. 16** (Dr. Cohen rep.) at 8.

[464] **Ex. 1** (Autopsy) at 2.

### b. Obesity

Kenneth's body-mass index was 35.3, making him clinically obese.[465] A BMI over 35 puts patients, like Kenneth, at high risk of type 2 diabetes and hypertension.[466] Kenneth's obesity, among limiting other major life activities, impaired his ability to breathe.[467] People who are obese are also at greater risk or injury or death during a "hogtie."[468]

Thus, Kenneth's obesity was a "disability" under the ADA and Rehabilitation Act – it was a physical condition that impaired his major life activity of breathing. *See*, *e.g.*, *E.E.O.C. v. Resources for Human Dev., Inc.*, 827 F.Supp.2d 688, 693-94 (E.D. La. 2011); *Melson v. Chetofield*, 2009 WL 537457, *3 (E.D. La. Mar. 4, 2009); *Cook v. Rhode Island*, 10 F.3d 17, 25-26 (1st Cir. 1993); *McCollum v. Livingston*, 2017 WL 608665, *33 (S.D. Tex. Feb. 3, 2017); *Lowe v. American Eurocopter, Inc.*, 2010 WL 5232523, *8 (N.D. Miss. Dec. 16, 2010); *Anderson v. Macy's, Inc.*, 943 F.Supp.2d 531, 544-45 (W.D. Penn. 2013); *Whittaker v. America's Car-Mart, Inc.*, 2014 WL 1648816, *2 (E.D. Mo. 2014).

[465] Body-mass index is calculated using height and weight. Kenneth was 5'10" tall, and weighed 246 pounds at autopsy. **Ex. 1** (medical examiner report) at 3. *See* Nat'l Inst. of Health, Calculate Your Body Mass Index, *available at*: https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[466] NAT'L INST. OF HEALTH, *Classification of Overweight and Obesity by BMI*, *available at*: https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_dis.htm.

[467] *See* **Ex. 16** (Dr. Cohen rep.) at 4; **Ex. 13** (Dr. Hall rep.) at 2. The County's arguments about the weight of Dr. Hall and Dr. Cohen's testimony are for a jury to decide. *See* Doc. 152, pp. 101-02.

[468] **Ex. 16** (Dr. Cohan rep.) at 8.

129

c.   **Anxiety/Xanax Withdrawal**

Kenneth also suffered from diagnosed anxiety disorder. Anxiety disorder is a condition recognized by the American Psychiatric Association in the Diagnostic and Statistical Manual.[469] Friends testified Kenneth had taken Xanax for years to control his anxiety – he took one pill every day, and additional pills when he suffered an anxiety attack.[470] Kenneth's anxiety attacks were "debilitating," requiring medical treatment.[471] When Kenneth experienced a panic attack, he would suffer "shortness of breath, bad headaches, and he would be in bed, just shaking, trembling, trying to deal with … whatever it entails[.] … He would be in a sweat and shaking and just going through it."[472] Anxiety attacks would affect Kenneth's "breathing, most definitely his breathing … He always complained how he couldn't breathe when he was having one."[473] Attacks could last as long as an hour, and leave Kenneth "try[ing] to stay in bed" for the rest of the day.[474] On several occasions, the panic attacks were so bad Kenneth went to the emergency room.[475] Kenneth would always carry his Xanax with him, in case of an attack.[476] When he was able to take his medication, "it would … calm his … thoughts or his nerves. …. [The medicine]

---

[469]   AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.), 300.02. *See also* **Ex. 16** (Dr. Cohen rep.) at 1.

[470]   **Ex. 26** (Chlamon dep.) at 30:6-11, 34:6-7 (Alprazolam is the generic name of Xanax). When Kenneth had health insurance, the Xanax was prescribed by his doctors. *Id*. at 42:8-43:2, 48:23-49:4.

[471]   *See* **Ex. 16** (Dr. Cohan rep.) at 6.

[472]   **Ex. 16** (Chlamon dep.) at 33:6-16.

[473]   **Ex. 33** (T.J.L. dep.) at 83:8-14.

[474]   **Ex. 16** (Chlamon Dep.) at 71:10-19.

[475]   **Ex. 25** (Gradney dep.) at 50:17-23.

[476]   **Ex. 26** (Chlamon dep.) at 57:25-58:5.

would just make it stop, …. [and] put him at ease."[477] Conversely, when Kenneth missed doses of his medication, he would appear irritable and "grumpy."[478]

During intake at the jail, before he began suffering from withdrawal symptoms, Kenneth told Harris County medical providers that he had been diagnosed with "Bipolar [disorder] with anxiety" fourteen years ago.[479] Even during that first interview, the providers noted Kenneth was "poorly groomed," "confused," "hi [sic] anxiety," "fidgety," and had "pressured" speech.[480] Thus, the County's providers noticed Kenneth's difficulties with the major life activities of "caring for [him]self," "speaking," "thinking," and "communicating." 42 U.S.C. § 12102(2). The providers confirmed a diagnosis of "anxiety disorder," which requires the patient to suffer "significant distress or impairment in social, occupational, or other areas of functioning."[481] When he was discharged from the hospital and returning to the jail, Kenneth even suffered a panic attack and medical providers described him as "gasping for air."[482] *See* 42 U.S.C. § 12102(2) (major life activity of "breathing").

Anxiety disorders are well-recognized substantially limiting disabilities. *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562 (4th Cir. 2015); *Bedford v. Michigan*, --- Fed. App'x ----, 2018 WL 618479, *3 (6th Cir. Jan. 30, 2018).

---

[477] **Ex. 2**6 (Chlamon dep.) at 37:5-19.

[478] **Ex. 26** (Chlamon dep.) at 37:15-19.

[479] **Ex. 21** (Harris Cty. Medical Records (Bates No. 00615)).

[480] **Ex. 21** (Harris Cty. Medical Records (Bates No. 00615)).

[481] AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed.), 300.02.

[482] **Ex. 21** (Harris Cty. Medical Records (Bates No. 0064)). *See also* **Ex. 16** (Dr. Cohen rep.) at 6.

Kenneth's withdrawal symptoms – hallucinations, rambling incoherent speech, and bizarre behavior – also substantially limited his ability to think, speak, see, hear, and communicate. *See* 42 U.S.C. § 12102. Withdrawal from the Xanax made Kenneth delusional – Harris County's medical staff observed Kenneth with "rambling speech, banging on the door, … and sounding confused all morning."[483] During the cell extraction, Kenneth suffered hallucinations, repeatedly begging the officers to, "don't do this in front of [the kids]," and "watch the baby" – though there were obviously no children present in the jail.[484] When a counseling intern attempted to speak to Kenneth shortly before he was killed, she noted Kenneth was "rambling and not able to be understood," and could not "stand still and stay on topic."[485] Kenneth complained it had been "nine days" since the intern last saw him, although she had never met him before (and he had only been imprisoned for four days).[486] The intern even observed Kenneth was "out of breath as if he had been running."[487] "Severe agitation" – the condition that led the officers to storm Kenneth's cell – is a common symptom of Xanax withdrawal.[488] "Withdrawal is a serious and potentially deadly medical condition." *Hernandez v. Cty. of Monterey*, 110 F.Supp.3d 929, 948 (N.D. Cal. 2015).[489]

The County's argument that it could deny Kenneth accommodations for anxiety and the related drug withdrawal because he was taking the Xanax without a prescription is a red herring.

[483] **Ex. 21** (Harris Cty. Medical Records) at Bates No. 00610.

[484] **Ex. 2-A** (video) 6:18 & 5:56.

[485] **Ex. 21** (Harris Cty. Medical Records) at Bates No. 00610.

[486] *Id.*

[487] *Id.*

[488] **Ex. 16** (Dr. Cohen rep.) at 5 & 12.

[489] *See also* **Ex. 16** (Dr. Cohan rep) at 12.

The ADA and Rehabilitation Act do exempt people "currently engaging in the illegal use of drugs" from protection, but *only if* "the covered entity acts on the basis of such use." 42 U.S.C. § 12210(a). Harris County was not denying Kenneth accommodations *because of* his alleged illegal Xanax use. *Cf. Gilmore v. Univ. of Rochester Strong Mem. Hosp. Div.*, 384 F.Supp.2d 602, 610 (W.D. N.Y. 2005) (employer legally discharged employee using cocaine).[490] Harris County denied Kenneth accommodations for the withdrawal symptoms caused by Xanax cessation – it did not deny him the services *because he (allegedly) used Xanax illegally*. The ADA and Rehabilitation Act's "illegal drug use" exclusion explicitly rejects the County's argument. "Notwithstanding [the exclusion for current illegal drug use] an individual shall not be denied health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." 42 U.S.C. § 12210(c). Kenneth's disability was his drug addiction (and resulting physical withdrawal symptoms), not his drug *use* which the ADA and Rehabilitation Act do not require accommodations for.

The County's argument that the individual officers were unaware of Kenneth's disabilities is similarly unavailing. First, Harris County undisputedly did know – it provided Kenneth medical treatment for all these conditions during previous incarcerations, and County medical providers had diagnosed Kenneth with all these problems the day before Defendants killed him. *See* Doc. 152, p. 106 (County's motion: Prior to the cell extraction, "Dr. Sunder [had] pulled [Kenneth's] chart and noted that he had a history of hypertension and anxiety and

---

[490] Notably, alcoholism is a well-recognized "disability." *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F.Supp.2d 683, 689 (M.D. La. 2013). *See also Williams v. Widnal*, 79 F.3d 1003 (10th Cir. 1996)

133

believed he may be going through Xanax withdrawal"). Second, a jury could conclude the officers also knew about several of his disabilities – Kenneth was obviously obese and suffering a psychotic break during the extraction. Third, the individual officers are not required to know about Kenneth's disability to create liability – only the County is. Kenneth's "disability and its consequential limitations were known by the entity providing public services." *Windham v. Harris Cty., Tex.*, 875 F.3d 229, 236 (5th Cir. 2017).

A jury could also conclude the County knew that obese inmates suffering from heart conditions required accommodations and protection from the County's dangerous restraint practices. The law was clearly established that hogtying detainees suffering from side effects of drug use was "deadly force." *Gutierrez*, 139 F.3d at 446-47. Sheriff Garcia testified hogtying was prohibited "because of positional asphyxia" and when "hands and feet are connected [it becomes] very difficult for an individual to breathe."[491] A reasonable jury could conclude Harris County knew this risk would be even greater for a person who suffered other breathing problems – such as those caused by Kenneth's obesity, hypertension, and anxiety.

Likewise, Kenneth was not required to request an accommodation when his need for one was obvious. *Windham*, 875 F.3d at 237-38 (for "well-understood and outwardly visible disabilities" there is no need to explicitly request an accommodation and explain the needed accommodation). But even if Kenneth was required to make a request, the jury could conclude begging "I can't breathe" while he was restrained facedown on the gurney was a request for accommodations as the officers continued to hogtie him and compress his chest.

---

[491] **Ex. 4** (Sheriff Garcia dep.) at 47:1-25.

## 2. KENNETH WAS DENIED PARTICIPATION IN HARRIS COUNTY PROGRAMS AND SERVICES.

Harris County excluded Kenneth from participation in services or programs at the jail that were available to non-disabled prisoners. Harris County imprisons pretrial detainees too poor to pay bond. Harris County denied this safe confinement to Kenneth because it failed to accommodate his disabilities during the cell extraction.

Writing for a unanimous Supreme Court, Justice Scalia explained confinement in a jail or prison itself is a program or service for ADA/Rehabilitation Act purposes. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'"). "Because of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service, program, or activity." *Hernandez v. Cty. of Monterey*, 110 F.Supp.3d 929, 936 (N.D. Cal. 2015) (citing 28 C.F.R. Pt. 35, App. A). Kenneth undoubtedly required a "reasonable modification [of] rules, policies, or practices" of Harris County. *Yeskey*, 524 U.S. at 210-11 (citing 42 U.S.C. § 12131(2)). Indeed, according to the County, the officers were restraining Kenneth while taking him "down directly to the medical clinic" so he could receive medical services from the jail's doctors. *See* Doc. 152, p. 106.

Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" to accommodate people with disabilities – *not* simply treat people with disabilities the same as able-bodied people. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to

135

take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531-532 (discussing affirmative "duty to accommodate). *See also* 28 C.F.R. § 35.130 (b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability").

Harris County made no such accommodations for Kenneth when it violently attacked him, dragged him from his cell, held him facedown in the "basic hogtie position," and compressed his chest for a quarter-hour as he suffered withdrawal-induced agitation and delusions. Defendants treated Kenneth like any other able-bodied detainee, though hogtying and compressing the chest of an obese and hypertensive detainee suffering anxiety symptoms incalculably increased the threat to his life from an already dangerous practice. Sheriff Garcia testified that the cell extraction policy was the same, regardless of a detainee's disability.[492] As this Court has recognized repeatedly, "In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCollum*, 2017 WL 608665, *37 (citing *U.S. v. Georgia*, 546 U.S. 151 (2006)). Though hogtying even able-bodied inmates is very dangerous, an obese, hypertensive detainee suffering anxiety and withdrawal symptoms like Kenneth certainly suffered more. Simply put, Kenneth "needed something more than what was provided to the general population in order to ensure he did not suffer more pain." *McCollum*, 2017 WL 608665, at *36.

---

[492] **Ex. 4** (Sheriff Garcia dep.) at 27:15-28:5.

Likewise, several reasonable accommodations would have prevented officers from using any force on Kenneth. The officer who observed Kenneth pull the smoke detector off the ceiling referred Kenneth to the mental health treatment team because "a [mental health] professional may be able to help."[493] But, knowing the accommodation Kenneth really needed was mental health treatment, Harris County's officers called the containment team rather than wait until the "crisis intervention team" was "available." *See supra* nn. 20, 207.

Harris County's request that the Court extend *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000) to the jail context would contradict this settled law and enlarge *Hainze*'s already extra-textual interpretation of the acts. In *Hainze*, police officers were called to transport an armed, mentally-ill man who was menacing convenience store patrons to a mental health hospital. When he refused to drop his weapon and advanced on the officers, the police shot him. The Circuit concluded officers the ADA and Rehabilitation Act do not apply to "an officer's on-the-street responses to reported disturbances … *prior to the officer's securing the scene*." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) (emphasis added). The animating concern of *Hainze* was officers difficulty "comply[ing] with the ADA" while also "securing the safety of themselves, other officers, and nearby civilians [such that the statutes] would pose an unnecessary risk to innocents." *Id.* at 801. The facts in this case do not support extending the exception of *Hainze.* Kenneth was not "on-the-street"; he was "in-the-jail." The scene was secure – Kenneth was locked into his cell, by himself, and not threatening anyone (not even himself).[494]

_____

[493] **Ex. 20** (Detention Command, Inmate Incident Report) at Bates No. LUCAS0010.

[494] At a minimum, the jury should decide if pounding the smoke detector on the wall made the scene "insecure." *Hobart v. City of Stafford*, 784 F.Supp.2d 732, 758-59 (S.D. Tex. 2011) (fact issue as to whether "there was any need for any officer to secure the scene").

According to Defendant Thomas, throughout the encounter the officers were "in control of the situation."[495] The officers were heavily protected with extensive body armor and helmets with face shields. Thus, even if this Court were to extend *Hainze*'s judicial gloss to inside a secure corrections facility – which Congress specifically intended to be covered by the ADA and Rehabilitation Act[496] – there is still a fact issue as to whether the "scene was secure."

And the officers' failure to accommodate Kenneth was not the product of officers' evolving reactions to an unpredictable scene. The officers were highly trained in placing inmates facedown in hogtie positions during cell extractions, and executed their training perfectly. The officers' actions were the product of Harris County's deliberate and considered choices on how to conduct a cell extraction, not a spontaneous and evolving "on-the-street" response necessary to protect innocent bystanders. No court in the Fifth Circuit has applied the "scene is secure" exception to a highly-controlled correctional setting, and this Court should not accept the County's invitation to start now on these facts.[497]

---

[495] **Ex. 10** (Thomas dep.) at 47:23-48:3

[496] *See*, *e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) ("the statute's language unmistakably includes State prisons and prisoners within its coverage"). This is not an attempt to "pigeon hole" this case or "expand coverage … far beyond what Congress intended." Doc. 152, at 98. Congress explicitly intended the ADA and Rehabilitation Act to protect disabled prisoners and pretrial detainees. *Yeskey*, 524 U.S. at 210 ("State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government'") (citing 42 U.S.C. § 12131(1)(B)).

[497] Many courts outside the Fifth Circuit have declined to adopt *Hainze*, even when faced with identical facts, much less in the corrections context. *See*, *e.g.*, *Haberle v. Troxell*, --- F.3d ----, 2018 WL 1386431, *6 (3d Cir. March 20, 2018) (mentally ill man armed with handgun); *Mohney v. Pennsylvania*, 809 F.Supp.2d 384 (W.D. Pa. 2011) (mentally ill man who doused himself with gasoline); *Gogue v. City of Los Angeles*, 2010 WL 11549706, *3 (C.D. Cal. June 15, 2010) (mentally ill man armed with sword defacing busy highway); *Broadwater v. Fow*, 945 F.Supp.2d 574, 590 n. 15 (M.D. Penn. 2013); *DeBose v. Taser Int'l, Inc.*, 2011 WL 1807681, *3

### 3. LACK OF A REASONABLE ACCOMMODATION EXCLUDED KENNETH FROM PRETRIAL DETENTION.

Kenneth died because Harris County denied him these reasonable accommodations. His death prevented him from accessing any other programs and services available to able-bodied detainees, including pre-trial detention itself.

After Kenneth's death, Harris County implemented several reasonable accommodations for disabled detainees during cell extractions. Among other changes, detainees are now transported to the clinic on their side (rather than the facedown prone position) to alleviate pressure on the chest cavity, a "medical officer" is always present to monitor the detainee for signs of distress (like "I can't breathe"), the "crisis response team" and mental health providers always meet with the detainee before an extraction (*contra* Doc. 152, p. 19), and officers are required to observe a "cool down" period before rushing into the cell. *See supra* Part II.J.3. Of course, had Harris County attempted to treat Kenneth's Xanax withdrawal, he likely would not have been in the agitated and delusional state that led to the cell extraction in the first place. Had Harris County provided these obvious accommodations to disabled detainees before Kenneth died, he would likely be with his family today.

Under well-settled law, as this Court has recognized, a jury should be given the opportunity to decide if failing to provide these accommodations was unreasonable. "A reasonable jury could find that these kinds of accommodations were reasonable and that the failure to utilize any of them led to the denial of safe confinement" for Kenneth in the Harris County jail. *McCollum*, 2017 WL 608665, at *38. *See also McCoy*, 2006 WL 2331055, at *9;

(E.D. Mo. May 12, 2011) (naked mentally ill man invading bystanders' home). These cases, instead, evaluated whether the officers' response was a "reasonable accommodation," taking into account the suspects' dangerous behavior.

*Flynn v. Doyle*, 672 F.Supp.2d 858, 879 (E.D. Wisc. 2009) ("issue[s] of fact pertaining to the effectiveness of the accommodations" offered at the prison to be resolved by jury); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. Oct. 8, 2015) ("Determining the reasonableness of an accommodation, especially in the prison contest, is 'highly fact-specific' and determined on a case-by-case basis"). A jury could easily decide that the primary "accommodation" that Harris County provided Kenneth – a brief consultation with a counseling intern followed by Gordon screaming "Pass it to me!" (*see* Doc. 152, pp. 107-08) – was not "reasonable."

### 4. HARRIS COUNTY INTENTIONALLY DISCRIMINATED AGAINST KENNETH BY DENYING HIM REASONABLE ACCOMMODATIONS FOR HIS DISABILITIES.

Harris County discriminated against Kenneth because "[t]he discrimination prohibited [by the ADA and Rehabilitation Act] . . . includes the failure to make reasonable accommodations for a [prisoner's] disability." *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. Apr. 7, 2011); *see also Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. Jan. 16, 2014). When a person has a disability, the ADA/Rehabilitation Act requires public entities to provide a "reasonable accommodation" to assist them in accessing public programs and services – not just treat them like able-bodied people. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). Thus, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner." *McCollum*, 2017 WL 608665, at *37; *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014) *quoting McCoy*, 2006 WL 2331055, at *22 (citing *Melton*, 391 F.3d at 672 and *Georgia*, 546 U.S. at 156).

Here, a jury could reasonably conclude Harris County intentionally denied Kenneth accommodations under the ADA and Rehabilitation Act. This Court, as well as the Eastern and

Northern Districts of Texas, denied motions to dismiss (or for summary judgment) in similar wrongful-death lawsuits brought under the ADA and Rehabilitation Act.[498]

When a disabled prisoner suffers more than an able-bodied inmate but could be reasonably accommodated, that prisoner is suffering from illegal disability discrimination. Multiple district courts confirm that this Court's "more pain and punishment" analysis relied on in *McCollum* and *Martone*, and drawn from *McCoy*, is a correct statement of the law. *See O'Neil*, 804 F.Supp.2d at 538 (Robinson, J.); *Wright*, 2013 WL 6578994, at *4 (O'Connor, J.); *Hinojosa*, 994 F.Supp.2d at 843 (Ramos, J.); *Togonidze*, p. 6 (E.D. Tex.); *Coker v. Dallas Cty. Jail*, 2009 WL 1953038, *17 (N.D. Tex. Feb. 25, 2009); *Wolfe v. Fla. Dep't of Corr.*, No. 5:10–CV–663, 2012 WL 4052334, *4 (M.D. Fla. Sept. 14, 2012); *Miller v. Chapman*, No. 13–00367, 2014 WL 2949287, at *3 (M.D. La. June 30, 2014); *Reeves v. LeBlanc*, No. 13–0586, 2014 WL 7150615, *4 (M.D. La. Dec. 15, 2014); *Hacker v. Cain*, No. 3:14-00063, 2016 WL 3167176, *13 (M.D. La. June 6, 2016); *Cleveland v. Gautreaux*, 198 F.Supp.3d 717, 737 (M.D. La. Aug. 1, 2016); *Romero v. Bd. of County Comm'n of County of Curry, NM*, 202 F.Supp.3d 1223, 1265 (D. N.M. Aug. 15, 2016); *Jacobs v. Trochesset*, NO. 3:16-CV-65, 2016 WL 6518420, *1 (S.D. Tex. Nov. 2, 2016) (Hanks, J.). No courts have criticized this holding. The reasoning simply makes sense –

---

[498] *See McCollum*, 2017 WL 608665, at *40; *Martone v. Livingston*, 2014 WL 3534696 (S.D. Tex. July 16, 2014) (Ellison, J.); **Ex. 36**, *Togonidze v. Livingston*, No. 6:14-cv-00093-JDL, Doc. 52 (magistrate's April 9, 2014 recommendation) (E.D. Tex.) (Love, Mag. J.) and Doc. 56 (May 6, 2014 order adopting magistrate's recommendation) (Schneider, J.); **Ex. 36**, *Webb v. Livingston*, No. 6:13-cv-00711-JDL, Doc. 98 (magistrate's report and recommendation) (E.D. Tex.) (Love, Mag. J.) and Doc. 125 (May 5, 2014 order adopting magistrate's recommendation) (Schneider, J.); *Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014) (Gonzales Ramos, J.); *O'Neil*, 804 F.Supp.2d 532 (N.D. Tex. Apr. 7, 2011) (asthmatic prisoner denied accommodations, including restricted housing); *Borum v. Swisher Co.*, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) (Robinson, J.) (alcoholic prisoner denied accommodations); *Wright v. Tex. Dep't Crim. Justice*, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) (O'Connor, J.).

when the State controls every facet of an inmate's life, if the State fails to make reasonable accommodations for inmates with disabilities, those prisoners will suffer disproportionately more than able-bodied prisoners who do not need accommodations to live safely in pretrial detention. Here, the County used calculated violence against Kenneth without considering that his obesity, hypertension, anxiety, and withdrawal symptoms put him at far greater risk of death during a cell extraction than an able-bodied inmate. This is the very "discrimination" the ADA and Rehabilitation Act were designed to combat.

The Fifth Circuit's opinion in *Nottingham v. Richardson*, upon which the County relies heavily, is not persuasive. 499 Fed. App'x 368 (5th Cir. 2012) (unpublished). First, the relevant portions of the opinion are *dicta* in a suit litigated by a *pro se* prisoner. The Fifth Circuit affirmed summary dismissal of the prisoner's complaint merely because he had failed to administratively exhaust his claims. 499 Fed. App'x at 374 (noting "[e]xhaustion is a threshold issue"). The Circuit should not have even reached the merits (which were briefed without the benefit of counsel for the inmate). Second, the claims regarding the plaintiff's medical treatment in the county jail were time barred. *Id.* at 375. These claims were the most similar to the Plaintiffs' allegations here, but were not considered by the Circuit. Third, the facts in *Nottingham* are completely unlike this case. *Nottingham* used a wheelchair (or cane) and required prescription medication. He received both accommodations – as well as twenty medical appointments (in just over sixty days), "prescription medication, and a special diet, among other things." *Id.* at 375. "None of [the plaintiff's] claims [were] supported by the record." *Id.* at 376. Finally, unlike here, the plaintiff presented "no indication he was treated differently because of his disability" when he was left in a transport van for an extended period, or that his disability required accommodations to make his transport equivalent to an able-bodied prisoner's experience. *Id.* at

142

377. Here, in stark contrast, an able-bodied detainee would have likely survived the cell extraction with only minor injuries (as the County notes Kenneth was the first detainee killed during a cell extraction).

*Hay v. Thaler*, 470 Fed. App'x 411 (5th Cir. 2012), another unpublished opinion litigated by a *pro se* inmate,[499] is no more persuasive. In *Hay*, the *pro se* inmate merely disagreed with decisions made by a prison dentist, but did "not allege, much less explain, how his alleged disabilities made it more difficult for him to access the benefits of [the prison's] services – namely, dentures – or gave him less meaningful access to those services." That is not Plaintiffs' claim here. Kenneth was denied access to the medical services at the jail because of dangerous decisions made by non-medical staff – transporting him to the clinic in the facedown hogtie position while pressing down on his chest as he begged "I cannot breathe."

Defendants' reliance on the overruled *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) is likewise misplaced. *Bryant* was overruled by *Yeskey*. *Bryant* erroneously concluded the ADA did not provide *any* protections to prisoners. *Compare Bryant*, 84 F.3d at 248 ("it is very far from clear that prisoners should be considered 'qualified individuals' within the meaning of the [ADA]") *with Yeskey*, 524 U.S. at 209 ("the statute's language unmistakably includes State prisons and prisoners within its coverage"). The remainder of the *Bryant* opinion is *dicta*. In fact, other subsequent Seventh Circuit decisions support Plaintiffs' position and contravene *Bryant*. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (prison inaccessible to inmate

---

[499] As the County's motion recognizes, Hay failed to support his allegations with "any evidence in the record" – an obvious problem resulting from a *pro se* plaintiff that is not present here where ample record evidence supports that Harris County denied Kenneth accommodations necessary to access services due to his disabilities. Doc. 152, p. 118 (citing *Hay*, 470 Fed. App'x At 418).

with mobility impairments who required grab bars in halls and restrooms – "Refusing to make reasonable accommodations is tantamount to denying access").[500] For this reason, numerous courts now disagree with *Bryant*'s flawed conclusion that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[501] Finally, unlike *Bryant*, Plaintiffs' claims are not camouflaged "medical malpractice" allegations. Kenneth, unlike Bryant, was discriminated against by the practices Harris County used to take him to see the medical providers. *See also Paine v. Johnson*, No. 06 C 3173, 2010 WL 785397, *8 (N.D. Ill. Feb. 26, 2010) (distinguishing *Bryant*).

Though the Fifth Circuit has declined to explicitly define "intentional discrimination" in the ADA/Rehabilitation Act context,[502] every Circuit addressing the question has concluded "the standard for intentional violations is deliberate indifference to the strong likelihood of a

---

[500] Notably, Judge Posner later acknowledged the error of his earlier opinion, and reversed a district court decision dismissing a *pro se* inmate's Rehabilitation Act claims. *Norfleet v. Walker*, 684 F.3d 688 (7th Cir. 2012) (Posner, J.).

[501] *See*, *e.g.*, *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) (prescription medication for ALS patient); *Rouse v. Plantier*, 997 F.Supp. 575, 582 (D. N.J. 1998) (insulin for diabetics) (reversed on other grounds); *McNally v. Prison Health Services,* 46 F. Supp. 2d 49 (D. Me. 1999) (anti-retroviral drugs to treat HIV-positive patients); *Payne v. Arizona*, 2012 WL 1151957, *7 (D. Ariz. Apr. 5, 2012) (diabetic denied various accommodations); *Paine v. Bergland*, 2012 WL 6727243, *11 (N.D. Ill. Dec. 28, 2012) (denying summary judgment to jail that failed to provide mental health evaluation before releasing mentally ill woman in dangerous part of Chicago). Notably, the Seventh Circuit cited *Kiman* affirmatively in *Jaros*. 684 F.3d at 672.

[502] *See Frame*, 657 F.3d at 231 n. 71 (5th Cir. 2011) ("We express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination"); *Estate of A.R. v. Muzyka*, 543 Fed. App'x 363, 365 (5th Cir. Oct. 16, 2013) (unpublished) (declining to adopt competing "bad faith" or "deliberate indifference" standards for "intentional discrimination" advocated by the parties); *Perez*, 624 Fed. App'x at 184 ("declin[ing] to make new law on the nature of intent").

144

violation" of the ADA or Rehabilitation Act. *See*, *e.g.*, *Loeffler v. Staten Island Univ. Hospital*, 582 F.3d 268, 275 (2nd Cir. 2009); *A.G. v. Lower Merian School Dist.*, 542 Fed. App'x 194, 198 (3rd Cir. 2013); *Meagley v. Little Rock*, 639 F.3d 384 (8th Cir. 2011); *Duvall v. Co. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001); *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009); *Liese v. Indian River Co. Hospital*, 701 F.3d 334, 345 (11th Cir. 2012).[503] Deliberate indifference only requires officials to both (1) know about the person's disability, and (2) disregard the need for a reasonable accommodation. *See* Parts II.B.-I. (discussing individual Defendants' deliberate indifference).[504]

Because Harris County was at least deliberately indifferent to Kenneth's need for a reasonable accommodation, Plaintiffs can recover compensatory damages. The Fifth Circuit has ruled ignoring "clear indications" that a person has a disability in need of accommodation is sufficient to establish intentional discrimination. *See Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 Fed. App'x 180, 185 (5th Cir. 2015) (reversing summary judgment). Failure to provide an "effective" accommodation is "evidence of intentional discrimination." *Id*. Here, the jury could certainly conclude Kenneth needed an accommodation when he begged for "help!" and told officers "I cannot breathe" three times.

---

[503] The Sixth Circuit has also assumed, without deciding, this is the correct standard. *R.K. v. Bd. of Educ. of Scott County, Ky.*, 637 Fed. App'x 922, 925 (6th Cir. Feb. 5, 2016). The Fifth Circuit is "always chary to create a circuit split." *U.S. v. Kebodeaux*, 647 F.3d 137, 141 (5th Cir. 2011) *rev'd on other grounds at* 133 S.Ct. 2496 (2013).

[504] Notably, in assessing the County's deliberate indifference an objective – not a subjective – standard is applied. *Compare* Doc. 152, p. 100 (citing *Domino*, a case where an individual's liability required a showing of subjective deliberate indifference – not what the individual "should have perceived") *with Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997) (municipalities liable for practices maintained with "*objective*" deliberate indifference) (emphasis in original).

The Fifth Circuit certainly does not require "more" than deliberate indifference, as Harris County contends. The Fifth Circuit cursorily discussed "intentional discrimination" under Title II of the ADA in *Delano-Pyle v. Victoria Co.*, 302 F.3d 567 (5th Cir. 2002), on which Harris County incorrectly relies on for this proposition. There, the Circuit noted the texts of the ADA and Rehabilitation Act explicitly have "no deliberate indifference standard," but that plaintiffs must show "intentional discrimination" to recover compensatory damages. *Id*. at 575. While the Court did not discuss what "intentional discrimination" requires, it also did not, as Defendants mistakenly contend, imply it requires a showing *beyond* deliberate indifference. If anything, *Delano-Pyle* implies "intentional discrimination" requires a *less* demanding standard than "deliberate indifference." The defendant-county *advocated for* a deliberate indifference standard – Victoria County asserted the plaintiff "*failed* to establish deliberate indifference," and the district court's decision should be reversed. *Id.* at 575 (emphasis added). But the Circuit rejected the county's position, and found the facts supported a finding of "intentional discrimination."

Indeed, the facts in *Delano-Pyle* (and its successor, *Perez*), demonstrate knowledge of a need for an accommodation and a failure to provide it is enough. In *Delano-Pyle*, the Circuit affirmed a jury verdict for a deaf plaintiff who was arrested after police refused to provide him a sign-language interpreter during a traffic stop. Like here, the plaintiff's need for an accommodation in an encounter with law enforcement was obvious – the *Delano-Pyle* plaintiff was obviously deaf, just as Kenneth was plainly obese, delusional, agitated, and the County had treated him the previous day for chest pains, exceptionally high blood pressure, and begun treating his psychosis (when he was seen by the counseling intern). Though the Circuit reviewed the sufficiency of the *Delano-Pyle* evidence, it did not discuss any proof "beyond" deliberate indifference, when upholding the district court's award of compensatory damages. That the

146

officers (and hence the County) knew the plaintiff was deaf, but chose not to provide a sign-language interpreter and arrested him anyway, was enough. *See also Perez*, 624 Fed. App'x at 185 (hospital denied deaf parents' sign language interpreter).

Harris County's reliance on the unpublished opinion in *Estate of A.R. v. Muzyka* is equally misplaced. In *Estate of A.R.*, a deaf girl drowned after suffering a seizure during an afterschool swimming program for the deaf. 543 Fed. App'x 363, 364 (5th Cir. 2013) (per curiam). Unlike *A.R.*, where the child was enrolled in a "school that was established to teach and serve disabled children," nothing about the Harris County jail's cell extraction policies was designed to accommodate hypertensive and obese detainees suffering from withdrawal symptoms. Rather, Harris County treated disabled detainees the same way as the jail's healthiest prisoners. In *Estate of A.R.*, unlike at the Harris County jail, "[t]here [was] no evidence of any exclusion of A.R. from the benefits, services, programs, and activities of the school." The child's death was the product of a tragic accident – falling in the pool – a classic negligence claim. Kenneth's death, on the other hand, was caused by Harris County's calculated policy that failed to contemplate the obvious fact that putting a disabled detainee facedown in a "classic hogtie position" while compressing his chest would be extremely dangerous for prisoners whose disabilities already made it difficult for them to breathe. This is not negligently failing to observe a deaf child who suffered a seizure and fell in the pool. It is the calculated equivalent of placing a child with cerebral palsy in the pool, and forcing her to sink or swim.[505]

---

[505] Moreover, when the Fifth Circuit has discussed the meaning of "intentional discrimination" in the context of the ADA's employment provisions (Title I), it concluded  a plaintiff states a case for "intentional discrimination" by showing "(1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or

Ultimately, whether Harris County "intentionally" discriminated against Kenneth is a question for the jury: "Intent" is "usually shown only by inferences" which are "for a fact finder." *Perez*, 624 Fed. App'x at 184. Plaintiffs' evidence is sufficient to establish discriminatory intent. *McCollum*, 2017 WL 608665, at *39.

## VI.    <u>CONCLUSION</u>

Because a reasonable jury could conclude Plaintiffs' evidence shows the Defendants violated Kenneth's constitutional and statutory rights, Defendants' motions should be denied.

Dated: April 9, 2018

*[Signature Block on Next Page]*

---

she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997).

Respectfully submitted,

THE LANIER LAW FIRM, P.C.

EDWARDS LAW

The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel.     512-623-7727
Fax.    512-623-7729

By: /s/ Lawrence P. Wilson
W. MARK LANIER
State Bar No.: 11934600
S.D. Tex. No. 8461
wml@lanierlawfirm.com
Lawrence P. Wilson
State Bar No.: 21704100
S.D. Tex. No. 9217
larry.wilson@lanierlawfirm.com
Benjamin T. Major
State Bar No.: 24074639
S.D. Tex. No. 1503277
benjamin.major@lanierlawfirm.com
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
Telecopier: (713) 659-2204

By:      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
SCOTT MEDLOCK
State Bar No. 24044783
scott@edwards-law.com

*Attorneys in Charge for Plaintiff Deidra McCarty, as Friend of Minor Children K.J.L. and T.J.L*

*Attorneys in Charge for Plaintiffs Denise Collins, Kenneth Lucas, and Casandra Salcido, as Next Friend of Minor Children K.L. and C.L.*

ROY W. SMITH
Attorney at Law

2616 South Loop West, Suite 670
Houston, Texas  77054
(713) 759-9266 Office
(713) 759-9412 Facsimile

By:      /s/ Roy W. Smith
Roy W. Smith
State Bar No. 181681500
roy.w.smith@live.com

*Attorney in Charge for Plaintiff Amber Lucas Individually and In Her Capacity as Representative of the Estate of Kenneth Christopher Lucas, Deceased.*

149

CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the above has been filed using the Court's e-filing system and was provided to the following attorneys of record via electronic system:

Edward J. Kroger
State Bar No. 11729700
Federal ID No. 14585
kroger@krogerlaw.com
Colin Goodman
State Bar No. 24072020
goodman@krogerlaw.com
3100 Weslayan, Suite 300
Houston, Texas  77027
(713) 961-7952
(713) 961-7953 – Fax
*Attorneys for Defendants,*
*Laxman Sunder and Carrie O'Pry*

F. Clinton Gambill, II
clinton.gambill@cao.hctx.net
State Bar No. 07601700
1019 Congress, 15th Floor
Houston, Texas  77002
(713) 274-5136
(713) 755-8924 – Fax
*Attorney for Defendants,*
*Deputy Xavier Levingston, Officer Broderick*
*Green, Officer Jesse Bell, Officer Morris*
*Thomas, and Officer Adam Kneitz*

Vince Ryan
Harris County Attorney
Laura Beckman Hedge
Assistant County Attorney
State Bar No. 11373900
Federal ID No. 12524
laura.hedge@cao.hctx.net
Keith A. Toler
Assistant County Attorney
State Bar No. 24088541
Federal ID No. 2599245
keith.toler@cao.hctx.net
1019 Congress, 15th Floor
Houston, Texas  77002
(713) 274-5137
(713) 755-8924 – Fax
*Attorneys for Defendant,*
*Harris County*

Mary E. Baker
State Bar No. 08534000
mary.baker@cao.hctx.net
1019 Congress, 15th Floor
Houston, Texas  77002
(713) 274-5133
(713) 755-8924 – Fax
*Attorney for Defendants,*
*Deputy Alicia Scott and Deputy David Gordon*

By /s/   Benjamin T. Major
ATTORNEY FOR PLAINTIFFS

150