IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CASANDRA SALCIDO, AS NEXT          §
FRIEND OF MINOR CHILDREN K.L.      §
AND C.L., DENISE COLLINS,          §
KENNETH LUCAS, AMBER LUCAS,        §
INDIVIDUALLY AND AS                §
REPRESENTATIVE OF THE ESTATE       §
OF KENNETH CHRISTOPHER LUCAS,      §
DECEASED, AND DEIDRE MCCARTY,      §
AS NEXT FRIEND OF MINOR            §
CHILDREN K.J.L. AND T.J.L.,        §
                                   §
            Plaintiffs,            §
                                   §
v.                                 §      CIVIL ACTION NO. H-15-2155
                                   §
HARRIS COUNTY, TEXAS, DEPUTY       §
DAVID GORDON, DEPUTY XAVIER        §
LEVINGSTON, DETENTION OFFICER      §
BRODERICK GREEN, DETENTION         §
OFFICER ALICIA SCOTT,              §
DETENTION OFFICER JESSE BELL,      §
DETENTION OFFICER MORRIS           §
THOMAS, AND DETENTION OFFICER      §
ADAM KNEITZ,                       §
                                   §
            Defendants.            §

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Casandra Salcido, as next friend of minor children K.L. and C.L., Denise Collins, Kenneth Lucas, Amber Lucas, individually and as Representative of the Estate of Kenneth Christopher Lucas ("Lucas"), deceased, and Deidre McCarty, as next friend of minor children K.J.L. and T.J.L, bring this action against defendants, Harris County, Texas, and Harris County Sheriff's Office ("HCSO") employees in their individual capacities, Deputy David Gordon ("Gordon"), Deputy Xavier Leveston

("Leveston"), Detention Officer Broderick Green ("Green"),[1] Detention Officer Alicia (a/k/a Riley) Scott ("Scott"),[2] Detention Officer Jesse Bell ("Bell"), Detention Officer Morris Thomas ("Thomas"),[3] Detention Officer Adam Kneitz ("Kneitz"), Laxman Sunder, M.D. ("Sunder"), and Carrie O'Pry, LVN ("O'Pry"), under 42 U.S.C. § 1983 for violation of civil rights guaranteed by the Fourteenth Amendment to the United States Constitution, and for violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131, and § 504 of the Rehabilitation Act, 22 U.S.C. § 794. Plaintiffs seek compensatory and punitive damages, costs, and attorney's fees. Pending before the court are Deputy and Detention

---

[1] "Broderick Green was a licensed jailer/detention officer in February 2014 and became a Texas licensed peace officer/Deputy in 2015." Motion for Summary Judgment for *Individual Capacity Defendants* Xavier Leveston, Broderick Green, Jesse Bell, Morris Thomas and Adam Kneitz ("Deputy and Detention Officers' MSJ"), Docket Entry No. 145, p. 14 & n.2. All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2] Defendant Scott is transgender, and transitioned from his female name (Alicia) to his male name (Riley) after Lucas's death. Although plaintiffs sued the female Alicia Scott, there is no dispute that the male Riley Scott is the same person and a defendant in this action. See Plaintiffs' Consolidated Response to Defendants' Motions for Summary Judgment ("Plaintiffs' Consolidated Response"), Docket Entry No. 175, p. 24 n.7. See also Affidavit of Harris County Sheriff's Office Deputy Riley Scott ("Scott Affidavit"), Exhibit 2 to Motion for Summary Judgment by Defendants Harris County Sheriff's Office Deputies David A. Gordon and Riley Scott in Their Individual Capacities ("Deputies' MSJ," Docket Entry No. 150), Docket Entry No. 150-2, p. 2.

[3] "Morris Thomas was a licensed jailer/detention officer in February 2014 and became a Texas licensed peace officer/Deputy in June 2014." Deputy and Detention Officers' MSJ, Docket Entry No. 145, p. 15 & n.3.

Officers' MSJ (Docket Entry No. 145); Defendant Laxman Sunder, MD's Motion for Summary Judgment ("Sunder's MSJ," Docket Entry No. 146); Defendant Carrie O'Pry, LVN's Motion for Summary Judgment ("O'Pry's MSJ," Docket Entry No. 147); Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), Fed. R. Civ. P. ("Defendants' Motion to Dismiss," Docket Entry No. 148); Deputies' MSJ (Docket Entry No. 150); Defendant Harris County's Motion for Summary Judgment ("Harris County's MSJ," Docket Entry No. 151); Defendant Harris County's Amended Motion for Summary Judgment ("Harris County's Amended MSJ," Docket Entry No. 152); Plaintiffs' Motion to Unseal (Docket Entry No. 174); Plaintiffs' Motion to Strike Defendant Harris County's Appendix Exhibits 2 and 3 and Portions of Defendant Officers' Exhibit 7 ("Plaintiffs' Motion to Strike," Docket Entry No. 179); Defendants' Objections and Reply to Plaintiffs' Consolidated Response to Defendants' Motion for Summary Judgment ("Defendants' Objections and Reply," Docket Entry No. 190); Defendants' Amended Objections and Reply to Plaintiffs' Consolidated Response to Defendants' Motions for Summary Judgment ("Defendants' Amended Objections and Reply," Docket Entry No. 192); and Defendants' Motion to Strike Exhibits & Plaintiffs' Counsel's Affidavit ("Defendants' Motion to Strike," Docket Entry No. 194). The court has considered the motions, the responses, the replies, all other relevant filings, and the applicable law. For the reasons set forth below, the Deputy and Detention Officers' MSJ (Docket Entry No. 145) will be granted in part as to defendant

-3-

Kneitz and otherwise denied; Sunder's MSJ (Docket Entry No. 146) will be granted; O'Pry's MSJ (Docket Entry No. 147) will be granted; Defendants' Motion to Dismiss (Docket Entry No. 148) will be granted; the Deputies' MSJ (Docket Entry No. 150) will be denied; Harris County's MSJ (Docket Entry No. 151) will be declared moot; Harris County's Amended MSJ (Docket Entry No. 152) will be granted in part and denied in part; Plaintiffs' Motion to Unseal (Docket Entry No. 174) will be granted; Plaintiffs' Motion to Strike (Docket Entry No. 179) will be granted; Defendants' Objections and Reply (Docket Entry No. 190) will be declared moot; Defendants' Amended Objections and Reply (Docket Entry No. 192) will be granted in part and denied in part; and Defendants' Motion to Strike (Docket Entry No. 194) will be granted in part and denied in part.

## I. Undisputed Facts and Procedural Background

This action arises out of a use of force incident at the Harris County Jail during which inmate Lucas died.

### A. Undisputed Facts

On February 12, 2014, Lucas was arrested for violating a child custody order after he refused to return his teenage children to their mother.[4] Lucas's medical assessment upon intake to the

---

[4]Harris County's Amended MSJ, Docket Entry No. 152, p. 16 ¶ 5; Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 23.

-4-

Harris County Jail stated that he had a history of high blood pressure, anxiety, bipolar disorder, and Xanax use.[5]

On February 16, 2014, at 6:25 a.m., Lucas assaulted his cellmate while the cellmate was sleeping and was moved to a holding cell where he complained of chest pain. Following evaluation in the jail clinic Lucas was transferred to the hospital for further evaluation. Late that afternoon Lucas was returned to the jail where he was later assigned to a single cell in administrative separation for resisting restraint.[6]

On February 17, 2014, at 6:25 a.m., Lucas clogged his toilet with his shirt, flooded his cell, and was observed wrapping his wet shirt around his head. Jail personnel attempted to speak with Lucas, but he responded in a confused and aggressive manner that prompted a referral to the mental health clinic. At 9:55 a.m. jail personnel observed Lucas pull the smoke detector off of the ceiling of his cell, informed Lucas that he had committed the offense of "Destroying, Altering or Damaging County Property," offered Lucas the opportunity to provide a written statement, which he refused, and reported the incident to Sergeant Oldman Keculah ("Keculah"). At approximately 11:35 a.m. a Licensed Practitioner of the Healing

---

[5]HCSO's Health Services Records for Kenneth Lucas, Exhibit 21 to Plaintiffs' Consolidated Response, Docket Entry No. 176-1, pp. 9-11.

[6]Harris County's Amended MSJ, Docket Entry No. 152, p. 17 ¶ 6 (citing Exhibit 4, Inmate Offense Report 2014-4552, Docket Entry No. 155-4; and Exhibit 6, Inmate Offense Report 2014-4602, Docket Entry No. 155-6).

Arts ("LPHA") intern attempted to meet with Lucas, but because Lucas was rambling unintelligibly and banging on the door of his cell, the intern referred Lucas to the medical clinic for possible Xanax withdrawal.[7]

At about the same time that the LPHA intern was attempting to meet with Lucas, Keculah advised First Shift Watch Commander Lieutenant Lynette Anderson ("Anderson") that Lucas was disruptive. Anderson told Keculah that she would activate the Detention Command Containment Team ("DCCT") to extract Lucas from his cell, take him to the jail clinic, and then re-house him in another cell. Before meeting the DCCT team Anderson went to Lucas's cell to assess the situation. Anderson attempted to speak with Lucas but he would not stop yelling and screaming.[8]

Dressed in protective clothing, which included padded uniforms and helmets, the DCCT arrived at the cellblock at approximately 12:00 p.m. The DCCT consisted of defendants Gordon, the team supervisor; Leveston, the point man (i.e., the first in line to enter Lucas's cell); Green, the second man; Scott, the team leader

---

[7]Id. at 17-18 ¶¶ 7-9 (citing Exhibit 8, Inmate Offense Report 2014-4633, Docket Entry No. 155-8; Exhibit 9, Affidavit of Jumall Johnson, Docket Entry No. 155-9; and Exhibit 10, Inmate Offense Report 2014-4658, Docket Entry No. 155-10).

[8]Voluntary Statement of Lynette Anderson ("Anderson Statement"), Exhibit 12 to Harris County's Amended MSJ, Docket Entry No. 156-1, p. 1; Oral and Videotaped Deposition of Lynette Anderson ("Anderson Deposition"), pp. 44:14-46:18, 121:20-122:16, and 125:15-21, Exhibit 13 to Harris County's Amended MSJ, Docket Entry No. 156-2, pp. 9-11, 22-24.

and third man; Bell, the fourth man; Thomas, the fifth man; and Kneitz, the video camera operator. Gordon, the team supervisor, ordered Lucas to hand over the smoke detector. When Lucas refused to comply with Gordon's order to hand over the smoke detector, Leveston, Green, Scott, Bell, and Thomas lined up in a single file "stick," entered Lucas's cell, and forced Lucas to the floor using a plexiglass shield. On the floor Lucas struggled, but the DCCT managed to take the smoke detector away from him, handcuff him, and shackle his legs, which were then crossed and bent back at the knees. The DCCT then slid Lucas out of the cell, lifted and placed him face down onto a gurney for transport to the jail's medical clinic. During the transport Leveston was on Lucas's right side holding his right arm behind his back,[9] Green was on Lucas's left side holding his left arm behind his back,[10] Bell was on Lucas's left side to hold his left leg, and Thomas was on Lucas's right side to hold his right leg.[11] Scott got onto the gurney and held Lucas's shackled legs — which were crossed and bent back at the

_____

[9]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 24 (citing Exhibit 8, Oral and Videotaped Deposition of Xavier Leveston ("Leveston Deposition"), p. 34:12-16), Docket Entry No. 175-11, p. 26.

[10]Id. (citing Exhibit 9, Oral and Videotaped Deposition of Deputy Broderick Green ("Green Deposition"), pp. 23:2-3, 65:25-62:2, and 159:9-11, Docket Entry No. 175-12, pp. 22, 51-52, and 92.

[11]Id. (citing Exhibit 10, Oral and Videotaped Deposition of Deputy Morris Thomas ("Thomas Deposition"), p. 60:9-15, Docket Entry No. 175-13, p. 61.

knees — against his buttocks.[12]    Kneitz stayed near Lucas

videotaping the transport to the clinic.[13]  Anderson accompanied

Lucas and the DCCT members from the cellblock to the clinic.  In

the elevator lobby on the way to the clinic, Lucas said to

Anderson, "I can't breathe you fucking bitch."[14]  Because Lucas

could talk, Anderson concluded that Lucas could breathe and did

nothing to determine the validity of his complaint that he could

not breathe.[15]  The cell extraction and transport to the clinic took

approximately 12 minutes.[16]

When Lucas arrived at the clinic, Dr. Sunder ordered that he

be given 4 mg of Ativan.[17]  Lucas continued to curse and state that

---

[12]_Id._ _See also_ Anderson Statement, Exhibit 12 to
Harris County's Amended MSJ, Docket Entry No. 156-1, p. 2.

[13]_Id._ at 25 (citing Exhibit 11, Oral and Videotaped Deposition
of Detention Officer Adam Kneitz ("Kneitz Deposition"), p. 23:11-
12, Docket Entry No. 175-14, p. 24.

[14]Harris County's Amended MSJ, Docket Entry No. 152, p. 22 ¶ 15
(citing Anderson Deposition, pp. 103:19-104:11, Exhibit 13 to
Harris County's Amended MSJ, Docket Entry No. 156-2, pp. 20-21).
_See also_ Plaintiffs' Consolidated Response, Docket Entry No. 175,
pp. 27-28 (citing Anderson Deposition, pp. 67:3-24, 71:13-17, and
102:13-104:2, Exhibit 5, Docket Entry No. 175-8, pp. 103-105).

[15]Plaintiffs' Consolidated Response, Docket Entry No. 175,
p. 28 (citing Anderson Deposition, pp. 103:25-104:2, Exhibit 5,
Docket Entry No. 175-8, pp. 104-105).

[16]Deputy and Detention Officers' MSJ, Docket Entry No. 145,
p. 15 (summarizing chronology of events seen on the Cell Extraction
Video, Exhibit 16 to Harris County's Amended MSJ, Docket Entry
No. 156-5, and Exhibit 2-B to Plaintiffs' Consolidated Response,
Docket Entry No. 175-5).

[17]Harris County's Amended MSJ, Docket Entry No. 152, p. 22 &
n.41 (citing Exhibit 16, Cell Extraction Video, Docket Entry
No. 156-5, at 15:43).

he could not breathe.[18] Dr. Sunder told Lucas, "Relax, we are going to give you your medicines."[19] Lucas responded, "Fuck you," and a few seconds later yelled "take this off me, I can't breathe."[20] DCCT members continued to tell Lucas to relax, to which Lucas responded, "I can't bro."[21] Soon thereafter O'Pry can be heard in the background of the video asking, *would it be better for ya'll if we rolled him over and, and . . .? Oh, okay, never mind.*[22] Lucas mumbled as O'Pry attempted to administer a shot of sedative, but the needle broke.[23] O'Pry's next attempt to administer a shot of sedative was successful, and O'Pry stated that Lucas should be sleeping within 15-20 minutes.[24] O'Pry then attempted to take Lucas's blood pressure, but was not successful.[25] "Dr. Sunder states that Lucas has 'already calmed down' and asks Nurse O'Pry if

---

[18]Id. & n.42 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 16:00-16:35).

[19]Id. & n.43 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 16:35).

[20]Id. & n.44 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 16:43).

[21]Id. at 22-23 & n.45 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 17:15).

[22]Id. at 23 & n.47 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 17:58) (emphasis in original).

[23]Id. & n.49 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 19:20 and 19:34).

[24]Id. & n.50 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 20:02).

[25]Id. & n.52 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 22:45).

it is the drugs that has calmed him down or if it is 'just these people' to which Nurse O'Pry responds, 'I think it is a combination, I think he realizes they're not going to move.'"[26] "O'Pry lets Dr. Sunder know that she is "working on a blood pressure monitor" and Dr. Sunder asked if they can "move him a little bit on the legs" and Scott gets off of the gurney.[27] "While Nurse O'Pry asks Dr. Sunder if she can finish getting the blood pressure, the video shows Dr. Sunder looking at Lucas's face."[28] "While Nurse O'Pry makes the 'last' attempt to take Lucas's blood pressure, Dr. Sunder speaks to Lucas, saying "Sir" and then gets closer down to his face to look at him."[29] "Dr. Sunder becomes concerned about whether Lucas is breathing and instructs the DCCT to turn Lucas over."[30] "Nurse O'Pry, still trying to get a blood pressure reading, says 'I'm almost done.'"[31] "When Dr. Sunder loudly repeats that he wants to make sure Lucas is breathing, Nurse

---

[26]Id. & n.53 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 25:00).

[27]Id. at 23-24 & n.54 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 25:12).

[28]Id. at 24 & n.55 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 25:32).

[29]Id. & n.56 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 26:12).

[30]Id. & n.57 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5).

[31]Id. & n.58 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 26:50).

O'Pry says 'oh' and the team turns Lucas over."[32] "Dr. Sunder tells Nurse O'Pry to get a 'pulse ox' on Lucas 'ASAP' and she responds that she is 'working on it.'"[33] "Nurse O'Pry asserts she has a 'carotid pulse' and that 'we are doing good,' to which Dr. Sunder again tells her to get the pulse ox on Lucas."[34] "After Dr. Sunder tells Nurse O'Pry to get a pulse ox on Lucas for the third time, she responds that she is 'working on it.'"[35] "Dr. Sunder instructs the medical team to 'bag him' and to call 'HFD.'"[36] "Dr. Sunder inquires about the pulse ox, which is still not on Lucas. The nurse, who was using a bag-valve mask (commonly called an Ambu bag) had a DCCT team member take over so she can get the pulse ox on Lucas."[37] "The pulse ox is put on Lucas and Dr. Sunder says he is not breathing."[38] "The video ends shortly thereafter."[39] The cell

---

[32]Id. & n.59 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 26:56).

[33]Id. & n.60 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 27:20).

[34]Id. & n.61 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 27:30).

[35]Id. & n.62 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 28:13).

[36]Id. & n.63 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 28:39).

[37]Id. at 24-25 & n.64 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 29:00).

[38]Id. at 25 & n.65 (citing Exhibit 16, Cell Extraction Video, Docket Entry No. 156-5, at 29:11).

[39]Id.

extraction, transport to the clinic, and events that transpired in the clinic until shortly after Dr. Sunder told the nurse to call 911 took approximately 30 minutes.[40]

At 2:17 p.m. Lucas was pronounced dead at Ben Taub General Hospital.[41] According to the autopsy the cause of death was "[s]udden cardiac death . . . during physical restraint," and the manner of death was "homicide."[42]

## B. Procedural Background

On July 28, 2015, plaintiffs, as representatives of the estate and heirs of Lucas, initiated this action against Harris County, HCSO Deputies Gordon, Scott, Levenston, and Green, Detention Officers Bell, Thomas, and Kneitz, Dr. Sunder and Nurse O'Pry.[43] The live pleading is Plaintiffs' Fourth Amended Complaint (Docket Entry No. 77) filed on October 5, 2016. Plaintiffs allege that the defendants violated Lucas's constitutional rights protected by the Fourteenth Amendment to the United States Constitution by subjecting Lucas to an excessive use of force, being deliberately

---

[40]Deputy and Detention Officers' MSJ, Docket Entry No. 145, p. 15 (summarizing chronology of events seen on the Cell Extraction Video).

[41]Autopsy Report, Exhibit 24 to Harris County's Amended MSJ, Docket Entry No. 157-3, p. 2.

[42]Id. (citing Autopsy Report, Exhibit 24 to Harris County's Amended MSJ, Docket Entry No. 157-3, p. 1 ("CAUSE OF DEATH: Sudden cardiac death due to hypertensive and atherosclerotic cardio-vascular disease during physical restraint").

[43]Plaintiffs' Original Complaint, Docket Entry No. 1.

indifferent to Lucas's serious medical needs, and failing to prevent Lucas from being harmed.[44] Plaintiffs also allege that defendants' actions constitute violations of the ADA and the RA.[45] Plaintiffs seek compensatory and punitive damages, costs, and attorney's fees.[46]

Five members of the DCCT — Leveston, Green, Bell, Thomas, and Kneitz — have filed a joint motion for summary judgment, arguing that they are entitled to summary judgment because plaintiffs are unable to cite evidence capable of showing that they violated Lucas's constitutionally protected rights and because they are entitled to qualified immunity.[47] The DCCT supervisor, Gordon, and the DCCT team leader, Scott, have filed a separate motion for summary judgment similarly arguing that plaintiffs cannot show that they violated Lucas's constitutionally protected rights and that they too are entitled to qualified immunity.[48] The court refers to these defendants collectively as the "DCCT defendants."

Dr. Laxman and Nurse O'Pry have each filed separate motions for summary judgment in which they argue that they are entitled to summary judgment on plaintiffs' claims because plaintiffs are

---

[44]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, pp. 20-26 ¶¶ 54-74.

[45]Id. at 26-27 ¶¶ 75-83.

[46]Id. at 27-28.

[47]Deputy and Detention Officers' MSJ, Docket Entry No. 145.

[48]Deputies' MSJ, Docket Entry No. 150.

unable to cite evidence capable of showing that they violated Lucas's constitutionally protected rights and that they, too, are entitled to qualified immunity.[49]

Harris County has moved for summary judgment arguing that plaintiffs are unable to establish municipal liability because they cannot cite evidence capable of showing that Lucas suffered deprivation of a constitutionally protected right or that an official custom, policy, or procedure was the moving force behind a constitutional deprivation suffered by Lucas.[50]

## II. Motion to Dismiss Official Capacity Claims Asserted Against the Individually Named Deputy and Detention Officer Defendants

Defendants Gordon, Scott, Leveston, Green, Bell, Thomas, and Kneitz seek dismissal of all the claims asserted against them in their official capacities under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted.[51] These defendants argue that the official capacity claims asserted against them should be dismissed because those claims are actually claims against Harris County, and are redundant because Harris County is a named defendant in this action.[52] Plaintiffs

---

[49]Sunder's MSJ, Docket Entry No. 146; and O'Pry's MSJ, Docket Entry No. 147.

[50]Harris County's MSJ, Docket Entry No. 152.

[51]Defendants' Motion to Dismiss, Docket Entry No. 148, p. 1.

[52]Id. at pp. 3-4.

argue in response that Defendants' Motion to Dismiss should be denied because "Harris County has not agreed that it is responsible for the individual Defendants' actions in their official capacities."[53] Plaintiffs acknowledge, however, that "[t]o the extent Harris County is solely liable for each employee's official actions, as the individual Defendants contend and Harris County does not contest, the parties agree that the official capacity claims are redundant and therefore bear no prejudice whatsoever to any party."[54]

## A. Standard of Review

Rule 12(b)(6) motions test the formal sufficiency of the pleadings and are "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974

---

[53]Response in Opposition to Motion to Dismiss (Doc. 148), Docket Entry No. 178, p. 1.

[54]Id.

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id.

## B.   Applicable Law

Public officials like the individual deputy and detention officer defendants may be sued under 42 U.S.C. § 1983 in either their official and/or personal capacities. Hafer v. Melo, 112 S. Ct. 358, 361-63 (1991) (citing Kentucky v. Graham, 105 S. Ct. 3099 (1985)).

> [T]he distinction between official-capacity suits and personal-capacity suits is more than "a mere pleading device." . . . State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the identity of the government that employs them. . . . By contrast, officers sued in their personal capacity come to court as individuals.

Id. at 362. The real party in interest in an official-capacity suit is the governmental entity, not the named official. Id. at 361 (citing Graham, 105 S. Ct. at 3105) ("Suits against state officials in their official capacity . . . should be treated as

-16-

suits against the State."). A governmental entity can be sued and subjected to monetary damages under § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. <u>Monell v. Department of Social Services of City of New York</u>, 98 S. Ct. 2018, 2037-38 (1978) (§ 1983). A municipality may not be held liable under § 1983 on the basis of respondeat superior or vicarious liability. <u>Id.</u> Municipal liability under § 1983 requires proof of (1) a policy maker; (2) an official policy; and (3) a violation of a constitutional right whose moving force is the policy or custom. <u>Id.</u> <u>See also</u> <u>Cox v. City of Dallas, Texas</u>, 430 F.3d 734, 748 (5th Cir. 2005) ("Municipal liability under . . . § 1983 requires proof of three elements in addition to the underlying claim of a violation of rights: 'a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.'").

## C. Application of the Law to the Facts

Plaintiffs' claims for damages against the individually named deputy and detention officer defendants in their official capacities are in essence claims against Harris County. <u>See</u> <u>Brandon v. Holt</u>, 105 S. Ct. 873, 878 (1985) ("a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents"); <u>Goodman v. Harris County</u>, 571 F.3d 388, 396 (5th Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1143 and 1146

(2010) ("official capacity suits are really suits against the governmental entity").   Plaintiffs have not alleged that the individually named deputy and detention officer defendants are final policymakers whose actions may be directly imputed to Harris County under § 1983.   See Brooks v. George County, Mississippi, 84 F.3d 157, 165 (5th Cir. 1996) (noting that "even a single decision may create municipal liability *if* that decision were made by a final policymaker responsible for that activity") (emphasis in original) (quotation marks and citations omitted). Because under Monell, 98 S. Ct. at 2018, the actions of the individually named deputy and detention officer defendants cannot alone form the basis for a § 1983 claim against Harris County, and because Harris County, the real party in interest, is a party to this action, the § 1983 claims asserted against the DCCT defendants in their individual capacities will be dismissed.

Any official capacity claim that plaintiffs have asserted or are attempting to assert against the DCCT defendants for violation of the ADA and the RA fares no better.   Those claims are also subject to dismissal because Harris County, the real party in interest, is a party to the lawsuit.   See Graham, 105 S. Ct. at 3105 (Official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent.") (citation omitted).   See also Stevenson v. Housing Authority of City of Austin, Case No. A-09-CA-083-SS, 2009 WL 10669236, *2 (W.D. Tex. April 27, 2009) ("Plaintiff would suffer

-18-

no prejudice by the dismissal of his ADA claims against Blanco and Del Rio in their official capacities since HACA is already a party to this suit, and thus their presence in this case is redundant."). Accordingly, defendants' motion to dismiss the official-capacity claims asserted against Gordon, Leveston, Green, Scott, Bell, Thomas, and Kneitz will be granted.

### III.  **Evidentiary Motions**

Pending before the court are Plaintiffs' Motion to Strike (Docket Entry No. 179), Defendants' Objections and Reply (Docket Entry No. 190), Defendants' Amended Objections and Reply (Docket Entry No. 192), and Defendants' Motion to Strike (Docket Entry No. 194). Defendants' Objections and Reply (Docket Entry No. 190) will be declared moot based on the filing of Defendants' Amended Objections and Reply (Docket Entry No. 192). The court rules on objections to the evidence before reaching the merits of the summary judgment motions. See Payne v. Collins, 986 F. Supp. 1036, 1054 (E.D. Tex. 1997) (citing Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109-10 (5th Cir. 1991) (en banc)).

### A.  **Motions to Strike**

#### 1.  Plaintiffs' Motion to Strike (Docket Entry No. 179)

Plaintiffs move the court to strike defendant Harris County's Summary Judgment Appendix Exhibits 2 and 3 (Docket Entry Nos. 155-2 [arrest record] and 155-3 [criminal history]), and discussion of the same in Section VI of defendant officers' Summary Judgment

-19-

Appendix Exhibit 7 (Docket Entry No. 145-8, Affidavit of Jay O. Coons, Ph.D.) as irrelevant, inadmissible, and prejudicial. The exhibits plaintiffs move to strike are official records showing Lucas's criminal history. Asserting that "[d]efendants cite the exhibits for the sole purpose of attacking [Lucas's] character in violation of Fed. R. Evid. 404,"[55] plaintiffs argue that

> the exhibits are not relevant to any matters at issue in the case, as [Lucas's] prior charges and convictions are unrelated to the events surrounding [Lucas's] death at the hands of the officers, and as Defendants have provided no evidence that they considered or even knew about [Lucas's] history when they used excessive force and killed him.[56]

Defendants respond that they are not seeking to introduce evidence of Lucas's violent criminal history as character evidence but, instead, as a defense to plaintiffs' claims that Lucas was a peaceful, nonviolent inmate who did nothing to warrant extraction from his cell.[57] Citing <u>United States v. Beechum</u>, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), <u>cert. denied</u>, 99 S. Ct. 1244 (1979), defendants argue that

> [a]lthough extrinsic evidence of a crime, wrong, or other act is inadmissible to prove that on a particular occasion the person acted in accordance with their character, Federal Rule of Evidence 404(b) allows such evidence for another purpose, such as proving motive,

---

[55]Plaintiffs' Motion to Strike, Docket Entry No. 179, p. 2.

[56]<u>Id.</u>

[57]Defendants' Response in Opposition to Plaintiffs' Opposed Motion to Strike Defendant Harris County's Appendix Exhibits 2 & 3 & Portions of Defendant Officers' Exhibit 7 ("Defendants' Response in Opposition to Plaintiffs' Motion to Strike"), Docket Entry No. 195, p. 1.

> opportunity, intent, preparation, plan, knowledge,
> identity, absence of mistake, or lack of accident. Fed.
> R. Evid. 404(b). Such evidence is admissible so long as
> it is relevant to the issues and is not substantially
> outweighed by prejudice. Fed. R. Evid. 401, 402, 403.[58]

Defendants argue that they seek to introduce Lucas's prior criminal history "as essential elements of their defense and to prove intent, knowledge, absence of mistake, and lack of accident."[59] Defendants argue that the probative value of Lucas's prior criminal history is not substantially outweighed by a danger of unfair prejudice because his past

> charges for evading arrest and assault are similar to
> Defendants' contention that Lucas resisted orders to give
> up his makeshift weapon, resisted arrest by the
> extraction team, and attempted to assault them . . . as
> they entered his cell. Thus, the extrinsic evidence has
> a high probative value to Defendants' defenses in this
> case.
>
> Moreover, there is little to no danger of unfair
> prejudice. Without any support whatsoever — and
> contradicted by the video in this case — Plaintiffs
> allege Lucas was a peaceful, nonviolent inmate whose
> actions did not warrant a cell extraction. The video
> does not show Lucas attempting to assault the officers as
> they entered Lucas's cell, and thus extrinsic evidence of
> his criminal convictions shows Lucas intended to resist
> arrest and assault the officers. Plaintiffs also
> repeatedly argue the officers "killed" Lucas. Plaintiffs
> cannot hide behind unsupported accusations and then
> challenge Defendants' ability to defend themselves. The
> only unfair prejudice would be to Defendants if this
> evidence is excluded because Defendants will be hindered
> from defending against Plaintiffs' unsupported
> assertions.[60]

---

[58]Id. at 3.

[59]Id. at 4-6.

[60]Id. at 6-7.

Plaintiffs reply that "[a]ny probative value Defendants could conceivably extract from evidence of [Lucas]'s history is substantially outweighed by its undue prejudice to Plaintiffs.[61]

In Beechum, 582 F.2d at 911, the Fifth Circuit held that extrinsic evidence is admissible under Rule 404(b) if it is relevant to an issue other than the defendant's character, and if its probative value outweighs its prejudicial effect under Rule 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In performing a Rule 403 analysis, the court must balance "the incremental probity of the evidence . . . against its potential for undue prejudice." Beechum, 582 F.2d at 914. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In Beechum the defendant, a postman, was charged with stealing money from the mails. The money had been found in his possession after he had finished his route, and he claimed at trial that he intended to turn the money over to the Postal Service, having found

---

[61]Plaintiffs' Reply in Support of Motion to Strike Defendant Harris County's Appendix Exhibits 2 and 3 and Portions of Exhibit 7 ("Plaintiffs' Reply in Support of Motion to Strike"), Docket Entry No. 201, p. 1.

it loose while delivering mail. The government rebutted this by introducing evidence that several months before his arrest the defendant had taken two credit cards out of the mail and had them in his possession when arrested, which tended to show he intended to keep them permanently. This was put on to show that, just as he intended to keep the credit cards, he intended to keep the money.

The prior bad acts in <u>Beechum</u> tended to demonstrate the presence of the requisite intent in the crime charged. But in this case Lucas's prior arrests and convictions for evading arrest and assaults causing or threatening bodily injury have no relevance — other than as proof of propensity — to the intent to resist being extracted from his cell or intent to harm the officers who effected the cell extraction. And if the evidence were relevant to intent, its relevance would be slight, when compared with the prejudicial impact of such evidence in the mind of a jury, that to admit it would be an abuse of discretion under Rule 403, especially in view of the age of the prior convictions. <u>See</u> <u>id.</u> at 915 (holding that the temporal remoteness of an extraneous offense decreases the probity of the extraneous offense evidence). The prior convictions are not relevant to motive because they shed no light on why Lucas would have wanted to resist the cell extraction or harm the extracting officers. Nor does the evidence of prior convictions tend to show knowledge, absence of mistake, or lack of accident for the incident at issue in this action.

Although defendants argue that they seek to introduce evidence of Lucas's criminal history to defend against plaintiffs'

allegations that Lucas was nonviolent and did not fight with the officers or threaten them, as defendants aptly note, "the entire incident was captured on video, which shows Lucas's violent interaction with the officers."[62] The recording of the incident therefore obviates the need to introduce evidence of Lucas's criminal history as a means of countering plaintiffs' allegations that Lucas was non-violent. Because defendants offer no other reason for admitting evidence of Lucas's criminal history, the court concludes that evidence is inherently inflammatory, prejudicial, and irrelevant to the claims at issue in this action such that the probative value of that evidence is substantially outweighed by the risk of unfair prejudice to the plaintiffs. Accordingly, Plaintiffs' Motion to Strike will be granted.

2.  Defendants' Motion to Strike (Docket Entry No. 194)

Defendants Harris County and the DCCT defendants have moved to strike the declaration of plaintiffs' counsel, Benjamin Major (Docket Entry No. 175-1), and Exhibits 2-A, 3, and 15 (Docket Entry Nos. 175-4, 175-6, and 175-18) attached to Plaintiffs' Response to Harris County's motion for summary judgment on grounds that they are not competent summary judgment evidence.[63]

---

[62]Defendants' Response in Opposition to Plaintiff's Motion to Strike, Docket Entry No. 195, p. 4.

[63]Defendants' Motion to Strike, Docket Entry No. 194, p. 1.

-24-

(a)   Declaration of Benjamin Major

     Defendants argue that the Declaration of Benjamin Major should

be stricken because it is

> simply a list and description of Plaintiffs' exhibits.
> Despite declaring he has personal knowledge of the
> matters in the affidavit, there is no indication that
> Plaintiffs' counsel is the custodian of records for any
> of the documents attached as exhibits or that Plaintiffs'
> counsel has personal knowledge of the preparation and
> accuracy of such documents.   This is not a business
> records affidavit.   Therefore, the Court should strike
> the affidavit, of which Plaintiffs' counsel has no
> personal knowledge.[64]

Citing <u>McConathy v. Dr. Pepper/Seven Up Corp.</u>, 131 F.3d 558, 562

(5th Cir. 1998), plaintiffs respond that

> [t]he Court should not strike counsel's declaration
> identifying the documents in Plaintiffs' summary judgment
> appendix, as the declaration is an appropriate vehicle to
> support the (thus far uncontested) authenticity of other
> records in the appendix.   That a party produced a
> document in discovery is a fact militating towards its
> authenticity.[65]

Harris County replies that

> Plaintiffs' counsel's affidavit . . . is inadmissible
> because counsel did not prepare any of the exhibits and
> the affidavit is not based on personal knowledge.   Thus,
> the Court should strike the[] four exhibits Plaintiffs
> rely on for their Response to Defendants' motions for
> summary judgment.[66]

---

     [64]<u>Id.</u> at 11.

     [65]Plaintiffs' Consolidated Response to Defendants' Motion to
Strike and Objections to Summary Judgment Evidence ("Plaintiffs'
Consolidated Response"), Docket Entry No. 203, p. 24.

     [66]Defendant Harris County's Reply in Support of Its Motion to
Strike Exhibits & Plaintiffs' Counsel's Affidavit ("Harris County's
Reply in Support of Its Motion to Strike"), Docket Entry No. 205,
p. 2.

In pertinent part Rule 56 states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Fifth Circuit has held that "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" LSR Consulting, LLC v. Wells Fargo Bank, N.A., 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)2)). Rule 56, therefore, allows courts to consider for purposes of summary judgment, evidence that will likely be admissible at trial without imposing on parties the time and expense it takes to authenticate everything in the record. See Lee v. Offshore Logistical and Transport, LLC, 859 F.3d 353, 355 (5th Cir. 2017) (quoting Advisory Committee's note to 2010 amendment ("The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.")).

Because plaintiffs have not offered the Declaration of Benjamin Major as substantive evidence directed to the merits of the pending motions, and because defendants have neither argued nor offered evidence from which the court could conclude that the substantive exhibits defendants move to strike are not what Benjamin Major says they are in his declaration or that these exhibits are not capable of being presented in admissible form at

trial, defendants' motion to strike the Declaration of Benjamin Major will be denied. The court notes that defendants have not challenged the authenticity, as distinguished from the need for an authenticating affidavit, of any exhibit, and defendants have had the opportunity to, and did, brief their opposition to the substance of the summary judgment motion that these exhibits support. Even if the declaration of Benjamin Major were stricken, defendants have not demonstrated that the exhibits to which they object should necessarily be stricken. Accordingly, defendants' motion to strike the Declaration of Benjamin Major will be denied.

(b) Exhibit 2-A — Captioned Cell Extraction Video

Plaintiff's Exhibit 2-A is a video of Lucas's cell extraction annotated with captions provided by the plaintiffs. Defendants argue that "[t]his captioned video is not evidence and is not admissible — the captions, although allegedly prepared by a 'video editing firm,' are inaccurate, misleading and prejudicial."[67] Defendants argue that the captions are inaccurate because they misstate and/or omit some statements,[68] the captions are misleading because they prioritize Lucas's statements over statements of others, and the captions are prejudicial because in violation of Federal Rule of Civil Procedure 26(a)(1)(A)(ii) the captioned video was not disclosed to defendants, and plaintiffs have failed to

---

[67]Defendants' Motion to Strike, Docket Entry No. 194, p. 2.

[68]Id. at 3-4.

attach a certification swearing to the captions' accuracy.[69] Asserting that the uncaptioned video speaks for itself, defendants argue that "the Court does not need Plaintiff's manufactured evidence to explain what is on the video."[70]

Plaintiffs respond that the captioned video, Exhibit 2-A, is admissible pursuant to Rule 56(c)(2), and, alternatively, is "properly before the Court as a demonstrative exhibit or pedagogical aid pursuant to Federal Rule of Evidence 611(a) and advisory committee notes accompanying the rule."[71] Plaintiffs also assert that they "anticipate producing a witness at trial who can authenticate the transcript and attest to its accuracy,"[72] they are "hopeful that the parties can stipulate to the accuracy of a jointly-produced transcript for at least the vast majority of the video attached as Exhibit 2-B,"[73] and "if the parties cannot stipulate to the accuracy of a single transcript, Defendants will have the same opportunity to provide a transcript as the Plaintiffs, and the jury will decide which transcript is accurate."[74]

---

[69]Id. at 4.

[70]Id.

[71]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 20.

[72]Id. at 22.

[73]Id.

[74]Id.

Rule 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)2). Defendants object that Exhibit 2-A has not been presented in admissible form but fail to argue that it cannot be presented in inadmissible form at trial. Defendants object that the Exhibit 2-A captions are inaccurate and misleading, and therefore prejudicial because they leave the court with the wrong impression. But this is the summary judgment stage; there is no risk of prejudice because the court can focus on the audio and discount any inaccurate and misleading captions. Moreover, if at trial the parties are unable to stipulate to the accuracy of a jointly produced transcript, defendants will be free to offer their own captioned version of the video. Plaintiffs' explanation of how Exhibit 2-A could be produced in admissible form at trial renders it admissible for summary judgment purposes. See United States v. Chaney, 299 F. App'x 447, 454 (5th Cir. 2008) (quoting United States v. Onori, 535 F.2d 938, 947 (5th Cir. 1976) (recognizing that the Fifth Circuit has held that "it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a [recording]")). Therefore, defendants' motion to strike Exhibit 2-A will be denied for essentially the same reasons that the court has already concluded

that defendants' motion to strike the affidavit of plaintiffs'
counsel should be denied.

(c) Exhibit 3 — 2009 DOJ Findings Letter

Plaintiffs' Exhibit 3 (Docket Entry No. 175-6) is a June 4,
2009, Findings Letter written by Assistant Attorney General Loretta
King to Harris County Judge Ed Emmett concerning an investigation
by the Civil Rights Division of the United States Department of
Justice ("DOJ") into the conditions at the Harris County Jail.
Defendants move to strike the 2009 DOJ Findings Letter "because it
is untrustworthy and irrelevant."[75] Plaintiffs respond that the DOJ
Findings Letter is admissible because it is both relevant and
reliable, and because defendants have failed to carry their burden
of showing that it is untrustworthy.[76]

**(1) The DOJ Findings Letter is Trustworthy**

Citing Federal Rule of Evidence 803(8)(B) defendants argue
that although "public agency reports containing factual findings
resulting from an investigation are ordinarily not excluded by the
hearsay rule, such reports are inadmissible if they are
untrustworthy."[77] Defendants argue that the DOJ Findings Letter
lacks trustworthiness because it was prepared by an assistant

---

[75]Defendants' Motion to Strike, Docket Entry No. 194, p. 1.

[76]Plaintiffs' Consolidated Response, Docket Entry No. 203,
pp. 8-14.

[77]Defendants' Motion to Strike, Docket Entry No. 194, p. 5.

attorney general and is therefore "'lawyer talk' prepared by an advocate as a prerequisite to instituting litigation against Harris County,"[78] because no hearing was held to receive evidence and, consequently, its conclusions are based upon the stories of a statistically insignificant number of inmate witnesses,[79] and because it is inconsistent with findings made by other entities, including the DOJ's own National Institute of Corrections ("NIC"), the United States Marshals Service ("USMS"), the Texas Commission on Jail Standards ("TCJS"), independent advocacy groups, and other experts.[80]

Plaintiffs respond that the DOJ Findings Letter is trustworthy because "it arose from a multi-pronged investigation of facts on the ground in the jail by an authorized government agency,"[81] "the source is an agency experienced in correctional oversight,"[82] and "[i]t relied upon 'correctional experts in the fields of penology, medicine, psychiatry, and life safety.'"[83]  Citing <u>Shepherd v. Dallas County</u>, 591 F.3d 445, 457 (5th Cir. 2009), plaintiffs argue that the Fifth Circuit has "affirmed the admission of a[]

---

[78]<u>Id.</u> at 6.

[79]<u>Id.</u> at 7.

[80]<u>Id.</u>

[81]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 10.

[82]<u>Id.</u> at 11.

[83]<u>Id.</u> at 12.

comparable [DOJ] report sent to Dallas County regarding conditions in the county jail,"[84] and "rejected Dallas County's argument that the [DOJ] was not a credible author, as '[q]uestions of credibility are properly for the jury.'"[85]

The Fifth Circuit has held reports such as the DOJ Findings Letter to be admissible under Federal Rule of Evidence 803(8). See Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1305 (5th Cir. 1991). Rule 803(8) creates an exception to the rule against hearsay for public records, including "in a civil case . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). The Fifth Circuit has cited notes of the Advisory Committee for stating that the exception is justified by "'the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record.'" Moss, 933 F.2d at 1305 (citation omitted). Opinions and conclusions as well as facts are covered by this rule, and the Advisory Committee "assumes admissibility . . . in the first instance." Id.

Public records are admissible, however, only if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). The Fifth Circuit has adopted the Advisory Committee's suggested, non-exhaustive list of factors for assessing the trustworthiness of a

---

[84]Id.

[85]Id. (quoting Shepherd, 591 F.3d at 457).

public record: (1) "the timeliness of the investigation;" (2) "the special skill or expertise of the official;" (3) "whether a hearing was held and at what level;" (4) "possible motivational problems as in Palmer v. Hoffman, 63 S. Ct. 477 (1943)." Moss, 933 F.2d at 1305. In Palmer the Supreme Court held that "the railroad's version of events, embodied in the company's records, was inadmissible hearsay because the report was not part of the systematic conduct of a railroad business." Id. Thus, "[i]n light of the presumption of admissibility, the party opposing the admission of the report must prove the report's untrustworthiness." Id. The Fifth Circuit has explained:

> It follows that in determining trustworthiness under Rule 803(8)[], credibility of the report itself or the testimony in the report are not the focus. Instead the focus is the report's *reliability*. . . . The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon ("reliability"). The four factors suggested by the Advisory Committee correctly focus attention on the preparation of the report, . . . not on whether the court agrees with the conclusions of the report.

Id. at 1307. In other words, "reliability focuses on the methodology behind the report." Id. at 1308.

Defendants argue that the DOJ Findings Letter is not trustworthy because it was prepared by an assistant attorney general as a prerequisite to litigation. While the DOJ Findings Letter was written by an assistant attorney general, it was prepared as part of an investigation that the DOJ carried out

-33-

pursuant to its duties under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S. C. § 1997. The investigation began in March of 2007, included two on-site inspections conducted in July and August of 2008, and resulted in the Findings Letter written in June of 2009. The letter states that it was written "[c]onsistent with statutory requirements . . . to report the findings of [the] investigation and to recommend remedial measures needed to ensure that conditions at the Jail meet federal constitutional requirements."[86]   Courts typically assume that "public officials, in crafting such a report, acted 'properly and without bias.'" Daniel v. Cook County, 833 F.3d 728, 740 (7th Cir. 2016). Because the DOJ Findings Letter was written in close proximity to the dates of the underlying investigation, and because the investigation was conducted by the DOJ, an organization statutorily charged with authority not only to conduct such investigations but also to evaluate the conduct of law enforcement personnel against constitutional standards, the court concludes that neither the first factor — timeliness — nor the second factor — the special skill or expertise of the official — weigh against trustworthiness under Rule 803(8).

Asserting that no hearing was held to receive evidence, defendants argue that the DOJ Findings Letter is not trustworthy because the DOJ based its findings upon unsworn hearsay from a

---

[86]DOJ Findings Letter, Exhibit 3 to Plaintiffs' Consolidated Response, Docket Entry No. 175-6, p. 1.

statistically insignificant number of inmates — persons whom
defendants describe as "notoriously unreliable witnesses."[87] While
no hearing was held to receive evidence, defendants have failed to
cite any evidence supporting their contention either that the
letter's conclusions are based upon the stories of a statistically
insignificant number of inmate witnesses or that the testimony of
such witnesses is presumptively unreliable. Nor have defendants
cited any evidence contradicting the letter's description of the
underlying investigation as having obtained evidence from multiple
sources. In pertinent part the DOJ Findings Letter states:

> [C]orrectional experts in the fields of penology,
> medicine, psychiatry, and life safety, assisted us in
> reviewing records, interviewing staff, interviewing
> detainees, and inspecting facility living conditions.
> Before, during, and after our on-site inspections, we
> received and reviewed a large number of documents,
> including policies and procedures, incident reports,
> medical and mental health records, and other materials.
> Consistent with our commitment to provide technical
> assistance and conduct a transparent investigation, we
> provided debriefings at the conclusion of two on-site
> inspections conducted in July and August 2008. During
> the debriefings, our consultants provided their initial
> impressions and tentative concerns.
>
> Throughout this process, County and Jail officials
> cooperated fully with our review.[88]

The letter's description of the investigation shows that
information was obtained from many sources — including interviews
with both jail staff and detainees and from documents such as

_____

[87]Defendants' Motion to Strike, Docket Entry No. 194, p. 7.

[88]DOJ Findings Letter, Exhibit 3 to Plaintiffs' Consolidated
Response, Docket Entry No. 175-6, p. 2.

policies, procedures, incident reports, and medical and mental health records. The investigation included two on-site inspections followed by debriefings, and county and jail officials fully cooperated with the DOJ's review. Thus, while the findings stated in the DOJ Findings Letter have not yet been tested by cross-examination, the investigation was sufficiently broad, defendant Harris County was sufficiently involved, and the process was sufficiently open that the lack of a hearing does not weigh against trustworthiness. See Barr v. City of Albuquerque, No. 12-cv-01109-GBW/RHS, 2014 WL 11497833, at *2 (D.N.M. Aug. 22, 2014).

Finally, defendants argue that the motive for the report was to justify DOJ litigation against Harris County. But defendants have not cited any evidence that the DOJ Findings Letter is tainted by motivational problems. The mere fact that the letter mentions that litigation may result does not mean that the investigation was conducted for the specific purpose of gathering evidence for an inevitable lawsuit. Citing the Seventh Circuit's opinion in Daniel, 833 F.3d at 740-41, with approval, Fifth Circuit has observed that

> reports, prepared pursuant to the statutory duty of the Department under the Civil Rights of Institutionalized Persons Act, are not untrustworthy as documents prepared in anticipation of litigation. "The mere fact that 'the Attorney General may initiate a lawsuit' against the Jail if a resolution is not otherwise reached to address its unconstitutional conditions does not mean that the preliminary investigation was conducted as anticipatory fact-finding for a potential lawsuit. If the law were otherwise, many official investigative findings would be inadmissible." As our sister circuit found, reports of

this type may be especially relevant in <u>Monell</u> claims, where the plaintiff is burdened with demonstrating a systemic failing — "exactly what the Department of Justice experts were looking for."

<u>Hicks-Fields v. Harris County, Texas</u>, 860 F.3d 803, 809-10 (5th Cir. 2017). Thus, the court concludes that motivational problems do not weigh against trustworthiness.

Nor is the court persuaded that inconsistency between findings expressed in the DOJ Findings Letter and those expressed in reports conducted by other entities weigh against the letter's trustworthiness. This argument goes to the weight or credibility of the findings stated in the DOJ Findings Letter, which courts do not assess at the summary judgment stage. <u>Moss</u>, 933 F.2d at 1307.

Because the court has concluded that defendants have failed to show that any of the four factors that courts use to analyze the trustworthiness of a public record, i.e., timeliness, skill or experience of the official, whether a hearing was held, and motivation, weigh against finding the DOJ Findings Letter trustworthy, the court concludes that defendants have failed to carry their burden of establishing that the DOJ Findings Letter is inadmissible because it is not trustworthy. <u>See Moss</u>, 933 F.2d at 1305 ("In light of the presumption of admissibility, the party opposing the admission of the report must prove the report's untrustworthiness."); <u>Daniel</u>, 833 F.3d at 740 (holding that DOJ investigatory report regarding medical care at Cook County Jail satisfied requirements of Rule 803(8)).

**(2) The DOJ Findings Letter is Not Relevant to Claims Asserted Against the DCCT Defendants But is Relevant to the Claims Against Harris County.**

Defendants argue that even if the DOJ Findings Letter is trustworthy, that it is inadmissible because it is irrelevant.[89] Paraphrasing Federal Rule of Evidence 401, the Fifth Circuit has stated that "[e]vidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" <u>Hicks-Fields</u>, 860 F.3d at 809 (quoting <u>Brazos River Authority v. GE Ionics, Inc.</u>, 469 F.3d 416, 425 (5th Cir. 2006)).

### (i) DCCT Defendants

The DCCT defendants argue that the DOJ Findings Letter is not relevant as evidence against them because it does not identify them as having been the subjects of the underlying investigation or having engaged in misconduct, and because plaintiffs fail to cite any evidence that they received a copy of the letter, had any knowledge of the letter, or were in a position to affect county policy or protocol.[90] Without disputing that the DOJ Findings Letter does not identify any of the DCCT defendants as having been

---

[89]Defendants' Motion to Strike, Docket Entry No. 194, p. 1.

[90]Defendants' Reply to Plaintiffs' Consolidated Response to Defendants' Motion to Strike and Objections to Summary Judgment Evidence ("Defendants' Reply to Plaintiffs' Consolidated Response"), Docket Entry No. 204, p. 3.

subjects of the underlying investigation, having engaged in misconduct, or having received the DOJ Findings Letter, plaintiffs argue that the letter is nevertheless relevant as evidence against them because it "speaks to a material dispute of fact (including with the individual officers, who object to relevance) that hogtying is dangerous."[91]

The court is not persuaded by the plaintiffs' argument that the DOJ Findings Letter is admissible as evidence against the DCCT defendants because (1) plaintiffs have failed to cite any evidence capable of showing that any of these defendants dispute that hogtying is dangerous, and (2) although the DOJ Findings Letter states, "we found a significant number of incidents where staff used inappropriate force techniques,"[92] none of the documented incidents of inappropriate force techniques involved hogtying.[93] The only reference to hogtying in the DOJ Findings Letter relates to the staff training:

> The Jail's use of force policy is flawed in several regards. First, neither written policy nor training provide staff with clear guidance on prohibited use of force practices. For example, Harris County Jail does not train staff that hogtying and choke holds are dangerous, prohibited practices.[94]

---

[91]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 9.

[92]DOJ Findings Letter, Exhibit 3 to Plaintiffs' Consolidated Response, Docket Entry No. 175-6, p. 16.

[93]Id. at 16-17.

[94]Id. at 16.

Moreover, defendants have cited uncontradicted testimony of former Sheriff Adrian Garcia, individual defendant officers, and Harris County's corporate representative that in 2014 when Lucas was incarcerated Harris County policy and training prohibited hogtying.[95] The court therefore concludes that the DOJ Findings Letter, which was written over four years before Lucas was incarcerated, is inadmissible as evidence against the DCCT defendants because it is not relevant to any of the claims that the plaintiffs have asserted against them. See Bonilla v. Jaronczyk, 354 F. App'x 579, 582 (2d Cir. 2009) (affirming district court's decision to exclude a DOJ Findings Letter because the "constitutional violations [identified therein] did not implicate the facts of [the plaintiff's] case or name any of the individual defendants"). Defendants' motion to strike the DOJ Findings Letter as evidence against the DCCT defendants will be granted.

### (ii)   Harris County

Harris County argues that the DOJ Findings Letter is not relevant as evidence against it because the letter's statement that

> the Harris County Jail does not *train* staff that hogtying
> . . . [is a] dangerous, prohibited practice[,] . . . is
> controverted by the recent *testimony* of Sheriff Garcia
> and the Defendant Officers that Harris County *does* in

_____

[95]Harris County's Reply in Support of Its Motion to Strike, Docket Entry No. 205, pp. 1 and 5 (citing Harris County's Amended MSJ, Docket Entry No. 152, p. 27 ¶ 26; p. 30 ¶ 33; p. 44 ¶ 70, and p. 46 ¶ 76).

fact train staff that hogtying is a prohibited
practice,[96]

and because "[p]laintiffs are not claiming Harris County hogtied
Lucas — rather, they claim he was 'effectively hogtied,' which the
DOJ letter says nothing about."[97]   Harris County argues that the
fact "**[t]hat Lucas was not hogtied cuts off any connection the
letter may have [had] to this incident. . .**"[98]   Harris County also
argues that the DOJ Findings Letter is not relevant against it
because it

> does not criticize Harris County for hogtying in general,
> but only for what it perceived was a lack of training
> that hogtying is a dangerous, prohibited practice.  Such
> a statement is contradicted by Fifth Circuit precedent
> finding that a hogtie is not per se unconstitutional.
> *Khan v. Normand*, 683 F.3d 192, 194, 195 (5th Cir. 2012)
> [per curiam]; *Hill v. Carroll County, Mississippi*, 587
> F.3d 230, 235, 237 (5th Cir. 2009).[99]

Asserting that the DOJ Findings Letter "warned the County,
'the Harris County Jail does not train staff that hogtying and
choke holds are dangerous, prohibited practices,'"[100] plaintiffs
argue that the letter is "relevant to *Monell* liability, as it
refutes the County's argument that 'Plaintiffs have no evidence
Sheriff Garcia had constructive knowledge of an unconstitutional

---

[96]<u>Id.</u> at 4-5.

[97]<u>Id.</u> at 5.

[98]<u>Id.</u> (emphasis in the original)

[99]<u>Id.</u> at 5.

[100]Plaintiffs' Consolidated Response, Docket Entry No. 203,
p. 9.

custom or practice.'"[101] Citing Federal Rule of Evidence 801(c)(2), and asserting that the DOJ Findings "[L]etter's primary relevance is not for the truth of the matter asserted, but that those assertions were made,"[102] plaintiffs argue that the DOJ Findings Letter is

> offered to show notice to Harris County policymakers of the problem that caused Lucas' death, it is not hearsay. . . . Belying the County's contention that the document is "untrustworthy," the Department of Justice letter correctly warned of hogtying — the very method the County trained its extraction teams to use to restrain pre-trial detainees. . . The County clearly received the letter. . . . But the County did not do what a reasonable policymaker would: Instead of actually fixing its training and practices, it just had its defense attorneys write a long letter to the [DOJ]. . . . Accordingly, the [DOJ] letter is primarily relevant to show notice to the County of alleged constitutional deficiencies, rather than the truth of the matters asserted therein, so it is not hearsay and is admissible.[103]

In pertinent part the DOJ Findings Letter states:

> We have serious concerns about the use of force at the Jail. The Jail's use of force policy is flawed in several regards. First, neither written policy nor training provide staff with clear guidance on prohibited use of force practices. For example, Harris County Jail does not train staff that hogtying and choke holds are dangerous, prohibited practices. Indeed, we found a significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors. Second, use of force policies fail to distinguish between planned use of force (e.g., for extracting a[] detainee from a cell) and unplanned use of force (e.g., when responding to a fight). In many planned use of force

---

[101] Id.

[102] Id. at 13.

[103] Id. at 13-14.

situations, staff should be consulting with supervisors, and possibly medical staff, before using force. Third, Jail policies do not provide for routine videotaping of use of force. Fourth, the Jail does not have an appropriate administrative process for reviewing use of force. . .

As a result of systemic deficiencies including a lack of appropriate policies and training, the Jail exposes detainees to harm or risk of harm from excessive use of force. In a particularly troubling January 2008 case, staff applied a choke hold to a detainee, who subsequently died. The autopsy report identified the manner of death as homicide. Our review of the Jail's records suggests that such improper force technique is being used with troubling frequency. For instance, our consultant found a pattern of such incidents when reviewing use of force reports dated from January through June 2008. These incidents included the following:

- An officer reported that he "grabbed inmate RR by the front of his jumpsuit top and the back of his neck and forcibly placed inmate RR on the ground. Once on the ground, I continued to apply pressure to inmate RR's neck and placed my right knee in the small of his back."[104]

In <u>Hicks-Fields</u> the district court admitted the same DOJ Findings Letter at issue here to show that "Harris County was aware of the opinions of an outside public office regarding conditions of confinement and employee acts, [because] it arguably suggests Harris County's knowledge of patterns of unconstitutional conduct at the jail." <u>Hicks-Fields v. Harris County, Texas</u>, Civil Action No. H-12-3650, 2015 WL 9583861, *16 (S.D. Tex. November 23, 2015). The district court explained however that

---

[104]DOJ Findings Letter, Exhibit 3 to Plaintiffs' Consolidated Response, No. 175-6, pp. 16-17.

> [t]o the extent that the letter is offered as evidence of
> the conditions of the jail and any pattern of possibly
> unconstitutional conduct while Hicks was detained there
> two years later, it has no relevance. For purposes of
> summary judgment, the court considers it only as evidence
> of notice.

Id. On appeal the Fifth Circuit stated that

> [w]hether the DOJ report should have been admitted for
> purposes other than establishing notice under *Monell* is
> a close question. . . . Reports of this type may make it
> at least marginally more likely that patterns of
> unconstitutional conduct occurred. Hicks' death two
> years later could lead to the reasonable inference that
> those patterns — for example, a pattern of
> unconstitutional excessive force — had not abated.

Hicks-Fields, 860 F.3d at 809. Because Lucas's death four years after the DOJ Findings Letter was written could similarly lead to a reasonable inference that the pattern of unconstitutional excessive force documented in the letter had not abated, the court concludes that the DOJ Findings Letter is at least marginally relevant to the claims that plaintiffs have asserted against Harris County in this action. Id. (citing Shepherd, 591 F.3d at 456-58). Accordingly, defendants' motion to strike the DOJ Findings Letter as evidence against Harris County will be denied.

(d) Exhibit 15 — GMJ Memorandum

Plaintiffs' Exhibit 15 (Docket Entry No. 175-18) is a memorandum to John Dyess, Chief Administrative Officer, HCSO, from Natacha Peláez-Wagner, Director, Criminal Justice Division of Griffith Moseley Johnson & Associates ("GMJ"), regarding a review

of the HCSO's Forced Cell Movement Policy ("GMJ Memorandum").[105]
Asserting that "[t]he 10-page memorandum purports to provide a
summary of the incident at bar and to provide recommendations going
forward,"[106] defendants argue that "there are numerous issues with
this memorandum that make it irrelevant and inadmissible."[107]

Plaintiffs respond that the GMJ Memorandum is admissible in
its entirety because "i]t is *about* Lucas' death and the policies
and practices that caused it."[108]   Citing Collins v. Wayne Corp.,
621 F.2d 777 (5th Cir. 1980), superseded on other grounds as stated
in Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002),
plaintiffs argue that the GMJ Memorandum should not be stricken
because under Federal Rule of Evidence 801(d)(2)(C) it is not
hearsay but, instead, an admission by defendant Harris County, and
because under Federal Rule of Evidence 407 the memorandum is
admissible for purposes of impeachment and proving the feasibility
of precautionary measures.[109]

Defendants reply that the court should strike the memorandum
because the consultant who authored it is not identified as a

_____

    [105]GMJ Memorandum, Exhibit 15 to Plaintiffs' Consolidated
Response, Docket Entry No. 175-18.

    [106]Defendants' Motion to Strike, Docket Entry No. 194, p. 10.

    [107]Id.

    [108]Plaintiffs' Consolidated Response, Docket Entry No. 203,
p. 14.

    [109]Id. at 14-16.

retained, testifying expert whose statements bind Harris County[110] and because it is inadmissible as a subsequent remedial measure.[111]

> ### (1) The GMJ Memorandum Is Not Admissible under Rule 801(d)(2)(C)

The GMJ Memorandum is an out-of-court statement offered for its truth. It is therefore textbook hearsay under Federal Rule of Evidence 801(c). Plaintiffs argue that the memorandum is not hearsay because it is offered against an opposing party under Rule 801(d)(2)(C).[112] Rule 801(d)(2)(C) creates an exception to the rule against hearsay for statements "offered against an opposing party . . . made by a person whom the party authorized to make a statement on the subject." While that rule requires the court to consider the statement in determining whether it falls within the exclusion, the statement cannot by itself establish the authority to speak. Fed. R. Evid. 801(d)(2) ("The statement must be considered but does not by itself establish the declarant's authority under (C)."). Inquiries relating to a declarant's authority for purposes of applying Rule 801(d) are treated as preliminary questions to be resolved by the Court. The party seeking admission of evidence under Rule 801(d)(2) bears the burden

---

[110]Harris County's Reply in Support of its Motion to Strike, Docket Entry No. 205, pp. 8-11.

[111]Id. at 11-12.

[112]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 15.

of establishing its applicability by a preponderance of the evidence. _See_ Advisory Committee Note to 1997 amendments.

Citing _Collins_, 621 F.2d at 777, plaintiffs argue that the GMJ Memorandum is admissible under Rule 801(d)(2)(C) because Harris County hired GMJ to investigate the Lucas cell extraction and to write the memorandum relying solely upon statements by County employees and County records.[113]   In _Collins_ the Fifth Circuit held that the district court erred by failing to admit the deposition of the defendant's expert as an admission of the defendant.   The _Collins_ suit arose out of a collision between a tractor-trailer and a bus carrying members of a church group.   _Id._ at 780.   The plaintiffs were four of the injured and representatives of ten of the dead.   The plaintiffs sued Wayne Corporation (Wayne) for defective bus design.   _Id._ at 778.   The plaintiffs submitted an interrogatory to Wayne asking for the identity of each person whom it had retained as an expert in the field of automobile collision investigation.   Wayne responded that it had hired George Greene two days after the accident.   Wayne also provided the plaintiffs with the Report of Investigation prepared by Greene and later made Greene available to the plaintiffs so that they could depose him.   Prior to trial Wayne moved to exclude Greene's testimony by arguing that Greene was a consultant whose opinions were not discoverable under Fed. R. Civ. P. 26.   Plaintiffs

---

[113]_Id._

responded by arguing that Greene's deposition was admissible under Rule 801(d)(2)(C) as an admission of a party opponent. The court took the issue under advisement and refrained from ruling on the admissibility of Greene's deposition testimony until plaintiffs prepared to offer it at trial. <u>Id.</u> at 780. At trial

> [t]he district court held that the plaintiffs could offer Greene's deposition into evidence, but that they could not make any mention to the jury of the fact that Greene was employed by Wayne. Thus, the district court did not exclude Greene's deposition; it merely directed the plaintiffs not to attribute Greene's testimony to Wayne as an admission or otherwise.

<u>Id.</u> Following that ruling, the plaintiffs decided not to offer Greene's testimony into evidence. <u>Id.</u> at 781.

On appeal to the Fifth Circuit plaintiffs argued that Greene's deposition would have helped their case in two ways if it had been admitted as an admission of the defendant: (1) Greene's testimony supported the plaintiff's theory as to the speed of the vehicles; and (2) Greene's testimony acknowledged that the plaintiffs' expert was perhaps the foremost authority in the country in the field of bus design. The Fifth Circuit Court held:

> The district court erred in not allowing the plaintiffs to offer Greene's deposition into evidence as an admission of Wayne. Wayne stated in its response to the plaintiffs' interrogatory that it had employed Green as an expert to investigate and analyze the bus accident. Wayne also furnished a copy of Greene's accident analysis to the plaintiffs.

<u>Id.</u> In so holding the Fifth Circuit reasoned:

> <u>United States v. Lykes Brothers Steamship Co.</u>, 432 F.2d 1076 (5th Cir. 1970), presented a similar situation. There, the Government sued Lykes for damages incurred

when Lykes delivered several shipments of bagged wheat
flour and corn meal in a wet and damaged condition.  The
Government relied on documentary evidence to show an
essential part of its case: that Lykes discharged the
cargo in a damaged condition.  The district court held
that two reports prepared by an agent of Lykes were
inadmissible because the agents' authority allowed them
only to report to their principal on the condition of the
cargo.  This Court reversed, holding that the reports by
Lykes's agents were admissible as an admission of Lykes.
In this case, Greene was Wayne's agent as Wayne employed
Greene to investigate and analyze the bus accident.
Greene's report on his investigation and his deposition
testimony in which he explained his analysis and
investigation was an admission of Wayne.

Another case supporting the result we reach here,
Brown & Root, Inc. v. American Home Assurance Co., 353
F.2d 113 (5th Cir. 1965), cert. denied, 384 U.S. 943, 86
S. Ct. 1465, 16 L.Ed.2d 541 (1966)[,] began with a tug
pushing a barge loaded with drilling mud from Brownsville
to Corpus Christi on the Intercoastal Canal.  Along its
journey, the barge went aground on or near the channel
bank.  When it went aground, the barge listed, and most
of its cargo slid into the canal.  The cargo underwriter
sued the tug for negligent towage to recover the claims
it paid to the cargo owners.  The tug set up a defense
that the barge had struck an unmarked, unknown shoal
within the channel.  In support of this defense, the tug
introduced a report prepared by a marine surveyor who the
cargo underwriter had retained to investigate the
casualty and to report his conclusions.  This Court held
that, "Without a doubt the actions and reports of the
Surveyor . . ., made by one whose job was to investigate
and report, constituted admissions to prove the truth of
the declarations made."   353 F.2d at 116 (emphasis
original; footnote omitted).   Wayne hired Greene to
investigate the bus accident and to report his
conclusions.  In giving his deposition he was performing
the function that Wayne had employed him to perform.  His
deposition, therefore, was an admission of Wayne.
Greene's deposition testimony was not, of course, a
binding judicial admission, and had the district court
admitted Greene's deposition as an admission Wayne would
have had an opportunity to explain why some of Greene's
conclusions were not consistent with Wayne's position at
trial.

Id. at 781-82.

Collins requires a more extensive showing than plaintiffs have presented. The witness in Collins was an investigative agent hired by the defendant shortly after an accident to investigate the accident and to make a report. Moreover, the defendant in Collins not only identified the witness and provided his report to the plaintiffs, but also made the witness available to the plaintiffs for a deposition. Id. at 780. Here, plaintiffs seek to admit the GMJ Memorandum based on Rule 801(d)(2)(C) but submit no independent evidence that Harris County authorized GMJ to make any statements on its behalf with respect to the memorandum or its content. Instead, plaintiffs merely cite to the GMJ Memorandum itself as evidence that Harris County hired GMJ to conduct an investigation and write a report, and that the author of the memorandum has been authorized to speak on Harris County's behalf.[114] Rule 801(d)(2) requires the court to consider the statement at issue in determining whether it falls within the exclusion, but specifically provides that "the statement cannot by itself establish the authority to speak." Fed. R. Evid. 801(d)(2) ("The statement must be considered but does not by itself establish the declarant's authority under (C)."). Because plaintiffs have failed to make any independent showing either that Harris County hired the author of the GMJ Memorandum to conduct an investigation of Lucas's cell

---

[114]Id. at 15 ("[T]he report is not hearsay because the County hired the author of the report, who relied solely upon statements by County employees and the County's records to write the report. Doc. 175-18, Ex. 15, pp. 1-2.").

extraction or to speak on that subject on Harris County's behalf, the court concludes that the plaintiffs have failed to carry their burden of showing that the GMJ Memorandum is admissible under Rule 801(d)(2)(C).

### (2) The GMJ Memorandum is Not Admissible Under Rule 407

Citing Federal Rule of Evidence 407, defendants argue that the memorandum is unreliable and untrustworthy

> insofar as Plaintiffs rely on it for evidence of any constitutional violation. The report was only intended to serve as assistance to the Harris County Sheriff's Office in avoiding similar deaths in the future, which is a subsequent remedial measure that is not admissible to prove culpable conduct.[115]

Asserting that the GMJ Memorandum is not primarily about subsequent remedial measures, plaintiffs argue that "as to . . . changes the County made after Lucas's death, . . . evidence in the [GMJ Memorandum] is admissible under a black letter exception to Rule 407."[116]

Federal Rule of Evidence 407 states:

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:

- negligence;

- culpable conduct;

---

[115]Defendants' Motion to Strike, Docket Entry No. 194, p. 11.

[116]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 16.

-51-

- a defect in a product or its design; or

- a need for a warning or instruction.

> But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

Rule 407 is based on the theory of "encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Advisory Committee Note, Fed. R. Evid. 407.

Plaintiffs argue that the two exceptions identified in the last paragraph of the rule apply in this instance: impeachment and proving the feasibility of the precautionary measures. Citing the deposition testimony of defendant Gordon and Lieutenant Lynette Anderson, plaintiffs argue that

> the County's change in policy to require a medical review prior to forced cell extractions (as indicated in the report, Doc. 175, Ex. 15, p. 10) proves that such a change is feasible, which was disputed by at least two County employees (it also impeaches the credibility of those witnesses who testified this was not feasible).[117]

Plaintiffs also argue that

> [t]he multiple other safeguards the County implemented for cell extractions after Lucas' death — notably, the presence of medical staff during extractions and an officer dedicated to watching that the inmate's restraint does not obstruct breathing — contradict the Defendants' argument that placing Lucas face down on a gurney, wheeling him across the facility without any medical providers present, and ignoring the obvious signs that he

---

[117]Id. (citing Exhibit 5, Anderson Deposition, pp. 49:17-50:5, Docket Entry No. 175-8, pp. 50-51; and Exhibit 7, Oral and Videotaped Deposition of David Anthony Gordon ("Gordon Deposition"), p. 87:8-23, Docket Entry No. 175-10, p. 88).

was having trouble breathing was the "only option to transport the uncooperative Lucas."[118]

A review of plaintiffs' citations to the record persuades the court that the GMJ Memorandum is not admissible under Rule 407 either to impeach the cited portions of the Anderson and Gordon depositions, or to prove the feasibility of precautionary measures. In the cited portion of their depositions, Anderson and Gordon each testified that federal law, i.e., the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), prohibited them from asking about Lucas's medical and mental health history. Plaintiffs do not cite and the court did find any statements in the GMJ Memorandum that either contradict Anderson's and Gordon's testimony on this issue, or recommend that officers request an inmate's medical or mental health history before a cell extraction. Nor do plaintiffs cite any evidence in the summary judgment record showing that defendants contend any of the policy changes mentioned in the GMJ Memorandum were not feasible. The full text of the sentence from Harris County's Amended MSJ on which plaintiffs rely for this argument states: "After struggling with Lucas and finally handcuffing him and shackling his ankles, the DCCT put him on a gurney as their only option to transport the uncooperative Lucas to the first-floor medical clinic."[119] Plaintiffs fail to cite any

_____

[118]Id. at 16-17 (citing Harris County's Amended MSJ, Docket Entry No. 152, p. 59).

[119]Id. (citing Harris County's Amended MSJ, Docket Entry No. 152, p. 73 ¶ 139).

-53-

instance where Harris County contends that having medical staff present during extractions or having an officer dedicated to watching that the inmate's restraint does not obstruct breathing was not feasible, or that the GMJ Memorandum suggests that a different means of transport should be used to move an uncooperative inmate from a cell to the jail's medical clinic. The court concludes that plaintiffs have failed to show that the GMJ Memorandum is admissible under Rule 407 either for impeachment or for proving the feasibility of precautionary measures. See Mills v. Beech Aircraft Corp., Inc., 886 F.2d 758, 764 (5th Cir. 1989) (affirming trial court's exclusion of a modified instruction manual as an inadmissible subsequent remedial measure where defendants did not contest the feasibility of a better installation instruction, but rather maintained that the instructions in the original manual were acceptable).

Because the court has concluded that plaintiffs have failed to carry their burden of showing that the GMJ Memorandum is admissible under either Rule 801(d)(2)(C) or Rule 407, defendants' motion to strike the GMJ Memorandum will be granted.

**B.    The DCCT Defendants' Objections (Docket Entry No. 190) and Amended Objections (Docket Entry No. 192)**

The DCCT defendants have filed Defendants' Amended Objections and Reply (Docket Entry No. 192)[120] to the admission of Plaintiffs'

_____

[120]Also pending is Defendants' Objections and Reply (Docket Entry No. 190), which is moot in light of Defendants' Amended Objections and Reply (Docket Entry No. 192).

Exhibit 3 (Docket Entry No. 175-6), the June 4, 2009, DOJ Findings Letter,[121] to certain pages and lines of various deposition excerpts,[122] and to a number of statements and opinions in the Expert Report of Warden Ron McAndrew attached to Plaintiffs' Consolidated Response as Exhibit 24 (Docket Entry No. 175-27).[123] Defendants' Objections and Reply (Docket Entry No. 190) will be declared moot based on the filing of Defendants' Amended Objections and Reply (Docket Entry No. 192).

1. <u>Defendants' Amended Objections to the DOJ Findings Letter</u>

For the reasons stated in § III.A.2(c)(2)(i), above, the court has already concluded that the DOJ Findings Letter is not relevant to the claims asserted against the individually named deputy and detention officer defendants, and that defendants' motion to strike the DOJ Findings Letter as evidence against the DCCT defendants will therefore be granted.

2. <u>Defendants' Objections to Deposition Excerpts</u>

The DCCT defendants object to certain pages and lines of the deposition excerpts of defendant Scott attached to Plaintiffs' Response as Exhibit 6 (Docket Entry No. 175-9),[124] of defendant

---

[121]Defendants' Amended Objections, Docket Entry No. 192, p. 2.

[122]<u>Id.</u> at 3-19.

[123]<u>Id.</u> at 19-22.

[124]<u>Id.</u> at 3-7.

Gordon attached to Plaintiffs' Response as Exhibit 7 (Docket Entry No. 175-10),[125] of defendant Leveston attached to Plaintiffs' Response as Exhibit 8 (Docket Entry No. 175-11),[126] of defendant Green attached to Plaintiffs' Response as Exhibit 9 (Docket Entry No. 175-12),[127] of defendant Thomas attached to Plaintiffs' Response as Exhibit 10 (Docket Entry No. 175-13),[128] of defendant Kneitz attached to Plaintiffs' Response as Exhibit 11 (Docket Entry No. 175-14),[129] and of defendant Bell attached to Plaintiffs' Response as Exhibit 14 (Docket Entry No. 175-17).[130] Defendants have submitted charts noting specific lines of deposition testimony to which they object by asserting variously — but without elaboration — that the cited lines are vague, argumentative, call for speculation, call for a legal conclusion, harassing, irrelevant, over broad, assume facts not in evidence, asked and answered, and misstatements of testimony.

Plaintiffs respond that the individually named deputy and detention officer defendants "assert 1,076 generic deposition objections — but decline to explain a single one. The Court should

---

[125]Id. at 7-12.

[126]Id. at 12-14.

[127]Id. at 14-16.

[128]Id. at 16.

[129]Id. at 16-18.

[130]Id. at 18-19.

find they waived them or, in the alternative, that each one is meritless or moot."[131]

Defendants reply that "[i]n an effort to avoid over-burdening the Court and all parties, Defendants withdraw the objections asserted in their Amended Reply, on behalf of themselves only and for purposes of summary judgment only, with [certain noted] exceptions. . . ."[132] The exceptions pertain to excerpts from the depositions of defendants Scott and Gordon to which defendants continue to object.[133]

The DCCT defendants have asserted objections to hundreds of specific statements but have not provided any cogent or specific argument in support of their objections. Federal Rule of Evidence 103(a)(1) requires evidentiary objections to "state[] the specific ground, unless it was apparent from the context." Because the DCCT defendants have not asserted any specific objections to deposition excerpts that plaintiffs cite in response to the pending motions for summary judgment, and because for the reasons stated in § IV, below, the court is able to rule on the pending motions without referencing the excerpts from the Scott and Gordon depositions to which the DCCT defendants still object, the DCCT defendants' objections to deposition excerpts will be declared moot.

---

[131]Plaintiffs' Consolidated Response, Docket Entry No. 203, p. 1. See also id. at 19-32.

[132]Defendants' Reply to Plaintiffs' Consolidated Response, Docket Entry No. 204, p. 5.

[133]Id. at 5-18.

3. <u>Defendants' Objections to the McAndrew Report</u>

The individually named deputy and detention officer defendants object to a number of statements and opinions in the Expert Report of Warden Ron McAndrew, ret. ("McAndrew Expert Report") attached to Plaintiffs' Consolidated Response as Exhibit 24 (Docket Entry No. 175-27). Defendants specifically object to statements made on pages 5 and 7-11, as being irrelevant, confusing, prejudicial, and/or improper determinations of credibility.[134]

Plaintiffs respond that the McAndrew report is admissible in its entirety because as an expert witness, McAndrew is obliged to explain the basis of his opinions, including facts and evidence he reviewed that were not known to the individual defendants because: (1) McAndrew's opinions that the force used was excessive to the need and that more could have been done to prevent this tragedy are directly pertinent to the officer defendants; (2) McAndrew's experience with similar helmets to those the DCCT defendants used is relevant because the jury will have to decide how much the helmets impair hearing, and (3) McAndrew is more than competent to testify about how a reasonable officer should behave following a fatal use-of-force incident.[135]

The opinions contained in the McAndrew report are premised on McAndrew's experience and review of 14 different items specific to

---

[134]Defendants' Amended Objections, Docket Entry No. 192, pp. 19-22.

[135]Plaintiffs' Consolidated Response, Docket Entry No. 203, pp. 17-20.

this case.[136]  Defendants have not objected to the general admissibility of Warden McAndrew's report under Rules 702 or 703 but, instead, have objected to only eight specific statements in the report as being irrelevant, confusing, prejudicial, and/or improper determinations of credibility.  The court's practice is to rule on motions to exclude expert testimony during the course of trial because experts frequently modify their opinions, and at trial counsel often establish more extensive predicates for an experts' testimony.  Moreover, the context in which the testimony is offered is necessary to effectively rule on such issues. Because for the reasons stated in § IV, below, the court is able to rule on the pending motions for summary judgment without referencing the McAndrew Report, the DCCT defendants' objections thereto will be declared moot.

## IV.  **Motions for Summary Judgment**

Citing 42 U.S.C. § 1983, plaintiffs allege that intentional actions of all of the individually named defendants make them liable under 42 U.S.C. § 1983 for infringing plaintiffs' rights to be free from excessive force in violation of the Fourteenth Amendment either by using excessive force or failing to prevent the use of excessive force, and for deliberate indifference to Lucas's serious medical needs in violation of the Fourteenth Amendment

---

[136]McAndrew Expert Report, Exhibit 24 to Plaintiffs' Consolidated Response, Docket Entry No. 175-27, pp. 5-6 (listing the items reviewed).

right to substantive due process. Plaintiffs allege that Harris County is also liable for failure to train the individually named defendants. Plaintiffs allege that all of the defendants are liable for violation of the ADA and RA. Pending before the court are Deputy and Detention Officers' MSJ (Docket Entry No. 145); Sunder's MSJ (Docket Entry No. 146); O'Pry's MSJ (Docket Entry No. 147); Deputies' MSJ (Docket Entry No. 150); and Harris County's Amended MSJ (Docket Entry No. 152).[137]

The individually named defendants argue that they are all entitled to summary judgment because plaintiffs are unable to cite facts capable of establishing that Lucas suffered a deprivation of constitutional rights or rights protected by either the ADA or the RA. The individually named defendants also argue that they are all entitled to summary judgment because they are protected by qualified immunity from all of the claims asserted against them. In its motion Harris County argues that it is entitled to summary judgment because plaintiffs cannot prove that a constitutional violation occurred or that a county policy, practice, or custom was the moving force behind a constitutional deprivation suffered by Lucas.

## A. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and the law

---

[137]Also pending is Harris County's MSJ (Docket Entry No. 151), which is moot in light of Harris County's Amended MSJ (Docket Entry No. 152).

entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553-2554 (emphasis in original)). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Id.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S. Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and

it may not make credibility determinations or weigh the evidence."
Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110
(2000). Factual controversies are to be resolved in favor of the
nonmovant, "but only when there is an actual controversy, that is,
when both parties have submitted evidence of contradictory facts."
Little, 37 F.3d at 1075. "Moreover, the nonmoving party's burden
is not affected by the type of case; summary judgment is
appropriate in any case 'where critical evidence is so weak or
tenuous on an essential fact that it could not support a judgment
in favor of the nonmovant.'" Id. at 1075-76 (quoting Armstrong v.
City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993)).

## B.    Individually Named Defendants' Summary Judgment Motions

### 1.    Section 1983 Claims and Applicable Law

Plaintiffs allege:

55. Defendants violated Mr. Lucas's Fourteenth Amendment
freedom from excessive use of force by a government
actor. As a result of Defendants' objectively
unreasonable use of force, Mr. Lucas could not breathe,
fell unconscious, suffocated, suffered a cardiac event,
and ultimately died. Defendants acted unreasonably and
applied force that vastly exceeded their need when they
hogtied, forcibly pressed his legs into his back
preventing Mr. Lucas from breathing, injected a dangerous
sedative, and ultimately killed Mr. Lucas — especially
considering that Mr. Lucas was an unarmed, nonviolent
pretrial detainee. Defendants' use of force was also
objectively unreasonable because Mr. Lucas did not fight
with the Officers, was in a secure environment, was not
resisting or threatening to resist, and was vastly
outnumbered by the Officers wearing full riot gear.

56. Defendants also violated Mr. Lucas's right to
substantive and procedural due process. First,
Defendants had a duty to refrain from being deliberately

indifferent to Mr. Lucas's serious medical needs —
especially considering they caused Mr. Lucas's most
serious medical needs. Intentionally shirking their
duty, Defendants (1) failed to consult with medical staff
before the extraction; (2) hogtied Mr. Lucas face-down on
a gurney and prevented him from breathing; (3) hindered
the ability of medical professionals to assess and attend
to Mr. Lucas's medical needs; and (4) watched and caused
Mr. Lucas to struggle face-down, plead for help, lose the
ability to speak, fall unconscious, suffer from visible
and audible signs of physiological distress (including
labored breathing), and die. Defendants were well aware
of Mr. Lucas's serious medical needs and inability to
breath[e], and the resulting obvious risk of serious
injury and death, but they consciously refused to act
until several minutes after he fell unconscious and grew
limp, and several moments after he had apparently died.

57. Additionally, Defendants created Mr. Lucas's serious
medical conditions that caused Mr. Lucas's death by
forcing him into a prone, face-down, hogtie position and
injecting him with the powerful sedative, even though
Mr. Lucas was visibly struggling to breathe and was
losing consciousness. Despite the danger, Defendants
intentionally prevented Mr. Lucas from breathing,
hindered medical professionals' ability to treat Mr.
Lucas, and failed to release Mr. Lucas from a hogtie
position or seek medical treatment for him until after he
died.

58. Defendants Sunder and O'Pry were subjectively aware
of the serious medical and physical conditions of Kenneth
Lucas. Nevertheless, these defendants proceeded with
deliberate indifference toward Kenneth Lucas and his
health, safety and welfare.[138]

Plaintiffs also allege that each of the individually named

defendants are liable as bystanders because they each had a

reasonable opportunity to prevent the harm to Lucas, but

intentionally failed to assist him.[139]

---

[138]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77,
pp. 20-21 ¶¶ 55-58.

[139]Id. at 26 ¶¶ 72-74.

Plaintiffs allege that qualified immunity does not apply because:

> 59. . . . As set forth above, the Individual County Defendants violated Mr. Lucas's federal rights. Additionally, at the time the Individual County Defendants killed Mr. Lucas, it was clearly established that they had a duty to not be deliberately indifferent to the serious medical needs of a pretrial detainee such as Mr. Lucas. Additionally, the law clearly imposed a duty on state actors such as the Individual County Defendants to use a quantum and method of force that is reasonable under the circumstances. The law clearly prohibited the Individual County Defendants from using the quantum and method of force they used against Mr. Lucas in the circumstances described above. The law clearly prohibited the Individual County Defendants from deliberately refusing to address Mr. Lucas's serious medical needs, especially when Defendants caused those medical needs. Accordingly, the Individual County Defendants' conduct was objectively unreasonable under the state of the law at that time.

> 60. Additionally, the Individual County Defendants were aware that their acts and omissions violated clearly established constitutional duties. However, the Individual County Defendants consciously disregarded their clearly-established duties because they intended to harm Mr. Lucas and because they were allowed to unlawfully inflict harm on pretrial detainees pursuant to the County's customs, policies, and practices.[140]

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

---

[140]Id. at 21-22 ¶¶ 59-60.

injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Conner, 109 S. Ct. 1865, 1870 (1989) (quoting Baker v. McCollan, 99 S. Ct. 2689, 2694 n.3 (1979)). To establish § 1983 liability, plaintiffs must prove that Lucas suffered "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004). Plaintiffs must also show that the constitutional deprivation Lucas suffered was intentional or due to deliberate indifference and not the result of mere negligence. Id. See also Baker, 99 S. Ct. at 2689 ("Section 1983 imposes liability for violations of rights protected by the Constitution, nor for violations of duties of care arising out of tort law.").

Public officials may be sued pursuant to 42 U.S.C. § 1983 in either their official and/or their personal capacities. Hafer v. Melo, 112 S. Ct. 358, 361-63 (1991) (citing Kentucky v. Graham, 105 S. Ct. 3099 (1985)). The real party in interest in an official-capacity suit is the governmental entity, not the named official. Id. at 361 (citing Graham, 105 S. Ct. at 3105) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."). For the reasons stated in § II, above, the court has already concluded that the official capacity

-65-

claims asserted against the individually named defendants should be dismissed. To maintain a personal-capacity claim under § 1983 plaintiffs must adduce evidence capable of establishing that while acting under color of state law defendants were personally involved in the deprivation of a right secured by the laws or Constitution of the United States, or that defendants' wrongful actions were causally connected to such a deprivation. James v. Texas Collin County, 535 F.3d 365, 373 (5th Cir. 2008).

Public officials sued in their personal capacities under § 1983 are shielded from suit by the doctrine of qualified immunity. Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 812 (2009). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' . . . it is effectively lost if a case is erroneously permitted to go to trial." Id. The doctrine of qualified immunity was created to balance the interest of compensating persons whose federally protected rights have been violated against the fear that personal liability might inhibit public officials in the discharge of their duties. See Johnston v. City of Houston, Texas, 14 F.3d 1056, 1059 (5th Cir. 1994). At the summary judgment stage, plaintiffs must demonstrate that the defendant official is not entitled to qualified immunity. Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015), cert. denied, 136 S. Ct. 1517 (2016).

To overcome an assertion of qualified immunity plaintiffs must establish that (1) the defendants' actions violated the plaintiffs' federal rights, and (2) those rights were clearly established at the time. Id. See also Pearson, 129 S. Ct. at 815-16. Courts have discretion to decide which of the two elements to address first. Id. See also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) ("lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first"). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Id. at 2083 (quoting Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987)). See also Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) ("[The court] must ask whether the law so clearly and unambiguously prohibited [the official's] conduct that 'every "reasonable official would understand that what he is doing violates [the law]."'"). Recent Supreme Court decisions addressing claims for excessive force have "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 137 S. Ct. 548, 551-52 (2017) (per curiam) (quoting al-Kidd, 131 S. Ct. at 2085).

If the constitutional right was clearly established, the court "must decide whether the defendant's conduct was objectively reasonable." Gates v. Texas Department of Protective and

Regulatory Services, 537 F.3d 404, 419 (5th Cir. 2008). See also Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982) ("Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."). The Fifth Circuit considers "an official's conduct to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution." Id. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" al-Kidd, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 106 S. Ct. 1092, 1096 (1986)).

In cases where the defendants have not acted together, "'qualified immunity claims should be addressed separately' for each individual defendant.'" Kitchen v. Dallas County, Texas, 759 F.3d 468, 480 (5th Cir. 2014) (quoting Atteberry v. Nocona General Hospital, 430 F.3d 245, 253 (5th Cir. 2005), abrogated on other grounds, Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015)). In such cases courts examine each officer's actions independently to determine whether he or she is entitled to qualified immunity. Newman v. Guedry, 703 F.3d 757, 762 (5th Cir. 2012), cert. denied, 134 S. Ct. 162 (2013) (citing Meadours v. Ermel, 483 F.3d 417,

421-22 (5th Cir. 2007)). Once a defendant asserts qualified immunity, the burden shifts to the plaintiffs, who bear the burden of negating the defense of qualified immunity. See id. at 761.

(a)   The DCCT Defendants' Summary Judgment Motions

(1)   **Excessive Use of Force**

Plaintiffs' allegations that the intentional actions of the DCCT defendants make them liable under 42 U.S.C. § 1983 for infringing Lucas's rights to be free from excessive force raise claims for violation of procedural and substantive due process rights protected by the Fourteenth Amendment. See Kitchen, 759 F.3d at 477 ("[T]he constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." (alteration omitted) (quoting Hare v. City of Corinth, Mississippi, 74 F.3d 633, 639 (5th Cir. 1996) (en banc))). Citing Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993), and Hudson v. McMillian, 112 S. Ct. 995 (1992), the individually named deputy and detention officer defendants argue that they are entitled to summary judgment on these claims because (1) no constitutional violation occurred, and (2) they are entitled to qualified immunity.[141]

Plaintiffs argue in response that the DCCT defendants are not entitled to summary judgment because they violated Lucas's

_____

[141]Deputy and Detention Officers' MSJ, Docket Entry No. 145, pp. 36-49; Sunder's MSJ, Docket Entry No. 146, pp. 12-13; O'Pry's MSJ, Docket Entry No. 147, pp. 12-13; Deputies' MSJ, Docket Entry No. 150, pp. 23-32 ¶¶ 26-47.

constitutional right to be free from excessive force, they are not

entitled to qualified immunity, and their reliance on Valencia, 981

F.2d at 1440, and Hudson, 112 S. Ct. at 995, is misplaced because

the legal standard applicable to this case is that established in

Kingsley, 135 S. Ct. at 2466.[142]  Plaintiffs argue that the DCCT

defendants

> acted together using wholly unnecessary excessive force
> to restrain Kenneth in a facedown hogtie while
> compressing his chest.  As Kenneth gasped, "I cannot
> breathe," the officers either pushed down more or stood
> by and did nothing.  A jury will need to resolve material
> fact issues, such as 1) was any force necessary at all?
> and 2) did the officers continue to use objectively
> unreasonable force after Kenneth's alleged "resistance"
> completely stopped?  This force was objectively
> unreasonable, and it was clearly established by the Fifth
> Circuit in cases with similar fact patterns that such
> force violated a pretrial detainee's Fourteenth Amendment
> rights.[143]

> (i)  **Plaintiffs Have Cited Evidence Capable**
> **of Establishing that the DCCT Defend-**
> **ants Violated Lucas's Constitutional**
> **Right to be Free from Excessive Force.**

As a pretrial detainee, Lucas had a Fourteenth Amendment Due

Process right to be free from excessive force, and this right has

long been clearly established.  Kingsley, 135 S. Ct. at 2471-72

(recognizing pretrial detainee's Constitutional right to be free

from excessive force).  See also Valencia, 981 F.2d at 1445 ("the

Due Process Clause protects a pretrial detainee form the use of

--------------------------------------------------

[142]Plaintiffs' Consolidated Response, Docket Entry No. 175,
pp. 89-111.

[143]Id. at 20-21.

excessive force that amounts to punishment") (quoting Graham, 109 S. Ct. at 1871 & n.10. In 2014 when this incident occurred courts followed the rule that "when a pretrial detainee is allegedly the victim of a detention officer's use of excessive force, as explained in Valencia . . . such a claim is subject to the same analysis as a convicted prisoner's claim for use of excessive force under the Eighth Amendment." Kitchen, 759 F.3d 477. The Eighth Amendment standard involves a subjective test, i.e., whether the defendant used force maliciously and sadistically for the very purpose of causing harm, or in a good faith effort to maintain or restore discipline. Id. (citing Hudson, 112 S. Ct. at 999, and Whitley v. Albers, 106 S. Ct. 1078, 1085 (1986)). In analyzing this issue courts considered the following factors: (1) extent of the injury suffered; (2) the need for the application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the defendant; and (5) any efforts made to temper the severity of a forceful response. Id. (citing Hudson, 112 S. Ct. at 999, and Whitley, 106 S. Ct. at 1085).

In Kingsley, 135 S. Ct. at 2473, however, the Supreme Court held that instead of the subjective test previously applied in actions brought for use of excessive force by both pretrial detainees and convicted criminals, in cases brought by pretrial detainees, "the appropriate standard . . . is solely an objective

one." Specifically, the Supreme Court held "that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. Therefore, in order to prevail on their claims for use of excessive force against Lucas, plaintiffs only need to show that the force purposely or knowingly used against Lucas was objectively unreasonable. Id. Citing Graham, 109 S. Ct. at 1872, the Court explained that "objective reasonableness turns on the 'facts and circumstances of each particular case,'" Kingsley, 135 S. Ct. at 472, and that whether the force used against a detainee by government officers was reasonable must be determined from the perspective of a reasonable officer facing the same circumstances and taking into consideration only what the officers on the scene knew at the time force was used. Id. Factors courts consider when determining whether a use of force against a pretrial detainee was objectively reasonable include: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the detainee's injury; (3) any effort made to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the defendant; and (6) whether the detainee was actively resisting. Id. This list is not exhaustive but merely illustrative of the types of objective circumstances potentially relevant to a determination of excessive force. Id. The distinction between the Hudson and the Kingsley

standards makes no difference in this case because plaintiffs have cited evidence capable of showing that the DCCT defendants' actions were unreasonable regardless of which standard is applied.[144]

      (A)    Relationship Between the Need for Force and the Amount of Force Used Weighs Against the Reasonableness of the Defendants' Actions.

The DCCT defendants argue that the force used against Lucas was reasonably needed to maintain security and order in the jail because

> [a]ll of the claims in this case arise from the actions of jail staff taking steps to maintain security and order in the jail after Lucas became disruptive, refused to

---

[144]Although the DCCT defendants all cite the <u>Hudson</u> and <u>Kingsley</u> factors, their briefs fail to analyze the summary judgment evidence with respect to the factors identified in either <u>Hudson</u> or <u>Kingsley</u>. See Deputy and Detention Officers' MSJ, Docket Entry No. 145, pp. 36-40; and Deputies' MSJ, Docket Entry No. 150, pp. 23-32 ¶¶ 26-47. Instead, asserting that the pleadings specifically refer to placing Lucas in a "hogtie" and "hogtie position" as a use of excessive force and violation of his rights, the DCCT defendants all cite evidence showing that Lucas was not "hogtied," and argue that even if Lucas was "hogtied," his constitutionally protected rights were not violated because the Fifth Circuit has repeatedly held that a "hogtie" or four-point restraint does not constitute excessive force <u>per se</u>. See Deputy and Detention Officers' MSJ, Docket Entry No. 145, pp. 36-38 (citing <u>Khan</u>, 683 F.3d at 194-96; <u>Hill</u>, 587 F.3d at 237; <u>Gutierrez v. City of San Antonio</u>, 139 F.3d 441 (5th Cir. 1998); and <u>Pratt v. Harris County</u>, 822 F.3d 174, 179, and 184 (5th Cir. 2016)); and Deputies' MSJ, Docket Entry No. 150, pp. 23-28 ¶¶ 26-36. The DCCT defendants' arguments based on the weakness of plaintiffs' evidence that Lucas was hogtied and the Fifth Circuit's failure to have held that use of such restraint represents a constitutional violation <u>per se</u> disregard plaintiffs' allegations and evidence that the DCCT defendants either subjected Lucas to the use of excessive force by exerting pressure on Lucas's limbs, back, and chest in a manner that impaired his ability to breathe, or observed but failed to prevent the use of such force against Lucas.

hand over the metal smoke detector that he was banging
against the window of his cell door after he had torn it
off the wall of his cell and he refused repeated requests
to calm down.[145]

These defendants argue that their interactions "with Lucas were
videotaped and the video provides clear evidence of the actions of
each Individual Defendant/Team member working to restore order in
the jail by removing Lucas from his cell and then immediately
taking Lucas for a medical evaluation in the jail Clinic."[146]
Citing <u>Carnaby v. City of Houston</u>, 636 F.3d 183, 187 (5th Cir.
2011), defendants argue that "[w]hile the evidence is reviewed in
the light most favorable to the nonmoving party at the summary
judgment level, the Court assigns greater weight to the facts
evident from video recordings taken at the scene."[147]    <u>Carnaby</u>
relied upon the Supreme Court's opinion in <u>Scott v. Harris</u>, 127
S. Ct. 1769, 1776 (2007).  In <u>Scott</u> the Court stated that "[w]hen
opposing parties tell two different stories, one of which is
blatantly contradicted by the record, so that no reasonable jury
could believe it, a court should not adopt that version of the
facts for purposes of ruling on a motion for summary judgment."
<u>Scott</u> therefore allows a court to discredit a summary judgment
nonmovant's version of the facts when a video blatantly contradicts

---

[145]Deputy and Detention Officers' MSJ, Docket Entry No. 145,
p. 35.

[146]<u>Id.</u> at 36.

[147]<u>Id.</u> at 20.

the nonmovant's version of the facts, but not where the video only offers some support for the movant's version. See Comeaux v. Sutton, 496 F. App'x 368, 371-73 (5th Cir. October 11, 2012) (reversing the district court's grant of summary judgment because it failed to view the facts and inferences in the light most favorable to the nonmovant). Defendants argue that they are entitled to qualified immunity and summary judgment on the excessive force claims because "Plaintiffs have only made conclusory 'shoulda-woulda-coulda' arguments and they have absolutely no admissible evidence that any Movant violated a clearly established right and used excessive force."[148]

Citing their own affidavits, Gordon and Scott similarly argue that the force involved in this incident was reasonably needed to maintain security and order in the jail because

> Lucas had been acting abnormally, had removed the smoke detector, which could possibly be used as a weapon, and repeatedly and consistently failed to follow Deputy Gordon's orders and instructions to place the smoke detector in the panhole and turn around and be handcuffed.[149]

Like the other DCCT defendants, Gordon and Scott rely on the videotape of the incident as evidence that Lucas resisted the DCCT.[150] Citing his own affidavit, Gordon also argues that he is

---

[148]Id. at 39-40.

[149]Deputies' MSJ, Docket Entry No. 150, p. 31 ¶ 45.

[150]Id. at 23 & n.8 ("The claim that Inmate Lucas was not resisting is belied by viewing the videotape of this incident, which clearly shows Inmate Lucas's resistance.").

entitled to summary judgment for the additional reason that "he used no force whatsoever during the course of the extraction."[151]

Plaintiffs argue in response that there was no need for any force.[152] Plaintiffs argue that there was no need to enter Lucas's cell to confiscate the smoke detector because Lucas was locked in a secure cell by himself, being closely observed by correctional officers, and unable to harm anyone. Plaintiffs argue that under these circumstances the objectively appropriate response was to get Lucas psychiatric care and simply wait.[153] Plaintiffs argue that

> [e]ven assuming the Officer Defendants employed
> reasonable force when they forcibly entered the cell and
> placed Kenneth in restraints — and there is at least a
> material fact dispute on these points — their use of
> force quickly became excessive and deadly as they lifted
> him on to the gurney and began pushing down on his chest.
> After Kenneth was completely restrained, he yelled for
> "help!" at least fifteen distinct times over the next
> eight minutes (until he became unconscious), and Kenneth
> told officers[,] "I can't breathe" three times.
> Defendant Thomas opined that once the five containment
> team members — who all wore extensive body armor —
> restrained Kenneth with leg irons and handcuffs, they
> were "in control of the situation."[154]

Plaintiffs argue that

> even if retrieving the smoke detector did justify
> violence, the officers removed Kenneth from the cell at
> 9:11 on the video, then proceeded to hold him facedown in

---

[151]Id. at 31 ¶ 46.

[152]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 46-49.

[153]Id. at 90-92.

[154]Id. at 49 (citing Exhibit 2-A, Cell Extraction Video, Docket Entry No. 175-4, at 14:04, 15:22, 16:54, and 17:13-17:17; and Exhibit 10, Thomas Deposition, Docket Entry No. 175-13, pp. 47:23-48:3).

a "basic hogtie position" and compress his chest for the next sixteen minutes. Dr. Hall opines that the officers continued retraining Kenneth *even after he became unconscious and then died.* Presumably, the smoke detector could have been safely retrieved at any time after Kenneth was out of the cell without subjecting Kenneth to any further violence. Indeed, the officers only used *deadly* force against Kenneth *after* any legitimate need to use any force had passed.[155]

Plaintiffs also assert that "[a]ll officers agree the situation did not justify deadly force."[156]

The DCCT defendants had a need to apply reasonable force to control an uncooperative, disruptive inmate and maintain order in the jail by entering Lucas's cell, removing the smoke detector, and restraining Lucas for transport to the clinic. See <u>Grayson v. Peed</u>, 195 F.3d 692, 696-97 (4th Cir. 1999), <u>cert. denied sub nom. Grayson v. Royer</u>, 120 S. Ct. 1673 (2000) ("In dealing with such agitated detainees prison officials must not be forced to walk a tightrope and face the prospect of a lawsuit no matter which way they turn . . . If officers attempt to restrain [such] a detainee

_____

[155]<u>Id.</u> at 91 (citing Exhibit 13, Report of Dr. Kris Hall ("Hall Report"), pp. 3-5, Docket Entry No. 175-16, pp. 4-6).

[156]<u>Id.</u> at 51 & n.142 (citing Exhibit 5, Anderson Deposition, p. 101:1-6; Docket Entry No. 175-8, p. 102; Exhibit 6, Oral and Videotaped Deposition of Riley Alexander Scott ("Scott Deposition"), pp. 18:19-19:1, 152:21-25, Docket Entry No. 175-9, pp. 16-17, 103; Exhibit 7, Gordon Deposition, p. 68:9-17, Docket Entry No. 175-10, p. 69; Exhibit 8, Leveston Deposition, pp. 44:7-9, 45:7-46:6, 49:20-23, Docket Entry No. 175-11, pp. 34-36 and 39; Exhibit 9, Green Deposition, pp. 62:5-24, 94:22-25, Docket Entry No. 175-12, pp. 48 and 57; Exhibit 10, Thomas Deposition, pp. 65:13-24 and 93:6-23, Docket Entry No. 175-13, pp. 66 and 94; Exhibit 14, Oral and Videotaped Deposition of Jesse Bell ("Bell Deposition"), pp. 14:13-18, 22:22-23:14, and 25:5-14, Docket Entry No. 175-17, pp. 15, 23-24, and 26. See also <u>id.</u> at 51-54.

. . ., they risk an excessive force claim.  On the other hand, if they fail to restrain such a detainee they could be subject to another lawsuit brought by other detainees or even the obstreperous detainee himself.").  The DCCT defendants reasonably exerted force to subdue Lucas and retrieve the broken smoke detector, either to calm the general environment or to prevent Lucas from hurting himself.  See Flores v. County of Hardeman, Texas, 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known suicidal tendencies was clearly established when Flores committed suicide in January 1990.").

However, the court's inquiry does not end with the initial use of force because any unreasonable use of force can be a constitutional violation, even if other uses of force in the same set of circumstances are not unreasonable.  See Morris v. Bria, Civil Action No. 7:17-034-O-BP, 2018 WL 2436724, *7 (N.D. Tex. May 30, 2018) (citing Williams v. Bramer, 180 F.3d 699, 704 (5th Cir. 1999), decision clarified on reh'g, 186 F.3d 633 (5th Cir. 1999) (finding that the first instance of the defendant choking the plaintiff was not a cognizable constitutional violation as it was pursuant to a lawful search, but the second choking was not)).  The DCCT defendants argue that "[t]he claim that Inmate Lucas was not resisting is belied by viewing the videotape of this incident, which clearly shows Inmate Lucas's resistance,"[157] and also argue that the court should assign greater weight to the video evidence

_____

[157]Deputies' MSJ, Docket Entry No. 150, p. 23 n.8.

than to plaintiffs' version of the facts.[158]   But none of the
defendants' briefing addresses the need for force after Lucas was
restrained and placed face down on the gurney.  Instead, citing the
Anderson Deposition and the affidavits of defendants Gordon and
Scott, the DCCT defendants reply collectively that their use of
force against Lucas during the transport to the clinic was
objectively reasonable because they all acted pursuant to their
training, and pursuant to the policies and procedures of
Harris County with regard to cell extractions and transport to the
clinic following a cell extraction involving the use of force.[159]

The video shows — and defendants do not dispute — that once
Lucas was extracted from his cell, his legs were crossed, shackled,
and folded at the knees, he was placed face down on the gurney, and
subjected to pressure exerted by five DCCT members.  The brief
filed by Gordon and Scott describes the pressure exerted on Lucas:

> 43.  Officer Scott was kneeling on the gurney, with her
> body against Inmate Lucas's crossed, shackled legs, but
> she was not lying on Inmate Lucas.  She was in a semi-
> squat position.  Inmate Lucas's legs were placed in this
> position to prevent him from kicking, pursuant to the
> DCCT's training.  When an inmate is combative, as Inmate
> Lucas continued to be, the DCCT was trained to position

---

[158]Deputy and Detention Officers' MSJ, Docket Entry No. 145,
p. 20.

[159]Defendants' Amended Objections and Reply, Docket Entry
No. 192, pp. 26-27 ¶¶ 21-22 (citing Anderson Deposition, Exhibit 5
to Plaintiffs' Consolidated Response, pp. 6:12-21, 17:23-25, and
20:24-32:16, Docket Entry No. 175-8, pp. 7, 17, and 21-33; and
Gordon and Scott Affidavits, Exhibits 1 and 2 to Deputies' MSJ,
Docket Entry Nos. 150-1, p. 10 and 150-2 p. 10).

the smallest officer to hold the inmate's legs.  Officer
Scott was the smallest person on the DCCT that day and
took the position on the gurney.  See *Gordon Affidavit,
page* 7.

44.  Deputy Scott straddled Inmate Lucas's legs on the
gurney in a semi-squat position so he could not kick in
any manner.  Deputy Scott did not lie on Inmate Lucas's
legs, but *positioned herself* to keep the legs steady.
While Inmate Lucas was being transported to the clinic,
Deputy Scott did not apply constant pressure to his legs;
rather, he maintained his position to keep his legs
steady.  When Inmate Lucas was struggling and resistive
during the transport, Deputy Scott put a little pressure
on his legs with his chest, but he would ease off when he
stopped.  Officers Bell and Thomas had their hands on
Deputy Scott's back, and they were helping him to keep
steady, but they were not pushing Deputy Scott down.  The
DCCT is trained by the Sheriff's Office that if an inmate
is kicking, it is easier to cross their legs and apply
pressure to control the legs.  The DCCT is also trained
to maintain this position if the inmate continues to
kick.  *Scott Affidavit, page* 7.[160]

Although defendants argue that they only applied the amount of

force necessary to restrain Lucas, a reasonable "jury could decide

from viewing the video that Kenneth had stopped resisting by the

first time he told officers 'I can't breathe.'"[161]

In addition to the video plaintiffs cite the deposition

testimony of defendant Thomas that once Lucas was restrained with

leg irons and handcuffs the DCCT was "in control of the

situation,"[162] and the Hall Report that the DCCT continued to

_____

[160]Deputies' MSJ, Docket Entry No. 150, pp. 30-31 ¶¶ 43-44.

[161]Plaintiffs' Consolidated Response, Docket Entry No. 175,
p. 50.

[162]Thomas Deposition, pp. 47:23-48:3, Exhibit 10 to Plaintiffs'
Consolidated Response, Docket Entry No. 175-13, pp. 48-49.

restrain Lucas even after he had lost consciousness and died.[163] Construing the facts and inferences in plaintiffs' favor, the court finds that the force used in the first stage of the incident — entering Lucas's cell, and bringing him to the ground to retrieve the broken smoke detector and place him in restraints — appears to have been reasonably proportionate to the need for force. However, taking plaintiffs' version of the facts as true, the force used in the second stage when Lucas lay handcuffed, shackled in leg irons, and face down on the gurney could have been disproportionate to the need for force because, according to plaintiffs, Lucas was not resisting. It was at this point that the DCCT defendants applied most of the injurious force: effectively hogtying Lucas, and putting pressure on his legs, back, and chest, which allegedly caused his inability to breathe. Because "[o]nce a prisoner has been subdued, using gratuitous force on him is unreasonable," Preston v. Hicks, 721 F. App'x 342, 345 (5th Cir. 2018) (per curiam) (citing Cowart v. Erwin, 837 F.3d 444, 454 (5th Cir. 2016)), a jury could reasonably find that the force used at this second stage of the incident was unreasonable under the circumstances and, therefore, excessive. The court concludes that this factor weighs against the reasonableness of the DCCT defendants' actions.

---

[163]Exhibit 13, Hall Report, pp. 3-5, Docket Entry No. 175-16, pp. 4-6.

(B)     Extent of the Injury Suffered
        Weighs Against the Reasonableness
        of the DCCT Defendants' Actions.

As evidence of the injury that Lucas suffered plaintiffs cite

the autopsy report, which identifies the cause of death as

"[s]udden cardiac death . . . during physical restraint," and the

manner of death as "homicide."[164]  Because Lucas died, it is clear

that he suffered more than a _de minimis_ injury.  This factor thus

weighs against defendants' argument that their actions were

reasonable under the circumstances.

(C)     Efforts Made to Temper the
        Severity of the Force Used Weighs
        Against the Reasonableness of the
        Defendants' Actions.

Citing Scott's affidavit, Gordon and Scott argue that Lucas

remained resistive during transport to the clinic, but that

> Scott did not apply constant pressure to his legs;
> rather, he maintained his position to keep his legs
> steady.  When Inmate Lucas was struggling and resistive
> during the transport, Deputy Scott put a little pressure
> on his legs with his chest, but he would ease off when he
> stopped.  Officers Bell and Thomas had their hands on
> Deputy Scott's back, and they were helping him to keep
> steady, but they were not pushing Deputy Scott down.[165]

Plaintiffs argue that this evidence is contradicted by the video,

which shows that the DCCT defendants made no effort to temper or

limit the force used against Lucas "even after Kenneth repeatedly

_____

[164]Autopsy Report, Exhibit 24 to Harris County's Amended MSJ,
Docket Entry No. 157-3, p. 1.

[165]Deputies' MSJ, Docket Entry No. 150, pp. 30-31 ¶ 44 (citing
Exhibit 2, Scott Affidavit, p. 7, Docket Entry No. 150-2, p. 7).

begged for 'help!' and wheezed, 'I'm gonna pass out.'"[166] Plaintiffs argue that "[e]ven after the officers reached the infirmary — where Nurse O'Pry remarked quickly "would it be better for y'all if we rolled him over?" — the officers continued to sit on Kenneth and push his face and chest into the gurney."[167] Because the video and the Hall Report show that the DCCT defendants did not release Lucas until after he had stopped moving and had likely died,[168] this factor weighs against defendants' argument that their actions were reasonable under the circumstances.

(D)     Severity of the Security Problem and the Threat Reasonably Perceived by the Defendants Weigh Against the Reasonableness of the Defendants' Actions.

While there is no fact issue as to whether the defendants perceived a threat when entering Lucas's cell, plaintiffs argue that the DCCT defendants used unnecessary force while Lucas lay handcuffed, shackled, and face down on the gurney, allegedly not resisting or posing a threat. Because a reasonable jury could find that a prisoner who was handcuffed, shackled in leg irons, lying face down on a gurney, and not resisting, posed neither a security

---

[166]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 97 (citing Cell Extraction Video, Docket Entry No. 175-4, at 7:15, 14:04, and 16:56).

[167]Id. (citing Cell Extraction Video, Docket Entry No. 175-4, at 18:00).

[168]Id. at 91 (citing Exhibit 13, Hall Report, pp. 3-5, Docket Entry No. 175-16, pp. 4-6).

threat nor a reasonably perceived threat to the DCCT defendants, these factors weigh against the reasonableness of the defendants' actions.

> (E) Whether Lucas Was Actively Resisting Weighs Against the Reasonableness of the Defendants' Actions.

Defendant Scott states in his affidavit that Lucas was struggling and resistive during the transport to the clinic,[169] but defendant Thomas testified that once the DCCT members — who all wore extensive body armor — restrained Kenneth with leg irons and handcuffs, they were "in control of the situation."[170] Moreover, a reasonable jury could decide from viewing the video that Lucas had stopped resisting by the first time he told officers, "I can't breathe," and that each time Lucas moved, he was attempting to reposition his face from where the officers were pushing it into the gurney so that he could breathe. See Darden v. City of Fort Worth, Texas, 880 F.3d 722, 731 (5th Cir. 2018) (denying police officers qualified immunity when obese detainee who had been pushed face down into the floor "pushed himself up on his hands because he was trying to get into a position where he could breathe"). Because a reasonable jury could conclude that although Lucas resisted the cell extraction, he stopped resisting when he was

---

[169]Deputies' MSJ, Docket Entry No. 150, pp. 30-31 ¶ 44.

[170]Thomas Deposition, pp. 47:23-48:3, Exhibit 10 to Plaintiffs' Consolidated Response, Docket Entry No. 175-13, pp. 48-49.

placed faced down on the gurney and began to have trouble breathing, this factor weighs against the reasonableness of the defendants' actions.

For the reasons stated above, all of the six factors in the Kingsley analysis weigh against summary judgment regarding the first element of the qualified immunity analysis: whether the DCCT defendants committed a constitutional violation by allegedly using deadly force against a pretrial detainee after he had stopped resisting. The court would have reached the same conclusion had it analyzed this issue under the pre-Kingsley standard of Hudson, 112 S. Ct. at 999, and Valencia, 981 F.2d at 1447, which required courts to analyze "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Because the video shows that the DCCT defendants made no effort to temper or limit the force used against Lucas even after he repeatedly called for help, complained that he could not breathe, and warned that he was going to pass out,[171] and because the video and the Hall Report show that the DCCT defendants did not release Lucas until after Lucas had stopped moving and had likely died,[172] a reasonable jury could conclude that the DCCT defendants did not apply force in a good faith effort to maintain or restore discipline but, instead,

---

[171]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 97 (citing Cell Extraction Video, Docket Entry No. 175-4, at 7:15, 14:04, and 16:56).

[172]Id. at 91 (citing Exhibit 13, Report of Dr. Kris Hall, p. 5, Docket Entry No. 175-16, p. 6).

maliciously and sadistically for the very purpose of causing harm. See Simpson v. Hines, 903 F.2d 400, 403 (5th Cir. 1990) (inferring malice where decedent was recorded screaming in pain and begging for mercy before he ultimately succumbed to traumatic asphyxiation).

> (ii) The Constitutional Right Alleged Against the DCCT Defendants was Clearly Established.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" al-Kidd, 131 S. Ct. at 2083 (quoting Anderson, 107 S. Ct. at 3039). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. When determining whether a state actor has violated an individual's clearly established constitutional rights,

> [t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'

Bush v. Strain, 513 F.3d 492, 501-02 (5th Cir. 2008) (quoting Kinney v. Weaver, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

Plaintiffs have alleged and cited evidence capable of establishing the following factual basis for their excessive force claims, i.e.:

As a result of Defendants' objectively unreasonable use of force, Mr. Lucas could not breathe, fell unconscious, suffocated, suffered a cardiac event, and ultimately died. Defendants acted unreasonably and applied force that vastly exceeded their need when they hogtied, forcibly pressed his legs into his back preventing Mr. Lucas from breathing . . . especially considering that Mr. Lucas was an unarmed . . . pretrial detainee. Defendants' use of force was also objectively unreasonable because Mr. Lucas . . . was in a secure environment, was not resisting or threatening to resist, and was vastly outnumbered by the Officers wearing full riot gear.[173]

Fifth Circuit case law holds that using gratuitous force against a detainee who was restrained and not resisting can be a violation of clearly established statutory or constitutional rights of which a reasonable person would have known. See Simpson, 903 F.2d at 403 (jail officers subduing pretrial detainee by sitting "astraddle him" and applying pressure to his chest, while detainee "screams and [made] repeated cries for mercy" denied qualified immunity when detainee asphyxiates); Preston, 721 F. App'x at 345 ("Once a prisoner has been subdued, using gratuitous force on him is unreasonable.").

Disputes of material fact as to whether the individually named DCCT defendants used force that was unreasonable under the

_____

[173]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, p. 20 ¶ 55. See also Deputies' MSJ, Docket Entry No. 150, p. 23 ¶ 26 (stating that plaintiffs specifically allege: "Defendants' objectively unreasonable use of force occurred when Defendants allegedly hogtied Inmate Lucas, forcibly pressed his legs into his back, preventing him from breathing, and injected him with a dangerous sedative. Plaintiffs allege that this force was objectively unreasonable because Inmate Lucas '. . . did not fight with the officers, was in a secure environment, was not resisting or threatening to resist, and was vastly outnumbered by the Officers wearing full riot gear.'").

circumstances include whether Lucas continued to resist once he was handcuffed, shackled, and placed face down on the gurney for transport to the jail clinic, and whether and to what extent each of the DCCT defendants applied pressure to Lucas's chest during the transport to the clinic. The court concludes that plaintiffs have cited summary judgment evidence capable of establishing that the DCCT defendants took the alleged actions against Lucas, that those actions were not objectively reasonable, and that the DCCT defendants had fair warning that the conduct at issue was constitutionally impermissible. The court therefore concludes that the plaintiffs have cited evidence capable of establishing that the DCCT defendants violated clearly established law of which all reasonable officers would have known.

### (iii) The Court's Conclusions Apply to All the DCCT Defendants Except Kneitz.

The court is mindful that personal liability for constitutional torts is based solely on individual conduct, Michalik v. Hermann, 422 F.3d 252, 260 n.7 (5th Cir. 2005), and requires separate consideration of defendants' individual actions. Newman, 703 F.3d at 762 (citing Meadours, 483 F.3d at 421-22 & n.3). The Fifth Circuit has emphasized, however, that where separate defendants' actions are materially indistinguishable, "[s]eparate consideration does not require courts to conduct a separate *analysis* for each officer." Meadours, 483 F.3d at 421-22 & n.3 (emphasis added). See also Simpson, 903 F.2d at 403 (holding

that individual officers acting as a group were not entitled to qualified immunity even though the evidence suggested that only two of the ten had applied force sufficient to cause the plaintiff's injuries); Khan v. Lee, Civil Action No. 07-7272, 2010 WL 11509283, at *2 (E.D. La. Dec. 2, 2010) (holding that because multiple defendants functioned as a unit, they were not entitled to qualified immunity or summary judgment), aff'd sub nom. Khan v. Normand, 683 F.3d 192 (5th Cir. 2012). In the court's view, this is one of those cases. Tellingly, the seven DCCT members filed only two group motions for summary judgment and one joint reply.[174]

Two DCCT defendants have, however, sought separate consideration. Gordon, the DCCT supervisor, and Kneitz, the DCCT member who videotaped the incident, argue that they are entitled to summary judgment on plaintiffs' excessive force claims because it is undisputed that they did not exert any force against Lucas. Because it is undisputed that Kneitz videotaped the incident but exerted no force against Lucas, his motion for summary judgment on the use of excessive force will be granted, but his motion for summary judgment on bystander liability will be denied. Plaintiffs argue that Gordon's motion for summary judgment on this basis should not be granted because in his capacity as DCCT supervisor,

---

[174]The two motions for summary judgment are Docket Entry No. 145, filed on behalf of Leveston, Green, Bell, Thomas, and Kneitz, and Docket Entry No. 150, filed on behalf of Gordon, the DCCT supervisor, and Scott, the DCCT team leader. The joint reply is Docket Entry No. 193, filed on behalf of all seven DCCT members.

he not only gave the order to enter and extract Lucas from his cell, but also made the decision to place Lucas prone on the gurney in the basic hogtie position, and to continue restraining Lucas in that position with other DCCT members exerting pressure on him during the transport to and inside the clinic even after Lucas was under control and complained of the inability to breathe.[175] Because a supervisor like Gordon can be held liable when either (1) "he affirmatively participates in the acts that cause the constitutional deprivation," or (2) "acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates," Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011), Gordon's motion for summary judgment based on not having exerted force against Lucas will be denied.

For the reasons stated above the court concludes that the motions for summary judgment on plaintiffs' claims for excessive use of force urged by Kneitz will be granted, but that the motions urged by the other DCCT members, i.e., Gordon, Leveston, Green, Scott, Bell, and Thomas, will be denied. Decisions on disputed issues of material fact, such as those that exist in this case, are reserved for the fact-finder.

### (2) Bystander Liability

To establish a claim under § 1983 for a government actor's failure to prevent another government actor's use of excessive

---

[175]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 123-24.

force, plaintiffs must adduce evidence capable of establishing that (1) the bystanding actor knew that a fellow actor was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent violation, and (3) chose not to act. Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013), cert. denied, 134 S. Ct. 1935 (2014) (citing Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995), abrogated on other grounds, Kingsley, 135 S. Ct. at 2472-73). Such liability is premised on the theory that by choosing not to intervene, a bystanding actor participates in his fellow actor's acts. Id. See also Kitchen, 759 F.3d at 481 ("[B]ystander liability arises . . . only where the plaintiff can allege and prove 'another officer's use of excessive force.'" (quoting Hale, 45 F.3d at 919)). In 2014 it was clearly established that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." Hale, 45 F.3d at 919. To prevail on this claim the plaintiffs must show that the individually named deputy and detention officer defendants "(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." Kitchen, 759 F.3d at 480. See also Carroll v. Ellington, 800 F.3d 154, 177 (5th Cir. 2015).

The DCCT defendants argue that they are entitled to summary judgment and qualified immunity on plaintiffs' bystander-liability claims because

[b]eyond their conclusory allegations of "hog-tying" and Lucas having trouble "breathing" Plaintiffs do not identify any evidence that any Individual Defendant "knew" another defendant was violating Lucas' clearly established rights and also no evidence that with such knowledge the Defendant had a "reasonable opportunity to prevent the harm" and then "chose not to act".

In this case, the evidence shows that each of the Individual Defendants had a responsibility to focus on and maintain control of a different part of Lucas' body to control him. There is no admissible evidence that any one of the Individual Defendants "knew that a fellow officer was violating Lucas' rights, had an opportunity to prevent the harm and chose not to act."[176]

Citing their own affidavits, Gordon and Scott similarly argue that they are entitled to summary judgment on plaintiffs' bystander-liability claim because neither of them

observed any use of force during the cell extraction and transport of Inmate Lucas which they considered to be excessive and/or unreasonable. . . . [T]he cell extraction and subsequent transport of Inmate Lucas to the medical clinic was accomplished in precisely the manner in which the Defendants had been trained by the Sheriff's Office. . . . There was, therefore, nothing which would have informed Deputy Gordon and/or any other members of the DCCT that the procedures deployed were in violation of any corrections procedure in light of following the established Harris County training and protocol.[177]

For the reasons stated in § IV.B.1(a)(1), above, the court has already concluded that genuine issues of material fact exist concerning whether the force used against Lucas was unreasonable

---

[176]Deputy and Detention Officers' MSJ, Docket Entry No. 145, p. 43.

[177]Deputies' MSJ, Docket Entry No. 150, p. 38 ¶ 60 (citing Gordon Affidavit, Exhibit 1, Docket Entry No. 150-1, pp. 3, 6-7, 9-10; and Scott Affidavit, Exhibit 2, Docket Entry No. 150-2, pp. 3, 6-10).

under the circumstances. Therefore, the court is not persuaded by the DCCT defendants' argument that nothing could have informed them that Lucas's constitutionally protected rights were being violated. Moreover, although some of the DCCT defendants contend that they did not hear Lucas complain that he could not breathe until months later when they viewed the video,[178] one DCCT member can be heard on the video stating, "relax and you'll be able to breathe,"[179] and at least two DCCT defendants (Leveston and Thomas) have testified that they heard Lucas say he could not breathe.[180] The court therefore concludes that whether the defendants who contend otherwise actually heard Lucas is a genuine issue of material fact for trial. The DCCT defendants' motions for summary judgment on plaintiffs' bystander-liability claims will all be denied.

### (3) Denial of Medical Care

Plaintiffs allege that defendants intentionally shirked their duty to provide Lucas adequate medical care by (1) failing to consult with medical staff before the extraction; (2) hogtying

---

[178]See, e.g., Deputies' MSJ, Docket Entry No. 150, p. 37 ¶ 56 (citing the Gordon and Scott affidavits as evidence that neither Gordon nor Scott heard Lucas say that he couldn't breathe, observed Lucas to be gasping for breath, or noticed Lucas to be in respiratory distress).

[179]Cell Extraction Video, Exhibit 16 to Harris County's MSJ, Docket Entry No. 156-5, at 16:59-17:14.

[180]See Exhibit 8 to Plaintiffs' Consolidated Response, Leveston Deposition, pp. 45:22-49:23, Docket Entry No. 175-11, pp. 35-39; Exhibit 11 to Plaintiffs' Consolidated Response, Thomas Deposition, pp. 65:13-66:7, Docket Entry No. 175-13, pp. 66-67.

Lucas face down on a gurney and preventing him from breathing; (3) hindering the ability of medical professionals to assess and attend to Lucas's medical needs; and (4) watching and causing Lucas to plead for help, lose the ability to speak, fall unconscious, suffer physiological distress, and die.[181] Plaintiffs' allegations that the defendants hindered the ability of medical professionals to assess and attend to Lucas's medical needs and watched Lucas die are capable of supporting § 1983 claims for denial of medical care, see Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), but plaintiffs' other two allegations are simply alternate ways of stating their claims for excessive use of force.

Plaintiffs' allegations that the intentional actions of the DCCT defendants denied Lucas adequate medical care by hindering the ability of medical professionals to assess and attend to his needs and by watching Lucas die implicate both the Eighth and the Fourteenth Amendments. Id. Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment, which dictates that "a pretrial detainee may not be punished." Bell v. Wolfish, 99 S. Ct. 1861, 1872 & n.16 (1979). Inmates who have been convicted and sentenced to imprisonment, by contrast, are protected by the Eighth Amendment, which prohibits punishment that is "cruel and unusual." Id. The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted

---

[181]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, p. 21 ¶ 56.

criminals concerning basic human needs such as medical care. See Gibbs v. Grimmette, 254 F.3d 545, 548 (5th Cir. 2001) (citing Hare, 74 F.3d at 643). Thus the same legal standard governs constitutional claims for denial of medical care by pretrial detainees and convicted prisoners. Id.

Citing Farmer v. Brennan, 114 S. Ct. 1970 (1994), and Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003), the individually named deputy and detention officer defendants argue that they are entitled to summary judgment on these claims because (1) no constitutional violation occurred, and (2) they are entitled to qualified immunity.[182] Plaintiffs argue that none of the individually named defendants are entitled to summary judgment on the claims for deliberate indifference to Lucas's serious medical needs because

> the officers and Defendants . . . were deliberately indifferent to Kenneth's need for emergency medical attention, and watched him die in the jail's clinic instead of providing him with necessary emergency medical care. While in the clinic, under Dr. Sunder and Nurse O'Pry's care and observation, Kenneth again gasped, "I cannot breathe." The video of the ordeal shows Kenneth's eyes roll back into his skull, and spittle form on his lips, but the officers and medical staff do nothing. But the officers kept pressing down on Kenneth's chest and sitting on him, and Sunder and O'Pry did nothing for several crucial minutes, not even taking Kenneth's vital signs or checking his respirations. Different witnesses tell different stories about what they heard — a jury will need to resolve the Defendants' subjective knowledge and intent. Thus, all the individual defendants were deliberately indifferent to Kenneth's right to receive

---

[182]Deputy and Detention Officers' MSJ, Docket Entry No. 145, pp. 40-43; Deputies' MSJ, Docket Entry No. 150, pp. 32-38 ¶¶ 48-58.

care for a serious medical need, in violation of his Fourteenth Amendment rights.[183]

### (i) Applicable Law

An official's "deliberate indifference to serious medical needs of prisoners" can constitute "unnecessary and wanton infliction of pain" of the type proscribed by the Eighth Amendment and actionable under 42 U.S.C. § 1983. Estelle v. Gamble, 97 S. Ct. 285, 291 (1976); Hudson, 112 S. Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"). A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citation omitted). In this context, it is "obduracy and wantonness, not inadvertence or error in good faith," that characterizes the conduct prohibited by the Eighth Amendment, "whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998) (quoting Whitley, 106 S. Ct. at 1984). "Thus, the prison official's state of mind must be examined to determine whether the undue hardship endured by

---

[183]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 21.

the prisoner was a result of the prison official's deliberate indifference." Bradley, 157 F.3d at 1025 (citing Wilson v. Seiter, 111 S. Ct. 2321 (1991)). The deliberate indifference standard has both an objective and subjective component. See Farmer, 114 S. Ct. at 1977. To establish deliberate indifference under this standard, the prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) actually drew an inference that such potential for harm existed. Id. at 1979. Under the subjective prong of this analysis, a prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it." Gobert, 463 F.3d at 346 (quoting Farmer, 114 S. Ct. at 1984).

The deliberate indifference standard is an "extremely high" one to meet. Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). It is well established that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." Gobert, 463 F.3d at 346 (citations omitted). "A showing of deliberate indifference requires the prisoner to submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a

wanton disregard for any serious medical needs.'" <u>Gobert</u>, 463 F.3d at 346 (citation omitted).

(ii) <u>Genuine Issues of Material Fact Preclude Granting the DCCT Defendants' Summary Judgment Motion.</u>

The individually named deputy and detention officer defendants argue that they are entitled to summary judgment and qualified immunity on plaintiffs' claims for deliberate indifference to Lucas's serious medical needs because

> [t]he evidence shows that the number one priority was to bring Lucas under control and stop his disruptive behavior in the Jail. The video evidence shows that the next priority after the Team had Lucas under control was to immediately transport him to the Medical Clinic to have him evaluated by medical professionals and to defer to their medical judgment. Plaintiffs fail to demonstrate that any of the Individual Defendants recognized that Lucas had an excessive risk to his health or safety and than ignored his condition, refused to get him medical care, or engaged in any conduct that would clearly evidence a wanton disregard for any serious medical needs.
>
> The failure to alleviate a significant risk that an official or medical personnel should have perceived, but did not, likewise does not state a constitutional violation. The subjective intent to cause harm cannot be inferred from a . . . failure to act reasonably.
>
> Moreover, active treatment of an inmate's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered.[184]

Defendants Gordon and Scott similarly argue that "it is undisputed that after the cell extraction, Defendants transported Inmate Lucas

---

[184]Deputy and Detention Officers' MSJ, Docket Entry No. 145, p. 42 (citations omitted).

to the medical clinic for treatment,"[185] that there is "no evidence that once in the medical clinic, Defendants hindered the ability of the medical professionals to assess and attend to Inmate Lucas's serious medical needs,"[186] that neither Gordon nor Scott heard Lucas say he couldn't breathe or heard him gasp for air, and that if they had heard Lucas say he couldn't breathe or heard him gasp for air, they "each would have evaluated the validity of his claim and used their judgment and discretion to the extent of ordering the DCCT to release their hold and turn Inmate Lucas over immediately,"[187] and that in the medical clinic, "all decisions about Inmate Lucas's medical treatment were made by the health care providers there."[188]

> (A)     Plaintiffs Have Cited Evidence
>          Capable of Establishing that the
>          DCCT Defendants Were Aware of
>          Facts from which an Inference of
>          an Excessive Risk to Lucas's
>          Health or Safety could be Drawn.

As evidence that the DCCT defendants were aware of facts from which an inference of an excessive risk to Lucas's health and safety could be drawn, plaintiffs cite the deposition testimony of defendants Leveston and Thomas who admitting that they heard Lucas gasp, "I can't breathe," but did nothing.[189]  Plaintiffs also cite

---

[185]Deputies' MSJ, Docket Entry No. 150, p. 36 ¶ 54.

[186]Id. ¶ 55.

[187]Id. at 37 ¶ 56.

[188]Id. ¶ 57.

[189]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 112-113 (citing Exhibit 8, Leveston Deposition, pp. 47:8-48:18,
(continued...)

Thomas's deposition testimony that at the debriefing immediately after learning that Lucas died, Gordon told other officers that he had heard Lucas say, "I can't breathe."[190] Plaintiffs also cite the video as evidence that Lucas's eyes rolled back as he foamed at the mouth, but the videographer, Kneitz did nothing,[191] and that contrary to Gordon's and Scott's motion stating that once inside the clinic, the DCCT defendants moved out of the way to allow the medical staff to treat Lucas, the video shows that the DCCT defendants did not move out of the way until Lucas had lost consciousness and probably died.[192] Because at least two of the DCCT defendants (Leveston and Thomas) admit that they heard Lucas say he could not breathe but did nothing, and because the video shows Lucas saying that he can't breathe and the DCCT defendants doing nothing, plaintiffs have cited sufficient evidence to raise genuine issues of material fact for trial as to whether the other DCCT members also heard Lucas complain that he could not breathe. Since, moreover, the inability to breathe signifies a serious need

---

[189](...continued)
Docket Entry No. 175-11, pp. 37-38; and Exhibit 10, Thomas Deposition, pp. 58:20-59:3, 65:13-66:7, and 98:1-11, Docket Entry No. 175-13, pp. 59-60, 66-67, and 99).

[190]Id. at 113 (citing Exhibit 10, Thomas Deposition, p. 103:13-20, Docket Entry No. 175-13, p. 104).

[191]Id. (citing Cell Extraction Video, Docket Entry No. 175-4, at 20:18).

[192]Id. (citing Cell Extraction Video, Docket Entry No. 175-4, at 16:28 showing "Green standing between Dr. Sunder and the videographer"). See also Exhibit 13, Hall Report, pp. 3-5, Docket Entry No. 175-16, pp. 4-6.

that is so apparent even laymen would recognize that care is required, the court concludes that plaintiffs have cited evidence from which a reasonable jury could conclude that the DCCT defendants were aware of facts from which an inference of the existence of an excessive risk to Lucas's health or safety could be drawn. See Gobert, 463 F.3d at 345 n.12.

> (B) Plaintiffs Have Cited Evidence Capable of Establishing that the DCCT Defendants Actually Drew an Inference that Such Potential for Harm Existed.

As evidence that the DCCT defendants actually drew an inference that an excessive risk of potential for harm existed, plaintiffs cite Gordon's and Scott's motion stating that if they had heard Lucas say he couldn't breathe or heard him gasp for air, they "each would have evaluated the validity of his claim and used their judgment and discretion to the extent of ordering the DCCT to release their hold and turn Inmate Lucas over immediately."[193] Plaintiffs cite the video which they argue, "clearly captured [Lucas's] lamentation, and an officer actually responded by telling him, "you relax, and you'll be able to breathe."[194] Plaintiffs also cite the DCCT defendants' deposition testimony that their training taught them that hogtying was dangerous and prohibited due to the

---

[193]Id. at 115 (citing Deputies' MSJ, Docket Entry No. 150, p. 37 ¶ 56).

[194]Id. (citing Cell Extraction Video, Docket Entry No. 175-4, at 16:59).

possibility of positional asphyxiation.[195] This evidence is sufficient to raise genuine issues of material fact as to whether the DCCT defendants actually drew an inference that Lucas's inability to breathe created an excessive risk of potential for harm yet intentionally said and did nothing, thereby delaying Lucas's ability to receive medical care needed to address the serious need caused by his inability to breathe. Because Lucas suffered substantial harm when he died, and because delaying a prisoner's access to medical care has long been recognized as a violation of the Fourteenth Amendment rights of pretrial detainees when the delay results in substantial harm, Easter, 467 F.3d at 464, the court concludes that genuine issues of material fact preclude granting the DCCT defendants' motions for summary judgment on plaintiffs' claims for denial of medical care. See also Bozeman v. Orum, 422 F.3d 1265, 1274 (11th Cir. 2005) (noting that "[m]ost cases in which deliberate indifference is asserted are far from obvious violations of the Constitution" but that the officers were not entitled to qualified immunity when they delayed in providing

---

[195]Id. (citing id. at 45 n.115). See also Exhibit 4, Oral and Videotaped Deposition of Sheriff Adrian Garcia ("Garcia Deposition"), pp. 47:1-48:19, Docket Entry No. 175-7, pp. 28-29 (acknowledging that hogtying is dangerous due to positional asphyxiation); Exhibit 9, Green Deposition, pp. 38:14-20 and 94:22-25, Docket Entry No. 175-12, pp. 32 and 57 (acknowledging that hogtying is dangerous because it could impact a person's ability to breathe). See also Exhibit 10, Thomas Deposition, pp. 16:20-19:5, Docket Entry No. 174-13, pp. 17-20 (acknowledging dangerousness of hogtying) and Exhibit 14, Bell Deposition, pp. 25:24-26:3, Docket Entry No. 175-17, pp. 26-27 (same).

medical treatment to a pretrial detainee who "was unconscious and not breathing"), abrogated on other grounds by Kingsley, 135 S. Ct. at 2472.

### (4) Conclusions as to DCCT Defendants

For the reasons stated above, Kneitz's motion for summary judgment on plaintiffs' § 1983 claims for excessive use of force will be granted, but Kneitz's motion for summary judgment on the plaintiffs' § 1983 claims for bystander liability and denial of medical care will be denied, as will all the other DCCT defendants' motions for summary judgment on plaintiffs' § 1983 claims.

### (b) Sunder's and O'Pry's Motions for Summary Judgment

Plaintiffs' allege that Dr. Sunder and Nurse O'Pry administered Ativan, a powerful sedative, to Lucas without checking his vital signs when Lucas was not moving or speaking, and that although Lucas appeared to be completely unconscious just seconds later, these defendants did not instruct the DCCT defendants to stop holding Lucas in a hogtie position.[196] Plaintiffs allege that by these actions Dr. Sunder breached the applicable standard of care for a physician[197] and that Nurse O'Pry breached the applicable standard of care for a nurse.[198] Plaintiffs also allege that

---

[196]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, pp. 16-17 ¶¶ 44-45.

[197]Id. at 17-18 ¶ 46.

[198]Id. at 18 ¶ 47.

Dr. Sunder and Nurse O'Pry were subjectively aware of Lucas's serious medical and physical condition yet they proceeded with deliberate indifference towards his health, safety, and welfare,[199] and that Dr. Sunder and Nurse O'Pry knew that their fellow county employees were violating Lucas's rights but chose not to act.[200] These allegations state claims for denial of medical care and bystander liability. Dr. Sunder and Nurse O'Pry have filed separate motions for summary judgment in which they argue that they are entitled to summary judgment on plaintiffs' claims for denial of medical care and bystander liability because plaintiffs are unable to cite evidence capable of establishing that they violated a right protected by the United States Constitution and because they are entitled to qualified immunity.[201]

### (1) Denial of Medical Care

Dr. Sunder and Nurse O'Pry argue that they are entitled to qualified immunity and summary judgment on plaintiffs' claims for denial of medical care because plaintiffs cannot cite any evidence capable of showing that they were deliberately indifferent to Lucas's serious medical needs.

Citing his own deposition testimony, as well as the testimony of plaintiffs' expert, Dr. Kris Hall, Dr. Sunder asserts that the

---

[199]Id. at 21 ¶ 58.

[200]Id.

[201]Sunder's MSJ, Docket Entry No. 146; O'Pry's MSJ, Docket Entry No. 147.

summary judgment evidence shows that he was not deliberately indifferent to Lucas's serious medical needs.[202] Dr. Sunder asserts that his own deposition testimony shows that he read Lucas's medical records, believed that Lucas was suffering from Xanax withdrawal, and immediately started treating Lucas upon his arrival to the clinic by ordering that Lucas be injected with Ativan.[203] Dr. Sunder argues that the testimony of plaintiffs' medical expert, Dr. Hall, shows that using Ativan to treat Xanax withdrawal is appropriate.[204] Dr. Sunder argues that his treatment of Lucas was not objectively unreasonable because Lucas "was combative and uncooperative when he arrived in the clinic, making obtaining his vitals and treatment difficult."[205]

Citing her own deposition testimony, as well as the testimony of plaintiffs' expert, Dr. Kris Hall, Nurse O'Pry asserts that the summary judgment evidence shows that she was not deliberately indifferent to Lucas's serious medical needs.[206] Nurse O'Pry asserts that her own deposition testimony shows that Dr. Sunder

---

[202]Sunder's MSJ, Docket Entry No. 146, pp. 16-20.

[203]Id. at 16 (citing Exhibit C, Excerpts from Defendant Sunder's Deposition ("Sunder Deposition"), pp. 28:15-19, 33:24-34:12, 54:1-20, Docket Entry No. 146-3, pp. 8-11).

[204]Id. at 18 (citing Exhibit E, Excerpts from Deposition of Kris Hall, MD, p. 86:5-18, Docket Entry No. 146-5).

[205]Id. at 20 (citing Exhibit C, Excerpts from Defendant Sunder's Deposition ("Sunder Deposition"), p. 28:1-7, Docket Entry No. 146-3, p. 8).

[206]O'Pry's MSJ, Docket Entry No. 147, pp. 16-20.

ordered her to give Lucas Ativan, and that even though she was ultimately unsuccessful, she tried to obtain Lucas's vital signs.[207] Nurse O'Pry argues that her treatment of Lucas was not objectively unreasonable because the testimony of plaintiffs' medical expert, Dr. Hall, shows that she did not refuse to treat Lucas,[208] and because her own testimony shows that Lucas "was combative and uncooperative when he arrived in the clinic, making obtaining his vitals and treatment difficult."[209]

Referencing deposition testimony of the DCCT defendants who heard Lucas say that he could not breathe, plaintiffs argue in response that "there is substantial evidence each officer, the doctor, and the nurse knew of the severe danger to Kenneth and that he required immediate medical attention."[210] Plaintiffs assert that "[w]hen Kenneth exclaimed "I cannot breathe," Nurse O'Pry "was standing right in front of his face."[211] Citing Easter, 467 F.3d at 464, plaintiffs argue that "[d]elaying a prisoner's access to

---

[207]Id. at 16 (citing Exhibit C, Excerpts from Defendant O'Pry's Deposition, pp. 102:3-103:20, and 176:2-8, Docket Entry No. 147-3, pp. 10-11 and 12).

[208]Id. at 16-17 (citing Exhibit E, Hall Deposition, pp. 148:4-7, and 153:2-20, Docket Entry No. 147-5, pp. 6-7).

[209]Id. at 20 (citing Exhibit E, Hall Deposition, pp. 90-91, Docket Entry No. 147-5, p. 5; and Exhibit F, Sunder Deposition, p. 28:1-7, Docket Entry No. 147-6, p. 8).

[210]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 115.

[211]Id. at 115-16 (citing Exhibit 10, Thomas Deposition, p. 66:18, Docket Entry No. 175-13, p. 67).

medical care violates his Fourteenth Amendment rights when the delay results in 'substantial harm.'"[212]

Plaintiffs' argument that Dr. Sunder and Nurse O'Pry delayed treating Lucas's serious medical needs is grounded on plaintiffs' contention that they were aware that Lucas was unable to breathe and yet failed to take action to help him. While plaintiffs cite evidence capable of showing that the DCCT defendants heard Lucas complain that he could not breathe, plaintiffs' own briefing states that the DCCT defendants

> did not tell Dr. Sunder or Nurse O'Pry that Kenneth had begged for "help!" or exclaimed, "I can't breathe." No one said anything approaching "This man needs a doctor!" The officers did not encourage Sunder and O'Pry to examine their patient as these medical professionals lollygagged and ignored Kenneth during the emergency.[213]

Moreover, while Thomas testified that Nurse O'Pry was standing in front of Lucas when Lucas said that he couldn't breathe, Thomas did not testify that Nurse O'Pry failed to take any action. Instead, when asked if Nurse O'Pry did anything after Lucas said he could not breathe, Thomas responded that he saw Nurse O'Pry walk over to Lucas but that because Thomas was standing in the back, he could not see what she did.[214] Moreover, neither of plaintiffs' experts, Dr. Hall and Dr. Cohen, testified that Dr. Sunder or Nurse O'Pry

---

[212]Id. at 116-17.

[213]Id. at 117.

[214]See Exhibit 10, Thomas Deposition, p. 66:19-23, Docket Entry No. 175-13, p. 67.

refused to treat Lucas or failed to take any action once they became aware of his inability to breathe.

In pertinent part, Dr. Hall, testified:

Q.    . . . When do you think from the videotape Dr. Sunder recognized that — that Mr. Lucas was not breathing? Do you have that time in your report?

A.    I think so. I think he — best I can tell, he's — 26:40 is kind of what I have for first recognition. That's when he asked that they turn him over and release.

Q.    All right. And — and when he noticed Mr. Lucas not breathing, did he take actions to determine whether Mr. Lucas was not breathing?

A.    I believe he — he did. He asked them to uncuff him and turn him over and, of course, you see — and then, of course at the 28:40, we've already established he said "bag him" a minute-and-a-half later.

Q.    Did you see any objective evidence on the videotape that either Dr. Sunder or Nurse O'Pry recognized that Mr. Lucas was having breathing difficulties and then ignored that?

        I understand that you — you may feel that they did not recognize the patient's respiratory status.

        My question is — is not that. My question is: Did you see any objective evidence that they recognized he was — he was having any sort of breathing problem and that they then ignored that?

A.    I — I don't think they had any intent of ignoring. I — that's — so I — I didn't see any evidence of overt intentional behavior to — to withhold services for this man. I — the — what occurred, of course, is a different story and I have a different opinion about that. But as far as any evidence of overtly withholding and — I didn't see anything of that nature.[215]

_____

[215]Hall Deposition, pp. 152:13-153:20, Exhibit E to Sunder's MSJ, Docket Entry No. 146-5, p. 7, and Exhibit E to O'Pry's MSJ, Docket Entry No. 147-5, p. 7.

Plaintiffs' expert, Dr. Cohen, testified:

Q. Are you going to be testifying that Dr. Sunder was in any way trying to injure Mr. Lucas, was intending to?

A. No.

Q. Are you going to be testifying in any that Nurse O'Pry was intending to injure Mr. Lucas?

A. No.

Q. Are you going to be testifying in any way that Dr. Sunder or Nurse O'Pry refused to treat Mr. Lucas?

A. I mean, I think they didn't make the effort they needed to — to treat him, but they didn't refuse to treat him.

Q. Did you see anything objective you could point to that Dr. Sunder or Nurse O'Pry were intentionally ignoring Mr. Lucas?

A. They — they had to — as soon as he came in, they had to figure out what was going on in this guy who was — it was an emergency situation, so I think — if you could — I think the answer to your question is that they — what they did was not okay, so it —

Q. Okay.

A. — the way they behaved was — you know, caused him harm, and it was — and it was not the way they should have behaved.

. . .

Q. You believe that the care provided to Mr. Lucas in the clinic on February 17, 2014[,] fell below the standard of care?

A. Yes.

Q. And you believe that falling below the standard of care caused or contributed to the death of Mr. Lucas in ways that are described in detail in your report, correct?

A. Right, the failure to act and the — and the treatment up until those points, yes.

Q. In other words, the actions they took, the timing of their actions in your mind, as detailed in your report, fell below the standards of care?

A. The actions they didn't take.

Q. The actions they didn't take fell below the standards of care and caused his injuries?

A. Yes.

. . .

Q. . . . Were they trying to intentionally injure Mr. Lucas, that's what I'm asking? Did you see objective evidence of that?

A. No.[216]

The undisputed facts evidenced by the video and the deposition testimony of the defendants and of plaintiffs' experts show that Dr. Sunder and Nurse O'Pry actively treated Lucas from the moment he entered the jail clinic. While plaintiffs' experts opine that the treatment they provided to Lucas was below the standard of care that should have been provided, those opinions are only capable of establishing that Dr. Sunder and Nurse O'Pry treated Lucas negligently, not that they treated Lucas with deliberate indifference to his serious medical needs. Provision of negligent medical treatment is not actionable under § 1983. See Stewart v.

---

[216]Excerpts from Deposition of Robert Cohen, MD ("Cohen Deposition"), pp. 125:17-130:4, Exhibit D to Sunder's MSJ, Docket Entry No. 146-4, pp. 12-17, and Exhibit D to O'Pry's MSJ, Docket Entry No. 147-4, pp. 12-17.

<u>Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999) (recognizing that active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered); <u>Domino</u>, 239 F.3d at 756 (incorrect diagnoses, unsuccessful treatments, medical malpractice, acts of negligence, and delays in treatment, absent intent to cause harm, do not constitute deliberate indifference). To establish their § 1983 claims against Dr. Sunder and Nurse O'Pry for denial of medical care, plaintiffs must cite evidence capable of establishing that Dr. Sunder and Nurse O'Pry "refused to treat Lucas, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." <u>Gobert</u>, 463 F.3d at 346. Missing from plaintiffs' argument is any evidence capable of establishing that either Dr. Sunder or Nurse O'Pry intentionally mistreated or delayed medical care to Lucas. Because plaintiffs have failed to adduce evidence from which a reasonable jury could conclude that either Dr. Sunder or Nurse O'Pry engaged in conduct that is actionable under § 1983, both of these defendants are entitled to summary judgment on plaintiffs' claims for denial of medical care.

### (2) Bystander Liability

Plaintiffs also argue that "Dr. Sunder and Nurse O'Pry are . . . liable to [them] for standing by and doing nothing as they

heard Kenneth suffer and die."[217]  As evidence capable of
establishing the first element of their bystander liability claims,
i.e., that Dr. Sunder and Nurse O'Pry knew that a fellow officer
was violating an individual's constitutional rights, Kitchen, 759
F.3d at 480, plaintiffs cite the video showing that they watched
the DCCT defendants wheel Lucas into the clinic, and heard Lucas
say, "I cannot breathe."[218]  As evidence capable of establishing the
second and third elements of such a claim, i.e., that Dr. Sunder
and Nurse O'Pry had a reasonable opportunity to prevent the harm
and chose not to act, id., plaintiffs also cite the video arguing:

> [t]he video shows Dr. Sunder standing next to the gurney
> seconds after Kenneth exclaims, "I cannot breathe," but
> he does nothing.  The video shows Nurse O'Pry surmise —
> without actually examining Kenneth — that he has stopped
> moving not because he was dying, but because "he's
> realized that [the officers are] not gonna move" off of
> his body, after moments earlier explaining "my Ativan's
> not that good" to guess why Kenneth became motionless.
> When Dr. Sunder finally does ask the officers to first
> "loosen him up just a smidge" then at last to "turn him
> around" off his chest the officers comply.  If Dr. Sunder
> and Nurse O'Pry had actually examined their patient
> earlier — perhaps when they heard him gasp "I cannot
> breathe" — Kenneth would have survived as the officers
> eventually followed the medical providers' directions.[219]

For essentially the same reasons that the court has already
concluded that Dr. Sunder and Nurse O'Pry are entitled to summary
judgment on plaintiffs' claims for denial of medical care, the

_____

[217]Plaintiffs' Consolidated Response, Docket Entry No. 175,
p. 120.

[218]Id. at 121.

[219]Id. at 122.

court concludes that they are also entitled to summary judgment on plaintiffs' claims for bystander liability. Plaintiffs have failed to cite any evidence from which a reasonable jury could conclude either that Dr. Sunder and Nurse O'Pry knew that the DCCT defendants were violating Lucas's constitutional rights, or had the opportunity to act but failed to do so. To the contrary, the evidence that plaintiffs cite shows that Dr. Sunder and Nurse O'Pry both actively treated Lucas from the moment he entered the clinic. The video shows that soon after Lucas arrived at the clinic, Nurse O'Pry asked the DCCT defendants to reposition Lucas: "Would it be better for ya'll if we rolled him over and, and . . .? Oh, okay, never mind."[220] Moreover, plaintiffs acknowledge that Dr. Sunder directed the DCCT defendants to release Lucas as soon as he realized that Lucas was not breathing. Accordingly, the court concludes that both of these defendants are entitled to summary judgment on plaintiffs' claims for bystander liability.

2. ADA and RA Claims

Plaintiffs' Fourth Amended Complaint (Docket Entry No. 77), asserts claims pursuant to the ADA and the RA against "Defendants," which presumably includes the individually named defendants.[221] Although none of the DCCT defendants have addressed these claims in

_____

[220]Cell Extraction Video, Exhibit 16 to Harris County's MSJ, Docket Entry No. 156-5, at 17:58.

[221]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, pp. 26-27, ¶¶ 75-83.

their motions for summary judgment, Dr. Sunder and Nurse O'Pry both argue that they are not subject to suit under the ADA or the RA.[222] To the extent that plaintiffs have asserted or attempted to assert such claims against the DCCT defendants, plaintiffs agree that such claims are not cognizable and would be subject to summary judgment.[223] See Nottingham v. Richardson, 499 F. App'x 368, 376 & n.6 (5th Cir. 2012) (recognizing that government actors may not be sued in their individual capacities for violating the ADA or the RA). See also Lollar v. Baker, 196 F.3d 603, 609 (5th Cir. 1999) (holding that only public entities are amenable to suit under the RA); and Pace v. Bogalusa City School Board, 403 F.3d 272, 287-88 (5th Cir. 2005) (noting that because the rights and remedies under the ADA and the RA are the same, case law interpreting one statute can be applied to the other).

## C. Harris County's Motion for Summary Judgment

Plaintiffs assert claims against Harris County for violation of 42 U.S.C. § 1983 for depriving Lucas of rights protected by the Fourteenth Amendment to the United States Constitution, including the right to be free from cruel and unusual punishment in the form of excessive force, and the right to have his serious medical needs

---

[222]Sunder's MSJ, Docket Entry No. 146, pp. 21-22; O'Pry's MSJ, Docket Entry No. 147, pp. 21-22.

[223]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 144 n.458 ("Plaintiffs agree that ADA and Rehabilitation Act suits can only be brought against entities, not individuals.").

-114-

met,[224] and for failing to adequately train its employees to safely restrain pretrial detainees such as Lucas.[225] Plaintiffs also assert claims against Harris County for violation of the ADA and the RA.[226]

1.  Section 1983 Claims

Harris County argues that it is entitled to summary judgment on plaintiffs' claims because plaintiffs are not able to establish that Lucas suffered a constitutional injury or that any such injury was caused by a county policy or custom.[227] Citing Monell, 98 S. Ct. at 2035-2036, plaintiffs respond that

> [t]he County's policy, practice, and training instructed the officers to restrain [Lucas] in a "basic hogtie position," compress his chest, and ignore his cries for help. . . . Thus, the County is not liable to the Plaintiffs under a *respondeat superior* theory, but because Harris County's policymakers deliberately selected policy options that violated [Lucas's] Fourteenth Amendment rights and caused his death.[228]

(a)  Applicable Law

"Constitutional challenges by pretrial detainees may be brought under two alternative theories:  as an attack on the

---

[224]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, pp. 20-21 ¶¶ 55-56.

[225]Id. at 24 ¶ 65.

[226]Id. at 26-27 ¶¶ 75-83.

[227]Harris County's Amended MSJ, Docket Entry No. 152, pp. 36-37 ¶¶ 50-53.

[228]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 124.

'condition of confinement' or as an attack on an 'episodic act or omission.'" Shepherd, 591 F.3d at 452 (citing Hare, 74 F.3d at 644-45). Plaintiffs contend that their complaint alleges constitutional violations under both a "conditions of confinement" claim (based on Harris County's policies, customs, and practices), and an "episodic act or omission" claim (based on the acts or omissions of Harris County Jail personnel).[229] Harris County argues that the claims asserted in this action are not conditions-of-confinement claims but, instead, episodic-act-or-omission claims because plaintiffs are challenging the actions of jail personnel during Lucas's extraction from his cell, transport to the jail clinic, and treatment in the clinic.[230]

A condition of confinement claim is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." Hare, 74 F.3d at 644. See Scott v. Moore, 114 F.3d 51, 53 n.2 (5th Cir. 1997) (en banc) (listing cases deemed to state challenges to conditions of confinement). In a condition of confinement case a plaintiff must establish that the condition amounted to punishment and was not incident to some other legitimate governmental purpose. Id. (citing Bell, 99 S. Ct. at 1874 and Hare, 74 F.3d at 640). A plaintiff challenging jail

---

[229]Id. at 127-32 ("Conditions of Confinement Liability"), and 133-35 ("Episodic Act or Omission Liability").

[230]Harris County's Amended MSJ, Docket Entry No. 152, pp. 95-97 ¶¶ 205-09.

conditions must "demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." Shepherd, 591 F.3d at 454. Because a condition of confinement is usually a manifestation of an explicit policy or restriction, e.g., overcrowding, plaintiffs in such cases are relieved from the burden of demonstrating a governmental entity's or individual jail official's actual intent to punish because intent may be inferred from the decision to expose a detainee to an unconstitutional condition. Id.

Alternatively, if the alleged harm stems from a particular act or omission by an official, the action is properly characterized as an "episodic act or omission" claim. In such a case

> an actor usually is interposed between the detainee and the [county], such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the [county] that permitted or caused the act or omission.

Scott, 114 F.3d at 53. Because plaintiffs' claims stem from the particular acts or omissions of the DCCT members, Dr. Sunder, and Nurse O'Pry, the claims asserted in this action are episodic-acts-or-omissions claims, not conditions-of-confinement claims. Id. (rejecting a rape-victim plaintiff's argument that her claim was a condition of confinement claim because under-staffing allowed the assault to occur, and holding that the claim was episodic because the alleged harm was the assault itself).

(b)  Application of the Law to the Facts

To proceed on their § 1983 claims plaintiffs must cite evidence showing that a genuine issue of material fact exists concerning their episodic act or omission claims. To establish county liability under an episodic act or omission theory, plaintiffs must show that:  (1) a county employee violated Lucas's clearly established constitutional rights with subjective deliberate indifference; and (2) the violation resulted from a county policy or custom adopted or maintained with objective deliberate indifference.  Scott, 114 F.3d at 54.

> (1)  **Plaintiffs Have Raised Genuine Issues of Material Fact as to Whether DCCT Members Violated Lucas's Clearly Established Constitutional Rights with Subjective Deliberate Indifference.**

Plaintiffs argue that they have satisfied the elements of their episodic act or omission claims by citing evidence capable of establishing that the DCCT officers violated Lucas's constitutional rights by restraining Lucas in a basic hogtie position, compressing his chest, sitting on him, and ignoring his cries for "help!" and pleas that "I can't breathe."[231]  For the reasons explained in § IV.B.1(a), above, the court has already concluded that genuine issues of material fact preclude the court from granting the DCCT defendants' motions for summary judgment on the plaintiffs' claims

_____

[231]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 133.

that their actions violated Lucas's constitutionally protected rights to be free from excessive use of force and to have his serious medical needs met. Because the court has already concluded that plaintiffs have presented evidence capable of showing that the DCCT defendants violated clearly established rights guaranteed by the Fourteenth Amendment to the United States Constitution, Harris County's contention that it is entitled to summary judgment on the § 1983 claims asserted against it because plaintiffs are not able to show the violation of a constitutional right has no merit. See Monell, 98 S. Ct. at 2037-38.

> **(2) Plaintiffs Have Raised Genuine Issues of Material Fact as to Whether the DCCT Members' Alleged Violations Resulted from a County Policy or Custom Adopted or Maintained with Objective Deliberate Indifference.**

Counties cannot be held liable for the constitutional torts of their employees unless the employees were acting pursuant to an official policy. Monell, 98 S. Ct. at 2036-38 (local government liability cannot be sustained under a theory of respondeat superior). See also Board of County Commissioners of Bryan County, Oklahoma v. Brown, 117 S. Ct. 1382, 1388 (1997). For liability to attach, "the municipality must cause the constitutional tort, which occurs 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Bolton v. City of Dallas, Texas, 541 F.3d 545, 548 (5th Cir.),

-119-

cert. denied, 129 S.Ct. 1669 (2008) (quoting Monell, 98 S. Ct. at 2037-38). "To hold a [county] liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the [county's] policymaker was the moving force behind, or actual cause of, the constitutional injury." James v. Harris County, 577 F.3d 612, 617 (5th Cir. 2009), cert. denied, 130 S. Ct. 1078 (2010). The plaintiff must establish a "direct causal link" between the county policy and the constitutional deprivation. Id. Therefore, to defeat Harris County's motion for summary judgment, plaintiffs must present evidence capable of showing the existence of (1) an official policy or custom (2) of the county's policymaker (3) that caused (4) the deprivation of a constitutionally protected right. See Brown, 117 S. Ct. at 1388-89.

> An "official policy" is either a policy statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the [county's] policy.

Cox v. City of Dallas, Texas, 430 F.3d 734, 748 (5th Cir. 2005), cert. denied, 126 S. Ct. 2039 (2006). "The policymaker must have either actual or constructive knowledge of the alleged policy." Id. at 748-49. See also Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

As evidence that an official policy promulgated by the county's policymaker was the moving force behind, or actual cause

of, the constitutional violations alleged in this action, plaintiffs cite the deposition testimony of Sheriff Garcia that the DCCT members followed their training and carried it out as instructed, not just by placing Lucas face down on the gurney in a basic hogtie position, but also by ignoring Lucas's pleas for help until he was "entirely incapacitated,"[232] and that he knew restraining detainees in a basic hogtie position was dangerous due to the risk of positional asphyxia, which could result in death.[233]

Plaintiffs also cite the testimony of the DCCT members that they followed their training in carrying out Lucas's cell extraction and transport to the jail clinic. For example, defendant Leveston testified that after hearing Lucas say, "I can't breathe," he did nothing because in his opinion, and consistent with his training, "[i]f you're talking, you're breathing."[234] Leveston also testified that the DCCT "did everything based on our training,"[235] and that when the DCCT arrived in the clinic with Lucas Leveston did not tell the doctor that Lucas had said that he

_____

[232]Id. at 30-41 (citing Exhibit 4, Garcia Deposition, pp. 180:11-181:14 and 211:23-212:4, Docket Entry No. 175-7, pp. 94-95 and 107-08).

[233]Id. at 134-35 (citing Exhibit 4, Garcia Deposition, pp. 47:1-48:22, Docket Entry No. 175-7, pp. 28-29).

[234]Leveston Deposition, Exhibit 8 to Plaintiffs' Consolidated Response, pp. 47:13-48:18 and 95:16-19, Docket Entry No. 175-11, pp. 37-38 and 66.

[235]Id. at 62:12, p. 46.

could not breathe.[236] Defendant Bell similarly testified that he had followed his training one hundred percent,[237] and had he heard Lucas cry out that he couldn't breathe, he would not have reacted because he had been trained not to react because he had to continue holding Lucas's leg.[238]

As evidence that Harris County had a history of using hazardous restraint techniques, including hogtying, against detainees and knowledge of the dangers that such restraints imposed, plaintiffs cite the June 2009 DOJ Findings Letter.[239]

A reasonable jury could conclude from this evidence both that an official policy promulgated by Harris County's policymaker, i.e., Sheriff Garcia, was the moving force behind or actual cause of the constitutional deprivations at issue, James, 577 F.3d at 617, and that there exists a direct causal link between the county policy and the constitutional deprivations at issue in this action.

---

[236]Id. at 95:16-19, Docket Entry No. 175-11, p. 66.

[237]Bell Deposition, Exhibit 14 to Plaintiffs' Consolidated Response, p. 17:10-12, Docket Entry No. 175-17, p. 18.

[238]Id. at 15:22-16:7, Docket Entry No. 175-17, pp. 16-17. See also id. at 17:20-18:6, Docket Entry No. 175-17, pp. 18-19 (Q. Okay. So do I understand you correctly that the training from Harris County is that even if you were to hear . . . someone cry out, I can't breathe or I need help, that the person who's handling the leg shouldn't do anything other than maintain control over the leg? A. Well, that was then—that was . . . the way we were trained then. . .").

[239]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 35-37.

(3) **Plaintiffs Have Raised Genuine Issues of Material Fact on Their Failure to Train Claims.**

Harris County argues that plaintiffs cannot establish any failure to train the DCCT officers who extracted Lucas from his cell and transported him to the jail clinic because the DCCT officers complied with Texas Commission on Law Enforcement ("TCOLE") certified training and policies, which have not been alleged or shown to be constitutionally inadequate. Harris County also argues that plaintiffs cannot establish that the county policymaker, the Sheriff, was deliberately indifferent in adopting any training policy, particularly in the absence of any prior instances of injury or death resulting from a cell extraction that would indicate the training was inadequate.[240]

Plaintiffs argue in response that

the officers perfectly executed Harris County's training, and performed an "A"- grade cell extraction — even though they killed Kenneth. Harris County's cell extraction policies and training, known to the policymaker (Sheriff Adrian Garcia), caused the officers[] to use excessive force and ignore cries that "I cannot breathe," killing Kenneth. Further, Sheriff Garcia knew the officers were being trained to use these hazardous techniques — and had even been cautioned by the U.S. Department of Justice that the County's practices could kill detainees. Yet Sheriff Garcia and Harris County did nothing to address this known danger. Thus, Harris County violated Kenneth's Fourteenth Amendment rights under four distinct theories by: 1) creating a dangerous condition of confinement in the jail through its policies and training; 2) training officers to commit acts or omissions resulting in excessive force; 3) training officers to enforce a "code of silence" during cell

---

[240]Harris County's Amended MSJ, Docket Entry No. 152, p. 37.

extractions; and 4) its policymaker knowing about these dangerous conditions, policies, practices, and training but nonetheless approving the excessive force techniques and "entirely incapacitated" practice. Therefore, Harris County is not entitled to summary judgment on the Fourteenth Amendment claims.[241]

A county can be held liable when its failure to adequately train officers results in violations of constitutional rights. "[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." City of Canton, Ohio v. Harris, 109 S. Ct. 1197, 1205 (1989). To establish a failure to train claim, plaintiffs must cite evidence capable of establishing that

> (1) the [county] failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

Thompson v. Upshur County, Texas, 245 F.3d 447, 459 (5th Cir. 2001).

In support of their argument, plaintiffs cite the deposition testimony of defendant Thomas that the DCCT performed the cell extraction and transport of Lucas in the manner in which they had been trained,[242] and the deposition testimony of Sheriff Garcia that

---

[241]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 21-22.

[242]Id. at 137 (citing Exhibit 10, Thomas Deposition, p. 87:7-21, Docket Entry No. 175-13).

-124-

the DCCT members had followed their training,[243] that he knew the basic hogtie position was dangerous due to the risk of positional asphyxia which could result in death,[244] but nevertheless failed to train DCCT members about what to do should an inmate have difficulty breathing and, in fact, trained DCCT members to ignore calls for help and expressions of an inability to breathe.[245] The evidence cited by plaintiffs is sufficient to raise genuine issues of material fact for trial as to whether the highly predictable consequence of the county's failure to train the DCCT resulted in the specific injury suffered by Lucas, and whether the failure to train represented the moving force behind the constitutional violations at issue.

2.   ADA and RA Claims

Asserting that Lucas suffered from "obesity, hypertension, anxiety, and depression," that these "impairments" were "documented" and "substantially limited Mr. Lucas's ability to breathe, to carry out normal operation of his cardiovascular system, to think, to focus, and to exert himself physically,"[246]

_____

[243]Id. at 138 (citing Exhibit 4, Garcia Deposition, pp. 79:14, 163:1-165:15, Docket Entry No. 175-7, pp. 42, 82-84).

[244]Id. at 134-35 (citing Exhibit 4, Garcia Deposition, pp. 47:1-48:22, Docket Entry No. 175-7, pp. 28-29).

[245]Id. at 122. See also Exhibit 4 to Plaintiffs' Consolidated Response, Garcia Deposition, pp. 180:11-181:14 and 211:23-212:4, Docket Entry No. 175-7, pp. 94-95 and 107-08.

[246]Plaintiffs' Fourth Amended Complaint, Docket Entry No. 77, p. 26 ¶ 76.

that these "disabilities were obvious, as was [Lucas's] need for accommodations,"[247] that these disabilities "substantially increased Mr. Lucas's risk of injury and death as a result of the restraint techniques [used on him],"[248] plaintiffs allege that Harris County discriminated against Lucas because of his disabilities in violation of the ADA and the RA by intentionally and consciously refusing or failing (1) "to make reasonable accommodations for [Lucas's] needs, thereby causing him to suffer more pain and punishment than non-disabled detainees,"[249] and (2) "to implement any plans or protocols," "to employ any special effort, techniques, or personnel," or "to monitor the restraint of detainees with [Lucas's] disabilities to protect such detainees from injury and death caused by the quantum and type of restraint at issue in this case."[250] Plaintiffs also allege on information and belief that "the County accepts federal funding for the programs, divisions, and personnel at issue in this lawsuit."[251]

(a) Applicable Law

In pertinent part Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such

---

[247]Id.

[248]Id. ¶ 77.

[249]Id. at 27 ¶ 78.

[250]Id. ¶¶ 79-81.

[251]Id. ¶ 83.

disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines "public entities" to include local governments, 42 U.S.C. § 12131(1)(A), and it creates a private right of action against them for monetary and equitable relief. 42 U.S.C. § 12133. "These provisions allow individuals to sue local governments for disability discrimination committed by police in non-exigent circumstances." <u>Windham v. Harris County, Texas</u>, 875 F.3d 229, 234-35 (5th Cir. 2017) (citing <u>Delano-Pyle v. Victoria County, Texas</u>, 302 F.3d 567, 570-71, 574-76 (5th Cir. 2002); and <u>Hainze v. Richards</u>, 207 F.3d 795, 802 (5th Cir. 2000)). <u>See also</u> <u>Pennsylvania Department of Corrections v. Yeskey</u>, 118 S. Ct. 1952, 1954-55 (1998) (citing 42 U.S.C. § 12131(a)(B)). The RA states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). The ADA states that "[t]he remedies, procedures and rights" available under the RA are also accessible under the ADA. <u>Delano-Pyle</u>, 302 F.3d at 574 (quoting 42 U.S.C. § 12133). The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both," <u>Hainze</u>, 207 F.3d at 799, and that "[t]he RA and the ADA are judged under the same legal

standards, and the same remedies are available under both Acts."
Kemp v. Holder, 610 F.3d 231, 234 (5th Cir. 2010). In general, to
establish a prima facie claim for discrimination under the ADA and
the RA plaintiffs must show that Lucas was:   (1) a qualified
individual with a disability within the meaning of the ADA;
(2) excluded from participation in, or denied benefits of,
services, programs, or activities for which the public entity was
responsible, or was otherwise being discriminated against by the
public entity; and (3) such exclusion, denial of benefits, or
discrimination is by reason of his disability.  Melton v. Dallas
Area Rapid Transit, 391 F.3d 669, 671-72 (5th Cir. 2004).

        (b)  Application of the Law to the Facts

    Harris County argues that it is entitled to summary judgment
on plaintiffs' ADA and RA claims because Lucas's alleged conditions
do not demonstrate that he was a qualified individual with a
disability within the meaning of the ADA, the DCCT was not aware of
Lucas's alleged disabilities, plaintiffs cannot show that Lucas was
denied a reasonable accommodation, the ADA should not apply to
Lucas's cell extraction because of the exigent circumstances,
plaintiffs cannot meet the high burden to prove intentional
discrimination by allegations sounding in negligence, plaintiffs
cannot prove that Lucas was denied access to a program or service
that imposed more pain and punishment on him than similarly
situated detainees, Harris County Jail does not receive federal
funding for any program, service, or activity alleged by

plaintiffs, and failure to monitor and failure to protect do not state ADA claims.[252]

Plaintiffs argue in response that Lucas suffered from significant disabilities, including hypertension, obesity, anxiety/Xanax withdrawal; Lucas was denied participation in Harris County programs and services; lack of reasonable accommodation excluded Lucas from pretrial detention; and Harris County intentionally discriminated against Lucas by denying him reasonable accommodations for his disabilities.[253] Plaintiffs specifically argue that Harris County is not entitled to summary judgment on their ADA and RA claims because Harris County was

> completely indifferent to Kenneth's need for accommodations for his disabilities. Kenneth's mental illness and drug withdrawal required treatment — not the County's premeditated and calculated violence. And an obese and hypertensive detainee suffering from severe anxiety and prescription drug withdrawals was in even greater danger than an able-bodied detainee during the County's "basic hogtie position" practice. Indeed, Harris County made no reasonable accommodations to protect Kenneth — though several key changes (some as simple as waiting for a mental health professional to see the detainee first, or turning detainees on their side during restraint) were made as a result of his death and were completely feasible to have implemented in time to save Kenneth. Thus, Harris County violated Kenneth's rights under the Americans with Disabilities Act and Rehabilitation Act by deliberately failing to accommodate his disabilities, and is not entitled to summary judgment on these claims.[254]

---

[252]Harris County's Amended MSJ, Docket Entry No. 152, pp. 84-109.

[253]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 143-66.

[254]Id. at 22.

### (1) Plaintiffs Fail to Cite Evidence Showing Lucas was a Qualified Individual with a Disability.

Harris County argues that plaintiffs have failed to cite evidence capable of establishing that Lucas was a qualified individual with a disability because plaintiffs have failed to cite evidence capable of establishing that his obesity, hypertension, anxiety, and depression were impairments that substantially limited his ability to breathe, the normal operation of his cardiovascular system, the ability to think, focus, or exert himself physically, and that to the extent any of these conditions were caused by illegal drug use, they were not covered by the ADA or the RA.[255]

A qualified individual with a disability is someone

who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). "Disability" is a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12104(1)(A). A substantial impairment under the ADA is "one that limits an individual's ability to perform a major life activity as compared to most people in the general population." 29 C.F.R. 1630.2(j)(1)(ii). See also Weed v. Sidewinder Drilling, Inc., 245 F. Supp. 3d 826, (S.D. Tex. 2017)

---

[255]Harris County's Amended MSJ, Docket Entry No. 152, pp. 100-105.

("[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it."). "Neither the Supreme Court nor [the Fifth Circuit] has recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." Griffin v. United Parcel Service, Inc., 661 F.3d 216, 223 (5th Cir. 2011). Thus, standing alone, the diagnosis of a condition such as hypertension, obesity, and anxiety, is insufficient to trigger the protections of the ADA. Oswalt v. Sara Lee Corp., 74 F.3d 91, 91 (5th Cir. 1996). Instead, in determining whether an impairment is substantially limiting courts consider "(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Hale v. King, 642 F.3d 492, 500 (5th Cir. 2011).

As evidence that Lucas was a qualified individual with a disability, plaintiffs cite evidence that Lucas suffered from hypertension, obesity, and anxiety/Xanax withdrawal,[256] and plaintiffs argue that

---

[256]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 144-52.

several reasonable accommodations would have prevented officers from using any force on [Lucas]. The officer who observed [Lucas] pull the smoke detector off the ceiling referred [Lucas] to the mental health treatment team because "a [mental health] professional may be able to help." But, knowing the accommodation [Lucas] really needed was mental health treatment, Harris County's officers called the containment team rather than wait until the "crisis intervention team" was "available."[257]

Plaintiffs cite evidence that the conditions from which Lucas suffered can limit a person's ability to breathe, to carry out normal cardiovascular operation, to think, to focus, or to exert oneself physically, but plaintiffs fail to cite evidence from which a reasonable jury could conclude that these conditions substantially limited **Lucas's** ability to breathe, to carry out normal operation of his cardiovascular system, to think, to focus, or to exert himself physically as compared to most people in the general population. See 29 C.F.R. 1630.2(j)(1)(ii). Instead of citing evidence showing the nature and severity of Lucas's impairments, the duration or expected duration of the impairments, or the expected permanent or long-term impact of his impairments as compared to people in the general population, plaintiffs argue that the conditions from which Lucas suffered substantially limited his ability to be placed in a hogtie position.[258] Because being placed

---

[257]Id. at 155.

[258]Id. at 146 ("people with hypertension are at much greater risk of death when placed in a 'hogtie' position"); 147 ("[p]eople who are obese are also at greater risk of injury or death during a 'hogtie'") (citing Exhibit 16, Affidavit of Robert L. Cohen, MD, (continued...)

in a hogtie position is not a major life activity, and because plaintiffs have failed to cite evidence from which a reasonable jury could conclude that Lucas suffered from impairments that substantially limit his abilities to breathe, to carry out normal operation of his cardiovascular system, to think, to focus, or to exert himself physically as compared to most people in the general population, plaintiffs have failed to cite evidence capable of establishing that Lucas was an individual with a disability.

Allegations that Lucas's Xanax withdrawal increased his risk of death from being placed in a hogtie position are also unavailing because the only evidence in the summary judgment record regarding Lucas's use of Xanax is that he obtained Xanax illegally.[259] Substance addiction caused by illegal use of controlled substances does not constitute a disability when the claimant is "currently" using such substances. 29 C.F.R. § 1630.3. Plaintiffs argue that this provision is not applicable because 42 U.S.C. § 12210(c) provides that "[n]otwithstanding [the exclusion for current illegal drug use] an individual shall not be denied health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if

---

[258](...continued)
p. 8, Docket Entry No. 175-19, p. 9); 161 ("an able-bodied detainee would have likely survived the cell extraction with only minor injuries (as the County notes Kenneth was the first detainee killed during a cell extraction)").

[259]Harris County's Amended MSJ, Docket Entry No. 152, pp. 103-105 ¶¶ 226-228.

the individual is otherwise entitled to such services."[260] Plaintiffs' argument is unavailing because their ADA and RA claims are based on Harris County's failure to accommodate Lucas's disabilities during his cell extraction, not for denying him health services or services provided in connection with drug rehabilitation.

With respect to the qualified individual requirement, plaintiffs cite no evidence that Lucas could have participated in the activity, i.e., cell extraction and transport to the jail clinic, with the proposed accommodation. In other words, plaintiffs cite no evidence that given Lucas's particular disabilities, he would have been cooperative and able to participate in the cell extraction and transport to the jail clinic if the defendants had waited until the crisis intervention team was available. Accordingly, the court concludes that plaintiffs have failed to cite evidence capable of establishing that Lucas was a qualified individual with a disability under the ADA and the RA. See Dabilis v. Hillsborough County, Civil Action No. 14-371-JD, 2017 WL 1101070, *4 (D.N.H. March 23, 2017).

> ### (2) Plaintiffs Fail to Cite Evidence Showing that Harris County Discriminated Against Lucas by Reason of His Disability.

Harris County argues that plaintiffs have failed to cite evidence capable of establishing that it discriminated against

---

[260]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 151.

Lucas by reason of his disability.[261] Plaintiffs attempt to satisfy these two elements of their ADA/RA claims on a failure-to-accommodate theory.[262] The failure-to-accommodate theory is expressly codified in Title I of the ADA governing employment, which defines "discriminat[ion] . . . on the basis of disability" to include "not making reasonable accommodations [for a disabled employee's] known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Although Title II contains no similarly explicit definition, see 42 U.S.C. §§ 12131-132, the Fifth Circuit has recognized that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II. See Windham, 229 F.3d at 235 (citing Bennett-Nelson v. Louisiana Board of Regents, 431 F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." (citing 42 U.S.C. § 12131)). To maintain a failure-to-accommodate claim under Title II, plaintiffs must adduce evidence capable of establishing that: (1) Lucas was a qualified individual with a disability; (2) the disability and its consequential limitations were known by the public entity; and (3) the entity failed to make reasonable

---

[261]Harris County's Amended MSJ, Docket Entry No. 152, pp. 107-11 ¶¶ 231-42.

[262]Plaintiffs' Consolidated Response, Docket Entry No. 175, pp. 153-58.

accommodations. <u>Windham</u>, 875 F.3d at 236 n.8 (citing <u>Ball v.</u>
<u>LeBlanc</u>, 792 F.3d 584, 596 n.9 (5th Cir. 2015)).

Harris County argues that plaintiffs are unable to cite
evidence capable of establishing that it had: "(1) knowledge of
the alleged disabilities, (2) knowledge of the resulting
limitation, and (3) knowledge of the necessary accommodation."[263]
Harris County argues that

> [a]t the time of Lucas's extraction and transport, the
> training and practice of the DCCT was to transport
> combative inmates to the clinic in the prone position on
> a gurney. This method of transport had been used
> numerous times before with no resulting injury or death.
> Indeed, Dr. Sunder testified he recalled at least one
> prior incident in 2014 in which an inmate was brought
> "from court" to the medical clinic in the same prone
> position on a gurney — with the inmate's hands cuffed
> behind their back, ankles shackled, legs crossed and
> folded over, just like Lucas. Lt. Anderson testified she
> had been involved in five or six cell extractions prior
> to Lucas, with two involving a gurney. She testified
> that in both of those extractions with a gurney, the
> inmate was handcuffed, shackled, legs crossed and bent
> and in the prone position like Lucas and that there was
> no harm to either inmate. She further testified that the
> DCCT's extraction and transport of Lucas was, like the
> two prior inmates, done according to her training and the
> policies and procedures of Harris County.[264]

Asserting that plaintiffs' allegations sound in negligence,
Harris County also argues that plaintiffs cannot meet the high
burden to prove intentional discrimination,[265] and that plaintiffs

---

[263]Harris County's Amended MSJ, Docket Entry No. 152, p. 110
¶ 241.

[264]<u>Id.</u> at 111 ¶ 242.

[265]<u>Id.</u> at 113-118 ¶¶ 247-57.

are unable to prove that Lucas was denied access to any programs or services because of his disabilities.[266]

Plaintiffs respond that Lucas's obesity and anxiety were obvious, as was his need for an accommodation. Alternatively, plaintiffs argue that "the jury could conclude begging 'I can't breathe' while he was restrained facedown on the gurney was a request for accommodations as the officers continued to hogtie him and compress his chest."[267] Asserting that "the ADA and [RA] create an 'affirmative obligation' to accommodate people with disabilities — not simply treat people with disabilities the same as able-bodied people,"[268] plaintiffs argue that "Harris County denied safe confinement to [Lucas] because it failed to accommodate his disabilities during the cell extraction."[269] Asserting that Sheriff Garcia testified that the cell extraction policy was the same, regardless of a detainee's disability,[270] plaintiffs argue that Harris County "treated [Lucas] like any other able-bodied detainee, though hogtying and compressing the chest of an obese and hypertensive detainee suffering anxiety symptoms incalculably

---

[266]Id. at 118-21 ¶¶ 258-64.

[267]Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 152.

[268]Id. at 153 (citing Tennessee v. Lane, 124 S. Ct. 1978, 1994 (2004)).

[269]Id. at 153.

[270]Id. at 154 (citing Exhibit 4, Garcia Deposition, pp. 27:15-28:5, Docket Entry No. 175-4, pp. 11-2).

increased the threat to his life from an already dangerous practice."[271]  Plaintiffs argue that

> several reasonable accommodations would have prevented
> officers from using any force on [Lucas].  The officer
> who observed [Lucas] pull the smoke detector off the
> ceiling referred [Lucas] to the mental health treatment
> team because "a [mental health] professional may be able
> to help."  But, knowing the accommodation [Lucas] really
> needed was mental health treatment, Harris County's
> officers called the containment team rather than wait
> until the "crisis intervention team" was "available."[272]

Asserting that Lucas "died because Harris County denied him these reasonable accommodations[, and that h]is death prevented him from accessing any other programs and services available to able-bodied detainees, including pre-trial detention itself,"[273] plaintiffs argue that

> [a]fter [Lucas's] death, Harris County implemented
> several reasonable accommodations for disabled detainees
> during cell extractions.  Among other changes, detainees
> are now transported to the clinic on their side (rather
> than the facedown prone position) to alleviate pressure
> on the chest cavity, a "medical officer" is always
> present to monitor the detainee for signs of distress
> (like "I can't breathe"), the "crisis response team" and
> mental health providers always meet with the detainee
> before an extraction . . . and officers are required to
> observe a "cool down" period before rushing into the
> cell. . . [H]ad Harris County attempted to treat
> [Lucas's] Xanax withdrawal, he likely would not have been
> in the agitated and delusional state that led to the cell
> extraction in the first place.  Had Harris County
> provided these obvious accommodations to disabled

---

[271]Id.

[272]Id. at 155.

[273]Id. at 157.

detainees before [Lucas] died, he would likely be with his family today.[274]

Plaintiffs argue that "'[a] reasonable jury could find that these kinds of accommodations were reasonable and that the failure to utilize any of them led to the denial of safe confinement' for [Lucas] in the Harris County jail."[275]  Plaintiffs argue that a reasonable jury could also find that Harris County intentionally denied Lucas accommodations under the ADA and the RA[276] because the

> County used calculated violence against [Lucas] without considering that his obesity, hypertension, anxiety, and withdrawal symptoms put him at far greater risk of death during a cell extraction than an able-bodied inmate. This is the very "discrimination" the ADA and [RA] were designed to combat.[277]

Plaintiffs' arguments are not evidence.  While Lucas's obesity and anxiety may have been obvious, plaintiffs cite no evidence from which a reasonable jury could conclude either that the consequential limitations that those conditions allegedly had on Lucas's ability to survive a cell extraction were either known to Harris County or obvious or that an accommodation was necessary. Plaintiffs do not cite any summary judgment evidence from which a reasonable jury could conclude that Harris County's failure to accommodate Lucas's alleged disabilities during the cell extraction

---

[274]Id.

[275]Id.

[276]Id. at 158.

[277]Id. at 160.

and transport to the jail clinic was motivated by his disabilities. Because plaintiffs have failed to cite evidence from which a reasonable jury could conclude that Lucas was a qualified individual with a disability, that the need for accommodation was obvious, or that the accommodation sought (i.e., waiting for the crisis intervention team) would have allowed Lucas to function appropriately during the cell extraction and transport to the jail clinic, plaintiffs have failed to raise a genuine issue of material fact for trial as to Harris County's liability under the ADA and RA. See Dabilis, 2017 WL 1101070, at *5-*6 (failing to find triable issue of fact under similar circumstances).

### (3) Plaintiffs Fail to Cite Evidence Showing that Harris County Jail Received Federal Funding for any Program, Service, or Activity Alleged by Plaintiffs.

Asserting that "the RA limits its coverage to the 'program or activity' that 'receives' federal financial assistance,"[278] Harris County argues that it is entitled to summary judgment on plaintiffs' RA claims because plaintiffs have no evidence that the cell extraction and transport to the medical clinic is either a program or activity under the RA or one that receives federal financial assistance. Citing the affidavits of Major Martin and Lieutenant Bourgeois, Harris County argues that neither the DCCT members, their training, their equipment, their activation, nor

_____

[278]Harris County's Amended MSJ, Docket Entry No. 152, p. 121 ¶ 265.

their transport receives any federal funding.[279]  Plaintiffs have

not cited any evidence that Harris County receives federal funds

for any program, division, or personnel at issue in this action.

Accordingly, for this reason alone, Harris County is entitled to

summary judgment on plaintiffs' RA claims.  See United States

Department of Transportation v. Paralyzed Veterans of America, 106

S. Ct. 2705, 2710 (1986); Lightbourn v. County of El Paso, Texas,

118 F.3d 421, 427 (5th Cir. 1997) (claims asserted under § 504 of

the RA require evidence that the specific program or activity at

issue receives or directly benefits from federal financial aid).

### (c)  Conclusions

Plaintiffs' contention that "Kenneth's mental illness and drug

withdrawal required treatment — not the County's premeditated and

calculated violence," is simply an attempt to recast their claims

for denial of adequate medical care as ADA and RA claims.  While

the Constitution requires adequate medical treatment for jail

detainees, the ADA does not compel Harris County to provide any

particular treatment in order to prevent discrimination.  See

Nottingham, 499 F. App'x at 377 ("The ADA is not violated by 'a

prison's simply failing to attend to the medical needs of its

disabled prisoners.'").  See also Olmstead v. L.C. ex rel. Zimring,

119 S. Ct. 2176 [603 n.14] (1999) ("We do not in this opinion hold

---

[279]Id. (citing Exhibit 19, Affidavit of Lester Bourgeois,
Docket Entry No. 156-8; and Exhibit 29, Affidavit of John Martin,
Docket Entry No. 157-8).

that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'"). Plaintiffs' contention that "an obese and hypertensive detainee suffering from severe anxiety and prescription drug withdrawals was in even greater danger than an able-bodied detainee during the County's 'basic hogtie position' practice," and that "Harris County made no reasonable accommodations to protect Kenneth — though several key changes (some as simple as waiting for a mental health professional to see the detainee first, or turning detainees on their side during restraint) were made as a result of his death and were completely feasible to have implemented in time to save Kenneth,"[280] fails because plaintiffs have not cited evidence capable of establishing a prima facie ADA or RA case. Accordingly, Harris County's motion for summary judgment on the ADA and RA claims that plaintiffs have asserted against it will be granted, and those claims will be dismissed.

## V. Plaintiffs' Motion to Unseal

Plaintiffs move the court to unseal the record in this case.[281] In March of 2017 Harris County moved for and obtained, over plaintiffs' opposition, a protective order to keep witness

---

[280]See Plaintiffs' Consolidated Response, Docket Entry No. 175, p. 22.

[281]Motion to Unseal, Docket Entry No. 174.

identifiers, personnel files, Harris County Sheriff's Office Internal Affairs Division files, Harris County policies, and Harris County Sheriff's Office training videos showing cell extractions confidential and filed under seal.[282]

On February 9, 2018, Harris County filed for summary judgment, and filed an amended motion for summary judgment the next day.[283] Harris County filed every exhibit to its motion for summary judgment under seal.[284] Plaintiffs assert that Harris County's

> exhibits include a 106 page collection of current and former jail policies (exhibit 15), but also more than nine hundred pages of other exhibits: deposition excerpts (exhibits 1, 13, 18, 21, 22, 26, 27, 33-45), jail and medical records specific to the decedent in this case (exhibits 2, 3, 4, 5, 6, 7, 8, 10, 24, 28), affidavits solicited by the County (exhibits 9, 11, 12, 17, 19, 20, 23, 29-32), photographs of certain restraints and the removed sprinkler cover at issue (exhibit 14), the video that the County already published prior to the inception of this case (exhibit 16), and the TCOLE training summaries for the individual defendants (exhibit 25).[285]

Asserting that "Harris County has not shown that the Court has any reason to keep its exhibits under seal,"[286] and that "only one of the forty-six exhibits Harris County filed under seal matches a category under the protective order. And that one exhibit consists of 106 pages of policies — most of which are no longer in effect

---

[282]See Protective Order, Docket Entry No. 119.

[283]Harris County's Amended MSJ, Docket Entry No. 152.

[284]See Docket Entry Nos. 155-58.

[285]Motion to Unseal, Docket Entry No. 174, p. 2.

[286]Id.

and pose no foreseeable security concern,"[287] plaintiffs argue Harris County's exhibits should all be unsealed. Plaintiffs argue that the one exhibit that is subject to the protective order should not be kept under seal because Harris County is a government entity, and obscuring the county's policies and practices from the people the county represents does not serve the public interest.[288]

Harris County responds that plaintiffs' motion to unseal should be denied "because many of the exhibits contain confidential information and the Court's protective order requires them to be filed under seal."[289] Harris County argues, "Plaintiffs contend the public has a 'right to know' about this case. However, the public does *not* have a right to obtain information that is sensitive and confidential."[290] Harris County contends that

> [t]hirteen of Harris County's exhibits fall within the protective order and must remain filed under seal. Exhibits 2, 3, 4, 6, 7, 8, 10, 12, 17, 20, and 24 are Internal Affairs Division files that the Protective Order expressly requires be filed under seal. Exhibit 15 contains various HCSO policies that the Protective Order expressly requires be filed under seal. Exhibit 25 contains Texas Commission on Law Enforcement ("TCOLE") training records for various officers, which appear in the officers' personnel files but were requested directly from TCOLE with a business records affidavit.[291]

---

[287]*Id.* at 3.

[288]*Id.*

[289]Defendant Harris County Texas's Response to Plaintiffs' Opposed Motion to Unseal, Docket Entry No. 196, p. 2.

[290]*Id.* at 1.

[291]*Id.*

Harris County acknowledges that "[t]he other exhibits are primarily affidavits and excerpts from depositions in this case,"[292] and that it "filed all of its exhibits under seal to keep the exhibits together for the Court's convenience and, so all the exhibits appear together in a record on appeal."[293]

Citing S.E.C. v. Van Waeyenberghe, 990 F.2d 845, 848 (5th Cir. 1993), plaintiffs reply that the court should grant their "motion to unseal Harris County's evidence because Harris County has failed to satisfy its burden to prove that documents should be kept under seal. . ."[294]

## A.   Applicable Law

"Courts have recognized that the public has a common law right to inspect and copy judicial records." Van Waeyenberghe, 990 F.2d at 848 (citing Nixon v. Warner Communications, Inc., 98 S. Ct. 1306, 1312 (1978) and Belo Broadcasting Corp. v. Clark, 654 F.2d 423, 429 (5th Cir. 1981)). However, the right is not absolute, and the court has discretion to seal records when "files might . . . become a vehicle for improper purposes." Id. (internal quotation marks omitted). Accordingly, determining whether to seal records requires the court to "balance the public's common law right of

---

[292]Id.

[293]Id.

[294]Reply in Support of Motion to Unseal, Docket Entry No. 200, p. 1.

access against the interests favoring nondisclosure." Id. "Public access [to judicial records] serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness." Id. at 849 (quoting Littlejohn v. BIC Corp., 851 F.2d 673, 682 (3d Cir. 1988)). The party seeking to seal court documents bears the burden to establish that the presumption of public records should be overcome. See, e.g., Torres-Montalvo v. Keith, No. C-11-161, 2011 WL 5023271, at *1 (S.D. Tex. October 17, 2011) (citing LEAP Systems, Inc. v. MoneyTrax, Inc., 638 F.3d 216, 221-22 (3d Cir. 2011); Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006); and Virginia Department of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004)). The presumption may be overcome "by providing sufficiently compelling reasons that override the public policies favoring disclosure.'" Jeanbaptiste v. Wells Fargo Bank, N.A., Civil Action No. 3:14-0264-K, 2014 WL 6790737, at *4 (N.D. Tex. December 1, 2014) (quoting Bianco v. Globus Medical, Inc., No. 2:12-CV-00147-WCB, 2013 WL 3422000, at *2 (E.D. Tex. July 14, 2014)). The compelling reasons must be "supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." Id.

## B. Application of the Law to the Facts

Harris County argues that plaintiffs' motion to unseal should be denied "because many of the exhibits contain confidential information and the Court's protective order requires them to be filed under seal,"[295] but Harris County has not made any particularized showing that any specific prejudice or harm will result if the exhibits to its motion for summary judgment are unsealed, and has not presented any substantive reasons or argument to overcome the presumption against sealing public records. Harris County's only justification for keeping its exhibits sealed is simply the blanket assertion that many of its "exhibits contain confidential information and the Court's protective order requires them to be filed under seal."[296] Such general assertions are not sufficient to satisfy the requirement that a compelling showing be made to support a sealing order, particularly when the information has been filed in a case involving a public entity. The Protective Order does not, as Harris County otherwise suggests, automatically apply to any and all documents filed in this action. Instead, the Protective Order applies to expressly defined "Protected Documents." Harris County presents no particularized argument in support of its assertion that specific exhibits are such protected documents. To the contrary, Harris County candidly acknowledges

---

[295]Defendant Harris County Texas's Response to Plaintiffs' Opposed Motion to Unseal, Docket Entry No. 196, p. 2.

[296]Id.

that many of its "exhibits are primarily affidavits and excerpts from depositions in this case,"[297] and that it "filed all of its exhibits under seal to keep the exhibits together for the Court's convenience and, so all the exhibits appear together in a record on appeal."[298] Harris County has not cited any authority that allows court records to be filed under seal for the court's convenience, and this court does not find filing records under seal to be convenient.

Because Harris County has offered no compelling reasons supported by specific facts that outweigh the general history of access and the public policies favoring disclosure, e.g., that public resolution of court cases affords accountability, fosters public confidence, and alerts the public to the consequences of the conduct addressed in court opinions, the court concludes that the public's right of access to the court's records outweighs any legitimate need of the parties for any part of the court's file to remain sealed. Accordingly, plaintiff's motion to unseal will be granted, and the Clerk will be ordered to unseal all documents that have been filed under seal in this case.

## VI. Conclusions and Order

For the reasons stated in § II, above, Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), Fed. R. Civ. P. (Docket Entry No. 148) is **GRANTED**.

---

[297] Id.

[298] Id.

For the reasons stated in § III.A.1, above, Plaintiffs' Motion to Strike Harris County's Appendix Exhibits 2 and 3 and Portions of Defendant Officers' Exhibit 7 (Docket Entry No. 179) is **GRANTED**.

For the reasons stated in § III.A.2, above, the 2009 DOJ Findings Letter is **STRICKEN** as to the individually named defendants but not as to Harris County; and Plaintiffs' Exhibit 15 (Docket Entry No. 175-18), the memorandum to John Dyess, Chief Administrative Officer, HCSO, from Natacha Peláez-Wagner, Director, Criminal Justice Division of Griffith Moseley Johnson & Associates ("GMJ"), regarding a Review of HCSO's Forced Cell Movement Policy is **STRICKEN**. Accordingly, Defendants' Motion to Strike Exhibits & Plaintiffs' Counsel's Affidavit (Docket Entry No. 194) is **GRANTED IN PART and DENIED IN PART**.

For the reasons stated in § III, above, Defendants' Objections and Reply to Plaintiffs' Consolidated Response to Defendants' Motions for Summary Judgment (Docket Entry No. 190) is **MOOT**; and for the reasons stated in § III.B, the DCCT defendants' objections to the 2009 DOJ Findings Letter are **SUSTAINED**; and the DCCT defendants' objections to deposition excerpts and to excerpts from the McAndrew Report are **MOOT**. Accordingly, Defendants' Amended Objections and Reply to Plaintiffs' Consolidated Response to Defendants' Motions for Summary Judgment (Docket Entry No. 192) is **GRANTED IN PART and DENIED IN PART**.

For the reasons stated in § IV.B.1(a), above, the defendant Adam Kneitz's motion for summary judgment on plaintiffs' claim for excessive use of force is **GRANTED**, but the motions for summary judgment of the other individually named defendants are **DENIED**. Accordingly, the Motion for Summary Judgment for Individual Capacity Defendants Xavier Leveston, Broderick Green, Jesse Bell, Morris Thomas and Adam Kneitz (Docket Entry No. 145) is **GRANTED IN PART and DENIED IN PART**; and the Motion for Summary Judgment by Defendants Harris County Sheriff's Office Deputies David A. Gordon and Riley Scott in Their Individual Capacities (Docket Entry No. 150) is **DENIED**.

For the reasons stated in § IV.B.1(b), above, Defendant Laxman Sunder, MD's Motion for Summary Judgment (Docket Entry No. 146) is **GRANTED**; and Defendant Carrie O'Pry, LVN's Motion for Summary Judgment (Docket Entry No. 147) is **GRANTED**.

For the reasons stated in § IV, above, Defendant Harris County's Motion for Summary Judgment (Docket Entry No. 151) is **MOOT**. For the reasons stated in § IV.C, above, Defendant Harris County's Amended Motion for Summary Judgment is **GRANTED** as to plaintiffs' ADA and RA claims and **DENIED** as to plaintiffs' § 1983 claims; accordingly, Defendant Harris County's Amended Motion for Summary Judgment (Docket Entry No. 152) is **GRANTED IN PART and DENIED IN PART**.

For the reasons stated in § V, above, Plaintiffs' Motion to Unseal (Docket Entry No. 174) is **GRANTED**.[299]

The Clerk shall **UNSEAL** all of the records currently filed under seal in this case.

Counsel are **ORDERED** to appear for a scheduling conference on Friday, October 5, 2018, at 3:00 p.m. in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 28th day of September, 2018.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[299]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.